**FILED & ENTERED**

**SEP 30 2016**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY tatum       DEPUTY CLERK

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>VICTOR HUEZO,<br><br>             Debtor. | Case No. 2:11-bk-35922-RK<br><br>Chapter 7<br><br>Adv. No. 2:11-ap-02825-RK |
| JOEY BALL,<br><br>             Plaintiff,<br>  v.<br><br>VICTOR HUEZO,<br><br>             Defendant. | MEMORANDUM DECISION AND ORDER ON PLAINTIFF'S ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) |

The above-captioned adversary proceeding came on for trial before the undersigned United States Bankruptcy Judge on April 17, 18, 24 and 25, 2014 on the complaint of Plaintiff Joey Ball ("Ball" or "Plaintiff") to determine dischargeability of debt. Paul C. Bauducco, of the law firm of Lewitt, Hackman, Shapiro, Marshall & Harlan, appeared for Plaintiff.  Artin Gholian, Attorney at Law, appeared for Debtor Victor Huezo ("Huezo", "Defendant" or "Debtor").

In his complaint, Ball alleges, among other things, that Huezo made

1   misrepresentations of material fact in order to convince Ball to "invest" in Fremont

2   Investment Holdings, Inc. ("Fremont") by making loans to Fremont, Huezo's business that

3   provided loans to borrowers using investments from third-party investors.  Complaint,

4   ECF 1, ¶¶ 7-22.  Ball alleges that he made four "investments" in, or loans to, Fremont

5   totaling $844,750 in reliance upon Huezo's misrepresentations.  *Id*.  In the complaint, Ball

6   seeks a determination that Huezo is indebted to him in the principal amount of $844,750,

7   plus accrued interest, late fees, punitive damages, attorneys' fees and court costs, all of

8   which are nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6).  *Id., ¶¶* 34, 40

9   and 46.

10       After trial, in June, July and August 2014, Ball and Huezo each submitted

11   proposed findings of fact and conclusions of law, and interposed objections to each

12   other's proposed findings of fact and conclusions of law.  ECF 184, 185, 187, 188 and

13   195.  On July 17, 2014, Ball lodged his amended proposed findings of fact and

14   conclusions of law.  ECF 192.  On August 1, 2014, Ball lodged his second amended

15   proposed findings of fact and conclusions of law.  ECF 199.  On August 7, 2014, the

16   court granted Huezo leave to file objections to Ball's second amended proposed findings

17   of fact and conclusions of law, ECF 202, which Huezo filed on August 11 and 22, 2014,

18   ECF 204 and 206.  The matter was then taken under submission.

19       On May 17, 2016, the court issued an order requesting supplemental briefing on

20   the issue of allocation of payments by or on behalf of Fremont to Ball.  ECF 207.  On

21   June 17, 2016, both parties filed their supplemental briefs in response to the court's order

22   requesting supplemental briefing on payment allocation.  ECF 209 and 211.  On July 1,

23   2016, Plaintiff Ball filed a reply brief.  ECF 214.

24       Having considered the testimony of the witnesses at trial, the documentary

25   evidence received at trial, the parties' oral and written arguments, including their

26   proposed findings of fact and conclusions of law, the objections interposed thereto and

27   the supplemental briefs on the payment allocation issue, this court hereby makes the

28

1  following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal

2  Rules of Bankruptcy Procedure and Rule 52 of the Federal Rules of Civil Procedure.[1]

3  **FINDINGS OF FACT**

4      The court bases its findings of fact on the evidence admitted at trial as set forth

5  below.

6  1.  The court first notes that at trial and throughout the course of this litigation, neither

7      party submitted evidence of the entry of a judgment by another court on Ball's

8      underlying claims against Huezo, let alone any evidence of a state court action

9      between the parties concerning the underlying claims, showing that their claims

10     against each other were liquidated in another court.

11  **A.  Ball's Background**

12  2.  Ball grew up in La Crescenta, California.  Ball owns and operates tanning salons,

13     having opened or purchased six locations between 1995 and 2006.  Ball currently

14     operates two tanning salons in Sunland and Montrose.  Since 1995, the tanning

15     salons have been, and remain, Ball's primary source of income.  *Trial Declaration*

16     *of Joey Ball ("Ball Declaration")* at 1-2, ¶ 2.

17  3.  On March 2, 1993, Ball obtained a California Real Estate Salesperson's license.

18     Ball placed his license with ERA Castle Realty until September 2, 1994, when his

19     real estate license was suspended because he did not complete continuing

20     education requirements.  Ball did not complete any real estate transactions while

21     affiliated with ERA Castle Realty.  *Ball Declaration* at 2, ¶ 3.

22  4.  Ball retook the real estate license examination and received another real estate

23     salesperson's license on October 26, 2005.  From October 2005 until July 2007,

24     Ball placed his real estate license with Property Masters Realty.  During this time

25     with Property Masters Realty, Ball did not complete any real estate transactions.

26

27  _____
[1] Any findings of fact that should be properly characterized as conclusions of law will be
considered as such, and any conclusions of law that should be properly characterized as findings

28  of fact will be considered as such.

*Ball Declaration* at 2, ¶ 4.

### B. Ball's Relationship with Huezo and Curtis Hayden

5. Ball went to Crescenta Valley High School with Huezo's older brother, Juan
Huezo.  Through Juan Huezo, Ball has known the Huezo family for nearly 25
years, although he was not friends with Huezo until late 2006 when Huezo began
playing golf with Ball and his friends, including Eric Heldwein ("Heldwein") and
Curtis Hayden ("Hayden").  *Ball Declaration* at 2, ¶ 5; *Trial Testimony of Joey Ball*,
April 17, 2014 at 11:42-11:47 a.m.; *Trial Declaration of Victor Huezo ("Huezo
Declaration")* at 12-13, ¶¶ 27 and 30.

6. Hayden was a real estate agent who placed his license at Property Masters
Realty with Ball.  Hayden handled the sale of an apartment building for Ball in late
2006, which was a personal transaction of Ball.  Through this transaction and their
friendship, Hayden knew that Ball had accumulated over a million dollars through
his business and real estate transactions.  Hayden was Huezo's friend years
before meeting Ball, having known Huezo since junior high school and having
played football with Huezo in high school.  Hayden knew that Huezo was looking
for potential investors in Huezo's lending business, Fremont, and Hayden told Ball
about Fremont and suggested that Ball approach Huezo and invest in Fremont.  In
2007, Hayden began suggesting that Ball move his real estate license to Fremont
with Hayden.  *Ball Declaration* at 2-3, ¶¶ 5 and 7; *Trial Testimony of Joey Ball*,
April 17, 2014 at 1:51-1:54 p.m. and 3:52-3:57 p.m.; *Trial Declaration of Curtis
Hayden ("Hayden Declaration")* at 2-3, ¶¶ 3, 5 and 6; *Trial Testimony of Curtis
Hayden*, April 25, 2014 at 9:06-9:07 a.m., 9:09-9:10 a.m. and 9:12-9:13 a.m.

### C. Huezo's and Fremont's Background

7. Huezo, who held a real estate salesperson's license and a real estate broker's
license, has been involved in commercial lending since the late 1990s.
Specifically, before creating Fremont, Huezo opened and operated an income tax

return preparation office, held positions with John Hancock Life Insurance
Company selling various financial products, worked for Santa Monica Bank as a
personal banker and insurance investment representative, and worked for U.S.
Bank where he managed business loan sales. *Defendant's Trial Exhibit D-51;
Huezo Declaration* at 2-6, ¶¶ 5-12*; Trial Testimony of Victor Huezo,* April 24, 2014
at 2:01-2:02 p.m.

8. In 2007 Huezo was the majority owner of Fremont, along with Vahe Jordan
("Jordan"), who was a lawyer and a minority owner.  Huezo later bought out
Jordan and became Fremont's sole owner.  Huezo used the title of "Executive
Vice President-CEO" at Fremont, and "CEO" for "Chief Executive Officer",
meaning that Huezo was Fremont's top manager.  Huezo acted in all of these
capacities during the relevant time period involved in this litigation.  Huezo handled
all of the accounting functions for Fremont, which included managing its accounts,
handling wire transfers of funds in and out of Fremont and signing checks for
Fremont, handling all of its books and records, and preparing its tax returns, and
Huezo was the only person who handled these functions for Fremont.  Huezo had
a California real estate salesperson's license and, later, a real estate broker
license.  Through Huezo's efforts, Fremont acquired a California Department of
Corporations Finance Lender's License.  Although Fremont purported to have two
addresses, Huezo operated Fremont mainly at one address, which was his
residence. *Deposition of Victor Huezo,* January 24, 2013, *Plaintiff's Trial Exhibit
P-52* at 14:12-21:17 [page:line], 36:21-40:10, 51:6-52:2 and 58:3-60:19; *Huezo
Declaration* at 5-9, ¶¶ 11, 16 and 20; *Trial Testimony of Victor Huezo*, April 24,
2014 at 1:46-1:51 p.m. and 2:01-2:02 p.m.  Based on the evidence admitted at
trial, the court finds that Huezo was the principal of Fremont as its sole owner and
manager and the sole person acting on behalf of Fremont with respect to Ball's
"investments" in, or loans to, Fremont.

### D. **Huezo's Verbal and Written Representations Concerning Fremont's**
**Lending Business**

9.  In late 2006 and early 2007, Ball went on golf outings with Hayden, and Ball was introduced to Huezo, who began telling Ball about Fremont, Huezo's company. Huezo told Ball that Fremont was a real estate brokerage and lender and that Fremont was very profitable.  *Ball Declaration* at 2-3, ¶ 6*; Trial Testimony of Joey Ball*, April 17, 2014 at 1:33 p.m. The court finds Ball's testimony on these points to be credible.

10. Ball testified that during these five or six golf outings from late 2006 to early 2007, Huezo told Ball about Fremont's lending business, and Huezo encouraged Ball to consider investing in Fremont.  According to Ball, Huezo orally represented to Ball that: (1) Fremont had been making a lot of money on loans; (2) Fremont was getting a "lender's license" that would allow Fremont to "guarantee" loans; (3) Fremont had other investors who had already invested more money than Huezo was requesting from Ball; and (4) these other investors would buy out Ball's investment within 30 days if Ball wanted his money back.  Huezo orally represented to Ball that the loans were "highly collateralized secured loans", "little to no risk", "guaranteed" and that Ball would be paid a 15% return on Ball's investment in Fremont.  *Ball Declaration* at 2-3, ¶ 6; *Trial Testimony of Joey Ball*, April 17, 2014 at 1:32-1:34 p.m and 1:44-1:55 p.m.  The court finds Ball's testimony on these points to be credible.

11. On or about July 5, 2007, Huezo sent to Ball the written materials explaining Fremont's lending loan program to potential investors (the "Fremont Informational Materials"), stating that the return on investment to Fremont investors were "guaranteed" monthly payments at interest rates of 8.5% to 15% per year, with loans "ideally" at the 15% rate.  Huezo sent the Fremont Informational Materials by email, and the email message from Huezo to Ball accompanying the material with

the subject line, "Information on Lending from Victor," and the text of the message stated: "Joey, Here is some information on how the lending works.  Look it over and lets [sic] try to get together to go over this and the contract I sent you.  Thanks, Victor".   *Plaintiff's Trial Exhibits P-1 and P-2; Ball Declaration* at 3, ¶ 8; *Trial Testimony of Joey Ball*, April 17, 2014 at 1:55-2:28 p.m. and 2:36-2:57 p.m.; *Trial Testimony of Victor Huezo*, April 24, 2014 at 1:52-1:56 p.m. and 3:52-3:53 p.m.

12. The first page of the Fremont Informational Materials with Fremont's letterhead on top was addressed, "To Whom It May Concern," and as indicated by the signature block at the bottom of the page, the responsible person for the materials was "Victor Huezo, Executive Vice President-CEO."  Huezo's responsibility for the Fremont Informational Materials is also indicated by the fact that he is the only contact person for Fremont indicated in the materials and that he was the only email contact person in the materials ("Email: vhuezo@hotmail.com").  The court finds that Huezo is the sole person responsible for the creation and distribution of the Fremont Informational Materials and was the sole person who distributed these materials to Ball.

13. In deciding to loan Fremont money for its lending program, Ball relied on the written representations to potential investors about Fremont's lending program in the Fremont Informational Materials that Huezo sent him, *Plaintiff's Trial Exhibit P-2*, including the following:

a.  "Investor does a note with a guarantee [sic] monthly payment from Fremont Investment Holdings Inc. for the money lent out to borrowers.  This money is paid back with a guaranteed monthly or quarterly interest payment from Fremont Investment Holdings Inc.  The investors have their money secured by the assets and collateral Fremont Investment Holdings Inc. holds from the various loans made to borrowers.  Depending on the risk

associated with the loan being made the guaranteed monthly payment is
going to range between 8.5% and 15%." *Plaintiff's Trial Exhibit P-2 at 3.*

b. "For example: If a loan is made on a personal residence secured by a
deed of trust along with a personal guarantee, the guaranteed monthly
payment might be somewhere between 8.5% to 10% if the LTV is 75% or
less and the borrowers credit score is around 685. However, if we have a
borrower with a credit score of 600 and a LTV of 85% the guaranteed
monthly payment might be between 10% to [sic] 15% depending on finance
laws." *Plaintiff's Trial Exhibit P-2 at 3.*

c. "In order for investors to analyze their risk and reward an activity report
is sent out to all investors prior to processing any loans. The activity report
is going to outline what loans are being made and at what rate the investors
are getting paid at. (Please refer to activity report.)" *Plaintiff's Trial Exhibit
P-2 at 3.*

d. Activity Report format, describing the type and amount of loans,
proposed interest rate, total debt owed and collateral value for loans being
proposed. *Plaintiff's Trial Exhibit P-2 at 13.*

e. Activity Report language stating "Here is a list of the proposed loans we
are going to close this week. In order, [sic] to issue credit to our clients we
will need to know your commitment in funding these loans. Please take a
few moments to fax back your commitment. Priority on [sic] to the loan
commitments will be based on a first come, first serve basis." *Plaintiff's
Trial Exhibit P-2 at 13.*

f. "*Question 1: How are investors paid out completely.* [sic] Answer: Most
investors are paid within 12 months or when the loans made come due. If
an investor needs a portion of their money prior to the 12 months or any of
the loans coming due, a new investor either purchase [sic] existing debt or

Fremont Investment Holdings Inc. pays the investor off." *Plaintiff's Trial Exhibit P-2* at 16.

g. "*Question 4: How do we know what assets Fremont Investment Holdings Inc. has as collateral to protect the investor's money?* Answer: A balance sheet showing assets and liabilities will be sent to all investors on a quarterly basis." *Plaintiff's Trial Exhibit P-2* at 16.

h. "*Question 5: How do we recover our money from clients who cannot pay their debts back?* Answer: The loan is made to Fremont Investment Holdings Inc. not directly to the client.  It is the responsibility of Fremont Investment Holdings Inc. to pay all investors back within the time frames set.  In order, to lower the risk we spread our liabilities with clients and limit our exposure to any single client." *Plaintiff's Trial Exhibit P-2* at 16.

i. "*Question 6: What happens if Fremont Investment Holdings Inc. does not get payments from clients for a loan made?* Answer: The investor is lending the money to Fremont Investment Holdings Inc., therefore payments to investors must be made according to the terms agreed on." *Plaintiff's Trial Exhibit P-2* at 16.

j. "*Question 7: Why does Fremont Investment Holdings Inc. send an Activity report* [sic] *if the investor is not buying that specific loan or loans?* Answer: The reason for the activity report is to determine the guaranteed monthly payment to the investors.  This way they can see for themselves what loans are being made and why the guaranteed interest rate is more or less than the last deal they did." *Plaintiff's Trial Exhibit P-2* at 16; *Ball Declaration* at 2-3, ¶¶ 6 and 8; *Trial Testimony of Joey Ball*, April 17, 2014 at 1:55-2:28 p.m. and 2:36-2:57 p.m.

14. Page 1 of the Fremont Informational Materials provided by Huezo to Ball stated that "the majority of the lending we do is based on collateral and personal

guarantees." *Plaintiff's Trial Exhibit P-2*.  However, Ball testified that he did not

rely on the representations on page 1 of the Fremont Informational Materials.  *Trial*

*Testimony of Joey Ball*, April 17, 2014 at 2:36 p.m.

15. Page 3 of the Fremont Informational Materials, paragraph 1, provided by Huezo to

Ball, specifically stated: "The investors have their money secured by the assets

and collateral Fremont Investment Holdings Inc. holds from the various loans

made to borrowers." *Plaintiff's Trial Exhibit P- 2* at 3.  Ball testified that he read

and relied upon the representations on page 3 of the Fremont Informational

Materials and relied on all of Page 3 except for Paragraph 3 because Ball believed

that paragraph did not pertain to him.  *Id.; Trial Testimony of Joey Ball*, April 17,

2014 at 2:36-2:38 p.m.  The court finds Ball's testimony on these points to be

credible.

16. The Fremont Informational Materials provided by Huezo to Ball stated at Page 3,

Paragraph 1: "The investors have their money secured by the assets and collateral

Fremont Investment Holdings Inc. holds from the various loans made to

borrowers." *Plaintiff's Trial Exhibit P-2* at 3, ¶ 1.

17. The Fremont Informational Materials provided by Huezo to Ball also stated at

Page 3, Paragraph 2: "For example: If a loan is made on a personal residence

secured by a deed of trust along with a personal guarantee, the guaranteed

monthly payment might be somewhere between 8.5% to 10% if the LTV ["Loan To

Value"] is 75% or less and the borrowers credit score is around 685.  However, if

we have a borrower with a credit score of 600 and a LTV of 85% the guaranteed

monthly payment might be between 10% to 15% depending on finance laws."

*Plaintiff's Trial Exhibit P-2* at 3, ¶ 2.

18. The Fremont Informational Materials provided by Huezo to Ball further stated at

Page 3, Paragraph 3: "If we are securing a loan with a UCC filing using business

assets the guaranteed monthly payment is going to be somewhere between

10.75% to 15%." *Plaintiff's Trial Exhibit P-2* at 3, ¶ 3.

19. The Fremont Informational Materials provided by Huezo to Ball also stated at Page 3, Paragraph 5: "[I]n order for investors to analyze their risk and reward an activity report is sent out to all investors prior to processing any loans.  The activity report is going to outline what loans are being made and at what rate the investors are getting paid at.  (Please refer to the activity report.)." *Plaintiff's Trial Exhibit P-2 at 3, ¶ 5.*

20. The Fremont Informational Materials provided by Huezo to Ball contained a sample "activity report" to show how Fremont purportedly informed investors of loans it was working on, which described the type and amount of loans, proposed interest rate, total debt owed, and collateral value for proposed loans Fremont is going to close in a particular week.  Below the list of proposed loans, the activity report states "in order, to issue credit to our clients we will need to know your commitment to Fremont Investment Holdings Inc."  The activity report contained a fill-in-the-blank area for an investor to fill out, which indicates the investor's commitment to fund the described loans.  *Plaintiff's Trial Exhibit P-2* at 13.

21. Ball testified that originally during their golf outings, Huezo orally represented that Huezo would provide Ball with balance sheets showing Fremont's assets and liabilities.  *Trial Testimony of Joey Ball*, April 17, 2014 at 3:41 p.m.  The court finds Ball's testimony on this point to be credible.

22. At trial, when Huezo was questioned whether he had ever sent any balance sheets to Ball as described above in Question 4 of the "Q&As" in the Fremont Informational Materials, Huezo testified that he had in that the investor activity reports were the balance sheets referenced in Question 4 above, which Huezo sent to investors to demonstrate what assets and liabilities Fremont had as collateral.  *Trial Testimony of Victor Huezo*, April 24, 2014 at 1:55-1:57 p.m.  The court finds Huezo's testimony on this point not to be credible.

23. Ball testified that he did not request balance sheets from Huezo or Fremont until 2010.  Ball testified that he requested balance sheets for the January 2008 and February 2008 investments from Huezo, but never received them.  *Trial Testimony of Joey Ball*, April 17, 2014 at 3:16 and 3:41-3:43 p.m.*,* April 25, 2014 at 10:34 a.m. and 10:48-10:50 a.m.  The court finds Ball's testimony on these points to be credible.

24. Ball testified that he believed Huezo's representations regarding Fremont's profitability and that Fremont's loans were made on a secured basis because Ball thought of Huezo as a friend and trusted him.  *Ball Declaration* at 4, ¶ 12.  The court finds Ball's testimony on this point to be credible.

25. Ball testified that he relied on the verbal representations of Huezo regarding the profitability and security of "investment" in Fremont.  *Ball Declaration* at 4, ¶ 12.  The court finds Ball's testimony on this point to be credible.

26. While it is undisputed that Huezo provided Ball with the Fremont Informational Materials, the parties dispute what Huezo's purpose for providing Ball with the materials was.  Ball contends that Huezo provided him with the Fremont Informational Materials to induce him to "invest" his money in Fremont's lending program.  Huezo contends that he provided Ball with the Fremont Informational Materials to train Ball as a new agent working for Fremont to solicit other investing clients.  The court finds that Ball's contention is supported by a preponderance of the evidence and that Huezo's contention is not.  The evidence indicates the following: Fremont had few investors to give it the capital it needed to lend to borrowers in its business, and at trial, Huezo produced no other evidence showing that Fremont had any investors other than Ball and perhaps one other individual. The bulk of the capital that Fremont used to lend to borrowers came from Ball, and the lack of any other sources of capital than Ball for Fremont on this record, which Huezo has not shown to be otherwise, indicates that Ball was the target of the

sales pitch that Huezo was making for Ball to "invest" in, and lend to, Fremont, and

not to train Ball in soliciting other investors for Fremont.  Before Hayden introduced

Huezo to Ball on a golf outing, Hayden talked up Huezo's business, Fremont, to

Ball and encouraged Ball to invest in Fremont.  After being introduced to Ball on a

golf outing, Huezo actively solicited Ball to invest in Fremont, and the Fremont

Informational Materials provided by Huezo to Ball was an integral part of Huezo's

sales pitch for Ball to part with his money and invest in Fremont.  Huezo for his

part could argue that the language of the email transmittal for the Fremont

Informational Materials was ambiguous and supported his interpretation that the

materials were for training purposes only as to Ball and not for the purpose of

soliciting him as an investor and that the timing of transmittal of the materials in

July 2007, four months before Ball's first investment in November 2007, also

supports this interpretation.  However, the totality of the circumstances supports

Ball's contention that the Fremont Informational Materials were representations

intended to be made to him to solicit his "investment" in Fremont by making loans

to it.  Huezo, by providing the Fremont Informational Materials to Ball, made the

written representations contained in those materials to Ball, and because Huezo

was in fact Fremont, no one else, but Huezo, is responsible for the representations

made in those materials.

E.  **November Report and $240,000 "Investment"**

27. On November 8, 2007, Fremont obtained a California Finance Lender's License.

*Ball Declaration* at 4, ¶ 11; *Huezo Declaration* at 18, ¶ 47.

28. On or about November 26, 2007, Huezo sent by e-mail to Ball an "Activity Report"

("November Report").  Although the November Report listed four "Secured Loans"

whose sum adds up to $290,000, it listed the total loan amount as $240,000 which

appears to be a miscalculation.  Further, each of the four listed "Secured Loans,"

listed separate collateral values of $250,000, $500,000, $340,000 and $490,000,

which totaled $1,580,000.  Moreover, each "Secured Loan" listed an interest rate of $15%.  Below the list of four "Secured Loans" on the November Report, the November Report stated: "here is a list of proposed loans we are going to close this week.  In order, to issue credit to our clients we will need to know your commitment to Fremont Investment Holdings Inc.  Please take a few moments to fax back your commitment."  *Plaintiff's Trial Exhibits P-4 and P-6; Ball Declaration at 4, ¶ 11; Trial Testimony of Joey Ball*, April 17, 2014 at 2:57-3:07 p.m. and 3:14-3:15 p.m.; *Huezo Declaration* at 38-39 ¶¶ 109 and 110; *Trial Testimony of Victor Huezo*, April 24, 2014 at 1:56-1:59 p.m., 2:02-2:04 p.m. and 3:14-3:15 p.m.

29. In conversations with Ball, Huezo orally confirmed to Ball what the November Report said, i.e. that the $240,000 "investment" in, or loan to, Fremont was intended for the "secured" loans outlined in the November Report, which would be collateralized by real property with more than enough collateral to secure the loans.  According to the November Report, the loans were forecasted to be made to Fremont's borrowers on November 20, 2007.  *Plaintiff's Trial Exhibits P-4 and P-6*; *Ball Declaration* at 4, ¶ 11; *Trial Testimony of Joey Ball*, April 17, 2014 at 1:37-1:42 p.m. and 2:59-3:04 p.m.  The court finds Ball's testimony on this point to be credible.

30. Ball testified that he relied on Huezo's verbal representations regarding the profitability and security of Ball's "investments" in, or loans to, Fremont, which Ball believed was confirmed by the November Report.  *Ball Declaration* at 4, ¶ 12; *Trial Testimony of Joey Ball*, April 17, 2014 at 3:10-3:17 p.m.  The court finds Ball's testimony on this point to be credible.

31. Ball testified that what was important to him about the November Report was that the loans being made with his "investment" were secured, they were at the 15% interest rate and the collateral value was higher than what was owed on the loans.  *Trial Testimony of Joey Ball*, April 14, 2014 at 3:14-3:17 p.m.  The court finds

1    Ball's testimony on this point to be credible.

2    32. Ball, relying on Huezo's written and verbal representations regarding the $240,000

3    in "Secured Loans," immediately completed the "commitment" section of the

4    November Report agreeing to provide Fremont the requested $240,000

5    "investment" or loan and faxed it back to Huezo.  Ball then wire-transferred

6    Fremont with the $240,000 solicited by Huezo for Fremont.  *Plaintiff's Trial Exhibits*

7    *P-4 and P-6*; *Ball Declaration* at 4-5, ¶¶ 12, 13 and 14; *Trial Testimony of Joey*

8    *Ball*, April 17, 2014 at 1:25-1:29 pm, 1:31 p.m.-1:42 pm, 1:44-1:51 p.m., 1:54-2:28

9    p.m., 2:36-2:41 p.m., 2:48-3:04 p.m., 3:10-3:12 p.m. and 3:14-3:15 p.m.

10    33. In or about November or December 2007, Huezo prepared and hand delivered to

11    Ball a $240,000 promissory note from Fremont, dated November 28, 2007

12    ("November Note"), which provided for annual interest of 15%, monthly payments

13    of $3,000 to Ball, and a maturity date of January 1, 2009.  Paragraph 7 of the

14    November Note indicated that it was a "Uniform Secured Note."  *Plaintiff's Trial*

15    *Exhibit P-9; Ball Declaration* at 5, ¶ 14; *Trial Testimony of Joey Ball*, April 17, 2014

16    at 4:07-4:10 pm; *Huezo Deposition* at 117:4-118:16; *Trial Testimony of Victor*

17    *Huezo*, April 24, 2014 at 2:40-2:43 p.m.

18    34. The court finds that Fremont/Huezo did not take the appropriate steps to secure

19    the loans made by Fremont to borrowers described in the November Report as

20    "Secured Loans" with collateral.  The evidence indicates that Fremont/Huezo did

21    not obtain trust deeds signed by the borrowers at the time the loans were made or

22    obtain separate security agreements in the borrowers's other personal property.

23    *Trial Testimony of Victor Huezo*, April 24, 2014 at 2:16-2:20 p.m.  Moreover, this

24    factual finding is supported by the fact that Fremont/Huezo also did not file any

25    UCC financing statements with the California Secretary of State for these loans

26    after Fremont made the loans.  *Trial Testimony of Victor Huezo*, April 24, 2014 at

27    2:19–2:20 p.m.  The court finds Ball's testimony on these points to be credible.

28

35. Ball testified that Ball asked Huezo multiple times for a list of the addresses for the four properties for the "secured loans" that Ball's $240,000 "investment" or loan funded. *Trial Testimony of Joey Ball*, April 17, 2014 at 3:12-3:13 p.m. The court finds that Ball's testimony on this point to be credible.

36. Fremont/Huezo did not fund the secured loans identified in the November Report with Ball's "investment" in, or loan of $240,000 to Fremont as promised by Huezo represented to Ball, and Fremont/Huezo made unsecured loans or used the money for operational and other purposes without Ball's knowledge or consent and contrary to Huezo's representations to Ball that Ball's funds would be used for the secured loans identified in the November Report. *Ball Declaration, ¶ 13; Huezo Declaration, ¶¶ 88, 109-113, 150, 155, 232, 234, 238,  240, 244, 245; Huezo Trial Testimony,* April 24, 2014, 2:02 to 2:10 p.m. and 2:12 to 2:39 p.m.; *Plaintiff's Trial Exhibit P-52, Huezo Deposition,* at 55:20-25, 88:5-105:13, 106:4-110:21.

**F.  January 8, 2008, Report and $70,000 "Investment"**

37. It is undisputed that on January 8, 2008, Huezo solicited a loan from Ball, emailing him a Fremont "Investor Activity Report", dated January 8, 2007 [sic] ("January Report"). The January Report said Fremont was in the process of closing two (2) "Secured" loans, which were "Ready to fund", totaling $70,000, to borrowers with cumulative collateral worth "$790,000", at a proposed interest rate of 15% per loan. Below the list of two "Secured Loans" on the January Report, it was stated: "here is a list of proposed loans we are going to close this week. In order, to issue credit to our clients we will need to know your commitment to Fremont Investment Holdings Inc. Please take a few moments to fax back your commitment." *Plaintiff's Trial Exhibits P-10 and P-11; Ball Declaration  at 6, ¶ 16; Trial Testimony of Joey Ball*, April 17, 2014 at 3:15-3:16 p.m. and 3:35-3:41 p.m.*; Huezo Declaration at 39, ¶ 108; Trial Testimony of Victor Huezo,* April 24, 2014 at 3:15-

3:18 p.m.

38. Ball testified that in conversations with Ball, Huezo told Ball that Ball's $70,000 "investment" or loan was intended to fund the "Secured Loans" described in the January Report. *Trial Testimony of Joey Ball*, April 17, 2014 at 3:15-3:41 p.m. The court finds Ball's testimony on this point is credible. *See Plaintiff's Trial Exhibits P-10 and P-11; Ball Declaration* at 6 ¶ 16.

39. After having this conversation with Huezo, Ball completed the "commitment" section of the January Report agreeing to provide $70,000 to Fremont and faxed the January Report to Huezo. Ball wire-transferred $70,000 to Fremont in two installments; $40,000 on January 9, 2008 and $30,000 on January 11, 2008 (collectively the "January Investment"). Shortly thereafter, Huezo delivered to Ball a $70,000 promissory note from Fremont, dated January 8, 2008 ("January Note"), which provided for annual interest of 15%, monthly payments of $875 (equal to "interest only" payments at 15% per annum) to Ball and a maturity date of February 1, 2009. Paragraph 7 of the November Note indicates that it is a "Uniform Secured Note." *Plaintiff's Trial Exhibits P-11, P-12 and P-13; Ball Declaration* at 6-7, ¶¶ 17 and 19; *Trial Testimony of Joey Ball*, April 17, 2014 at 3:15-3:41 p.m. and 4:10- 4:11 p.m.; *Deposition of Victor Huezo,* January 24, 2013, *Plaintiff's Trial Exhibit P-52* at 133:12-134:16; *Trial Testimony of Victor Huezo*, April 24, 2014 at 2:43-2:44 p.m. and 3:18-3:21 p.m.

40. Ball testified that he relied on the written representations in the January Report, Huezo's verbal representations and the Fremont Informational Materials. *Plaintiff's Trial Exhibits P-11, P-12 and P-13; Ball Declaration* at 6, ¶ 17; *Trial Testimony of Joey Ball*, April 17, 2014 at 3:15-3:16 p.m. The court finds Ball's testimony on this point to be credible.

41. The court finds that Fremont/Huezo did not take steps to secure the loans that were described in the January Report as "Secured Loans." Fremont/Huezo did

not secure these loans by obtaining security agreements and trust deeds in real property collateral signed by the borrowers at the time the loans were made or by obtaining security agreements and UCC financing statements in the borrowers' personal property collateral. *Trial Testimony of Victor Huezo*, April 24, 2014 at 2:16-2:20 p.m.  Fremont/Huezo also did not file any UCC financing statement with the California Secretary of State after the purported "secured" loans were made. *Trial Testimony of Victor Huezo*, April 24, 2014 at 2:19-2:20 p.m.  The court finds Ball's testimony on this point to be credible.

42. Fremont/Huezo did not fund the secured loans identified in the January Report with Ball's "investment" in, or loan of $70,000 to Fremont as promised by Huezo represented to Ball, and Fremont/Huezo made unsecured loans or used the money for operational and other purposes, including a $30,000 disbursement from Fremont's bank account to Huezo's personal bank account within days of Fremont's receipt of Ball's wire transfers for this loan, without Ball's knowledge or consent and contrary to Huezo's representations to Ball that Ball's funds would be used for the secured loans identified in the January Report. *Ball Declaration,* ¶ 18; *Trial Declaration of Adrian Stern ("Stern Declaration"),* ¶17C; *Plaintiff's Trial Exhibit P-53, Expert Report of Adrian Stern,* Exhibit B at 2; *Trial Testimony of Adrian Stern,* April 24, 2014 at 9:36 to 9:48 a.m. and 10:03 to 10:06 a.m.; *Huezo Declaration,* ¶¶ 88, 114, 163, 164, 248, 249; *Huezo Trial Testimony,* April 24, 2014, 2:07 to 2:10 p.m. and 3:15 to 3:21 p.m.; *Plaintiff's Trial Exhibit P-52, Huezo Deposition,* at 55:20-25.

**G.  January 30, 2008 Email and $130,000 "Investment"**

43. On January 30, 2008, Huezo sent Ball an email stating "I also have two deals that I am closing out this week if you want to do them.  It is for a total of $130,000 at the 15% rate.  Let me know if you can do them." *Plaintiff's Trial Exhibit P-17; Ball Declaration* at 7, ¶ 20; *Trial Testimony of Joey Ball*, April 17, 2014 at 3:44-3:52

1    p.m.*; Trial Testimony of Victor Huezo*, April 24, 2014 at 3:21-3:23 p.m.

2    44. Ball testified that when Ball asked Huezo what the two deals referenced in the

3    January 30, 2008 email were, Huezo verbally represented that "they were a couple

4    of properties that had a lot of collateral just like the others."  Ball also testified that

5    Huezo did not tell Ball why these particular borrowers needed to borrow money

6    from Fremont.  Ball did not testify that Huezo said anything more specific about the

7    two deals.  *Trial Testimony of Joey Ball*, April 17, 2014 at 3:49-3:51 p.m.  The

8    court does not find Ball's testimony on these points to be credible because such

9    testimony is based on Ball's recollection of a conversation Ball had with Huezo six

10    years prior, of which Ball provided no foundation regarding any of the

11    circumstances surrounding the alleged conversation with Huezo, and this

12    testimony is not corroborated by any documentary evidence.   Unlike for the prior

13    "investments" or loans made by Ball, Ball did not offer any documentary evidence

14    that Huezo represented to him that this particular investment would be used to

15    extend secured loans to third party borrowers.  *See Plaintiff's Trial Exhibit P-17*.

16    Lacking specific details and corroboration, the court finds that Ball's testimony on

17    this point is based on his assumption that these loans were like the prior ones and

18    is not credible.

19    45. On February 1, 2008, Ball wire-transferred $130,000 to Fremont.  Shortly

20    thereafter, Huezo delivered to Ball a $130,000 promissory note from Fremont,

21    dated February 1, 2008 ("February Note"), which provided for annual interest of

22    15%, monthly payments of $1,625 to Ball, and a maturity date of February 1, 2009.

23    Paragraph 7 of the November Note indicates that it is a "Uniform Secured Note."

24    *Plaintiff's Trial Exhibits P-18 and P-19; Ball Declaration* at 7-8, ¶¶ 21 and 23; *Trial*

25    *Testimony of Joey Ball*, April 17, 2014 at 3:44-3:52 p.m.; *Trial Testimony of Victor*

26    *Huezo*, April 24, 2014 at 2:43-2:44 p.m. and 3:21-3:23 p.m.

27    46. Ball testified that based on the January 30, 2008 email and Huezo's alleged oral

28

comments to Ball, Ball believed the $130,000 "investment" or loan would be used to fund two secured loans by Fremont. *Plaintiff's Trial Exhibit P-17; Ball Declaration* at 7, ¶ 20. The email does not refer to secured loans, and the court finds that the testimony on the alleged oral comments lacks sufficient specific detail and corroboration to be credible evidence of a misrepresentation of these loans by Huezo.

**H.  "Las Vegas" and "Los Angeles" Deals and $404,750 "Investment"**

47. During February and March 2008, Huezo solicited an "investment" or loan from Ball to fund a "Las Vegas deal" for Martin Romano and a "Los Angeles deal" to fund an egg farm. On March 26, 2008, Ball wire-transferred $404,750 in funds to Fremont to invest in these deals, $367,250 of which was to be used to fund the "Las Vegas deal". *Plaintiff's Trial Exhibits P-20, P-21, P-22, P-23 and P-37; Ball Declaration* at 8 ¶ 26; *Trial Testimony of Victor Huezo*, April 24, 2014 at 3:23-3:27 p.m.

48. For these deals, Ball did not offer any documentary evidence at trial to prove that Huezo represented to Ball that these loans would be secured by real property or other collateral. The only documentary evidence submitted of representations Huezo made to Ball regarding the $404,750 investment are the following three emails: March 21, 2008 email, "Joey, I wanted to let you know that we are drawing loan docs on the Vegas deal and the deal in Los Angeles today. I just want to make sure you are still good for the loan that we have been discussing for a few months now. Please let me know as I am going to the Notary today to get our Promissory Note done as I plan on funding these deals on Thursday."; March 24, 2008 email, "Joey, Sorry to send another email but I have not heard back from you regarding this deal. I know we have been working on the Bruce deal but can you let me know where you stand on the loan. Please let me know today if possible."; and March 25, 2008 email, "Joey, Good news, we are signing loan docs

today and will be ready for funding tomorrow.  Please go ahead and wire the

money to me via the Fremont Investment Holding Account to avoid any bank

delays of having the money go to my personal account and then to the Fremont

account.  I will attach a copy of the Fremont checking account information for you

to wire the funds to me." *Plaintiff's Trial Exhibits P-20, P-22 and P-23.*

49. In his trial declaration, Ball testified that he agreed to make the [$404,750] loan "in

reliance on Huezo's representations, oral and written, that the $404,750 I was

lending to Fremont was going to two secured loans, with the larger of the two

loans being secured by real property in Las Vegas with equity well in excess of the

loan amount." *Ball Declaration* at 9, ¶ 27. The court does not find Ball's testimony

on these points to be credible because such testimony is based on Ball's

recollection of alleged representations of Huezo to Ball six years prior, of which

Ball provided no specific details to lay a foundation regarding any of the

circumstances surrounding the alleged oral representations by Huezo regarding

these transactions, and this testimony is not corroborated by any documentary

evidence.  Unlike for the prior investments made by Ball, Ball did not offer any

documentary evidence that Huezo represented to him that this particular

investment would be used to extend secured loans to third party borrowers.  *See*

*Plaintiff's Trial Exhibit P-17.*  Lacking specific details and corroboration, the court

finds that Ball's testimony on this point is based on his assumption that these

transactions were like the prior ones and is not credible.

50. At trial, Ball testified that Huezo verbally represented to Ball that through the "Las

Vegas deal", Fremont would loan money towards property that had "a ton of

collateral." *Trial Testimony of Joey Ball*, April 17, 2014 at 4:13-4:14 p.m.  The

court does not find Ball's testimony on this point to be credible because such

testimony is based on Ball's recollection of this alleged representation by Huezo to

Ball six years ago regarding this transaction, of which Ball provided no specific

details to lay a foundation regarding any of the circumstances surrounding the oral representation regarding this transaction, and there is no written documentation to corroborate the representation regarding this transaction, and therefore, the court does not find this testimony to be credible.

51. Huezo did not fund the "Las Vegas deal" because the deal fell through. *Ball Declaration* at 9, ¶ 28; *Huezo Declaration* at 96-99, ¶¶ 288-298.

52. Huezo testified that he called and texted Ball numerous times on March 27 and March 28, 2008 to discuss the "Las Vegas deal" and offered to refund Ball's money, but Ball refused to accept a refund. *Trial Testimony of Victor Huezo*, April 24, 2014 at 2:49-2:52 p.m. The court finds Huezo's testimony on this point to be credible.

53. Huezo did not provide Ball with a promissory note for the $404,750 invested or lent by Ball in and to Fremont for these transactions until early 2010 when Ball realized he had not received the promissory note and requested one from Huezo. *Plaintiff's Trial Exhibits P-40, P-41, P-42 and P-43; Ball Declaration* at 11, ¶ 34.

54. On March 21, 2008, a promissory note from "Fremont Investment Holdings Inc. DBA Fremont Investment Funding" for $404,750 was executed in favor of Ball. That note stated that monthly payments would commence on March 1, 2008. A second promissory note from "Victor Huezo of Fremont Investment Holdings, Inc. DBA Fremont Investment Funding" for the same amount was also executed in favor of Ball ("March Note"). That second note also stated that monthly payments to Ball would commence on March 1, 2008. *Plaintiff's Trial Exhibits P-45 and P-46; Trial Testimony of Victor Huezo*, April 24, 2014 at 2:46-2:51 p.m. .

55. On March 21, 2008, a promissory note from "Fremont Investment Holdings, Inc. DBA Fremont Investment Funding" for $460,000 was executed in favor of "Victor Huezo." On December 31, 2008, an "Assignment of Promissory Note" was executed by Huezo assigning to Ball the beneficial interest in the $460,000 note.

1    *Plaintiff's Trial Exhibits P-46 and P-47.*

2    56. Huezo prepared the promissory notes reflecting Ball's investments in Fremont.

3    There is no evidence that Ball was involved in the drafting of promissory notes.

4    *Plaintiff's Trial Exhibits P-1, P-2, P-4, P-5, P-6, P-9, P-10, P-15, P-16, P-17, P-18,*

5    *P-28, P-29 and P-51; Ball Declaration ¶ 14, 19, 23 and 35; Trial Testimony of Joey*

6    *Ball*, April 25, 2014 at 10:24-10:26 a.m.*; Trial Testimony of Victor Huezo,* April 24,

7    2014 at 2:37-3:00 p.m., April 25, 2014 at 9:30-9:54 a.m.

8

9    **I.  Payments from Fremont to Ball and Damages**

10   57. It is undisputed that Ball "invested" in, or lent to, Fremont a total of $844,750

11   through Huezo.  *Ball Declaration* at 12-13, ¶¶ 36 and 37; *Plaintiff's Trial Exhibit P-*

12   *49; Defendant's Proposed Findings of Facts and Conclusions of Law* ¶ 152.

13   58. From and after January 2008, Fremont made the following payments to Ball,

14   totaling $282,624.27:

15           a.  $3,000 on January 3, 2008

16           b.  $3,875 on February 1, 2008

17           c.  $5,500 on March 1, 2008

18           d.  $9,625 on April 16, 2008

19           e.  $9,966 on May 1, 2008

20           f.   $9,966 on June 2, 2008

21           g.  $9,966 on July 1, 2008

22           h.  $100,000 on August 15, 2008

23           i.   $40,726.27 on February 1, 2009

24           j.   $20,000 on February 17, 2009

25           k.  $10,000 on June 1, 2009

26           l.   $10,000 on July 31, 2009

27           m. $5,000 on June 15, 2010

28

n.  $15,000 on July 14, 2010

o.  $20,000 on July 20, 2010

p.  $10,000 on July 26, 2010

*Plaintiff's Trial Exhibits P-30, P-31, P-32, P-33, P-34, P-35 and P-49; Ball*

*Declaration* at 5-12, ¶¶ 15, 22, 25, 29, 33 and 36.

59. According to Ball, from 2008 to 2010, Fremont paid Ball $282,624.27.  *Plaintiff's*

*Trial Exhibits P-27, P-28, P-29, P-30, P-31, P-32, P-33, P-34, P-35 and P-49.*

60. According to Huezo, during this time period, Huezo and Fremont paid Ball

$333,085.49.  *Huezo Declaration* at 42-48, ¶¶ 121-148.

61. The parties stated their agreement on the record at trial that Ball agreed to credit

Fremont and Huezo for insurance adjustment fees as of September 17, 2010, in

the amount of $27,855.29 and a payment to a contractor as of September 14,

2009, in the amount of $3,500 for a total offset of $31,355.29 against the amount

of his claim against Fremont and Huezo.  *Trial Proceedings,* April 14, 2014 at

9:03-9:05 a.m.  Huezo claims the insurance offset should be $45,961.22.

62. Ball also received a distribution from the Fremont bankruptcy case on his claims

against Fremont in the amount of $102,855.96 on June 7, 2013, which reduces his

claims against Fremont and Huezo.

63. Based these adjustments, on August 1, 2014, the court entered an order reducing

Ball's claimed damages in this case by the amount of $134,210.58, subject to the

court's determination on the additional offset claimed by Huezo in the amount of

$18,105.93.  *Trial Proceedings*, April 18, 2014 at 9:03-9:06 a.m.*; Stipulation and*

*Order,* ECF 196 and 200.

64. During the period from November 28, 2007, when Ball made his initial investment

in, or loan to, Fremont, to May 5, 2011, when Fremont filed for bankruptcy, Huezo

took at least the amount of $307,160.95 out of Fremont.  *Trial Declaration of*

*Adrian Stern* ¶ 17C; *Plaintiff's Trial Exhibit P-53, Exhibit B of Expert Report of*

*Adrian Stern; Trial Testimony of Adrian Stern,* April 24, 2014 at 11:06-11:08 a.m.*; Huezo Declaration* at 56-73, ¶¶ 193-230.

65. Huezo testified that when the economic recession began due to the mortgage crisis in late 2009, his income, which depended upon real estate transactions, business loans, and home equity financing, dried up, and Fremont borrowers began defaulting on their loans. *Huezo Declaration* at 11, ¶ 25.

66. After July 26, 2010, Fremont made no further payments to Ball on his "investments" or loans, despite the expiration of the maturity dates on all of the promissory notes. *Plaintiff's Trial Exhibits P-9, P-16, P-19 and P-44; Ball Declaration* at 12-13, ¶¶ 36 and 37; *Trial Testimony of Joey Ball*, April 25, 2014 at 10:57-11:01 a.m.

67. Huezo testified that at Fremont, he assessed the risk of each loan made by Fremont and performed underwriting duties prior to funding each loan. *Huezo Declaration* at 8, 22, 32, 39, 73-96, ¶¶ 17, 56, 89, 110-111, 231-287.

68. Huezo testified that Fremont made $1,055,766 in loans secured by real property. *Huezo Declaration,* ¶¶ 110, 149, 150, 153, 161, 167, 168, 169, 173, 176, 178, 179, 180, 194, 195, 198, 205, 209, 232, 233, 238, 239, 240, 241, 254, 255, 258, 259, 260, 261, 262, 263, 268, 269 and 274.  The court finds Huezo's testimony on this point not to be credible because the evidence indicates that loans made by Fremont were not properly secured as Huezo admitted in his trial testimony that he did not obtain separate security agreements or file UCC financing statements with the California Secretary of State on loans that he claimed were "secured." *Trial Testimony of Victor Huezo*, April 24, 2014 at 2:16-2:20 p.m.

69. Huezo testified that he believed that by Fremont merely holding a promissory note for each loan, the loans were "secured," and Fremont/Huezo would still be able to collect from defaulting borrowers because their loan application documents showed that they owned collateral which could be collected upon. *Huezo*

*Declaration* at 73-95, ¶¶ 231-286; *Trial Testimony of Victor Huezo,* April 24, 2014 at 2:16–2:20 p.m.  The court finds Huezo's testimony on this point not to be credible.

70. Huezo testified that he believed that the term "secured asset" meant that a borrower had assets as reflected on the borrower's loan application that would help the borrower repay any debt owed if the borrower defaulted.  *Huezo Declaration* at 26, ¶ 70.  In light of Huezo's experience in commercial lending since the late 1990s and Huezo's licensing as a real estate salesperson and a real estate broker, the court does not find Huezo's testimony on this point to be credible because he knew that it took perfection of secured claims by taking and recording deeds of trust as to real property and UCC financing statements with the California Secretary of State as represented and acknowledged in the Fremont Informational Materials that Huezo is responsible for, and gave to Ball.

71. According to Huezo, if all the loans made by Fremont to borrowers had been repaid, Fremont/Huezo would have had the money to pay Ball back.  *Trial Testimony of Victor Huezo*, April 24, 2014 at 4:33-4:34 p.m.  The court finds Huezo's testimony on this point not to be credible, nor probative.  The evidence indicates that the Fremont borrowers did not pay back the loans made to them by Fremont through Huezo's efforts and that Fremont had no collateral to look to for payment of these loans since Fremont through Huezo's efforts did not perfect any security interests in borrower collateral, despite Huezo's representations to Fremont investors like Ball as described herein.

72. Fremont through Huezo's efforts funded loans not secured by real property or business assets with investor money like from Ball.  *Trial Testimony of Victor Huezo*, April 24, 2014 at 2:07-2:36 p.m. and 3:15-3:47 p.m.*, 3:54-4:14 p.m., 4:27-4:34 p.m.,* April 25, 2014 at 9:20-9:53 a.m., 9:56-10:00 a.m.

73. Huezo sent Ball an email message and two letters on November 19, 2010,

1    suggesting a settlement whereby Fremont would transfer real property valued at

2    $365,000 to Ball in return for credit applied towards the amount owed to Ball.

3    *Defendant's Request for Judicial Notice, Exhibit 3* at 17:1-4; *Huezo Declaration* at

4    105-106, ¶ 321; *Defendant's Exhibit D-12.*

5    74. Ball did not accept this settlement offer of Fremont by Huezo.  *Huezo Declaration*

6    at 107, ¶ 325-326; *Trial Testimony of Joey Ball*, April 18, 2014 at 9:42 a.m.

7    <u>**CONCLUSIONS OF LAW**</u>

8    Plaintiff's complaint in this adversary proceeding alleges claims for relief under 11

9    U.S.C. §§ 523(a)(2)(A) and (a)(6).  These claims are "core proceedings" pursuant to 28

10    U.S.C. § 157(b)(2)(I), and this court has jurisdiction over the claims pursuant to 28 U.S.C.

11    §§ 157(b)(1) and 1334.

12    **I.        The Court Has Jurisdiction to Enter a Monetary Judgment on Ball's**

13    **Unliquidated State Law Claims**

14    Under 11 U.S.C. § 157(b)(1), "[b]ankruptcy judges may hear and determine all

15    cases under title 11 and all core proceedings arising under title 11 . . . and may enter

16    appropriate orders and judgments . . . ."  Further, under 11 U.S.C. § 157(b)(2)(I), a

17    dischargeability determination of a particular debt is a core proceeding.  Accordingly, in

18    conjunction with a dischargeability determination, the bankruptcy court has jurisdiction to

19    enter a judgment on an underlying unliquidated state law claim.  *In re Kennedy*, 108 F.3d

20    1015, 1016-1017 (9th Cir. 1997); *see also,* 11 U.S.C. § 157(b)(2)(B) (core proceedings

21    do not include the liquidation of unliquidated personal injury torts).

22    At trial and throughout the course of litigation, the parties failed to present

23    evidence of the entry of any judgment by another court on Ball's underlying claims

24    against Huezo, let alone any evidence of any state court action between the parties

25    concerning the underlying claims.  Accordingly, the court determines that Ball has

26    unliquidated fraud claims against Huezo, and pursuant to 11 U.S.C. § 157(b) and *In re*

27    *Kennedy*, and in conjunction with its debt dischargeability determinations under 11 U.S.C.

28

1   §§ 523(a)(2)(A) and (a)(6), the court has jurisdiction to enter a monetary judgment on

2   Ball's unliquidated state law claims, which are not based on personal injury torts.

3   **II.    Because Ball's "Investments" in Fremont Were Loans to Fremont,**

4   **California's Usury Laws Apply**

5   As a preliminary matter, the court considers whether Ball made "loans" to or

6   "investments" with Fremont.  Throughout their papers, the documentary record, and their

7   oral argument and testimony at trial, both parties primarily characterized the four

8   transactions whereby Ball advanced a total of $844,750 to Fremont solicited by Huezo as

9   "loans," but also refer to the transactions as "investments," which seems inconsistent, if

10  not confusing.  *See, e.g., Plaintiff Joey Ball's Trial Brief,* ECF 176, filed on April 10, 2014,

11  at 1 ("Ball brings this action for Fraud under 11 U.S.C. § 523(a)(2)(A) and Willful and

12  Malicious Conduct under 11 U.S.C. § 523(a)(6) against Defendant Victor Huezo ('Huezo')

13  based on Huezo's intentional misrepresentations, intended to and resulting in Ball loaning

14  Huezo's company, Fremont Investment Holdings, Inc. ('Fremont'), $844,750 under false

15  pretenses.") and at 3 ("Huezo told Ball that there was little risk to the loans [by Fremont to

16  borrowers] and that Ball would be paid a 15% return on his 'investment' in Fremont."),

17  *cting, Ball Declaration,* ¶ 6); *Defendant Victor Huezo's Trial Brief,* ECF 180, filed on April

18  10, 2014, at 2 ("Ball and Fremont/Huezo entered into four agreements wherein Ball

19  loaned Fremont (on three occasions) and Huezo (on one occasion) money at 15%

20  annual interest . . . Moreover, Ball never invested into Fremont.  Ball never received any

21  equity or shares in Fremont.  Ball admits he made four loans to Fremont."); *Plaintiff's Trial*

22  *Exhibit P-2,* Fremont Informational Materials (many references to clients like Ball

23  advancing money to Fremont as "investor(s)" and an advance by clients as an

24  "investment").  As part of each of these transactions, Fremont delivered to Ball

25  "promissory notes" stating that, in addition to the principal Fremont owed to Ball, Fremont

26  promised to pay Ball 15% interest per annum.  *See Plaintiff's Trial Exhibits P-9, P-16, P-*

27  *19 and P-44.*  The court must determine whether the transactions constitute loans or

28

1  investments because such a determination affects whether California's usury laws apply

2  as argued by Huezo and whether the 15% interest provided in the notes is recoverable

3  by Ball.  *Defendant Victor Huezo's Trial Brief,* ECF 180 at 11-12.

4       As explained by the Miller and Starr treatise on California real estate law:

5       **The Usury Law does not apply to an investment transaction.** Numerous
   transactions involving the advance of money are structured in some form
6       other than a loan.  In some cases these ventures are actually investments
   and not loans, in the sense that the investor expects a return on the funds
7       advanced but also risks a loss or receipt of no return.  In these cases the
   courts reject the claim of usury even though the investor receives a return
8       on investment which exceeds the maximum usury rate.

9  11 Miller and Starr, California Real Estate Law, § 37:5 ("Loan or forbearance of money")

10  (4th ed. online ed. September 2016 update), *citing, Roodenburg v. Pavestone Co., L.P.*,

11  171 Cal.App.4th 185, 194 (2009).   One California court has characterized the situation of

12  determining whether a transaction is a loan or investment as follows:

13

14       The rule set forth in 55 Am.Jur. 342 does indicate to the court a reasonable
   line of demarkation between a legitimate business venture with the parties
15       unequal in the extent of their risk but equally eager in their anticipation of
   profit, and a situation in which a necessitous borrower is victimized by a
16       designing usurious lender. It is there suggested that a transaction is likely to
   be a loan where the recipient of the money parts with title to *property of his*
17       *own* as security. On the other hand, the transaction is more likely to be a
   business venture where the money is used entirely for the purchase of
18       *property not theretofore owned by either* of the persons.

19  *Batchelor v. Mandigo,* 95 Cal.App.2d 816, 823 (1950).  More precisely, the issue in this

20  case is whether Ball's advances to Fremont/Huezo were investments in a joint venture or

21  loans to a borrower, which is a factual question.   11 Miller and Starr, *California Real*

22  *Estate Law*, § 37:13  and nn. 3-5 ("Partnerships and joint ventures"), *citing inter alia*,

23  *Batchelor v. Mandigo, supra*; *see also, Wooton v. Coerber*, 213 Cal.App.2d 142, 146

24  (1963) (finding that a transaction was an investment even where the transaction was

25  documented by a promissory note); *Giorgi v. Conradi*, 199 Cal.App.2d 82 (1962) (same);

26  and *Atkinson v. Wilcken*, 142 Cal.App.2d 246 (1956) (same).

27       "There are three primary factors which distinguish a loan transaction from a

28  partnership or joint venture transaction: (1) whether there is an absolute obligation of

1  repayment; (2) whether the investor may suffer a risk of loss; and (3) whether the investor

2  has any right to participate in management." *Id.* and n. 10*, citing, Junkin v. Golden West*

3  *Foreclosure Service, Inc.,* 180 Cal.App.4th 1150, 1155-1157 (2010).   Applying these

4  criteria, it appears that the transactions between Ball and Fremont/Huezo were loans as

5  the parties generally characterize them and as indicated in the transaction documents

6  themselves.   The promissory notes issued by Fremont/Huezo to Ball for the advances

7  made by Ball to Fremont/Huezo recite an absolute obligation to repay Ball, do not

8  indicate that the investor, Ball, may suffer a risk of loss and do not indicate that the

9  investor, Ball, has any right to participate in management of Fremont and its use of the

10  invested funds.   There is no evidence that indicates otherwise, and the parties do not

11  argue otherwise.   Based on the criteria stated above regarding characterization of a

12  transaction as a loan or a joint venture for usury law transaction purposes, Ball's

13  advances to Fremont/Huezo were loans.   Therefore, California's usury laws apply to

14  these transactions.   *See* California Constitution, Article XV § 1; *Sheehy v. Franchise Tax*

15  *Board*, 84 Cal.App.4th 280, 282-283 (2000) ("For a transaction to be usurious, (1) it must

16  constitute a loan or forebearance  . . . A forbearance is an agreement to extend the time

17  for payment of the obligation due either before or after the obligation's due date.")

18  (internal citations and quotations omitted).

19      "A usurious transaction is a 'loan or forebearance of money, goods or things in

20  action' pursuant to which a 'person, company, association or corporation' directly or

21  indirectly takes or receives in 'money, goods, or things in action, or in any other manner

22  whatsoever, any greater sum or any greater value' than is allowed by law."  11 Miller and

23  Starr, *California Real Estate Law*, § 37:4 and n. 1 ("Essential elements of usury"), *citing,*

24  Uncodified Laws, Stats. 1919, p. lxxxiii, §§ 1-3 [Civ. Code, §§ 1916-1, 1916-2, 1916-3];

25  Cal. Const., art. XV.   Proving usury is a mixed question of law and fact, and the borrower

26  who claims usury has the burden of proving the elements of usury by a preponderance of

27  the evidence.   11 Miller and Starr, *California Real Estate Law*, § 37:4 and nn. 10 and 11,

28

1   *citing inter alia, Ghirardo v. Antonioli,* 8 Cal.4th 791, 798 (1994).  Four essential elements

2   must be proven to establish usury: (1) the transaction must be a loan or forbearance of

3   the use of money; (2) the interest received by the lender must be in excess of the

4   statutory maximum rate that is applicable to the transaction; (3) the loan and interest

5   must be absolutely payable by the borrower, and not contingent, at risk, or in the control

6   of the borrower; and (4) the lender must have a willful intent to enter into a usurious

7   transaction.  11 Miller and Starr, *California Real Estate Law,* § 37:4 and nn. 3-7, *citing*

8   *inter alia,* Cal. Const. art. XV and *Ghirardo v. Antonioli,* 8 Cal.4th at 798.  As discussed

9   above, the first element of the transactions being loans and the third element of an

10   absolute obligation of the borrower to repay the loans have been shown here as not

11   disputed.

12        The second element of usury that the interest received by the lender is in excess

13   of the statutory maximum rate applicable to the transactions is demonstrated here.  The

14   rate of interest for Ball's loans to Fremont/Huezo was 15% based on the agreement of

15   the parties and as reflected in the transaction documents, which facts are not disputed.

16   For non-consumer loans (i.e., not primarily for personal, family or household purposes),

17   such as Ball's loans to Fremont/Huezo, the statutory maximum rate of interest is either 10

18   percent per year or the "federal discount rate," plus 5 percent per year, whichever is

19   greater, but since the "federal discount rate" has been below 5 percent since January 31,

20   2001 except for a short time period between December 13, 2005 and October 31, 2007

21   not relevant here since the loans were made in November 2007 and March 2008, the

22   maximum rate is 10 percent.  California Constitution, Art. XV; 11 Miller and Starr,

23   California Real Estate Law, § 37:18 and n. 3 ("Determining the maximum allowable  rate

24   of interest – In general – Maximum rate for non-consumer loans"), *citing,* link to current

25   and historical data for "federal discount rate" on the website of the Federal Reserve Bank

26   of San Francisco, http://www.frbsf.org/banking-supervision/banking-economic-

27   data/discount-rate (now http://www.frbsf.org/banking/discount-window/discount-rate).

28

1  Because Ball's loans at 15% exceeded the 10% maximum rate, the loans were usurious

2  on their face.

3       "When the transaction is in the form of a loan and it is usurious on its face, there is

4  no need to examine the underlying facts, and the lender's intent is presumed merely a

5  patent willingness to charge the excessive rate of interest."  11 Miller and Starr, *California*

6  *Real Estate Law*, § 37:31 and n. 12 ("Intent to violate the Usury Law"), *citing inter alia,*

7  California Evidence Code § 668 and *Martin v. Kuchler,* 212 Cal.536, 558-539 (1931).

8  Here, Ball's loans were usurious on their face with the excessive 15% interest rate.

9  "Although an intent to commit usury is a necessary element of a usurious transaction,

10 there is no requirement to prove the lender's intent to violate the law.  It is merely

11 necessary to prove an intent by the lender to receive a greater rate of interest than is

12 permitted by law.  Neither ignorance of the law nor the absence of a guilty intent to violate

13 the law is material in finding the requisite intent for a usurious transaction."  11 Miller and

14 Starr, *California Real Estate Law*, § 37:31 and nn. 13 and 14, *citing inter alia, Ghirardo v.*

15 *Antonioli,* 8 Cal.4th at 798 and *Williams v. Reed,* 48 Cal.2d 57, 68 (1957); *see also, In re*

16 *Dominguez,* 995 F.2d 883, 886 (9th Cir. 1993)(citations omitted); 1 Witkin, *Summary of*

17 *California Law,* Contracts, § 468 ("Effect of Usurious Provision – In General") at 511 (10th

18 ed. 2005 and 2016 Supp.) ("If a transaction is usurious on its face, neither good faith nor

19 absence of guilty intent is material."), *citing inter alia, Martin v. Kuchler,* 212 Cal. at 539.

20 "The usurious interest provision is void, but the principal of the loan is unaffected."  1

21 Witkin, *Summary of California Law,* Contracts, § 468 at 511, *citing inter alia, Haines v.*

22 *Commercial Mortgage Co.,* 200 Cal. 609, 622 (1927).

23       Here, Ball does not argue that his loans are not usurious on their face, but that

24 Huezo should be estopped from claiming the loan is usurious based on his fraudulent

25 misconduct in structuring the loans as usurious and that Ball should be allowed

26 prejudgment interest at the legal rate of 7 percent per year.  *Plaintiff Joey Ball's Trial*

27 *Brief,* ECF 176 at 22-25, *citing inter alia, Buck v. Dahlgren,* 23 Cal.App.3d 779, 788-789

28

1  (1972) and California Civil Code § 3517 ("No one can take advantage of his own

2  wrong.").

3          Harking back to the language of the California Court of Appeal in *Batchelor v.*

4  *Mandigo,* 95 Cal.App.2d at 823, in the transactions where Ball advanced money to

5  Fremont, this is not a situation where Fremont, the recipient of Ball's money advances

6  and the borrower of these advances, was victimized by a designing usurious lender, Ball,

7  as asserted by Huezo.  To the contrary, it was Fremont, with Huezo acting on its behalf,

8  which designed the structure of the loan transactions, including the issuance and use of

9  investor activity reports and the promissory notes with the 15 percent interest.  The

10  November and January Reports were issued on Fremont's business forms that Huezo

11  emailed to Ball.  *Plaintiff's Trial Exhibits P-4, P-6, P-10 and P-11.*  The initial written

12  communications between Huezo and Ball regarding Ball's third and fourth investments—

13  the January 30, 2008 email, which solicited an advance for $130,000, *Plaintiff's Trial*

14  *Exhibit P-17,* and the emails related to the Las Vegas and Los Angeles deals, which

15  resulted in Ball wire-transferring Fremont $404,750, *Plaintiff's Trial Exhibits P-20 through*

16  *P-23*—were initiated by emails sent on behalf of Fremont from Huezo to Ball.  Ball's

17  money was used by Fremont/Huezo as their capital to make unsecured loans to third

18  party borrowers despite Fremont/Huezo's promises to Ball that some of the loans would

19  be secured.  Accordingly, the court determines that the transactions between Ball on

20  behalf of himself and Huezo on behalf of Fremont involving Huezo's fraudulent

21  representations justify an estoppel here against Huezo regarding his usury defense and

22  to warrant the imposition of prejudgment interest on the loans.

23          "Because the principal of the loan is unaffected, the usurious interest provision

24  results in a note payable at maturity without interest; and the creditor-payee is entitled to

25  interest at the legal rate from the date of maturity to the date of judgment."  1 Witkin,

26  *Summary of California Law,* Contracts, § 468 at 512, *citing inter alia, Epstein v. Frank,*

27  125 Cal.App.3d 111, 123-124 (1981).  Thus, under the general rule regarding repayment

28

1  of principal of the loan without interest and the allowance of prejudgment interest and the

2  basis for an estoppel against Huezo in light of his fraudulent conduct, Ball is entitled to

3  his unpaid loan principal, plus prejudgment interest at the legal rate of 7 percent per year.

4  **III.   Huezo May Be Held Personally Liable to Ball for Debts Arising Out of**

5  **Ball's Loans to Fremont**

6  As another threshold matter, because Ball's loans were made to Fremont,

7  and not with Huezo individually, before the court addresses the nondischargeability of

8  any debts of Huezo arising from such loans, the court must first determine whether

9  Huezo is individually liable for the debts owed by Fremont to Ball.  In *Golden v.*

10  *Anderson*, 256 Cal.App.2d 714, 719-720 (1967), the California Court of Appeal stated

11  that in an action for an intentional tort, "[a]ll persons who are shown to have participated

12  are liable for the full amount of the damages suffered."  (citations omitted); *see also, Price*

13  *v. Hibbs*, 225 Cal.App.2d 209, 222 (1964) ("When conspiring corporate officials act

14  tortiously [sic] and individuals are injured as a proximate result, such tortfeasors are liable

15  to the injured persons even though the corporation may also be liable." (citations

16  omitted)); *Woodworking Enterprises, Inc. v. Baird (In re Baird)*, 114 B.R. 198, 204 (9th

17  Cir. BAP 1990) (applying Arizona law, "[A] corporate officer of director who engages in

18  tortious conduct is personally liable for the tort notwithstanding the fact that the officer

19  may have acted on behalf of the corporation."); *In re Pontier*, 165 B.R. 797, 800 (Bankr.

20  D. Md. 1994) ("The general rule is that corporate officers . . . are personally liable for

21  those torts which they personally commit, or which they inspire or participate in, even

22  though performed in the name of an artificial body."), *citing inter alia*, *Fletcher v. Western*

23  *National Life Insurance Company,* 10 Cal.App.3d 376 (1970).

24  The evidence here indicates that Huezo was an officer and agent of Fremont at all

25  times pertinent to this matter, that Huezo was the sole actor who made the

26  representations on behalf of Fremont to Ball and handled Ball's loans on behalf of

27  Fremont, and Huezo was the sole actor of Fremont who engaged in all the actions that

28

1  caused harm to Ball, the court determines that Huezo can be held personally liable to Ball

2  for the any torts under applicable law, including deceit and fraud under California Civil

3  Code §§ 1709 and 1710.  *See also, Engalla v. Permanente Medical Group, Inc.,* 15

4  Cal.4th 951, 973-981 (1997).

5      **IV.     Liability for and Nondischargeability of Debt Arising from False**

6          **Representation**

7      Under California law, "[t]he elements of fraud that will give rise to a tort action for

8  deceit are: (a) misrepresentation (false representation, concealment, or nondisclosure);

9  (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d)

10  justifiable reliance; and (e) resulting damage."  *Engalla v. Permanente Medical Group,*

11  *Inc.,* 15 Cal.4th at 974 (citations and internal quotation marks omitted); 4 Witkin,

12  *Summary of California Law,* Torts, §§ 772 at 1121.  Ball as the plaintiff has the burden of

13  proving the tort of fraud or deceit against Huezo as defendant by a preponderance of the

14  evidence.  California Evidence Code §§ 115 and 500.

15      11 U.S.C. § 523(a)(2)(A) provides in pertinent part that "[a] discharge under

16  section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an

17  individual debtor from any debt –

18                                    * * * *

19      (2) for money, property, services, or an extension, renewal, or refinancing of credit,

20      to the extent obtained by –

21      (A) false pretenses, a false representation, or actual fraud, other than a statement

22      respecting the debtor's or an insider's financial condition; . . . ."

23      The elements of a claim under 11 U.S.C. §523(a)(2)(A) are: (1) the debtor made

24  representations; (2) that at the time the debtor knew they were false; (3) the debtor made

25  those representations with the intention and purpose of deceiving the creditor; (4) the

26  creditor justifiably relied on these representations; and (5) the creditor sustained losses

27  as a proximate result of the debtor's representations.  *Ghomeshi v. Sabban (In re*

28

35

1  *Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010) (citations omitted); *Citibank (South*

2  *Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996) (citations

3  omitted); *accord, Van Zandt v. Mbunda (In re Mbunda)*, 484 B.R. 344, 350 (9th Cir. BAP

4  2012).  These elements are substantially the same as the elements of fraud or deceit

5  under California law as discussed previously.

6        In this adversary proceeding to determine debt dischargeability under 11 U.S.C. §

7  523(a)(2)(A), Ball has the burden of proving every element of the claim by a

8  preponderance of the evidence.  *Grogan v. Garner,* 498 U.S. 279, 286-287 (1991);

9  *Kawaauhau v. Geiger*, 523 U.S. 57 (1998).  The standard of proof on the element of

10 reliance is justifiable reliance.  *Field v. Mans*, 516 U.S. 59, 72-75 (1995) (citations and

11 footnotes omitted).  Whether a requisite element of a claim under 11 U.S.C. § 523(a)(2)

12 has been satisfied is a factual determination.  *Islamov v. Ungar (In re Ungar)*, 633 F.3d

13 675, 679 (8th Cir. 2011).

14       11 U.S.C. § 523(a)(6) provides in pertinent part that "[a] discharge under section

15 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual

16 debtor from any debt –

17                                        * * * *

18       (6) for willful and malicious injury by the debtor to another entity or to the property

19       of another entity . . . ."

20        "Willful" and "malicious" are both required elements to establish non-

21 dischargeability under 11 U.S.C. § 523(a)(6).  *Ormsby v. First American Title Company of*

22 *Nevada (Matter of Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010).  The "willful injury"

23 requirement is met when the creditor shows that: the debtor had a subjective motive to

24 inflict the injury; or the debtor believed the injury was substantially certain to occur as a

25 result of his or her conduct.  *Petralia v. Jercich (In re Jercich),* 238 F.3d 1202, 1208 (9th

26 Cir. 2001); *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1144 (9th Cir. 2002).

27       Although Ball made four separate loans to Fremont induced by Huezo, because

28

1   the first and second loans are similar to each other, and because the third and fourth

2   loans are similar to each other, the court structures its analysis around those two

3   separate "sets" of investments.

4       **A.  Ball's First and Second Loans: The November and January**

5           **Reports**

6           **i.  False Representations under California Law and 11 U.S.C. §**

7               **523(a)(2)(A)**

8               1.  Representations

9       The court determines that Ball has proven by a preponderance of the evidence

10  that Huezo made false representations, as detailed below, to Ball regarding the

11  characterization of the loans to be made by Fremont described in the November and

12  January Reports to induce Ball to "invest" in and fund these loans for Fremont.  The

13  dispute between the parties regarding Huezo's representations related to the November

14  and January Loans does not solely come down to a contest of credibility of the parties as

15  to who made what oral representations.  Rather, the court finds that the documentary

16  evidence in this case is dispositive and supports Ball regarding his first and second loans

17  to Fremont.

18      Regarding the type of security for the loans that Fremont used the funds from

19  Ball's November and January Loans to fund, as detailed above, through Huezo's

20  representations prior to Ball's first loan to Fremont, through the Fremont Informational

21  Materials and through the November and January Reports, Huezo consistently

22  represented to Ball that the proceeds of Ball's November and January Loans would be

23  used to fund "secured" loans.  First, based on Ball's testimony, which the court finds to be

24  credible, during golf outings in late 2006 and early 2007, Huezo told Ball, among other

25  things, that Fremont's loans were "highly collateralized secured loans", "little to no risk"

26  and "guaranteed."  Second, the documentary evidence, that is, specifically, the Fremont

27  Informational Materials, which Huezo provided to Ball on July 5, 2007, and which

28

explained Fremont's lending business and process to Ball before Ball made any "investments" in, or loans to, Fremont, unequivocally stated that "the majority of the lending we do is based on collateral and personal guarantees." Although the Fremont Informational Materials implied that not all of Fremont's loans were secured, the Fremont Informational Materials did state that the activity reports outlined what loans will be made for the particular investment made by an "investor" (lender) of Fremont. Third, both the November and January Reports provided by Huezo to Ball "outline[d] what loans are being made and at what rate the investors [Fremont's lenders] are getting paid at", and unequivocally represented that Ball's "investments" or loans would be used to make secured loans to borrowers of Fremont.

The November Report that Huezo sent to Ball listed four "Secured Loans" totaling $240,000 with collateral valued at $1,580,000. Right below this information on the November Report listing the four "Secured Loans", it stated: "Here is a list of the proposed loans we are going to close this week. In order, to issue credit to our clients we will need to know your commitment to Fremont Investment Holdings Inc." Similarly, the January Report that Huezo sent to Ball listed two "Secured Loans" totaling $70,000 with collateral valued at $790,000. The court finds that Huezo, in sending the November and January Reports to Ball, made written representations to Ball that if Ball made the loans to Fremont being solicited by Huezo for Fremont through the November and January Reports that the funds lent by Ball would be made to fund secured loans.

Ball testified that Huezo also made oral representations to Ball that Fremont's loans to borrowers would be secured by real property. This testimony is corroborated by documentary evidence in the November and January Reports, emailed by Huezo to Ball on November 26, 2007 and January 8, 2008, respectively, representing to Ball that the loans funded by the investments being solicited by Huezo for Fremont were "secured loans" and listed a collateral amount to accompany each loan to be funded by the investor's funds ($1,580,000 and $790,000 of collateral respectively). The fact that a

"collateral value" column on the November and January Reports listing the value of collateral accompanied each loan further reinforced the written representation in the reports that Ball's money lent to Fremont would be funding secured loans and corroborates Ball's testimony that Huezo made oral representations to him that Fremont's loans to borrowers with Ball's money would be secured by real property. *Plaintiff's Trial Exhibits P-9 and P-10*. Based on this evidence, the court determines that Ball has shown by a preponderance of the evidence that Huezo made representations to him orally and in writing that Ball's November and January "Investments" in, or loans to, Fremont would be used to fund secured loans.

Thus, the court determines that Huezo made the following representations to Ball, which supports Ball's claims under 11 U.S.C. § 523(a)(2)(A): (1) that Ball's November "Investment" in, or loan to, Fremont would fund secured loans; (2) that Ball's January "Investment" in, or loan to, Fremont would fund secured loans; and (3) that if Ball wanted his loans back from Fremont, it would buy out Ball's "investments" (or pay back the loans) ahead of schedule. Huezo's representations were false because the evidence shows that Fremont did not make the secured loans with Ball's November and January "Investments" or loans. At trial, Huezo testified that he believed Fremont made secured loans to borrowers because it obtained promissory notes from borrowers for the loans, but conceded that Fremont did not obtain deeds of trust to secure the loans with real property collateral, nor did it file UCC financing statements to secure loans with personal property collateral with the California Secretary of State. *Huezo Trial Testimony,* April 24, 2014 2:15-2:20 p.m.; *see also,* California Civil Code § 2922; 4 Witkin, *Summary of California Law,* Security Transactions in Real Property, §§ 39-47 at 835-840 (formalities required to create security interest in real property); California Commercial Code §§ 9310(a)-9316; 4 Witkin, *Summary of California Law,* Secured Transactions in Personal Property, §§ 61-104 at 617-663 (formalities required to create security interest in personal property). No evidence was offered at trial to show that any loans made by

39

1    Fremont with the money advanced by Ball through his November and January

2    "Investments" or loans were used to fund secured loans based on effective security

3    interests in real or personal property of the Fremont borrowers.

4        Accordingly, the court finds that Ball has shown by a preponderance of the

5    evidence that Huezo made false representations to him that Ball's November and

6    January "Investments" in, or loans to, Fremont would be used to fund secured loans,

7    which establishes the first element of false representation to prove a tort claim for fraud

8    or deceit under California law and nondischargeability of debt under 11 U.S.C. §

9    523(a)(1)(A).

10                2.    Knowledge of Falsity

11        Based on the evidence admitted at trial, the court finds that Huezo knew that his

12    representations to Ball were false, and in so finding, the court makes several

13    observations based on its review of the evidence before it.  Regarding Huezo's

14    representations that Fremont's loans to borrowers with Ball's money would be secured,

15    the court observes as previously stated, that Huezo testified that he believed Fremont

16    made secured loans because it obtained promissory notes along with the loans, but,

17    Huezo conceded that Fremont did not obtain deeds of trust to secure the loans with real

18    property collateral, nor did Fremont file UCC financing statements to secure loans with

19    personal property collateral with the California Secretary of State. *Huezo Trial*

20    *Testimony,* April 24, 2014 2:15-2:20 p.m.

21        The court considers the credibility of Huezo's trial testimony that as a licensed real

22    estate salesperson acting on behalf of Fremont, a California Department of Finance

23    licensed lender, he was unaware that in order to truthfully characterize a loan as secured,

24    the loans needed to be perfected.  The court determines that this portion of his testimony

25    is not credible.  First, the Fremont Informational Materials that Huezo sent to Ball before

26    Ball's November and January Investments expressly referred to the rate of return for

27    Fremont investors based on examples of loans made by Fremont, including situations "if

28

1  a loan is made on a personal residence secured by a deed of trust" and "[i]f we are

2  securing a loan with a UCC filing using business assets," *Plaintiff's Trial Exhibit P-2* at 3,

3  in addition to unsecured loans, which suggests that Huezo knew that there was a

4  difference between secured and unsecured loans.  Second, given that Huezo had a real

5  estate salesperson's license and a real estate broker's license, and has been involved in

6  commercial lending since the late 1990s, holding various positions with John Hancock

7  Life Insurance Company, Santa Monica Bank and U.S. Bank, the last of which where

8  Huezo managed business loan sales, the court determines that, more likely than not,

9  Huezo knew that secured loans needed to be perfected in real property by obtaining

10 security agreements and trust deeds from the borrowers, and by obtaining security

11 agreements and UCC financing statements from the borrowers.  The testimony of Huezo

12 as a lending and real estate professional with extensive experience with commercial

13 lending that Huezo, on behalf of Fremont, would not make multiple representations —

14 orally and in writing— that a loan would be secured without taking the necessary steps to

15 perfect secured loans, then extend unsecured loans while not knowing that his

16 representations were false, is simply unbelieveable.

17      As stated previously, Huezo testified that he did not obtain separate security

18 agreements from the Fremont borrowers for the loans from the money from Ball's

19 November and January "Investments" or loans or file UCC financing statements with the

20 California Secretary of State on several loans that he claimed were "secured."  *Trial*

21 *Testimony of Victor Huezo,* April 24, 2014 at 2:16-2:20 p.m.  Accordingly, the court finds

22 the preponderance of the evidence shows that Huezo knew his representations that the

23 money from Ball's November and January "Investments" or loans would fund secured

24 loans were false.

25              3.   Intent to Deceive

26      The court also determines that Huezo made the previously mentioned

27 representations with the intent to deceive Ba``ll into making Fremont an attractive

28

41

1  investment opportunity to Ball.  Although the court finds that Huezo's prior payments to

2  Ball supports the determination that Huezo intended to pay Ball back on the

3  "investments" or loans, it appears that, first and foremost, these were material false

4  statements made both orally and in writing with the intent to induce Ball to "invest" in

5  Fremont by making loans to it.

6         The court also places great weight on the contradictions between Huezo's oral

7  testimony at trial and the documentary record.  The court observes that Fremont's

8  Informational Materials indisputably stated that its "investors" (or lenders) will know what

9  assets Fremont has as collateral by sending a balance sheet showing Fremont's assets

10  and liabilities.  At trial, Huezo testified that the investor activity reports were such balance

11  sheets and were the only balance sheets sent to Ball.  Such testimony is inconsistent

12  with the November and January Reports themselves.  Contrary to Huezo's testimony, the

13  November and January Reports both state "here is a list of proposed loans we are going

14  to close this week."  The reports do not show what loans are going to be closed, as the

15  November and January Reports state, nor do the reports show what assets and liabilities

16  Fremont presently owns as the balance sheets were supposed to show according to the

17  Fremont Informational Materials.  Huezo's trial testimony that the investor activity reports

18  served as the balance sheets reflecting Fremont's assets and liabilities is thus not

19  credible.

20         In addition to this inconsistency, the Reports also represent to prospective

21  "investors" (or lenders) that the "investors" are agreeing to invest in Fremont in order to

22  fund the proposed loans listed in the Report.  Huezo also did not stay true to the

23  statements in the Fremont Informational Materials that "investors" (lenders) would know

24  what loans their "investments" (or loans) would be funding.  Huezo stated numerous

25  times that he did not feel bound to the Investor Activity Reports and used Ball's

26  investments for various purposes.  Accordingly, the court finds Huezo's testimony on this

27  point to be deceptive and thus, consistent with his intent to deceive Ball into "investing"

28

1  in, or lending to, Fremont.  Based on the foregoing, the court determines the

2  preponderance of the evidence shows that Huezo represented that the money from Ball's

3  November and January "Investments" or loans would be used to fund secured loans by

4  Fremont with the intent to deceive Ball.

5                          4.  Justifiable Reliance

6         The court determines that Ball "justifiably" relied on Huezo's representations that

7  Ball's "investments" in, or loans to, Fremont would be used to fund secured loans.  "A

8  creditor claiming nondischargeability under § 523(a)(2)(A) must also show it was justified

9  in relying on the debtor's fraudulent conduct in obtaining the money, property or

10  services."  4 March, Ahart & Shapiro, *California Practice Guide: Bankruptcy*, ¶ 22:480 at

11  22-71 (2015), *citing*, *Field v. Mans*, 516 U.S. at 73-76.  "A person may justifiably rely on a

12  representation 'even if the falsity of the representation[s] could have been ascertained

13  upon investigation.'"  4 March, Ahart & Shapiro, *California Practice Guide: Bankruptcy,* ¶

14  22:481 at 22-71, *citing*, *In re Eashai*, 87 F.3d 1082, 1090 (9th Cir. 1996).

15         Here, the court finds Ball's testimony credible that given the long history of familial

16  friendship that Ball had with Huezo's family and the verbal representations, which were

17  consistent with the November Report and the January Report's representations that the

18  loans by Fremont to borrowers funded by "investors" were "guaranteed," "secured," and

19  had large collateral values to accompany the loans, that Ball justifiably relied on Huezo's

20  representations.  Further, Ball did not blindly rely solely on the verbal representations

21  because he also had written documentation showing a collateral value with a seemingly

22  large equity cushion to "secure" his loans to corroborate and confirm Huezo's oral

23  representations.  Along with these representations, Ball also obtained promissory notes

24  from Huezo for these two "investments" or loans.  Therefore, the court finds that the

25  preponderance of the evidence shows that Ball justifiably relied on Huezo's

26  representations which induced him to make loans to Fremont that were riskier than

27  Huezo represented and that Ball had bargained for since the loans made by Fremont had

28

1   no real collateral to secure them, exposing Ball to a greater risk of loss than Huezo had

2   promised, and Ball had bargained for.

3                           5.   Losses as a Proximate Result

4           "A creditor seeking a § 523(a)(2)(A) nondischargeability determination must

5   demonstrate a *causal nexus* between the fraud and the debt—i.e., that the debtor's fraud

6   was a proximate cause of the loss to the creditor."  4 March, Ahart & Shapiro, *California*

7   *Practice Guide: Bankruptcy*, ¶ 22:490 at 22-72, *citing*, *Field v. Mans*, 516 U.S. at 64

8   (1995) (emphasis in original).  As to the November and January "Investments" in, or

9   loans to, Fremont that Ball made, which totaled $310,000, the court determines that the

10  preponderance of the evidence shows that Huezo's misrepresentations that Fremont's

11  loans would be secured was a proximate cause of Ball's loss if Ball did not receive at

12  least $310,000 back in satisfaction of the debts owed by Fremont to Ball from Ball's

13  November and January "Investments" or loans.

14          In demonstrating that the preponderance of the evidence establishes a claim for

15  relief to deny dischargeability of debt for fraudulent misrepresentation under 11 U.S.C. §

16  523(a)(2), Ball has also shown that the preponderance of the evidence establishes his

17  state law claims for fraud or deceit.  Ball has shown by a preponderance of the evidence

18  that Huezo misled him with promises of using Ball's money through "investments" in, or

19  loans to, Fremont to make loans to borrowers secured with real or personal property

20  collateral to induce Ball to make these "investments" or loans, and instead of doing what

21  he promised, Huezo and Fremont did not use Ball's money to make secured loans, but

22  used the money for unsecured loans or for other purposes, including paying Fremont's

23  operational expenses and paying Huezo personally.  Thus, Ball's money was not used for

24  the purposes of making secured loans as Huezo promised, but diverted for other

25  purposes, exposing Ball to greater risk of loss than he would have agreed to, and

26  resulted in losses to him when Fremont's borrowers did not repay the loans made to

27  them, and Fremont's investors could not rely upon the real or personal property collateral

28

1  to recover some, if not all, of the value of their losses from Fremont's borrowers.

2      Although the court observes that Ball received at least $416,835.50 in distributions

3  from Fremont, offsets and distributions from Fremont's bankruptcy estate, there is a

4  question regarding how to credit that amount against the four separate debts Huezo

5  owes to Ball stemming from the four separate investments Ball made to Fremont.

6  Because the answer to that question depends in part on the nondischargeability analysis

7  with respect to Ball's third and fourth investments in Fremont, before the court considers

8  this question, the court will analyze the remainder of Ball's nondischargeability claims

9  against Huezo, then address the question at the end in the section titled "Payment

10  Allocation Analysis"

11          **ii. 11 U.S.C. § 523(a)(6)**

12      The debt of an individual debtor arising from "willful and malicious injury by the

13  debtor to another" or "to property of another" may be excepted from discharge under 11

14  U.S.C § 523(a)(6).  An injury is "willful" "when it is shown that either the debtor had a

15  subjective motive to inflict injury or that the debtor believed that injury was substantially

16  certain to occur as a result of his conduct."  *In re Jercich*, 238 F.3d at 1208.  If the act

17  was intentional and the debtor knew that it would necessarily cause injury, "willful" intent

18  does not require that the debtor have had the specific intent to injure the creditor.  *Id.* at

19  1207.  "Willful" means "voluntary" or "intentional."  *Kawaahau v. Geiger*, 523 U.S. at 61-

20  62, *citing,* Restatement (Second) of Torts, § 8A, comment A.  The standard focuses on

21  the debtor's subjective intent, and not "whether an objective, reasonable person would

22  have known that the actions in question were substantially certain to injure the creditor."

23  *In re Su*, 290 F.3d at 1145-1146.

24      The "malicious" injury requirement is separate from the "willful" requirement.  *Id.* at

25  1146.  An injury is "malicious" if it involves "(1) a wrongful act, (2) done intentionally, (3)

26  which necessarily causes injury, and (4) is done without just cause or excuse."  *In re*

27  *Jercich*, 238 F.3d at 1209, *citing Kawaahau v. Geiger*, *supra.*  This definition "does not

28

1  require a showing of biblical malice, i.e., personal hatred, spite, or ill will." *In re Bammer*,

2  131 F.3d 788, 791 (9th Cir. 1997).  The Supreme Court narrowly held that

3  "nondischargeablity takes a deliberate or intentional *injury*, not merely a deliberate or

4  intentional *act* that leads to injury." *Kawaahau v. Geiger*, 523 U.S. at 61 (emphasis in

5  original).

6      Here, the court determines that Huezo's wrongful actions, as previously detailed,

7  were Huezo's oral and written representations that Ball's investments would be "secured"

8  by real property, orally representing that Fremont could "guarantee" payments to Ball.

9  Huezo, as a real estate professional with extensive experience with commercial lending,

10  would have known that a secured loan would be less likely to injure Ball than an

11  unsecured loan; however, such knowledge does not rise to the level of a "subjective

12  motive to inflict injury" on Ball or prove that Huezo had a "substantial certainty" that Ball

13  would be injured.  Further, although the court determines that Huezo made these

14  representations to induce Ball into investing in Fremont, Huezo's representations do not

15  rise to the level of "malicious" for three reasons.  First, Fremont/Huezo made some

16  payments to Ball on his loans, and Fremont's loan business was not a sham as the

17  evidence indicates that Fremont was actively making loans to borrowers to make a profit.

18  Huezo's testimony that if it were not for Fremont's borrowers having missed payments,

19  Ball would have been paid back in full, though not very plausible, is not completely

20  implausible.  Second, as to Huezo's subjective intentions, Huezo testified that he had

21  performed underwriting duties on these loans and believed that the borrowers that

22  Fremont made loans to had assets that Fremont would be able to collect.  It appears that

23  Fremont/Huezo's business model was to lend money to borrowers at high interest rates

24  to pay the returns promised to investors like Ball, but it was easier for Fremont/Huezo to

25  make these loans if Fremont did not ask for collateral from the borrowers despite any

26  promises made to investors like Ball.  Due to market conditions, Fremont's borrowers

27  defaulted and could not repay the loans, and Fremont attempted to collect from the

28

46

1    borrowers, but were unable to do so, though not that it lacked intent to do so.  Fremont

2    thus was unable to repay the investors like Ball.  Third, Huezo had offered to transfer

3    assets to Ball to offset some of Ball's losses.  All these facts indicate to the court that

4    Huezo was incompetent in business rather than malicious and do not show that Huezo

5    had the requisite willful and malicious intent to injure Ball as required by the Supreme

6    Court in *Kawaahau v. Geiger*.  Thus, Ball is unable to meet both the "willful" and

7    "malicious" elements of 11 U.S.C. § 523(a)(6).

8    **B.  January Email and $130,000 "Investment", and the "Las Vegas" and**

9    **"Los Angeles" Deals and Corresponding $404,750 "Investment"**

10    **i.  11 U.S.C. § 523(a)(2)(A)**

11        As to Ball's final two "investments" in, or loans to, Fremont, the $130,000 and

12    $404,750 investments, the court determines that Ball has not proven by a preponderance

13    of the evidence that Huezo made representations, which he knew were false, with the

14    intention to deceive Ball, in which Ball was justified in relying upon and that Ball sustained

15    losses as a proximate result.  Contrary to the dispute regarding the November and

16    January "Investments" or loans, the dispute regarding the $130,000 and $404,750

17    investments comes down to a contest of credibility regarding whether Huezo represented

18    that these "investments" or loans would be used to fund secured loans.  *Ball Declaration*

19    at 7 and 9, ¶¶ 20 and 27.  Unlike with Ball's November and January "Investments" or

20    loans, no such documentary evidence of false representations by Huezo to induce these

21    "investments" or loans was presented to the court, and the court denies Ball's claims

22    under 11 U.S.C. § 523(a)(2)(A) based on a lack of proof.

23        The only evidence that Ball offered that Huezo represented to Ball that the money

24    from Ball's $130,000 and $404,750 "investments" would be used to fund secured loans is

25    Ball's oral and written trial testimony, based on Ball's recollection of oral statements

26    Huezo made to Ball six years prior.  Such testimony is not corroborated by any

27    documentary evidence or any specific details surrounding when such oral

28

representations were made that would establish that Ball actually remembered such oral

representations being made.  Further, the allegation that Huezo orally represented that

Ball's "investments" or loans would be used to fund secured loans without any

corroborating documentary evidence is in stark contrast to the prior transactions between

the parties whereby Huezo made written representations in the Activity Reports which

Ball relied upon to make "investments" in, or loans to, Fremont, stating that Fremont's

loans funded by the investments would be secured.

Regarding the January email and corresponding $130,000 "investment" or loan,

the only documentary evidence submitted by the parties of representations related to that

investment is an email from Huezo to Ball, which states "I also have two deals that I am

closing out this week if you want to do them.  It is for a total of $130,000 at the 15% rate.

Let me know if you can do them."  That email provides no substantive information other

than the requested investment amount and interest rate, and makes no reference to

secured or unsecured loans.  Nonetheless, through his declaration, Ball stated that

"[b]ased on the email and Huezo's comments to me at the time, I believed that this loan

was to be like the first two 'secured loans' to Fremont."  Yet at trial, regarding the two

deals mentioned in the email, Ball testified that Huezo told Ball that "they were a couple

of properties that had a lot of collateral just like the others."  Ball also testified that Huezo

did not tell Ball why these particular borrowers needed to borrow money from Fremont.

This was the only oral testimony Ball gave as to Huezo's verbal representations

regarding the $130,000 investment, which, combined with the email, in this court's view,

does not prove by a preponderance of the evidence that Huezo represented to Ball that

the $130,000 investment would be used to fund secured loans.  Ball may have thought or

assumed that these transactions were the same as before, but he has not shown that

Huezo represented that they were the same or were otherwise secured.

Regarding the circumstances surrounding the "Las Vegas" and "Los Angeles"

deals and the corresponding $404,740 investment, as with the $130,000 investment, the

only documentary evidence submitted by the parties of representations Huezo made to
Ball related to that investment are three emails that state the following: March 21, 2008
email, "Joey, I wanted to let you know that we are drawing loan docs on the Vegas deal
and the deal in Los Angeles today.  I just want to make sure you are still good for the loan
that we have been discussing for a few months now.  Please let me know as I am going
to the Notary today to get our Promissory Note done as I plan on funding these deals on
Thursday."; March 24, 2008 email, "Joey, Sorry to send another email but I have not
heard back from you regarding this deal.  I know we have been working on the Bruce
deal but can you let me know where you stand on the loan.  Please let me know today if
possible."; and March 25, 2008 email, "Joey, Good news, we are signing loan docs today
and will be ready for funding tomorrow.  Please go ahead and wire the money to me via
the Fremont Investment Holding Account to avoid any bank delays of having the money
go to my personal account and then to the Fremont account.  I will attach a copy of the
Fremont checking account information for you to wire the funds to me."  These emails
provide no substantive information regarding the loans and whether they would be
secured.  Nonetheless, through his declaration, Ball stated that he agreed to loan
Fremont $404,750 based on Huezo's oral and written representations that the $404,750
was going to two secured loans.  Yet at trial, regarding the deals mentioned in the email,
Ball testified that Huezo verbally represented to Ball that through the "Las Vegas deal",
Fremont would loan money towards property that had "a ton of collateral." This was the
only oral testimony Ball gave as to Huezo's verbal representations regarding the
$404,750 "investment" or loan.  Again, the court observes that such testimony is not
corroborated by any documentary evidence or any details surrounding when such oral
representations were made that would establish that Ball actually remembers such oral
representations being made.  In this court's view, that verbal representation combined
with the previously mentioned emails does not prove by a preponderance of the evidence
that Huezo represented to Ball that the $404,750 "investment" or loan would be used to

1   fund secured loans.

2       The court also determines that, even assuming for the sake of argument that

3   Huezo did make false representations to Ball that the $130,000 and the $404,750

4   "investments" or loans would be used to fund secured loans, Ball did not justifiably rely on

5   those representations.  Although "justifiable" reliance is a lower standard than reasonable

6   reliance, "[j]ustifiability is not without some limits . . . a person is 'required to use his

7   senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of

8   which would be patent to him if he had utilized his opportunity to make a cursory

9   examination or investigation.'"  *Field v. Mans*, 516 U.S. at 71, *citing,* Restatement

10  (Second) of Torts § 541, Comment *a* (1976).  Here, although the court believes that Ball

11  "trusted Huezo" because he thought of Huezo as a friend, *Ball Declaration* at 4 ¶ 12, Ball

12  was not justified in relying on such representations because there was no investor activity

13  report, which contrasted with the prior practice between Ball and Huezo and the business

14  practices of Fremont as represented in the Fremont Informational Materials.  At that

15  point, Ball cannot claim justifiable reliance on Huezo's communications to make large

16  "investments" or loans of $130,000 and $404,750 without specific representations of

17  secured status of the loans being made by Fremont with the money in the absence of

18  written substantive information about what loans these "investments" would fund, and for

19  Ball to do this through a process that was different from the November and January

20  "Investments" or loans.  Because there was no documentary evidence regarding the

21  characterization of the loans being secured and because the Informational Materials

22  stated that Fremont made both secured and unsecured loans, the court determines that

23  Ball was not justified in believing that these loans were secured by real property.

24      Regarding the fact that Huezo did not use Ball's $130,000 "investment" to fund the

25  two deals referred to in the January 30, 2008 email, and the fact that Huezo did not use

26  $367,250 of Ball's $404,750 "investment" to fund the "Las Vegas Deal", the court

27  determines that such conduct, in and of itself, is insufficient to establish

28

1  nondischargeability under 11 U.S.C. § 523(a)(2)(A).  As previously discussed, given the

2  lack of information that Ball had regarding both "investments" or loans, the court

3  determines that Ball has failed to prove by a preponderance of the evidence that Ball

4  justifiably relied on Huezo's representations regarding the $130,000 and $404,750

5  "investments" or loans and that Ball suffered losses as a proximate result of Huezo's

6  representations.

7        For the foregoing reasons, as to the $130,000 and the $404,750 investments, the

8  court determines that Ball has not proven his claim under 11 U.S.C. § 523(a)(2)(A) by a

9  preponderance of the evidence.

10              **ii. 11 U.S.C. §523(a)(6)**

11        Regarding the "willful" requirement under *In re Jercich, supra,* as to Ball's

12  $130,000 and the $404,750 "investments" or loans, based on the factual findings recited

13  above, the court determines that Huezo did not have a subjective motive to inflict injury

14  on Ball.  Ball failed to prove that Huezo intended to inflict injury on Ball because Huezo

15  did not know that Fremont borrowers would default as Huezo went through a non-sham

16  underwriting process for Fremont to make the loans, and Huezo paid Ball back a

17  significant amount on the promissory notes.  Moreover, Huezo made attempts to

18  compensate Ball by offering to give Ball assets owned by Fremont which Ball did not

19  accept.  For the same reasons, Ball failed to prove that Huezo believed the injury was

20  substantially certain to occur as a result of Huezo's conduct.

21        Regarding the "malice" requirement under *In re Jercich, supra,* as to the $130,000

22  and the $404,750 investments, based on the factual findings recited above, the court

23  determines that Ball has not proved that the Debtor acted maliciously.  Huezo made

24  significant payments to Ball after Ball's $404,740 investment, and Huezo testified that if it

25  were not for Fremont's borrowers missing payments, Ball would have been paid back in

26  full.  The court also observes that Huezo testified that he offered to refund Ball's money

27  as to the "Las Vegas deal", but Ball refused to accept a refund.  Moreover, Huezo also

28

1   testified that he had performed underwriting duties on these loans and believed that the

2   borrowers that Fremont made loans to had assets that Fremont would be able to collect.

3   All of these findings refute the determination that Huezo had the requisite intent to injure

4   Ball as required by the Supreme Court in *Kawaahau v. Geiger*.  Accordingly, as to Ball's

5   $130,000 and $404,750 investments, the court determines that Ball has failed to prove by

6   a preponderance of the evidence both the "willful" and "malicious" elements of 11 U.S.C.

7   § 523(a)(6).

8          **V.      Payment Allocation Analysis**

9          As noted above, if Ball did not receive at least $310,000 back in satisfaction of the

10  debts owed by Fremont to Ball from the November and January "Investments" or loans,

11  the court determines that Huezo's representations that Ball's November and January

12  "Investments" or loans would fund secured loans was a proximate cause of Ball's losses

13  and thus, that Ball has a nondischargeable claim under 11 U.S.C. § 523(a)(2)(A) as to

14  the November and January Investments.

15         Ball made four loans to Fremont, the first of which was made on November 29,

16  2007 and the last of which was made on March 26, 2008.  Further, Fremont made

17  payments totaling at least $282,624.27 to Ball during the period of January 3, 2008 to

18  July 26, 2010.  Both Huezo and Ball testified that these amounts were paid by Fremont to

19  Ball.  *Compare Plaintiff's Trial Exhibits P-30, P-31, P-32, P-33, P-34, P-35 and P-49 and*

20  *Ball Declaration* at 5-12 ¶ 15, 22, 25, 29, 33 and 36, *with Huezo Declaration* at 43-47, ¶¶

21  123-147.  Nonetheless, because of the timing of the payments from Fremont to Ball, the

22  first of which was made on January 3, 2008, which is between the time of Ball's

23  November and January "Investments" in, or loans to, Fremont, and the last payment from

24  Fremont to Ball, which was made on July 26, 2010, which is after Ball's fourth and final

25  loan to Fremont, the court must necessarily decide how to allocate the payouts in

26  satisfaction of Huezo's debts to Ball.

27         As a preliminary matter, when allocating such payouts, the court must determine

28

1   whether to apply federal or state law.  "Federal law governs the dischargeability of debts.

2   However, the validity of a creditor's claim is determined by rules of state law."  *In re*

3   *Roussos*, 251 B.R. 86, 91 (9th Cir. BAP 2000), *citing*, *In re Berr*, 172 B.R. 299, 304 (9th

4   Cir. BAP 1994) and *Grogan v. Garner,* 498 U.S. at 283; *see also, Travelers Casualty &*

5   *Surety Co. v. Pacific Gas & Electric Co.*, 549 U.S. 443, 450-451 (2007), *quoting, Vanston*

6   *Bondholders Protective Comm. v. Green*, 329 U.S. 156 161 (1946) ("What claims of

7   creditors are valid and subsisting obligations against the bankruptcy at the time a petition

8   in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be

9   determined by reference to state law.").  Here, because the allocation of the payments to

10  Ball necessarily determines whether Ball's claims subsist against Huezo, in determining

11  the proper payment allocation, the court applies state law.

12      Under *California Civil Code* § 1479:

13  Where a debtor, under several obligations to another, does an act, by way
14  of performance, in whole or in part, which is equally applicable to two or
    more of such obligations, such performance must be applied as follows:

15  One—If, at the time of performance, the intention or desire of the debtor that
16  such performance should be applied to the extinction of any particular
    obligation, be manifested to the creditor, it must be so applied.

17  Two—If no such application be then made, the creditor, within a reasonable
18  time after such performance, may apply it toward the extinction of any
    obligation, performance of which was due to him from the debtor at the time
19  of such performance, except that if similar obligations were due to him both
    individually and as a trustee, he must, unless otherwise directed by the
20  debtor, apply the performance to the extinction of all such obligations in
    equal proportion; and an application once made by the creditor cannot be
21  rescinded without the consent of [the] debtor.

22  Three—If neither party makes such application within the time prescribed
    herein, the performance must be applied to the extinction of obligations in
23  the following order; and, if there be more than one obligation of a particular
    class, to the extinction of all in that class, ratably:

24  1.    Of interest due at the time of the performance.

25  2.    Of principal due at that time.

26  3.    Of the obligation earliest in date of maturity.

27  4.    Of an obligation not secured by a lien or collateral undertaking.

28

5.      Of an obligation secured by a lien or collateral undertaking.

From and after January 2008, Fremont made sixteen payments to Ball totaling

$282,624.27.  Based on California Civil Code § 1479, the court allocates those payments

amongst the debts owed from Huezo to Ball for the November, January, February and

March Notes as follows:

| Payment Date | Amount Paid | Allocation to November Note | Allocation to January Note | Allocation to February Note | Allocation to March Note |
|---|---|---|---|---|---|
| 1/3/08 | $3,000 | $3,000 | $0 | $0 | $0 |
| **Ruling:** The court determines that the payment should be applied to the November Investment because the payment was made before Ball made any other investments in Fremont. | | | | | |
| 2/1/08 | $3,875 | $3,000 | $875 | $0 | $0 |
| **Ruling:** The court determines that $3,000 should be applied to the November Note and $875 should be applied to the January Note because Huezo made that application by earmarking such on the check.  Plaintiff's Trial Exhibit P-28. | | | | | |
| 3/1/08 | $5,500 | $3,000 | $875 | $1,625 | $0 |
| **Ruling:** The court determines that $3,000 should be applied to the November Note, $875 should be applied to the January Note, and $1,625 should be applied to the February Note because Huezo made that application by earmarking such on the check.  Plaintiff's Trial Exhibit P-29.  Although the check does not state how much should be applied to each note, the court determines that the following amounts are appropriate because they are consistent with both the previous allocations and the payments called for in the respective notes. | | | | | |
| 4/16/08 | $9,625 | $3,208 | $3,208 | $3,208 | $0 |
| **Ruling:** The check states "460k x 5% x2", which does not correspond to any of the investment amounts (the November, January and February notes total $440,000, not $460,000).  Plaintiff's Trial Exhibit P-31.   Further, no other evidence was presented to the court regarding whether any application was made by Huezo or Ball.  The court observes that the March Note stated that its payments would commence on March 1, 2008, which is the same date that this payment was made.  Accordingly, the court determines that there is insufficient evidence regarding whether any application was made and therefore, under California Civil Code § 1479, the court applies the $9,966 ratably to all four notes, that is, $2,491.50 to each of the four notes. | | | | | |
| 5/1/08 | $9,966 | $2,491.50 | $2,491.50 | $2,491.50 | $2,491.50 |

| | | | | | |
|---|---|---|---|---|---|
| **Ruling:** The check states "460k x 5% x2", which does not correspond to any of the investment amounts (the November, January and February notes total $440,000, not $460,000). Plaintiff's Trial Exhibit P-31.   Further, no other evidence was presented to the court regarding whether any application was made by Huezo or Ball.  The court observes that the March Note stated that its payments would commence on March 1, 2008, which is the same date that this payment was made.  Accordingly, the court determines that there is insufficient evidence regarding whether any application was made and therefore, under California Civil Code § 1479, the court applies the $9,966 ratably to all four notes, that is, $2,491.50 to each of the four notes. | | | | | |
| 6/2/08 | $9,966 | $2,491.50 | $2,491.50 | $2,491.50 | $2,491.50 |
| **Ruling:** The check states "460k x2 extra", which does not correspond to any of the investment amounts (the November, January and February notes total $440,000, not $460,000).  Plaintiff's Trial Exhibit P-32.  Further, no other evidence was presented to the court regarding how the payments should be allocated.  Accordingly, the court determines that there is insufficient evidence regarding whether any application was made and therefore, under California Civil Code § 1479, the court applies the $9,966 ratably, that is, $2,491.50 to each of the four notes. | | | | | |
| 7/1/08 | $9,966 | $2,491.50 | $2,491.50 | $2,491.50 | $2,491.50 |
| **Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $9,966 ratably, that is, $2,491.50 to each of the four notes. | | | | | |
| 8/15/08 | $100,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| **Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code 1479, the court applies the $100,000 ratably, that is, $25,000 to each of the four notes. | | | | | |
| 2/1/09 | $40,726.27 - | $10,181.57 | $10,181.57 | $10,181.57 | $10,181.57 |
| **Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $40,726.27 ratably, that is, $10,181.57 to each of the four notes. | | | | | |
| 2/17/09 | $20,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| **Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $20,000 ratably, that is, $5,000 to each of the four notes. | | | | | |
| 6/1/09 | $10,000 | $2,500 | $2,500 | $2,500 | $2,500 |
| **Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $10,000 ratably, that is, $2,500 to each of the four notes. | | | | | |
| 7/31/09 | $10,000 | $2,500 | $2,500 | $2,500 | $2,500 |

| | | | | | |
|---|---|---|---|---|---|
| **Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $10,000 ratably , that is, $2,500 to each of the four notes. | | | | | |
| 6/15/10 | $5,000 | $1,250 | $1,250 | $1,250 | $1,250 |
| **Ruling:** Because the check states "1st payment in 2010", which does not clarify whether any application was made, and because no other admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $5,000 ratably, that is, $1,250 to each of the four notes.  Plaintiff's Trial Exhibit P-33. | | | | | |
| 7/14/10 | $15,000 | $3,750 | $3,750 | $3,750 | $3,750 |
| **Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $15,000 ratably, that is, $3,750 to each of the four notes. | | | | | |
| 7/20/10 | $20,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| **Ruling:** Because the check does not state any application and because no other admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $20,000 ratably, that is, $5,000 to each of the four notes. Plaintiff's Trial Exhibit P-34. | | | | | |
| 7/26/10 | $10,000 | $2,500 | $2,500 | $2,500 | $2,500 |
| **Ruling:** Because the check states "4th payment 3rd was Cashier CK #7/20", which does not clarify whether any application was made, and because no other admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $10,000 ratably, that is, $2,500 to each of the four notes. Plaintiff's Trial Exhibit P-35. | | | | | |
| **Total** | **$282,624** | **$77,364.40** | **$70,114.40** | **$69,989.40** | **$65,156.07** |

Accordingly, under California Civil Code § 1479, as to the payments discussed above, the court determines that Ball has received a total of $147,478.80 ($77,364.40 + $70,114.40) in satisfaction of the debts Huezo owes to Ball from the November and January "Investments" or loans.

In addition to the payments discussed above, Fremont paid Manuel Duran $3,500 for construction work on Ball's property, Ball received at least $27,855.29 in insurance adjuster fees, and Ball received $102,855.96 from Fremont's bankruptcy estate.  ECF 196 and 200.  Based thereupon, the court ordered that Plaintiff's damages be reduced by $134,210.58 (it appears the court made an error in calculation and the proper amount is $134,211.25).  ECF 200.  This necessarily presents the question to the court of how these particular amounts should be applied to Ball's loans, pro-rata or otherwise.

1       Regarding the insurance adjuster fees, by stipulation and order, ECF 196 and 200,

2   the court reserved ruling on whether the insurance adjuster fees should offset Ball's

3   damages by an additional amount of $18,105.93.  The court determines that Huezo has

4   failed to demonstrate that Ball received an extra $18,105.93 in insurance adjuster fees

5   and therefore, as to the insurance adjuster fees, the court limits the offset to Ball's

6   damages by $27,855.29.  Further, regarding the $27,855.29 that Ball received in

7   insurance adjuster fees and the $3,500 that Fremont paid Manuel Duran for construction

8   work on Ball's property, no evidence was presented to the court regarding whether any

9   application under California Civil Code § 1479 was made.  Therefore, the court

10  determines that under California Civil Code § 1479, both amounts should be allocated

11  ratably; that is, $7,838.82 should be applied to the November, January, February and

12  March loans.

13      Regarding the $102,855.96 payment from Fremont's bankruptcy estate to Ball, the

14  court determines that because the payment is an involuntary payment and because Ball

15  has elected to apply the payment to the dischargeable portion of his debt, that is, to the

16  January Investment and the "Las Vegas" and "Los Angeles" Investments, Supplemental

17  Brief On Payment Allocation Issue, ECF 209 at 5, the payment should be applied to

18  those debts.  Under *In re Gerwer*, 253 B.R. 66 (9th Cir. BAP 2000) a bankruptcy

19  distribution by a Chapter 7 trustee to a creditor is an involuntary payment.  253 B.R. at

20  70-71.  Accordingly, under California Civil Code § 1479, neither the debtor nor the trustee

21  may direct the allocation of that payment and therefore, Ball can.  *See also*, *In re*

22  *Stanmock, Inc.*, 103 B.R. 228, 234 (9th Cir. BAP 1989) ("[T]he majority of courts have

23  found that payment in the context of a judicial proceeding, including bankruptcy, should

24  be treated as involuntary.").  Based thereupon, the court determines that the $102,855.96

25  payment from Fremont's bankruptcy estate to Ball is allocated to the dischargeable

26  portion of Ball's debt and not to either the November or January "Investments" or loans.

27

28

1     **VI.**      **Ball is Owed Interest under the California Prejudgment Rate, Not the**

2                **Interest Rate Set Forth in the Promissory Notes and the Investor**

3                **Activity Reports**

4          Because Ball's claims are based on Huezo's fraudulent misrepresentations that

5 Ball's investments would be used to fund secured loans and thus, sound in tort and not in

6 contract, in determining whether Ball is owed interest on any of his loans to Fremont, the

7 court does not apply the 15% interest rate set forth in the investor activity reports and the

8 promissory notes.

9          Under California Civil Code § 3287(a), "A person who is entitled to recover

10 damages certain, or capable of being made certain by calculation, and the right to

11 recover which is vested in the person upon a particular day, is entitled also to recover

12 interest thereon from that day, except when the debtor is prevented by law, or by the act

13 of the creditor from paying the debt." Under California Civil Code § 3287(c), "Unless

14 another statute provides a different interest rate . . . interest shall accrue at a rate equal

15 to the weekly average one year constant maturity United States Treasury yield, but shall

16 not exceed 7 percent per annum." California Civil Code § 3287(a) prejudgment interest

17 may be awarded in tort actions. *See, e.g., Levy-Zentner Company v. Southern Pacific*

18 *Transportation Company*, 74 Cal.App.3d 762, 798 (1977).

19          Here, Huezo could have computed the amount of damages based on the

20 difference between what Ball invested and what Fremont owed Ball. Further, the right to

21 recover was vested in Ball on the day that Fremont/Huezo used the money from Ball's

22 loans to fund unsecured loans by Fremont to borrowers rather than the secured loans as

23 Huezo promised Ball. Accordingly, the court determines that for the debts of Huezo

24 determined to be nondischargeable, Ball is entitled to prejudgment interest at a rate equal

25 to the weekly average one year constant maturity United States Treasury yield, but shall

26 not exceed 7 percent per annum commencing on the day that Fremont/Huezo used Ball's

27 loan to fund unsecured loans. In this regard, despite the usurious nature of Ball's loans

28

to Fremont, the court does not apply the general rule for usurious loans to allow recovery of principal, plus interest at the legal rate from the date of maturity of the loan, but applies an estoppel against Huezo based on his fraudulent conduct to start the date of accrual of interest at the legal rate for prejudgment interest from as early as the dates that the wrongful conduct occurred, the dates when Fremont made the unsecured loans to borrowers with Ball's money in disregard of Huezo's representations to Ball that only secured loans would be made to borrowers.  Ball may choose a later date, such as the dates of maturity of the November and January notes if he is unable to establish earlier dates.

## VII.    Conclusion

Based on the previous analysis and allocations, the court determines that the sum of $147,478.80, $7,838.82 and $7,838.82, which equals $163,364.78, should be applied to the debt of $310,000.00 that Huezo owes to Ball for the losses from the November and January Investments or loans induced by his fraudulent misrepresentations.  Therefore, the court determines that Huezo owes Ball a nondischargeable debt in the amount of the difference between $310,000.00 and $163,364.78, which is $148,635.22, plus prejudgment interest under California Civil Code § 3287(a).

///

///

///

1    Counsel for Ball is ordered to lodge a proposed final judgment consistent with this

2  memorandum decision and file a declaration in support of Ball's computations of

3  prejudgment interest within 30 days of entry of this memorandum decision and order.

4    IT IS SO ORDERED.

5                                        ###

Date: September 30, 2016

                                        _____
                                        Robert Kwan
                                        United States Bankruptcy Judge