1  PAUL C. BAUDUCCO, ESQ., SBN 119512
   NICHOLAS KANTER, ESQ., SBN 239436
2  LEWITT, HACKMAN, SHAPIRO,
      MARSHALL & HARLAN
3  16633 Ventura Boulevard, 11th Floor
   Encino, California 91436-1865
4  Telephone:  (818) 990-2120
   Telecopier:  (818) 981-4764
5
   Attorneys for Plaintiff JOEY BALL
6

7              **UNITED STATES BANKRUPTCY COURT**

8              **CENTRAL DISTRICT OF CALIFORNIA**

9                 **LOS ANGELES DIVISION**

10  In re                          )  **CASE NO:  2:11-BK-35922-RK**
                                    )
11  VICTOR HUEZO                    )  **CHAPTER 7**
                                    )
12              Debtor.             )  **ADV. NO.  2:11-ap-02825-RK**
                                    )
13  _____ )  **SECOND AMENDED FINDINGS OF**
                                    )  **FACT (WITH TRIAL TRANSCRIPT**
14                                  )  **CITATIONS)**
                                    )
15  JOEY BALL,                      )  **The Honorable Robert N. Kwan**
                                    )
16              Plaintiff,          )  **Trial: April 17, 18, 24 and 25**
                                    )  **Place: Courtroom 1675**
17      vs.                         )
                                    )
18  VICTOR HUEZO,                   )
                                    )
19              Defendant.          )
                                    )
20  _____ )

21

22

23          Plaintiff Joey Ball ("Ball") hereby submits the prior Second Amended

24  Findings of Fact updated with Trial Transcript Citations.

25  / / /

26  / / /

27  / / /

28  / / /

*Law Offices*
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

I.    **FINDINGS OF FACT**

A.    **Ball's Background**

1.    Ball grew up in La Crescenta, California.  Ball owns and operates tanning salons, having opened or purchased six (6) locations between 1995 and 2006.  Ball currently operates two (2) tanning salons in Sunland and Montrose. Since 1995, the tanning salons have been, and remain, Ball's primary source of income. (Joey Ball Trial Declaration ("Ball Declaration"), ¶ 2).

2.    On March 2, 1993, Ball obtained a California Real Estate Salespersons license.  Ball placed his license with ERA Castle Realty until September 2, 1994, when his real estate license was suspended because Ball did not complete continuing education requirements.  Ball did not complete any real estate transactions while working under ERA Castle Realty's license. (Ball Declaration, ¶ 3).

3.    Ball retook the real estate license examination and received another real estate salesperson's license on October 26, 2005.  From October of 2005 until July of 2007, Ball placed his real estate license with Property Masters Realty. During this period Ball did not complete any real estate transactions. (Ball Declaration, ¶ 4).

B.    **Ball's Relationship with Huezo and Curtis Hayden**

4.    Ball went to Crescenta Valley High School with Huezo's older brother, Juan Huezo.  Through Juan Huezo, Ball has known the Huezo family for nearly 25 years, although he was not friends with Huezo until late 2006, when Huezo began playing golf with Ball and his friends, including Eric Heldwein ("Heldwein") and Curtis Hayden ("Hayden").  (Ball Declaration, ¶ 5; Trial Testimony ("Transcript"), 4/17, 98:5-103:10[1]).

---

[1] "4/17" refers to the date of the testimony, i.e. April 17th, "__:__" references are to "Page:Line in deposition or trail transcripts .  This format will be followed for all other trial testimony references.

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

5.      Hayden was a real estate agent who hung his license at Property Masters Realty with Ball.  Hayden handled the sale of an apartment building for Ball in late 2006.  Through this transaction and their friendship, Hayden knew that Ball had accumulated over a million dollars through his business and real estate transactions.  Hayden was Huezo's friend years before meeting Ball, having known Huezo since junior high school and playing football with Huezo in high school. Hayden brought Huezo and Ball together in late 2006.  (Ball Declaration, ¶¶ 5 and 7; Transcript, 4/17, 135:1-137:22; 200:21-202:5; Curtis Hayden Trial Declaration ("Hayden Declaration"), ¶¶ 3, 5 and 6; Transcript, 4/25, 6:2-7:1, 8:21-10:3, 12:2-9).

## C.      Huezo's Representations Concerning Fremont's Lending Business

6.      Huezo has been involved in commercial lending since the late 1990's and, by 2006, had extensive experience with commercial lending.  (January 24, 2013 Deposition of Victor Huezo (Exhibit P52[2]) ("Huezo Deposition"), 27:13-31:12; Huezo Trial Declaration ("Huezo Declaration"), ¶¶ 5-12; Transcript, 4/24, 143:6-20).

7.      In late 2006 and early 2007 Huezo began telling Ball about his company, Fremont Investment Holdings, Inc. ("Fremont"), which Huezo said was very profitable.  Huezo told Ball Fremont was a real estate brokerage and lender. (Ball Declaration, ¶ 6, Transcript, 4/17, 114:3-122:24).

8.      In 2007 Huezo was an owner of Fremont, along with Vahe Jordan ("Jordan").  Huezo was Fremont's Executive Vice President and CEO.  Huezo handled all of the accounting functions for Fremont.  This included managing its accounts, wiring of Fremont funds and signing Fremont checks. Huezo acquired a real estate salespersons license and, later, a real estate broker license.  Huezo also acquired a California Department of Corporations Finance Lender License for

LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
Law Offices
A LAW CORPORATION

---

[2] Exhibit references are identified as they are listed in Ball's and Huezo's Trial Exhibit Registers.

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

1    Fremont. (Huezo Deposition (Exhibit P52), 14:12-21:17, 36:21-40:10, 51:6-52:2,

2    58:3-60:19; Huezo Declaration, ¶¶ 11, 16 and 20; Transcript, 4/24, 130:11-135:19,

3    143:6-20).

4         9.    In 2007, Hayden began suggesting that Ball move his real estate

5    license to Fremont with him. (Ball Declaration, ¶ 7; Transcript, 4/17, 135:20 -

6    137:22, 200:21-203:20).

7         10.   From late 2006 to mid-2007, during their golf outings, Huezo began

8    telling Ball about Fremont's lending business.  Huezo told Ball (1) Fremont had

9    been making a lot of money on loans; (2) Fremont was getting a "lender's license"

10   which would allow it to "guarantee" loans; (3) Fremont had other "investors" who

11   had already invested much more money than Huezo was asking from Ball and

12   would continue to put much more money into Fremont; and (4) these other

13   investors would buy out Ball's investment if he wanted his money back for any

14   reason.  Huezo went into great detail how the loans would be secured by real

15   property, substantial collateral and all the assets of Fremont.  Huezo told Ball that

16   there was little or no risk to the loans and that Ball would be paid a 15% return on

17   his "investment" in Fremont. (Ball Declaration, ¶ 6, Transcript, 4/17, 114:3–

18   122:10, 126:5-139:13).

19        11.   On or about July 5, 2007, Huezo provided Ball with written materials

20   describing Fremont's loan program, stating that "guaranteed" monthly payments to

21   Fremont's "investors" would be at interest rates of 8.5% to 15%, with loans

22   "ideally" at the 15% rate.  (Exhibits P1 and P2; Ball Declaration, ¶ 8; Transcript,

23   4/17, 139:14-143:7 144:12-162:6; Transcript, 4/24, 135:20-139:20).

24        12.   In deciding to loan Fremont money for its lending program, Ball also

25   relied on the written representations in the Fremont loan program materials

26   (Exhibit P2), including the following:

27        a.    "Investor does a note with a guarantee [sic] monthly payment

28        from Fremont Investment Holdings Inc. for the money lent out to borrowers.

LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
*Law Offices*
A LAW CORPORATION

This money is paid back with a guaranteed monthly or quarterly interest payment from Fremont Investment Holdings Inc.  The investors have their money secured by the assets and collateral Fremont Investment Holdings Inc. holds from the various loans made to borrowers.  Depending on the risk associated with the loan being made the guaranteed monthly payment is going to range between 8.5% and 15%." (Exhibit P2:3[3]).

b.    "For example: If a loan is made on a personal residence secured by a deed of trust along with a personal guarantee, the guaranteed monthly payment might be somewhere between 8.5% to 10% if the LTV is 75% or less and the borrowers credit score is around 685.  However, if we have a borrower with a credit score of 600 and a LTV of 85% the guaranteed monthly payment might be between 10% to [sic] 15% depending on finance laws." (Exhibit P2:3).

c.    "In order for investors to analyze their risk and reward an activity report is sent out to all investors prior to processing any loans.  The activity report is going to outline what loans are being made and at what rate the investors are getting paid at. (Please refer to activity report.)" (Exhibit P2:3).

d.    Activity Report format, describing the type and amount of loans, proposed interest rate, total debt owed and collateral value for loans being proposed. (Exhibit P2:13).

e.    Activity Report language stating "Here is a list of the proposed loans we are going to close this week.  In order, [sic] to issue credit to our clients we will need to know your commitment in funding these loans.  Please take a few moments to fax back your commitment.  Priority on [sic] to the loan commitments will be based on a first come, first serve basis." (Exhibit P2:13).

---

[3] Exhibit page references are "__:__", for example "P2:3" refers to Exhibit P2, page 3.

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

f.    "*Question 1: How are investors paid out completely.* [sic] Answer: Most investors are paid within 12 months or when the loans made come due.  If an investor needs a portion of their money prior to the 12 months or any of the loans coming due, a new investor either purchase [sic] existing debt or Fremont Investment Holdings Inc. pays the investor off." (Exhibit P2:16).

g.    "*Question 4: How do we know what assets Fremont Investment Holdings Inc. has as collateral to protect the investor's money?* Answer: A balance sheet showing assets and liabilities will be sent to all investors on a quarterly basis." (Exhibit P2:16).

h.    "*Question 5: How do we recover our money from clients who cannot pay their debts back?* Answer: The loan is made to Fremont Investment Holdings Inc. not directly to the client.  It is the responsibility of Fremont Investment Holdings Inc. to pay all investors back within the time frames set.  In order, to lower the risk we spread our liabilities with clients and limit our exposure to any single client." (Exhibit P2:16).

i.    "*Question 6: What happens if Fremont Investment Holdings Inc. does not get payments from clients for a loan made?* Answer: The investor is lending the money to Fremont Investment Holdings Inc., therefore payments to investors must be made according to the terms agreed on." (Exhibit P2:16).

j.    "*Question 7: Why does Fremont Investment Holdings Inc. send an Activity report* [sic] *if the investor is not buying that specific loan or loans?* Answer: The reason for the activity report is to determine the guaranteed monthly payment to the investors.  This way they can see for themselves what loans are being made and why the guaranteed interest rate is more or less than the last deal they did." (Exhibit P2:16).

(Ball Declaration, ¶¶ 6 and 8; Transcript, 4/17, 139:14-143:7 144:12-162:6).

*Law Offices*
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

### D.  **Keenan Towns Promissory Note**

13.    In August of 2007, after Huezo had already begun soliciting "investments" from Ball for Fremont's lending business, Keenan Towns ("Towns") asked to borrow $120,000 from Ball for a short period of time.  Towns, a friend of Ball, proposed an annual interest rate of 20% and prepared a promissory note (the "Towns Note") in favor of Ball, for $120,000 at 20% interest.  Ball did not, in any way, suggest the 20% interest rate, and did not participate in the preparation of the Towns Note.  When Towns failed to repay the loan in a timely fashion, Ball agreed to accept payment of the principal only and Towns finally paid Ball the balance of the principal in 2012.  Towns never paid Ball any interest on the Towns Note.  Other than the Towns loan and promissory note, Ball did not make loans and was not "in the business" of loaning money.  Ball was not involved in and did not have experience as commercial lender or loan officer.  Ball never told Huezo he was a "hard money lender" or that he was in the "business of making loans".  (Exhibit P3; Ball Declaration, ¶ 9; Transcript, 4/17, 87:13-98; 4/25, 64:2-12; Transcript, 4/25, 41:5-48.8).

14.    In August of 2007, Ball was unaware that the interest rate Towns had put in the Towns Note was usurious.  Ball did not learn about usurious interest rates until Huezo raised the issue as a defense to Ball's claims in litigation. (Exhibit P3; Ball Declaration, ¶ 10).

### E.  **Ball's Loans to Fremont/Fremont's Payments and Defaults**

15.    On November 8, 2007, Fremont obtained a California Finance Lenders License. (Ball Declaration, ¶ 11; Huezo Trial Declaration ("Huezo Declaration"), ¶ 47).

16.    On or about November 26, 2007, Huezo solicited a loan from Ball, sending him a Fremont "Investor Activity Report" ("November Report").  The November Report said Fremont was in the process of closing four (4) "Secured" loans totaling $240,000, to borrowers with cumulative collateral worth

Law Offices
LEWITT, HACKMAN, SHAPIRO, MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT PRINTED ON RECYCLED PAPER]

"$1,580,000", at a proposed interest rate of 15% per loan.  Huezo, who prepared the November Report, incorrectly added the proposed loan total, stating the "Total loans" to be $240,000, when the actual total of the loans listed was $290,000. (Exhibit P4; Ball Declaration, ¶ 11; Transcript, 4/17,162:7-167:8, 177:3-12; Huezo Deposition (Exhibit P52), 88:5-96:20; Huezo Declaration, ¶¶ 109 and 110; Transcript, 4/24, 139:21-141:22, 143:23-143:5).

17.    In conversations with Ball, Huezo confirmed what the November Report said, i.e. that the $240,000 loan was intended for the "secured" loans outlined in the November Report, which would be collateralized by real property with more than enough collateral to secure the loans.  According to the November Report, the loans forecast were for November 20, 2007 (Exhibits P4 and P6; Ball Declaration, ¶ 11; Transcript, 4/17, 124:12-127:23, 163:14-167:8).

18.    Ball, relying on Huezo's written and verbal representations regarding the $240,000 in secured loans, immediately completed the "commitment" section of the November Report agreeing to provide Fremont the requested $240,000 and faxed it back to Huezo.  Ball then provided Fremont with the $240,000 solicited by Huezo. (Exhibits P7 and P8; Ball Declaration, ¶¶ 12, 13 and 14; Transcript, 4/17, 112:14-115:10, 118:9-127:23, 129:5-135:19, 129:5-135:19, 138:11-143.7,  144:12-148-8,155:25-159:16, 159:22-162:24, 163:14-167:8, 172:12-175:16, 177:3-12).

19.    In late November or early December of 2007, Huezo prepared and hand delivered to Ball, a $240,000 promissory note from Fremont, dated November 28, 2007 ("November Note"), which provided for annual interest of 15%, monthly payments of $3,000 (equal to "interest only" payments at 15% per annum) to Ball and a maturity date of January 1, 2009.  (Exhibit P9; Ball Declaration, ¶¶ 12, 13 and 14; Transcript, 4/17, 213:1-214:21; Huezo Deposition (Exhibit P52), 117:4-118:16; Transcript, 4/24, 175:12-177:2).

20.    Huezo and Fremont kept Ball's $240,000 but did not fund the "secured" loans identified in the November Report.  Instead, Huezo and Fremont,

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT PRINTED ON RECYCLED PAPER]

1   without any notice to Ball, used the $240,000 for other purposes. (Ball Declaration,

2   ¶13; Huezo Deposition (Exhibit P52), 55:20-25, 88:5-105:13, 106:4-110-21;

3   Huezo Declaration, ¶¶ 88, 109-113; Transcript, 4/24, 143:21-149:5, 149:14-175:1).

4          21.    Huezo's testimony about who the borrowers listed in the November

5   Report is not supported by the evidence because Huezo failed to provide the loan

6   documents showing how any of the purported loans matched up with the timing of

7   the November Report, or the loan amounts, debt and collateral shown on the

8   November Report:

9          a.     The only credit application for Gemini Security produced by

10  Huezo at trial was a one page "U.S. Gate Supply" credit application, dated

11  October 24, 2007, and Huezo failed to provide any information or

12  documents matching the loan amount, debt or collateral shown in the

13  November Report. (Exhibits P6 and D26:1; Huezo Declaration, ¶ 244;

14  Transcript, 4/24, 149:14-157:14).

15         b.     The Gemini Security loan was for $43,000, not matching any of

16  the listed "secured" loan amounts in the November Report, and was not

17  secured by real property or any other collateral. (Exhibit P6; Huezo

18  Declaration, ¶¶ 155, 244 and 245; Transcript, 4/24, 149:14-157:14).

19         c.     The Janet Smith loan for $50,000 was based on a loan

20  application dated November 30, 2007, ten days after the November 20, 2007

21  date listed in the November Report and four days after the November Report

22  had been sent to Ball on November 26, 2007. (Exhibits D22:18-21, P4, and

23  P6; Ball Declaration, ¶ 11; Huezo Declaration, ¶ 232; Transcript, 4/24,

24  149:14-157:14).

25         d.     Huezo failed to provide any information or documentation

26  relating to the Janet Smith loan matching the debt or collateral shown on the

27  November Report. (Exhibits D22:18-21, P4, and P6; Huezo Declaration, ¶

28  232; Transcript, 4/24, 149:14-157:14).

*Law Offices*
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

e.      The Edelmira Cruz loan was an unsecured loan for $2,000, not matching any of the "secured" loan amounts in the November Report and, notwithstanding Huezo's testimony that Edelmira Cruz applied for a $50,000 loan, no application for such an amount was produced at trial. (Exhibits D32:1-7 and P4; Ball Declaration, ¶11; Huezo Declaration, ¶ 234; Transcript, 4/24, 166:3–172:21).

f.      The only Edelmira Cruz application provided by Huezo was dated December 4, 2007, fourteen (14) days after the November 20, 2007 date in the November Report and eight (8) days after the November Report had been sent to Ball. (Exhibits D23:7 and P4; Ball Declaration, ¶ 11; Huezo Declaration, ¶ 234; Transcript, 4/24, 166:3–172:21).

g.      The Inocencio Rodriguez loans for $175,000 and $250,000 cited by Huezo do not match the loan amounts in the November Report and the only loan application produced by Huezo was dated December 7, 2007, seventeen (17) days after the November 20, 2007 date in the November Report and eleven (11) days after the November Report was sent to Ball on November 26, 2007. (Exhibits P4 and D24:1-31; Ball Declaration, ¶ 11; Huezo Declaration, ¶¶ 109, 110, 112, 150, 238 and 240; Transcript, 4/24, 159:13-166:2).

h.      Huezo failed to produce any loan documentation which confirmed his alleged underwriting of the purported loans matching the timing of the November Report, or matching the debt and collateral numbers in the November Report.  (Exhibits P4 and D24:1-31; Huezo Declaration, ¶¶ 109, 110, 112, 150, 155, 232, 234, 238, 240, 244 and 245; Transcript, 4/24, 149:14-172:21).

22.    On January 3, 2008, Fremont paid Ball $3,000 as called for in the November Note.  (Exhibit P27; Ball Declaration, ¶ 15).

Law Offices
LEWITT, HACKMAN, SHAPIRO, MARSHALL & HARLAN
A LAW CORPORATION

\\Fs1\apps\lhsmh\KLE\14404-2\1205614_2.doc

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

[THIS DOCUMENT PRINTED ON RECYCLED PAPER]

23. On January 8, 2008, Huezo solicited a loan from Ball, emailing him a Fremont "Investor Activity Report", dated January 8, 2007 [sic] ("January Report"). The January Report said Fremont was in the process of closing two (2) "Secured" loans, which were "Ready to fund", totaling $70,000, to borrowers with cumulative collateral worth "$790,000", at a proposed interest rate of 15% per loan. (Exhibits P10 and P11; Ball Declaration, ¶ 16; Transcript 4/17, 177:15-178:6; 186:5-191:14 ; Huezo Declaration, ¶ 108; Transcript, 4/24, 194:7-196:11).

24. Huezo used the November Report to produce the January Report, which is why the date stated January 8, 2007 instead of January 8, 2008. (Exhibits P4 and P10; Huezo Deposition (Exhibit 52), 129:12-130:13; Huezo Declaration, ¶ 108).

25. In conversations with Ball, Huezo confirmed that the $70,000 would fund the "Secured" "Ready to fund" loans outlined in the January Report, the loans to be secured by real property. (Exhibits P10 and P11; Ball Declaration, ¶16; Transcript, 4/17, 177:15-179:25).

26. Ball, relying on Huezo's written and verbal representations concerning the $70,000 in secured loans, immediately completed the "commitment" section of the January Report agreeing to provide Fremont the requested $70,000. Ball then provided Fremont with the $70,000 solicited by Huezo, $40,000 on January 9, 2008 and $30,000 on January 11, 2008. Huezo then prepared and provided Ball with a $70,000 promissory note from Fremont, dated January 8, 2008 ("January Note"), which provided for annual interest of 15%, monthly payments of $875 (equal to "interest only" payments at 15% per annum) to Ball and a maturity date of February 1, 2009. (Exhibits P11, P12 and P13; Ball Declaration, ¶¶17 and 19; Transcript, 4/17, 177:15-179:25; 214:22-215:18; Huezo Deposition (Exhibit P52), 133:12-134:16; Transcript, 4/24, 177:4-25; 196:12-197:24).

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

27.    Huezo and Fremont kept the $70,000 but did not fund the two (2) "Secured" "Ready to fund" loans identified in the January Report.  Instead, Huezo and Fremont, without any notice to Ball, used the $70,000 for other purposes, including a $30,000 payment by Fremont to Huezo on January 14, 2008.  Ball wired $30,000 into Fremont's account on Friday, February 11, 2008, and Fremont wire transferred the funds into Huezo's account on Monday, February 14, 2008, the first day the funds were available to Fremont.  Huezo's Trial Declaration, shows no commissions due to him from Fremont in January of 2008.  (Trial Declaration of Adrian Stern ("Stern Declaration"), ¶ 17C; Stern Expert Report (Exhibit P53), Exhibit B, Page 2; Ball Declaration, ¶ 18; Transcript, 4/24, 27:10-36:17;  Huezo Deposition (Exhibit P52), 55:20-25; Huezo Declaration, ¶¶ 88, 194-197; Transcript, 4/24, 146:8-149:5:).

28.    Huezo's testimony about who the borrowers listed in the January Report is not supported by the evidence because Huezo failed to provide the loan documents showing how any of the purported loans matched up with the timing of the January Report, or the two "Secured" "Ready to fund" loans with respect to loan amounts, debt and collateral:

a.    The Robert Gray DBA TGK Enterprises loan for $46,000 was unsecured by real property or any other collateral. (Exhibits P10; Huezo Declaration, ¶¶ 114, 163, 164, 248, 249; Transcript, 4/24, 194:7-196.11).

b.    The only loan application for the Robert Gray DBA TGK Enterprises loan for $46,000 provided by Huezo is unsigned and lacks any documentation verifying the income and assets purportedly included therein. (Exhibit D26:2-6; Huezo Declaration, ¶¶ 114 and 248; Transcript, 4/24, 194:7-196.11).

c.    The Robert Gray DBA TGK Enterprises loan for $46,000 was not funded until April 11, 2008 in the sum of $35,000, more than a month

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

after the January Report said the $40,000 loan was "Ready to fund". (Huezo Declaration, ¶¶ 163 and 164).

       d.    Huezo failed to produce any loan documentation confirming his alleged underwriting of the Robert Gray DBA TGK Enterprises loan, or which matched the debt and collateral numbers in the January Report. (Exhibits P10 and D26:2-6; Huezo Declaration, ¶¶ 114 and 248; Transcript, 4/24, 194:7-196.11).

       e.    The Eugenia Duran loan for $40,000 was unsecured by real property or any other collateral when made on May 20, 2008, nearly four (4) months after the January Report said the $30,000 loan was "Ready to fund". (Exhibits P10; Huezo Declaration, ¶¶ 116, 166 and 256; Transcript, 4/24, 196:12-197:24).

       f.    Huezo failed to produce any loan documentation confirming his alleged underwriting of the Eugenia Duran loan, or which matched the debt and collateral numbers in the January Report. (Exhibits P10; Huezo Declaration, ¶ 256; Transcript, 4/24, 196:12-197:24).

29.    On January 30, 2008, Huezo solicited a loan from Ball, sending him an email saying "I also have two deals that I am closing out this week if you want to do them. It is for a total of $130,000 at the 15% rate. Let me know if you can do them." (Exhibit P17; Ball Declaration, ¶ 20; Transcript, 4/17, 194:12-200:20; Transcript, 4/24, 197:25-198.18).

30.    In conversations with Ball, Huezo led Ball to believe the "two deals" for $130,000, like the loans in the November and January Reports, would be "secured" loans. (Exhibit P17; Ball Declaration, ¶ 20; Transcript, 4/17, 194:12-200:20).

31.    On February 1, 2008, Fremont paid Ball $3,875 as called for in the November and January Notes. (Exhibit P28; Ball Declaration, ¶22).

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

*Law Offices*
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

32.   On February 1, 2008, Ball, in reliance on Huezo's email and verbal representations, provided Fremont with the $130,000 solicited by Huezo.  Huezo then prepared and provided Ball with a $130,000 promissory note from Fremont, dated February 1, 2008 ("February Note"), which provided for annual interest of 15%, monthly payments of $1,625 (equal to "interest only" payments at 15% per annum) to Ball and a maturity date of February 1, 2009.  (Exhibits P17, P18 and P19; Ball Declaration, ¶¶ 21 and 23, Transcript, 4/17, 194:12-200:20; Huezo Deposition (Exhibit P52), 138:10-140:23; Transcript, 4/24, 177:4-2, 197:25-198.18).

33.   Huezo and Fremont kept the $130,000 but did not fund the two (2) loans referred to in the email.  Instead, Huezo and Fremont, without any notice to Ball, used the $130,000 for other purposes. (Ball Declaration, ¶24; Huezo Deposition (Exhibit P52), 55:20-25, 135:12-138:3; Huezo Declaration, ¶ 88; Transcript, 4/24, 146:8; 197:25-198:18).

34.   On March 1, 2008, Fremont paid $5,500 to Ball as called for in the November, January and February Notes. (Exhibit P29; Ball Declaration, ¶ 25).

35.   During February and March of 2008, Huezo solicited a loan from Ball to fund a "Vegas" deal for Martin "Marty" Romano and a "Los Angeles" deal to fund an egg farm, for which Ball loaned Fremont $404,750.  Huezo told Ball that both loans would be secured by real property and that the Romano loan, which was by far the largest portion of the money Fremont would be lending ($367,250), would be secured by real property with equity far in excess of the money being loaned by Fremont. (Exhibits P20, P21, P22, P23 and P37; Ball Declaration, ¶26; Transcript, 4/17, 216:9-231:11; Transcript, 4/24, 199:3-201:12).

36.   On March 26, 2008, Ball, in reliance on Huezo's written and verbal representations concerning the secured "Vegas" and "Los Angeles" deals, wired $404,750 to Fremont for the "Vegas" and "Los Angeles" deals which Huezo had represented the funds would be used for.  Despite receipt of these funds, Huezo did

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

1  not provide Ball with a promissory note reflecting the loan until early 2010 when

2  Ball realized he had not received the promissory note and requested it.  (Exhibit

3  P26; Ball Declaration, ¶¶27, 28 and 34; Transcript, 4/17, 216:9-220:23; Transcript,

4  4/24, 199:3-201:12).

5       37.    Huezo and Fremont kept the $404,750 but did not fund the larger of

6  the two (2) deals referred to in his emails.  Instead, Huezo, without any notice to

7  Ball, used at least $367,250 of the $404,750 for other purposes, including

8  purportedly funding a $460,000 loan by Huezo to Fremont.  In May of 2008,

9  Huezo confirmed that the "Vegas Deal" had not closed, sending Bonnie Romano

10  an email saying "I finally was able to place the funds I had ready for your loan

11  with another client.  I know things happen but can you please tell me what you

12  ended up doing or who did your loan." (Exhibit P38; Ball Declaration, ¶28;

13  Transcript, 4/25, 70:16-72:9; Huezo Deposition (Exhibit P52), 55:20-25, 154:2-

14  173:7, 175:8-182:11; Huezo Declaration, ¶¶88 and 297; Transcript, 4/24, 206:20-

15  209:20).

16       38.    In July of 2008, Huezo continued to misrepresent that Fremont had

17  funded the "secure" "Vegas Deal".  When Ball questioned where his $404,750 had

18  gone, Huezo provided Ball with a copy of the June 2, 2008 check from Fremont to

19  Ball for $9,966.00, with handwritten notes purporting to explain how his loan to

20  Fremont had been used.  (Exhibit P32)  Using the handwritten notes on the copy of

21  the check, Huezo falsely represented to Ball that the "Vegas Deal" had gone

22  forward, including "pre-paid interest" of "$55,250".  Huezo also falsely

23  represented how the difference between the $367,250 loan to the Romanos (the

24  "Vegas Deal") and the $404,750 loan went into the "egg deal". (Exhibit P32; Ball

25  Declaration, ¶ 30; Transcript, 4/18, 31:22-33:9; 4/25, 31:22-33:9, 70:16-72:9).

26       39.    Ball never suggested the 15% annual interest rate on his loans to

27  Fremont.  The 15% interest rate was proposed by Huezo verbally, in the Fremont

28  lending program materials (Exhibit P2), November and January Reports (Exhibits

*Law Offices*
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

P6 and P11), emails (Exhibit P17) and Promissory Notes, all of which were prepared by Huezo on behalf of Fremont. (Exhibits P9, P16, P19 and P44)  Nor did Ball ever tell Huezo, or anyone else at Fremont, that he would only loan Fremont money at the 15% per annum interest rate. There are no documents, including letters, emails or text messages, showing Ball proposing a 20% interest rate or demanding a minimum interest rate of 15% on his loans to Fremont. (Exhibits P4, P6, P9, P10, P11, P16, P17, P44; Ball Declaration, ¶¶ 8, 11, 14, 16, 19, 20, 23, 35 and 41; Transcript, 4/25, 64:13-65:2; Huezo Deposition (Exhibit P52), 118:19-122:11; Transcript, 4/24, 172:22-193:17).

40.     Ball did not participate, in any way, in the drafting of the promissory notes reflecting his loans to Fremont.  Huezo prepared all of the promissory notes reflecting Ball's loans to Fremont, which were the standard Fremont form of promissory note used in multiple third party loans by Fremont. There are no documents, including letters, emails or text messages, showing Ball was in any way involved in drafting the promissory notes. (Exhibits P1, P2, P4, P5, P6, P9, P10, P51:1-6, 15-18, 28-29; Ball Declaration, ¶¶ 14, 19, 23 and 35; Transcript, 4/25, 64:13-65:2; Huezo Deposition (Exhibit P52), 118:19-122:11; Transcript, 4/24, 172:22-193:17; 4/25, 34:3-49:9).

41.     Ball never suggested that the $404,750 be loaned to Huezo personally, nor did he ever agree to such a loan. There are no letters, emails or text messages showing Ball asked Huezo to borrow the $404,750 personally. (Exhibits P44; Ball Declaration, ¶¶ 27 and 28; Transcript, 4/25, 70:16-72:9; Transcript, 4/24, 202:1-203:4).

42.     On November 19, 2010 Huezo, as the Executive Vice President and CEO of Fremont, sent Ball a letter confirming Ball's $844,750 in loans to Fremont and, with some errors, Fremont's payments to Ball through July of 2010.  The letter correctly stated the amounts and dates of Ball's loans to Fremont, including the $404,750 loan from March of 2008, but omitted a June 15, 2010 payment from

LEWITT, HACKMAN, SHAPIRO, MARSHALL & HARLAN
Law Offices
A LAW CORPORATION

[THIS DOCUMENT PRINTED ON RECYCLED PAPER]

\\Fs1\apps\lhsmh\KLE\14404-2\1205614_2.doc

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

1    Fremont while overstating Fremont's payments to Ball by $5,000, the correct total

2    being $282,624.27, not the $287,624.27 set forth in the letter.  (Exhibit P49; Stern

3    Declaration, ¶ 17E; Stern Expert Report (Exhibit P53), Exhibit A; Ball

4    Declaration, ¶¶ 36 and 37; Transcript, 4/25, 72:10-19; Transcript, 4/25, 17:14-

5    18:2).

6            43.    Ball never agreed to waive principal or interest payments on his

7    promissory notes from Fremont as consideration for Huezo "personally" borrowing

8    the $404,750 from Ball, or for any other reason.  There are no letters, emails or text

9    messages showing Ball agreeing to waive principal or interest payments on the

10   November, January and February Notes. (Exhibits P9, P16, P19, P39, P40, P41,

11   P42, P43, P44 and P49; Ball Declaration, ¶¶ 27, 28, 30, 35, 38, 39 and 40;

12   Transcript, 4/25, 70:16-72:9; Transcript, 4/24, 216:7-15).

13           44.    From and after March of 2008, Fremont made the following payments

14   to Ball on the four loans Ball had made:

15           -April 16, 2008, $9,625 (Exhibit P30)

16           -May 1, 2008, $9,966 (Exhibit P31)

17           -June 2, 2008, $9,966 (Exhibit P32)

18           -July 1, 2008, $9,966

19           -August 15, 2008, $100,000

20           -February 1, 2009, $40,726.27

21           -February 17, 2009, $20,000

22           -June 1, 2009, $10,000

23           -June 15, 2010, $5,000 (Exhibit P33)

24           -July 31, 2009, $10,000

25           -July 14, 2010, $15,000

26           -July 20, 2010, $20,000 (Exhibit P34)

27           -July 26, 2010, $10,000 (Exhibit P35)

28           (Exhibit P49; Ball Declaration, ¶¶ 29, 33 and 36).

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

45.     During 2008, 2009 and 2010, Fremont paid Ball $282,624.27. (Exhibits P27, P28, P29, P30, P31, P32, P33, P34, P35 and P49; Stern Declaration, ¶ 17E; Stern Expert Report (Exhibit P53), Exhibit A).

46.     Ball also agreed to credit on his behalf against the sums owed to him by Fremont, insurance adjustment fees as of September 17, 2010 in the amount of $27,855.29, and payment to a contractor as of September 14, 2009 in the amount of $3,500, for a total offset of $31,355.29. Huezo disputes the insurance offset, claiming it is $45,961.22.  Ball also received a distribution from the Fremont Bankruptcy Trustee in the amount of $102,855.96 on June 7, 2013, which sum is not disputed. (Transcript, 4/18, 4:19-5:25; Stipulation and Order).

47.     Ball never received any payments on the four loans to Fremont from Huezo.  Even the $3,500 check to Ball's contractor Manuel Duran, as part of the $31,355.29 offset, was paid with a Fremont Check. (Exhibit D59:14; Transcript, 4/24, 203:5-13).

48.     During the period from November 28, 2007, when Ball made his initial loan to Fremont, until May 5, 2011, when Fremont filed bankruptcy, Huezo took at least $307,160.95 out of Fremont. (Stern Declaration, ¶ 17C; Stern Expert Report (Exhibit P53), Exhibit B; Transcript, 4/24, 85:18-86:16; Huezo Declaration, ¶¶ 193-230).

49.     In early 2010, following repeated requests by Ball, Huezo hand delivered Ball a promissory note for the $404,750 loan, dated March 21, 2008, listing "Fremont Investment Holdings, Inc. DBA Fremont Investment Funding" as the borrower ("Fremont/Ball Note").  The Fremont/Ball Note provided for an annual interest rate of 15% and monthly payments of $5,059.37 (equal to "interest only" payments at 15% per annum).  It also had several incorrect references, including a payment commencement date and loan maturity date of "March 1, 2008", clearly a typographical error since the Fremont/Ball Note was dated March 21, 2008.  Ball believed that the Fremont/Ball Note was a one year note like

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

the prior three loans had been.  Huezo signed the Fremont/Ball Note "Victor Huezo-Executive Vice President-CEO Individually and not for Fremont Investment Holdings, Inc."  Ball did not notice that Huezo had signed the Fremont/Ball Note differently than the prior promissory notes.  There is no letter, email or text message showing Ball agreeing that the Fremont/Ball Note would not have a maturity date. (Exhibits P39, P40, P41, P42 and P43; Ball Declaration, ¶¶ 34 and 35; Transcript, 4/18, 24:12-31:21; 4/25, 92:3-94:21; Huezo Deposition (Exhibit P52), 164:22-173:7, 212:11-213:13; Transcript, 4/24, 178:1-193:17).

50.    From and after July 26, 2010, Fremont made no further payments to Ball, despite the maturity dates on all of the promissory notes having passed and repeated demands for payment by Ball. (Exhibits P9, P16, P19, P44; Ball Declaration ¶¶ 36-37; Transcript, 4/25, 92:3-94:21).

51.    Unbeknownst to Ball, Huezo also prepared another promissory note, dated March 21, 2008, for the $404,750 loan, with a first page identifying "Victor Huezo of Fremont Investment Holdings Inc. DBA Fremont Investment Funding" as the "Borrower", "Joey D. Ball" as the "Lender", with annual interest of 15%, monthly payments of $5,059.37.  Like the Fremont/Ball Note, the Huezo/Ball Note also had a payment commencement date and loan maturity date of "March 1, 2008", notwithstanding the date of the Huezo/Ball Note being March 21, 2008 ("Huezo/Ball Note").  The second page of the Huezo/Ball Note is the same as the Fremont/Ball Note.  Ball did not learn of the Huezo/Ball Note until receiving a copy of it in discovery during litigation with Huezo.  There is no letter, email or text message showing Ball knew about the Huezo/Ball Note, or agreed that the Huezo/Ball Note would not have a maturity date. (Exhibits P44 and P45; Ball Declaration, ¶ 38; Transcript, 4/18, 24:12-31:3; Huezo Deposition (Exhibit P52), 164:22-173:7, 178:18-179:17, 212:11-213:13; Transcript, 4/24, 178:1-193:17, 202:1-203:4, 255:16-20).

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

52.    Unbeknownst to Ball, Huezo also prepared another promissory note, dated March 21, 2008, purportedly documenting a loan from Huezo to Fremont for $460,000 ("Fremont/ Huezo Note").  The Fremont/ Huezo Note identified "Fremont Investment Holdings Inc. DBA Fremont Investment Funding" as the "Borrower", "Victor Huezo" as the "Lender", with annual interest of 10%, monthly payments of $3,833.33 and a maturity date of "March 21, 2010".  Ball did not learn of the Fremont/Huezo Note until receiving a copy of it during discovery in litigation with Huezo.  Huezo testified that $404,750 of the loan came from Ball's March 26, 2008 wire transfer to Fremont, with the balance of the $460,000 coming from commissions and other compensation due to Huezo which was left in Fremont.  Huezo has no ledgers showing these commissions or how Fremont applied them to the $460,000 loan. (Exhibit P46; Ball Declaration, ¶ 39; Transcript, 4/18, 24:12-31:3; Huezo Deposition (Exhibit P52), 176:11-178:14; Transcript, 4/24, 178:1-193:17; 202:1-203:4).

53.    Unbeknownst to Ball, Huezo also prepared an "Assignment of Promissory Note" ("Assignment"), purportedly assigning the Fremont/Huezo Note to Ball.  Ball did not learn of the Assignment until receiving a copy of it during discovery in litigation with Huezo. There are no letters, emails or text messages showing Huezo giving the Assignment to Ball. (Exhibit 47; Ball Declaration, ¶ 40; Huezo Deposition (Exhibit P52), 179:18-182:11; Transcript, 4/24, 205:23-206:19).

54.    Huezo failed to provide evidence that Dimitrios Karnakis loaned Fremont the full $75,000, failing to present evidence supporting the claim that Karnakis loaned Fremont the remaining $25,000 by paying "other Fremont borrowers directly…."  Huezo also fails to provide documentation showing Karnakis being repaid.  The only copy of the purported promissory note from Fremont to Mr. Karnakis being an unsigned copy misdated and marked "Paid". (Exhibit 48; Huezo Deposition (Exhibit P52), 40:11-42:21; Huezo Declaration, ¶ 98).

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

55.    Huezo failed to produce any general ledgers or other documents for 2007, 2008, 2009 or 2010, confirming why commissions or portions of commissions were due to Huezo from Fremont in the amounts claimed, why the commissions were left in Fremont, or showing that said funds were used for Fremont loans to third party borrowers as opposed to operational or other unrelated company expenses.  Even taking all of the "commission retentions" alleged by Huezo's Trial Declaration at Paragraphs 188 to 230 at face value, the total "retention" is slightly more than $181,000 and does not account for the $30,000 transfer from Fremont to Huezo on January 14, 2008, which would reduce the total retention in Huezo's commissions to just over $150,000.  Huezo fails to present any evidence that Vahe Jordan ("Jordan") left any commissions in Fremont during 2007, 2008, 2009 or 2010. (Huezo Deposition (Exhibit P52), 39:13-58:2, 176:11-178:9; Huezo Declaration, ¶¶ 188-230; Transcript, 4/24, 203:14-204:10, 221:4-229:4).

56.    Other than Mr. Karnakis' alleged loan of $75,000 to Fremont in December of 2007, Ball's loans of $844,750 to Fremont were the only funds invested in Fremont by an outside "investor" from 2007 until May of 2011 when Fremont filed bankruptcy.  (Huezo Deposition (Exhibit P52), 39:13-58:2, 176:11-178:9; Huezo Declaration, ¶¶ 79-82, 84 and 98; Transcript, 4/24, 203:14-204:10, 217:16-219:7, 221:4-229:4, 238:1-254:4).

57.    Ball, in reliance on Huezo's verbal and written representations, including the statements in "Question 1" on page 16 of the Fremont lending materials (Exhibit P2), believed he would be repaid his Fremont loans when the third party Fremont loans funded by Ball's loans were repaid or came due.  Ball was never told the proceeds from Fremont loans funded by his loans to Fremont would be used for subsequent Fremont loans, including high risk unsecured loans, when the initial loans were repaid.  Ball was also never told his loans to Fremont would be used for "operating expenses" or however Huezo and Fremont wished.

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]
\\Fs1\apps\lhsmh\KLE\14404-2\1205614_2.doc
SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

1   (Exhibit P2; Ball Declaration, ¶¶ 11, 12, 13, 16, 17, 18, 20, 21, 24, 26, 27, 28 and

2   30; Transcript, 4/17, 139:14-143:37, 159:22-162:6: 4/25, 66:3-67:10).

3        58.    Fremont never paid off the promissory notes with Ball when they

4   came due, defaulting on all four notes. (Exhibits P9, P16, P19, P44, P49 and P53;

5   Ball Declaration, ¶32; Transcript, 4/18, 33:10-34:8, ;4/25: 71:24-72:19;Transcript,

6   4/24, 229:5-238.21, 254:5-258:14,; Stern Declaration, ¶ 17E; Stern Expert Report

7   (Exhibit P53), Exhibit A).

8        59.    Fremont never provided Ball with any balance sheets showing

9   Fremont's assets and liabilities, despite the representations in Exhibit P2 and Ball's

10  requests that Fremont provide them. (Exhibits P2:16, P39-P43; Transcript, 4/17,

11  191:22-192:9, 4/25, 64:13-65:2; Huezo Deposition (Exhibit 52), 214:16-215:7;

12  Transcript, 4/24, 135:20-139:20).

13       60.    Huezo promised Ball Investor Activity Reports for the $130,000 and

14  $404,750 loans, but never provided them. (Exhibits P2, P41, P42 and P43;

15  Transcript, 4/17, 194:122-196:15).

16       61.    Fremont had only $14,372.42 in its combined bank accounts on

17  December 31, 2008, the day before the November Note for $240,000 came due.

18  (Exhibits P9, P53 and P55:42, 234 and 418; Stern Declaration, ¶ 17E and F;

19  Transcript, 4/24, 229:5-238:21, 254:5-258:14).

20       62.    Fremont had only $146,042.87 in its combined bank accounts on

21  January 31, 2009, the day before the January ($70,000) and February ($130,000)

22  Notes totaling $200,000 came due.  Adding the unpaid total from the November

23  Note, more than $400,000 was due to Ball on February 1, 2009. (Exhibits P9, P16,

24  P19 and P55:45, 238 and 421; Stern Declaration, ¶ 17E and F; Huezo Testimony,

25  4/24, 229:5-238:21, 254:5-258:14).

26       63.    Fremont had only $25,576.97 in its combined bank accounts on

27  February 28, 2009, the day before Ball believed the Fremont/Ball Note for

28  $404,750 came due.  Adding the unpaid total of more than $400,000 from the

LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION
Law Offices

1   November, January and February Notes, the unpaid total as of March 1, 2009 was

2   more than $800,000. (Exhibits P9, P16, P19, P44, P49 and P55:49, 242 and 425;

3   Stern Declaration, ¶ 17E and F; Transcript, 4/24, 229:5-238:21, 254:5-258:14).

4      64.   Based on Ball's promissory notes with Fremont, as of March 1, 2009,

5   Ball would have been owed and/or paid $971,462, consisting of the principal of

6   $844,750 and interest at 15% per annum, totaling $126,712 as the notes provided

7   for interest only payments. (Exhibits P9, P16, P19, P44, P49).

8      65.   Based on Huezo's Trial Declaration and the Exhibits, the Fremont

9   loans made between November of 2007 and March of 2009, with maturity dates

10  prior to March 1, 2009 are as follows:

LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION
Law Offices

| Date Made | Borrower | Amount of Loan | Matured or Paid |
|---|---|---|---|
| 11/30/07 and 6/6/08 | Janet Smith | $50,000 Increased to $64,000 | 8/8/08 |
| 12/2/07 | Edelmira Cruz | $3,000 | 6/1/08 |
| 12/4/07 | Ana Cruz | $4,000 | 6/1/08 |
| 12/7/07 | Innocencio Rodriguez | $175,000 increased to $250,000 | 7/1/08 |
| 12/7/07 | Vilma Escobar | $3,000 | 6/08 |
| 12/11/07 | Gemini Security, Inc. | $43,000 | 9/1/08 |
| 2/1/08 | Robert Gray | $46,000 | 9/1/08 |
| 2/12/08 | Maroun Atallah | $20,000 | 9/1/08 |
| 3/31/08 | Valerie Camacho | $23,000 | 9/1/08 |
| 7/28/08 | Jose Sarinana | $3,000 | 1/1/09 |
| 8/29/08 | Manuel Duran | $100,000 | 1/1/09 |
| 11/11/08 | Deborah Szabo | $20,000 | 1/6/09 |

[THIS DOCUMENT PRINTED ON RECYCLED PAPER]

1   Assuming all funds were paid as set forth in the loan documents, the total

2   cash available from principal repayment of Fremont loans to repay Ball's $844,750

3   in promissory notes on March 1, 2009 would have been $578,000. (Exhibits P50-

4   P51, D20-D24, D26-D27, D31-32, D34-D35, D37-D38, D41 and D46; Huezo

5   Declaration, ¶¶ 149, 169, 232, 233, 258-259.).

6   66.   Based on Huezo's Trial Declaration and the Exhibits, the Fremont

7   loans made between November of 2007 and March of 2009, with maturity dates

8   after March 1, 2009 are as follows:

| **Date Made** | **Borrower** | **Amount of Loan** | **Maturity Date** |
|---|---|---|---|
| 1/13/08 | Advanced Access Systems | $16,347.77 | 1/15/10 |
| 6/6/08 | Eugenia Duran | $260,000 (Incorporating prior loans) | 4/1/09 |
| 6/6/08 | Leonel Ramirez | $100,000 | 6/1/09 |
| 12/16/08 | Jose Velasco | $7,188.34 | 1/15/10 |
| 12/19/08 | Rolling Door Mechanics | $706.33 | 1/15/10 |
| 1/9/09 | Jose Hernandez | $16,766 | 2/1/24 |
| 2/3/09 | Bradley Ent. Grp., Inc. | $16,000 | 1/15/10 |
| 2/17/09 | Luis Roman | $12,000 | 2/17/13 |

23   Assuming that loans set forth above were made as represented in Huezo's

24   Trial Declaration, the loans made between November of 2007 and March 1, 2009,

25   which did not mature or were paid before March 1, 2009, total $429,008.44.

26   Deducting $429,009.44 from the available principal repayments of $578,000

27   leaves only $148,991.56 in cash available to pay Ball's $844,750 in promissory

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

notes on March 1, 2009. (Exhibits P50-51, D20-24, D31-32, D34-35, D37-38, D41-42 and D46; Huezo Declaration, ¶¶ 149-181, 231-287).

67.    Based on Huezo's Trial Declaration and the Exhibits, the interest which Fremont would have earned if every loan made by Fremont had been paid pursuant to its terms would be as follows:

| Borrower | Loan Amount | Interest Rate | Loan Date | Maturity Date | Interest Due |
|---|---|---|---|---|---|
| Janet Smith | $50,000 | 12.99% or $17.79 per day | 12/7/07 | 6/12/08 | $3,220 $17.79 x 181 days (3/1/09) |
| Janet Smith | $64,000 | 12.99% or $22.77 per day | 6/12/08 | 8/13/08 | $1,412 $22.77 x 62 days (8/13/08) |
| I. Rodriguez | $175,000 | | | 12/10/07 | $1,930 paid in fees and interest (12/10/07) |
| E. Cruz | $3,000 | 29.99% or $2.47 per day | 12/4/07 | 8/15/08 | $647 $2.47 x 262 days (3/1/09) |
| V. Escobar | $3,000 | 29.99% or $2.47 per day | 12/7/07 | 6/08 | $432 $2.47 x 175 days (3/1/09) |
| I. Rodriguez | $250,000 | 14.99% or $102.67 per day | 12/7/07 | 6/15/08 | $19,507 $102.67 x 190 days (6/15/08) |

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

Law Offices
LEWITT, HACKMAN, SHAPIRO, MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT PRINTED ON RECYCLED PAPER]

| **Borrower** | **Loan Amount** | **Interest Rate** | **Loan Date** | **Maturity Date** | **Interest Due** |
|---|---|---|---|---|---|
| A. Cruz | $4,000 | 29.99% or $3.29 per day | 1/3/08 | 6/1/08 | $589<br>$3.29 x 179 days<br>(3/1/09) |
| Gemini Security | $43,000 | 24.99% or $29.44 per day | 1/10/08 | 2/1/09 | $11,364<br>$29.44 x 386 days<br>(2/1/09) |
| Advanced Access Systems | $16,347 | 25% or $11.20 per day | 1/13/07 | 1/15/10 | $4,603<br>$11.20 x 411 days<br>(3/1/09) |
| Maroun Atallah | $20,000 | 12.99% or $7.12 per day | 2/19/08 | 11/15/08 | $1,915<br>$7.12 x 269 days<br>(11/15/08) |
| E. Duran | $120,000 | 12.99% or $42.71 per day | 3/27/08 | 4/1/08 | $3,032<br>$42.71 x 71 days<br>(6/10/08) |
| V. Camacho | $23,000 | 24.99% or $15.75 per day | 3/31/08 | 9/1/08 | $2,410<br>$15.75 x 153 days<br>(9/1/08) |
| R. Gray | $46,000 | 29.99% or $37.80 per day | 4/11/08 | 9/1/08 | $5,368<br>$37.80 x 142 days<br>(9/1/08) |

*Law Offices*
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

*Law Offices*
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

| Borrower | Loan Amount | Interest Rate | Loan Date | Maturity Date | Interest Due |
|---|---|---|---|---|---|
| E. Duran | $40,000 | 21.602% or $23.67 per day | 5/20/08 | 6/6/08 | $402 $23.67 x 17 days (6/10/08) |
| L. Ramirez | $100,000 | 14.99% or $41.07 per day | 6/6/08 | 4/1/09 | $10,966 $41.07 x 267 (3/1/09) |
| E. Duran | $260,000 | 12.99% or $92.53 per day | 6/10/08 | 4/1/09 | $24,335 $92.53 x 263 days (3/1/09) |
| M. Duran | $100,000 | 24.99% or $68.47 per day | 7/11/08 | 1/1/09 | $8,490 $68.47 x 124 days (1/1/09) |
| D. Szabo | $20,000 | Assume 29.99% or $16.43 per day since no note | 11/11/08 | 11/1/09 | $1,807 $16.43 x 110 days (3/1/09) |
| Rolling Door Mechanics | $706.33 | 25% or $.48 per day | 12/19/08 | 1/15/10 | $34 $.48 x 71 days (3/1/09) |
| Bradley Ent. Grp. | $16,000 | 25% or $10.96 per day | 1/9/09 | 1/15/10 | $548 $10.96 x 50 days (3/1/09) |

*\\Fs1\apps\lhsmh\KLE\14404-2\1205614_2.doc*
SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

[THIS DOCUMENT PRINTED ON RECYCLED PAPER]

| Borrower | Loan Amount | Interest Rate | Loan Date | Maturity Date | Interest Due |
|---|---|---|---|---|---|
| J. Hernandez | $16,766 | 9.9% or $4.55 per day | 2/1/09 | 2/1/24 | $127 $4.55 x 28 days (3/1/09) |
| L. Roman | $12,000 | 29.99% or $9.86 per day | 12/2/09 | 2/17/13 | $878 $9.86 x 89 days (3/1/09) |

Assuming that all of the interest on Fremont's outstanding loans was paid as set forth in the promissory notes and other loan documents for the period from November of 2007 to March 1, 2009, Fremont would have received $104,016 in interest payments. (Exhibits P50-51, D20-24, D31-32, D34-35, D37-38, D41-42 and D46; Huezo Declaration, ¶¶ 149-181, 231-287).

68.     Based on the loans represented to have been made in the Huezo Declaration, even if every loan obligation had been paid on time and there were no defaults, Fremont's loan program would have had only $253,007.56 (Principal of $148,991.56 and Interest of $104,016) on hand as of March 1, 2009 to pay Ball the balance due on the promissory notes for the $844,750 Ball loaned Fremont. (Findings of Fact No.'s 61-67; Exhibits P9, P16, P19 and P44; Huezo Declaration, ¶¶149-181, 231-287).

69.     Contrary to all the written materials Huezo provided to Ball, including the Fremont lending materials, November Report, January Report, January 30, 2008 email and emails regarding the "Las Vegas" and "Los Angeles" deals, Huezo intended to use the funds obtained from Ball however he wished instead of for the loans he represented they were for when soliciting the funds from Ball. (Findings of Fact No.'s 21 and 28; Exhibits P2, P4, P10, P17, P20, P21, P22, P23 and P38; Ball Declaration, ¶¶ 13, 18, 24, 28 and 30; Transcript, 4/18, 31:22-33:9; Huezo Deposition (Exhibit P52), 55:20-25; 88:5-105:13; 106:4-114;17, 135:12-138:3,

154:2-163:21; Huezo Declaration, ¶¶ 88, 110, 112-116; Transcript, 4/24, 143:21-145:16, 146:8-149:5, 149:14-172:21, 194:7-14:21).

70.    Huezo used Ball's loans to Fremont, as well as the proceeds from the third party loans Fremont made with Ball's loans, to fund largely unsecured, high risk loans. Hundreds of thousands of dollars of these loans ultimately went unpaid and proved to be entirely or largely unsecured. (Exhibit P50; Huezo Deposition (Exhibit P52), 195:18-201:2; Huezo Declaration, ¶¶ 88, 149-181, 231-287; Transcript, 4/24, 146:8-149:5, 149:14-172:21, 194:7-14:21, 219:8-227:18, 229:5-238:21, 229:5-238:21, 254:5-258:14; 4/25, 17:14-18:2, 50:6-53:25).

71.    Huezo earned higher fees, including loan origination fees, from loans funded by Fremont, than from loans arranged for other lending institutions. Fees earned through Fremont funded loans were up to double what other lending institutions paid Huezo. (Transcript, 4/25, 20:16-21:2).

72.    Huezo's representations in the Fremont loan materials (Exhibit P2) were false, and Huezo knew them to be false when he made them, because in July of 2007 when he sent the materials to Ball:

a.    Huezo knew Fremont could not "guarantee" monthly payments to Ball. (Findings of Fact No.'s 61-68; Ball Declaration, ¶32; Huezo Declaration, ¶¶149-181, 231-287, Transcript, 4/24, 146:8-149:5, 149:14-172:21, 194:7-14:21, 219:8-227:18, 229:5-238:21, 229:5-238:21, 254:5-258:14; 4/25, 17:14-18:2, 50:6-53:25).

b.    Huezo knew Fremont would never be able to repay Ball's loans based on the loans they were making to third parties. (Findings of Fact No.'s 61-68; Ball Declaration, ¶32; Huezo Declaration, ¶¶ 149-181, 231-287, Transcript, 4/24, 146:8-149:5, 149:14-172:21, 194:7-14:21, 219:8-227:18, 229:5-238:21, 229:5-238:21, 254:5-258:14; 4/25, 17:14-18:2, 50:6-53:25).

c.    Huezo knew Ball's loans to Fremont were not secured and were high risk. (Exhibits P50; Huezo Declaration, ¶¶ 149-181, 231-287,

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

1    Transcript, 4/24, 146:8-149:5, 149:14-172:21, 194:7-14:21, 219:8-227:18,

2    229:5-238:21, 229:5-238:21, 254:5-258:14; 4/25, 17:14-18:2, 50:6-53:25).

3        d.    Huezo knowingly submitted false Activity Reports to Ball to

4    solicit loans for Fremont. (Findings of Fact No.'s 21 and 28; Exhibits P4 and

5    P10; Huezo Deposition (Exhibit P52), 55:20-25, 88:5-105:13, 106:4-110:21,

6    128:3-133:6;  Huezo Declaration, ¶¶ 88, 110, 112,-113, 114-116; Transcript,

7    4/24, 149:14-149:14-157:14).

8        e.    Huezo knew he would be using the funds loaned by Ball to

9    Fremont for purposes other than the "secured" loans he had listed in the

10   fabricated Activity Reports. (Findings of Fact No.'s 21 and 28; Huezo

11   Deposition (Exhibit P52), 55:20-25, 88:5-105:13, 106:4-110:21, 135:12-

12   138:3; Huezo Declaration, ¶¶ 88, 110, 112-113, 114-116; Transcript, 4/24,

13   146:8-149:5, 149:14-172:21, 194:7-14:21, 219:8-227:18, 229:5-238:21,

14   229:5-238:21, 254:5-258:14; 4/25, 17:14-18:2, 50:6-53:25).

15       f.    Huezo did not intend to pay Ball in full on the promissory notes

16   as the Fremont loans made with Ball's funds were paid or came due.

17   Instead, Huezo used proceeds from Fremont loans funded with Ball's loans

18   to Fremont, including Fremont loans secured with real property, to fund

19   additional loans, including unsecured, high risk loans. (Findings of Fact

20   No.'s 61-68; Exhibits P2:16; P55:42, 45, 49, 53, 234, 238, 242, 246, 418,

21   421, 425 and 428; Huezo Deposition (Exhibit P52), 39:13-58:2, 176:11-

22   178:9, 196:3-24; Huezo Declaration, ¶¶ 88, 149-181, 231-287; Transcript,

23   4/24, 146:8-149:5, 149:14-172:21, 194:7-14:21, 219:8-227:18, 229:5-

24   238:21, 229:5-238:21, 254:5-258:14; 4/25, 17:14-18:2, 50:6-53:25).

25       g.    Huezo always intended to use the loans from Ball to Fremont

26   for whatever he wanted. (Findings of Fact No.'s 21 and 28; Huezo

27   Deposition (Exhibit P52), 55:20-25, 88:5-105:13, 106:4-110:21, 135:12-

28   138:3; Huezo Declaration, ¶¶ 88, 149-181, 231-287; Transcript, 4/24, 146:8-

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

149:5, 149:14-172:21, 194:7-14:21, 219:8-227:18, 229:5-238:21, 229:5-238:21, 254:5-258:14; 4/25, 17:14-18:2, 50:6-53:25).

    h.    Huezo knew Fremont had no other investors to buy out Ball's loans as he represented to Ball verbally and in Question 1 on page 16 of the Fremont lending materials (Exhibit P2, Page 16; Huezo Deposition (Exhibit P52), 39:13-58:12, 40:11-42:21, 176:11-178:9; Huezo Declaration, ¶¶ 79-82, 84 and 98; Transcript, 4/24, 203:14-204:10, 217:6-219-7, 221:4-227:18).

73.    Huezo's representations in the November and January Reports regarding purported "secured" loans, debt and collateral were completely false. Huezo did not have pending loans with the debt and collateral as represented in the Reports, and intended to use the funds however he saw fit. (Findings of Fact No.'s 20 and 27; Exhibits P4, P6, P10, P11, D26:1, D22:18-21, D32:1-7, D23:7, D24:1-31; Huezo Deposition (Exhibit P52), 55:20-25, 88:5-105:13, 106:4-110:21; Huezo Declaration, ¶ 88, 109-116, 150, 155, 232, 234, 238, 240, 244, 245; Transcript, 4/24, 149:14-157:14, 194:7-196:11).

74.    Huezo's representations in the January 30, 2008 email to Ball that he had two deals for $130,000 and his oral representations to Ball that the two loans were secured like the prior 6 loans were completely false. (Exhibit P17; Huezo Deposition (Exhibit P52), 55:20-25, 135:12-138:3; Huezo Declaration, ¶ 88; 114-116; Transcript, 4/24, 146:8-149:5, 197:25-198:18).

75.    Huezo's oral representations and written representations in the March 2008 emails to Ball regarding the $404,750 loan to Fremont for the "Vegas" and "Los Angeles" deals were false, as Huezo intended to use the funds for a personal loan to Fremont. (Exhibits P20, P21, P22, P23 and P46; Ball Declaration, ¶¶ 26, 27, 28 and 30; Huezo Deposition (Exhibit P52), 55:20-25, 154:2-173:7, 175:8-182:11; Huezo Declaration, ¶¶ 88, 92-96; Transcript, 4/24, 178:1-193:17, 203:14-217:16).

*Law Offices*
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

\\Fs1\apps\lhsmh\KLE\14404-2\1205614_2.doc

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

76.    From and after March of 2008, Huezo intentionally misled Ball into believing his $404,750 loan to Fremont had been used to fund the proposed $367,250 loan to Martin and Bonnie Romano, even after the proposed loan had been terminated and Huezo had used the Ball's loan to Fremont for other purposes. (Exhibits P32, P37 and P38; Ball Declaration, ¶30; Transcript, 4/18, 31:22-33:9; 4/25, 64:13-65:2, 70:16-72:9, 89:9-91:13; Huezo Declaration, ¶ 303; Transcript, 4/24, 207:14-214:21).

77.    As part of his fraudulent representations to Ball, Huezo prepared multiple documents with incorrect dates, often by using prior documents as part of his scheme of manufacturing false documents, including the January Report (dated 2007 when it was prepared in 2008), the Fremont/Ball Note (dated March 21, 2008, with payment commencement and loan maturity dates of March 1, 2008), the Huezo/Ball Note (dated March 21, 2008, with payment commencement and loan maturity dates of March 1, 2008) and the purported Karnakis Promissory Note, (dated December 11, 2008,when it was allegedly prepared on December 11, 2007). (Exhibits P11, P44, P45 and P48; Huezo Deposition (Exhibit P52), 129:14-130:13, 209:23-213:7; Huezo Declaration, ¶¶ 98, 108).

78.    Ball never refused to accept payments of principal or interest from Fremont or Huezo on the $844,750 in loans he made to Fremont.  Fremont's bank records show it was never in a position to pay off Ball's promissory notes. (Findings of Fact No.'s 59-66; Exhibits P39-P43, P49, P55: 42, 45, 49, 234, 238, 242, 418, 421 and 425; Ball Declaration, ¶¶32-38; Transcript, 4/18, 18:17-21:16; 4/25, 70:16-72:9; Transcript, 4/24, 214:23-216:6).

79.    Huezo kept most of Fremont's books and records at the office he maintained in his home. (Huezo Deposition (Exhibit P52), 14:12-21:17, 51:6-52:1; Transcript, 4/24, 130:23-135:9).

80.    Huezo claims to have lost Fremont business records in two computer crashes in 2008 and/or 2009, having no hard copies of the general ledgers or other

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

\\Fs1\apps\lhsmh\KLE\14404-2\1205614_2.doc

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

documents relating to how Ball's loans to Fremont were used, or showing what
funds Huezo and Jordan invested in Fremont. (Huezo Deposition (Exhibit P52),
17:12-22:22; Transcript, 4/24, 130:23-135:9, 239:1-254:4).

81.     To the extent Huezo did not lose the documents in the computer
crashes, he failed to produce the documents relating to the borrowers listed in the
November and January Reports and referred to in the January 30, 2008 email, with
respect to verification of the debt and collateral for the purported borrowers.
(Findings of Fact No.'s 20 and 27; Exhibits P4, P6, P10, P11, D26:1, D22:18-21,
D32:1-7, D23:7, D24:1-31; Huezo Deposition (Exhibit P52), 55:20-25, 88:5-
105:13, 106:4-110:21; Huezo Declaration, ¶ 88, 109-116, 150, 155, 232, 234, 238,
240, 244, 245; Transcript, 4/24, 149:14-172:21, 194:7-197:24).

82.     Huezo failed to produce documents evidencing his purported review
and underwriting of the majority of loan applications for Fremont borrowers
between November of 2007 and February of 2010. (Exhibits D26:1, D22:18-21,
D32:1-7, D23:7, D24:1-31, Huezo Declaration, ¶¶ 231-287; Transcript, 4/24,
149:14-172:21, 194:7-197:24).

83.     Huezo failed to acquire or record deeds of trust on real property, or
UCC liens on personal property, to secure Fremont loans to third parties which
were primarily funded through Ball's loans to Fremont.  (Findings of Fact No. 54;
Exhibits P2, P9, P16, P19, P44 and P49; Huezo Declaration, ¶¶ 231-287;
Transcript, 4/24, 149:14-157:14, 166:3-172:1, 194:7-197.24, 202:1-209:20; 4/25,
17:14-21:16, 21:17-48:8).

84.     Huezo and Fremont commingled their assets and Huezo used Fremont
funds for personal uses, including a January 14, 2008 transfer of $30,000 from
Fremont to Ball, which followed Ball's wire of $30,000 to Fremont on Friday,
January 11, 2008.  Huezo's Trial Declaration fails to show any commission or
other compensation due from Fremont to Huezo in January of 2008.  (Exhibit P53
(Exhibit B to Stern Expert Report); Stern Declaration, ¶¶ 3-7, 9, 17A, B and C;

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

1  Transcript, 4/24, 7:11-9:21, 27:10-36:17, 38:8-41:20, 83:3-86:16; Huezo

2  Declaration, ¶¶ 194-195, 196-197).

3      85.    Huezo and Fremont operated their business in a manner that failed to

4  conform with Generally Accepted Accounting Principles ("GAAP") as they were

5  legally required to do.  Their failure included failing to maintain proper records

6  conforming to a commercial lending business, including but not limited to hard

7  copies or other backup of financial records, general ledgers and other documents

8  showing in detail how funds, including funds loaned to Fremont by Ball, were

9  classified and used.  Huezo and Fremont failed to maintain proper records

10  classifying and providing backup for funds received by Fremont, as well as checks,

11  wire transfers and other expenses paid for by Fremont between November of 2007

12  (commencement of Fremont's lending business and first loan from Ball) and May

13  of 2011 (Fremont filing bankruptcy). (Exhibit P53 (Exhibit B to Stern Expert

14  Report); Stern Declaration, ¶¶ 3-7, 9, 17A, B and C; Transcript, 4/24, 7:11-9:21,

15  27:10-36:17, 38:8-41:20, 83:3-86:16; Huezo Declaration, ¶¶ 194-195, 196-197).

16      86.    Huezo continues to work as a real estate broker and loan officer

17  following Fremont's and his personal bankruptcies.  Prior to the 2008 economic

18  crisis, Huezo was earning between $300,000 and $400,000 a year. (Huezo

19  Declaration, ¶¶ 22-23, 187-230; Transcript, 4/25, 54:1=56:24).

20      **F.    Huezo's Testimony**

21      87.    In his January 14, 2013 deposition, Huezo testified that he used the

22  Ball's $240,000 loan to Fremont for purposes other than the loans listed in the

23  November Report and specifically got Ball's permission to do so.  During trial

24  Huezo directly contradicted his deposition testimony, claiming he never had such a

25  conversation and actually made the loans proposed in the November Report.

26  (Huezo Deposition (Exhibit P52), 88:5-95:1; Huezo Declaration, ¶¶ 109-110;

27  Transcript, 4/24, 143:21-145:16, 146:8-149:5).

28

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

1    88.    In his January 14, 2013 deposition, Huezo testified that the March 1,

2    2008 "maturity date" on the March 21, 2008 Huezo/Ball Note was an error.

3    During trial, Huezo directly contradicted his deposition testimony, claiming the

4    March 1, 2008 loan commencement and loan maturity dates were intentional,

5    meaning there was no "maturity date" on the March 21, 2008 Huezo/Ball Note,

6    which Huezo claimed would never come due as long as he was not in default on

7    the Huezo/Ball Note.  Ball denies that the maturity date was misstated on purpose

8    and there are no letters, emails or text messages evidencing an agreement to a

9    promissory note without a maturity date. (Exhibits P39-45 and P49; Transcript,

10    4/25, 92:3-94:21; Huezo Deposition (Exhibit P52), 163:22-165:4, 171:8-23, 211:6-

11    213:7; Transcript, 4/24, 178:1-193:17, 255:16-20).

12    89.    In his January 14, 2013 deposition, Huezo could not remember 3 of

13    the four proposed borrowers in the November Report, representing $190,000 of the

14    $240,000 being loaned.  In his trial declaration, Huezo testified that the borrowed

15    funds for the four proposed borrowers specifically went to Gemini Security, Janet

16    Smith, Innocencio Rodriguez and Edelmira Cruz.  In his trial declaration, Huezo

17    then contradicted his prior statements by declaring that "[t]he entirety of the funds

18    from the first Ball Note was used to fund the Rodriguez loan….At no time did I

19    use any portion of the funds from the first Ball Note for a purpose other than to

20    fund the Rodriguez loan." (Finding of Fact No. 21; Huezo Deposition (Exhibit

21    P52), 88:5-96:7; Huezo Declaration, ¶¶ 109-110, 112-113; Transcript, 4/24,

22    149:14-172:21).

23    90.    In his January 14, 2013 deposition, Huezo could not remember the

24    two proposed borrowers representing the $70,000 in "Secured Loan[s] (Ready to

25    fund)" listed in the January Report.  In his trial declaration, Huezo testified that the

26    borrowed funds specifically went to Robert Gray DBA TGK and Eugenia Duran.

27    However, these two loans were unsecured and Huezo failed to present any

28    evidence that the Gray and Duran loans in any way matched the loan dates, loan

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

amounts, debt or collateral set forth in the January Report. (Finding of Fact No. 28; Huezo Deposition (Exhibit P52), 129:14-133:6; Huezo Declaration, ¶ 114 and 116; Transcript, 4/24, 194:7-196:11).

91.    Huezo's January 14, 2013 deposition testimony and trial testimony that Ball insisted he would only lend Fremont money at an interest rate of 15% is directly contradicted by the all of the documents in this case, including Huezo's emails and letters to Ball, and by the promissory notes prepared by Huezo.  There are no letters, emails or text messages showing Ball suggesting any interest rates on the loans to Fremont or demanding a minimum annual rate of 15% interest on such loans. (Exhibits P4, P6, P9, P10, P11, P16, P17, P44; Ball Declaration, ¶¶8, 11, 14, 16, 19, 20, 23, 35 and 41; Transcript, 4/25, 64:13-65:2; Huezo Deposition (Exhibit P52), 118:19-122:11; Transcript, 4/24, 135:20-139:20, 141:23-143:5, 175:12-17:2, 177:4-25).

92.    Huezo's January 14, 2013 deposition testimony and trial testimony that Ball drafted the promissory notes for the loans to Fremont and the alleged personal loan to Huezo are directly contradicted by all of the documents in this case, including Huezo's emails and letters to Ball, and by the promissory notes prepared by Huezo.  There are no letters, emails or text messages showing that Ball in any way participated in the drafting of any Fremont promissory note, or the alleged "personal" promissory note from Huezo to Ball for $404,750.  The promissory notes between Fremont and Ball are the same form used by Fremont for multiple third party loans to Fremont borrowers.  (Exhibits P1, P2, P4, P5, P6, P9, P10, P44, P45, P51:1-6, 15-18, 28-29; Ball Declaration, ¶¶14, 19, 23, 35, 38 and 39; Transcript, 4/17: 213:1-215:18, 4/18, 24:12-31:3; 4/25, 63:11-64:1; Transcript, 4/24, 135:20-139:20, 141:23-143:5, 175:12-177:2, 177:4-193:17).

93.    Huezo's January 14, 2013 deposition testimony and trial testimony that Ball insisted that Huezo personally borrow the $404,750 in March of 2008 due to the pending audit of Ball's business by the Internal Revenue Service ("IRS") is

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

1 directly contradicted by the documents and evidence, including Huezo's emails

2 and letters to Ball, the promissory notes prepared by Huezo, and the May 19, 2008

3 IRS Form 4549 (Exhibit P60). (Exhibits P32, P39, P40, P41, P42, P43, P49, P44,

4 P60; Ball Declaration, ¶¶ 26-31, 34-35, 38-40; Transcript, 4/25, 70:1-72:9, 72:20-

5 76:10; Transcript, 4/24, 178-193:17, 199:3-203.4, 204:11-217:15).

94.    Huezo's claim that the language on page 16 of Exhibit P2 is to train

7 Fremont agents how to address questions from Fremont borrowers instead of

8 Fremont "investors" is directly contradicted by the plain language of the document

9 and Huezo's prior deposition testimony. The language is clearly directed towards

10 Fremont's potential "investors", or persons loaning money to Fremont for it to

11 make loans to Fremont Borrowers.  (Exhibit P2; Transcript, 4/24, 229:5-238:21).

95.    The correspondence between Huezo and Ball, including angry emails

13 between them in April and May of 2010 and Huezo's November 19, 2010 Fremont

14 letters to Ball, is inconsistent with Huezo's testimony as it fails to make any

15 mention of: (1) Ball making a personal loan of $404,750 to Huezo in March of

16 2008; (2) any concerns by Ball about the IRS audit; (3) Ball asking to Huezo to

17 send him phony emails about the "Vegas"/Romano deal; (4) Ball asking Huezo to

18 "fake" the handwritten notes on Exhibit P32 for the IRS; (5) an agreement by Ball

19 to waive interest on the first three promissory notes in consideration of Huezo

20 doing Ball the favor of keeping and using the $404,750 loan from March of 2008;

21 (6) Ball's refusal of any attempt by Fremont or Huezo to return the $404,750 loan

22 in March or April of 2008, or at any time; and (7) Ball's refusal, at any time, to

23 accept repayment of moneys due on any of the promissory notes representing his

24 $844,750 in loans to Fremont. (Exhibits P39-P44 and P49).

96.    The correspondence between Huezo and Ball, including angry emails

26 between them in April and May of 2010 and Huezo's November 19, 2010 Fremont

27 letters to Ball, is consistent with Ball's testimony in that it specifically addresses:

28 (1) Ball's inability to locate the promissory note for the $404,750 March 26, 2008

LEWITT, HACKMAN, SHAPIRO, MARSHALL & HARLAN
A LAW CORPORATION

loan to Fremont and 2010 request that Huezo provide him with a promissory note for the loan; (2) Ball's requests for Investor Activity Reports for the $130,000 February 2008 and $404,750 March 2008 loans; and (3) Ball's request for details on where his loans to Fremont went and the pending "deals" Fremont is going to close to generate the funds to pay Ball's loans. (Exhibits P39-P44 and P49).

### G.  Hayden's Relationships with Huezo and Ball

97.    Hayden grew up with Huezo, worked with Huezo at Fremont, and went on to work with Jordan, Huezo's former partner, after Fremont declared bankruptcy.  Hayden understood that Fremont filed bankruptcy, and he lost his ability to earn commissions with and through Fremont, in part because Ball sued Fremont. (Hayden Declaration, ¶¶ 3, 4, 29 and 34; Hayden Transcript, 4/25, 6:2-7:1).

98.    Hayden is no longer friends with Ball, but remains friends with Huezo and Jordan. (Hayden Declaration, ¶¶ 3, 4, 8, 29 and 33; Hayden Transcript, 4/25, 8:5-20).

### H.  Damages

99.    Ball is owed a principal balance of $427,914.48, consisting of the unpaid principal balance of $562,125.73, less the offset of $31,355.29 and the distribution from the Fremont bankruptcy of $102,855.96. (Exhibits P27-P35, P49, P53; Ball Declaration, ¶¶ 15, 22, 25, 29, 33 and 36; Stern Declaration, ¶¶ 12, 13, 17E and F; Transcript, 4/18,4:19-5:25).

100.    Applying all payments received by Ball from Fremont to each promissory note in the order that they were entered into, at a simple interest rate of 7% per annum pursuant to *California Civil Code* §3287, as being due on the unpaid balance of $562,125.73, calculated through April 17, 2014, Ball is entitled to prejudgment interest of $284,077.96 as set forth below:

/ / /

/ / /

LEWITT, HACKMAN, SHAPIRO, MARSHALL & HARLAN
*Law Offices*
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

1    **Ball loans to Huezo and Fremont Loan 1 at 7%**

2    Compound Period:        Annual

3    Nominal Annual Rate:    7.000 %

4    CASH FLOW DATA

| Event | Date | Amount |
|-------|------|--------|
| Loan | 11/28/2007 | 240,000.00 |
| Payment | 01/03/2008 | 3,000.00 |
| Payment | 02/01/2008 | 3,000.00 |
| Payment | 03/01/2008 | 3,000.00 |
| Payment | 04/16/2008 | 7,125.00 |
| Payment | 05/01/2008 | 7,466.00 |
| Payment | 06/02/2008 | 7,466.00 |
| Payment | 07/01/2008 | 7,466.00 |
| Payment | 08/15/2008 | 100,000.00 |
| Payment | 02/01/2009 | 40,726.27 |
| Payment | 02/17/2009 | 20,000.00 |
| Payment | 06/01/2009 | 10,000.00 |
| Payment | 07/31/2009 | 10,000.00 |
| Payment | 07/14/2010 | 15,000.00 |
| Payment | 07/20/2010 | 20,000.00 |
| Payment | 07/26/2010 | 5,326.01 |

AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|------|---------|----------|-----------|---------|
| Loan: 11/28/2007 | | | | 240,000.00 |
| **2007 Totals** | 0.00 | 0.00 | 0.00 | |
| 01/03/2008 | 3,000.00 | 1,656.99 | 1,343.01 | 238,656.99 |
| 02/01/2008 | 3,000.00 | 1,327.33 | 1,672.67 | 236,984.32 |
| 03/01/2008 | 3,000.00 | 1,318.02 | 1,681.98 | 235,302.34 |
| 04/16/2008 | 7,125.00 | 2,075.82 | 5,049.18 | 230,253.16 |
| 05/01/2008 | 7,466.00 | 662.37 | 6,803.63 | 223,449.53 |
| 06/02/2008 | 7,466.00 | 1,371.31 | 6,094.69 | 217,354.84 |
| 07/01/2008 | 7,466.00 | 1,208.85 | 6,257.15 | 211,097.69 |
| 08/15/2008 | 100,000.00 | 1,821.80 | 98,178.20 | 112,919.49 |
| **2008 Totals** | 138,523.00 | 11,442.49 | 127,080.51 | |
| 02/01/2009 | 40,726.27 | 3,681.48 | 37,044.79 | 75,874.70 |
| 02/17/2009 | 20,000.00 | 232.82 | 19,767.18 | 56,107.52 |

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

\\Fs1\apps\lhsmh\KLE\14404-2\1205614_2.doc

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| 06/01/2009 | 10,000.00 | 1,119.08 | 8,880.92 | 47,226.60 |
| 07/31/2009 | 10,000.00 | 543.43 | 9,456.57 | 37,770.03 |
| **2009 Totals** | 80,726.27 | 5,576.81 | 75,149.46 | |
| 07/14/2010 | 15,000.00 | 2,520.76 | 12,479.24 | 25,290.79 |
| 07/20/2010 | 20,000.00 | 29.10 | 19,970.90 | 5,319.89 |
| 07/26/2010 | 5,326.01 | 6.12 | 5,319.89 | 0.00 |
| **2010 Totals** | 40,326.01 | 2,555.98 | 37,770.03 | |
| **Grand Totals:** | 259,575.28 | 19,575.28 | 240,000.00 | |

**Ball loans to Huezo and Fremont Loan 2 at 7%**

| Compound Period: | | Annual |
|---|---|---|
| Nominal Annual Rate: | | 7.000% |

CASH FLOW DATA

| Event | Date | Amount |
|---|---|---|
| Loan | 01/09/2008 | 40,000.00 |
| Payment | 02/01/2008 | 500.00 |
| Payment | 03/01/2008 | 500.00 |
| Payment | 04/16/2008 | 500.00 |
| Payment | 05/01/2008 | 500.00 |
| Payment | 06/02/2008 | 500.00 |
| Payment | 07/01/2008 | 500.00 |
| Payment | 07/26/2010 | 4,594.74 |
| Payment | 07/26/2010 | 79.25 |
| Payment | 03/20/2013 | 47,157.22 |

AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| Loan    01/09/2008 | | | | 40,000.00 |
| 02/01/2008 | 500.00 | 176.44 | 323.56 | 39,676.44 |
| 03/01/2008 | 500.00 | 220.67 | 279.33 | 39,397.11 |
| 04/16/2008 | 500.00 | 347.56 | 152.44 | 39,244.67 |
| 05/01/2008 | 500.00 | 112.90 | 387.10 | 38,857.57 |
| 06/02/2008 | 500.00 | 238.47 | 261.53 | 38,596.04 |
| 07/01/2008 | 500.00 | 214.66 | 285.34 | 38,310.70 |
| **2008 Totals** | 3,000.00 | 1,310.70 | 1,689.30 | |

*Law Offices*
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

*\\Fs1\apps\lhsmh\KLE\14404-2\1205614_2.doc*

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| 07/26/2010 | 4,594.74 | 5,761.52 | 1,166.78- | 39,477.48 |
| 07/26/2010 | 79.25 | 0.00 | 79.25 | 39,398.23 |
| **2010 Totals** | **4,673.99** | **5,761.52** | **1,087.53-** | |
| 03/20/2013 | 47,157.22 | 7,758.99 | 39,398.23 | 0.00 |
| **2013 Totals** | **47,157.22** | **7,758.99** | **39,398.23** | |
| **Grand Totals** | **54,831.21** | **14,831.21** | **40,000.00** | |

**Ball loans to Huezo and Fremont <u>Loan 3</u> at 7%**

Compound Period:         Annual

Nominal Annual Rate:      7.000%

CASH FLOW DATA

| Event | Date | Amount |
|---|---|---|
| Loan | 01/11/2008 | 30,000.00 |
| Payment | 02/01/2008 | 375.00 |
| Payment | 03/01/2008 | 375.00 |
| Payment | 04/16/2008 | 375.00 |
| Payment | 05/01/2008 | 375.00 |
| Payment | 06/02/2008 | 375.00 |
| Payment | 07/01/2008 | 375.00 |
| Payment | 04/17/2014 | 42,523.32 |

AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| Loan:        01/11/2008 | | | | 30,000.00 |
| 02/01/2008 | 375.00 | 120.82 | 254.18 | 29,745.82 |
| 03/01/2008 | 375.00 | 165.44 | 209.56 | 29,536.26 |
| 04/16/2008 | 375.00 | 260.57 | 114.43 | 29,421.83 |
| 05/01/2008 | 375.00 | 84.64 | 290.36 | 29,131.47 |
| 06/02/2008 | 375.00 | 178.78 | 196.22 | 28,935.25 |
| 07/01/2008 | 375.00 | 160.93 | 214.07 | 28,721.18 |
| **2008 Totals** | **2,250.00** | **971.18** | **1,278.82** | |
| 04/17/2014 | 42,523.32 | 13,802.14 | 28,721.18 | 0.00 |

*Law Offices*
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

\\Fs1\apps\lhsmh\KLE\14404-2\1205614_2.doc

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| **2014 Totals** | 42,523.32 | 13,802.14 | 28,721.18 | |
| **Grand Totals** | 44.773.32 | 14,773.32 | 30,000.00 | |

**Ball loans to Huezo and Fremont <u>Loan 4</u> at 7%**

Compound Period:        Annual

Nominal Annual Rate:    7.000 %

CASH FLOW DATA

| Event | Date | Amount |
|---|---|---|
| Loan | 02/01/2008 | 130,000.00 |
| Payment | 03/01/2008 | 1,625.00 |
| Payment | 04/16/2008 | 1,625.00 |
| Payment | 05/01/2008 | 1,625.00 |
| Payment | 06/02/2008 | 1,625.00 |
| Payment | 07/01/2008 | 1,625.00 |
| Payment | 04/17/2014 | 185,946.21 |

AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| Loan:        02/01/2008 | | | | 130,000.00 |
| 03/01/2008 | 1,625.00 | 723.01 | 901.99 | 129,098.01 |
| 04/16/2008 | 1,625.00 | 1,138.89 | 486.11 | 128,611.90 |
| 05/01/2008 | 1,625.00 | 369.98 | 1,255.02 | 127,356.88 |
| 06/02/2008 | 1,625.00 | 781.59 | 843.41 | 126,513.47 |
| 07/01/2008 | 1,625.00 | 703.62 | 921.38 | 125,592.09 |
| **2008 Totals** | 8,125.00 | 3,717.09 | 4,407.91 | |
| 04/17/2014 | 185,946.21 | 60,354.12 | 125,592.09 | |
| **2014 Totals** | 185,946.21 | 60,354.12 | 125,592.09 | |
| **Grand Totals** | 194,071.21 | 64,071.21 | 130,000.00 | |

**Ball loans to Huezo and Fremont <u>Loan 5</u> at 7%**

Compound Period:        Annual

Nominal Annual Rate:    7.000 %

CASH FLOW DATA

LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
*Law Offices*
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

\\Fs1\apps\lhsmh\KLE\14404-2\1205614_2.doc

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

| Event | Date | Amount |
|---|---|---|
| Loan | 03/26/2008 | 404,750.00 |
| Payment | 04/17/2014 | 609,983.43 |

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| Loan: 03/26/2008 | | | | 404,750.00 |
| **2008 Totals** | 0.00 | 0.00 | 0.00 | |
| 04/17/2014 | 609,983.43 | 205,233.43 | 404,750.00 | 0.00 |
| **2014 Totals** | 609,983.43 | 205,233.43 | 404,750.00 | |
| **Grand Totals** | 609,983.43 | 205,233.43 | 404,750.00 | |

101.   Deducting 7% interest from the $102,855.96 Fremont bankruptcy distribution from June 7, 2013 ($6,134.73), the $3,500 offset from September 14, 2009 ($1,122.97) and the $27,855.29 offset from September 17, 2010 ($6,971.38), leaves a balance of $269,848.88 in prejudgment interest through April 17, 2014. Interest on the $427,914.48, continues to accrue after April 17, 2014 at the rate of $82.06 per day. (Exhibits P27-P35, P49, P53; Ball Declaration, ¶¶ 15, 22, 25, 29, 33 and 36; Stern Declaration, ¶¶ 12, 13, 17E and F).

<u>Interest at 7% per annum - simple interest</u>

Loan Number 1 (240,000 on 11/28/2007        $-

Loan Number 2 ($40,000 on 1/9/2008)        $-

Loan Number 3 ($30,000 on 1/11/2008)        $14,773.32

Loan Number 4 ($130,000 on 2/1/2008)        $64,071.21

Loan Number 5 ($404,750 on 3/26/2008)        $205,233.43

Total Interest on Loans:        $284,077.96

**Less:**

Law Offices
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION
Law Offices

1  $102,855.96 (Bankruptcy Court distribution) for the period from June 7, 2013 to

2  April 17, 2014 at 7%:   ($6,134.73)

3  6/7/2013 - 4/14/2014   311 Days   0.852055   0.07   -102856   -6134.73

4  $3,500 (Contractor payment offset) for the period from September 14, 2009 to

5  April 17, 2014 at 7%:   ($1,122.97)

6  9/14/2009 - 4/14/2014   1673 Days   4.583562   0.07   -3500   -1122.97

7  $27,855.29 (Insurance adjustment offset) for the period from September 17, 2010

8  to April 17, 2014 at 7%: ($6,971.38)

9  9/17/2010 - 4/14/2014   1305 Days   3.575342   0.07   -27855   -6971.38

10  **TOTAL INTEREST:     $269,848.88**

11  102.   Huezo is a licensed real estate broker with extensive experience in

12  commercial lending, obtaining a California Department of Corporations Finance

13  Lender License for Fremont in November of 2007.  In 2006 Huezo deposited

14  earnings of $276,272 in Fremont's accounts.  During the first six months of 2007

15  Huezo deposited earnings of $390,706 into Fremont's accounts.  During the period

16  from November of 2007 (Ball's first loan to Fremont) to May of 2011 (Fremont's

17  bankruptcy filing), Huezo took at least $307,160.95 out of Fremont, which Huezo

18  claims to have been earned commissions.  Huezo continues in business as a

19  licensed real estate broker and continues to arrange loans for outside lenders.

20  (Huezo Declaration, ¶¶ 5-16, 21-23, 187-230; Transcript, 4/25, 54:1-56:24; Stern

21  Trial Declaration ("Stern Declaration"), ¶ 17C)

22  **I.   Mitigation of Damages**

23  103.   Huezo failed to present credible evidence that Ball failed to mitigate

24  his damages by rejecting Huezo's proposed assignment of Fremont's assets in late

25  2010.  The assignment would have required Ball to bear the future expense of

26  Fremont's collection efforts.  Ball did not reject the proposal, but asked Huezo for

27  information on the assets Huezo proposed to transfer so he could analyze the

28  proposal.  Despite Ball's request, Huezo never provided him with the requested

1   information.  When Ball realized he had been defrauded by Huezo, he promptly

2   filed a lawsuit against Fremont and Huezo. (Exhibits 12:1-2; Ball Declaration,

3   ¶¶37-38; Transcript, 4/18, 35:15-38:11; Huezo Declaration, ¶¶321-323)

4

5       DATED:  June 21, 2017          PREPARED AND SUBMITTED BY:
                                        LEWITT, HACKMAN, SHAPIRO,
6                                          MARSHALL & HARLAN

7                                       By:  */s/Nicholas Kanter*
                                             NICHOLAS KANTER
8                                            Attorneys for Plaintiff JOEY BALL

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[THIS DOCUMENT
PRINTED ON
RECYCLED PAPER]

*\\Fs1\apps\lhsmh\KLE\14404-2\1205614_2.doc*

SECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)

*Law Offices*
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
A LAW CORPORATION

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
16633 Ventura Boulevard, 11th Floor, Encino, California 91436

A true and correct copy of the foregoing document entitled (*specify*): S**ECOND AMENDED FINDINGS OF FACT (WITH TRIAL TRANSCRIPT CITATIONS)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) June 21, 2017, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Paul C Bauducco    PBauducco@lewitthackman.com**
- **Nicholas S Kanter    nkanter@lewitthackman.com**
- **Brad D Krasnoff (TR)    jmcdaniel@dgdk.com, bkrasnoff@ecf.epiqsystems.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**

☐ Service information continued on attached page

**2. <u>SERVED BY UNITED STATES MAIL</u>**:
On (*date*) June 21, 2017, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

> **Artin Gholian**
> Jordan Law Group APLC
> 12416 Ventura Blvd
> Studio City, CA 91604

☐ Service information continued on attached page

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) June 21, 2017, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Personal Delivery:
Hon. Robert Kwan, U. S. Bankruptcy Court - Central District
Edward R. Roybal Federal Building and Courthouse
255 East Temple Street, Courtroom 1675
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 21, 2017 | Kathy L. Evans | *Kathy L. Evans* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**