FILED & ENTERED

SEP 30 2019

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bakchell  DEPUTY CLERK

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>VICTOR HUEZO,<br><br>              Debtor.<br><br>_____<br><br>JOEY BALL,<br><br>              Plaintiff,<br>    vs.<br><br>VICTOR HUEZO,<br><br>              Defendant. | Case No. 2:11-bk-35922-RK<br><br>Chapter 7<br><br>Adv. No. 2:11-ap-02825-RK<br><br>**AMENDED MEMORANDUM DECISION ON PLAINTIFF'S ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A) and (a)(6)** |

## I.    INTRODUCTION

This adversary proceeding came on for trial before the undersigned United States Bankruptcy Judge on April 17, 18, 24, and 25, 2014 on the complaint of Plaintiff Joey Ball ("Ball" or "Plaintiff") to determine dischargeability of debt.  Paul C. Bauducco, of the law firm of Lewitt, Hackman, Shapiro, Marshall & Harlan, appeared for Plaintiff.  Artin Gholian, Attorney at Law, appeared for Debtor Victor Huezo ("Huezo," "Defendant," or "Debtor").

In his complaint, Ball alleges, among other things, that Huezo made misrepresentations of material fact in order to convince Ball to "invest" in Fremont Investment Holdings, Inc. ("Fremont") by making loans to Fremont, Huezo's business that

provided loans to borrowers using investments from third-party investors.  Complaint, ECF 1, ¶¶ 7-22.  Ball alleges that he made four "investments" in, or loans to, Fremont totaling $844,750 in reliance upon Huezo's misrepresentations.  *Id*.  In the complaint, Ball seeks a determination that Huezo is indebted to him in the principal amount of $844,750, plus accrued interest, late fees, punitive damages, attorneys' fees and court costs, all of which are nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6).  *Id.,* ¶¶ 34, 40 and 46.

After trial, in June, July and August 2014, Ball and Huezo each submitted proposed findings of fact and conclusions of law, and interposed objections to each other's proposed findings of fact and conclusions of law.  ECF 184, 185, 187, 188 and 195.  On July 17, 2014, Ball lodged his amended proposed findings of fact and conclusions of law.  ECF 192. On August 1, 2014, Ball lodged his second amended proposed findings of fact and conclusions of law.  ECF 199.  On August 7, 2014, the court granted Huezo leave to file objections to Ball's second amended proposed findings of fact and conclusions of law, ECF 202, which Huezo filed on August 11 and 22, 2014, ECF 204 and 206.  The matter was then taken under submission.

On May 17, 2016, the court issued an order directing the parties to file supplemental briefing on the issue of allocation of payments by or on behalf of Fremont to Ball.  ECF 207. On June 17, 2016, both parties filed their supplemental briefs in response to the court's order directing supplemental briefing on payment allocation.  ECF 209 and 211.  On July 1, 2016, Plaintiff Ball filed a reply brief.  ECF 214.

On September 30, 2016, the court entered its Memorandum Decision and Order on Plaintiff's Adversary Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) ("Memorandum Decision and Order"), which ordered counsel for Ball to lodge a proposed final judgment consistent with the Memorandum Decision and Order, and to file a declaration in support of Ball's computations of prejudgment interest within 30 days of entry of the Memorandum Decision and Order.  ECF 215.  Before counsel for Ball lodged a proposed final judgment, Huezo filed a purported Notice of Appeal of the court's Memorandum Decision and Order on October 14, 2016, ECF 217, and an Amended

1   Notice of Appeal of the court's Memorandum Decision and Order on October 24, 2016.

2   Thereafter, counsel for Ball lodged his proposed final judgment, ECF 224, and filed his

3   supporting declaration, ECF 225.

4           On November 29, 2016, upon reviewing the proposed final judgment and supporting

5   declaration submitted by Ball through his counsel, and the notice of appeal and amended

6   notice of appeal filed by Huezo through his counsel, the court entered its Order Vacating

7   the Court's Memorandum Decision and Order.  ECF 237.  In that order, the court

8   (1) explained that it erroneously relied on California Civil Code § 3287(c) in determining

9   prejudgment interest; (2) acknowledged Huezo's position that the court failed to consider

10  certain documents contained in two requests for judicial notice filed on the court's docket

11  before trial but after the pretrial conference, ECF 171 and 172; (3) vacated its

12  Memorandum Decision and Order; (4) and set a post-trial status conference to discuss

13  further proceedings and address these issues.  *See id.*  Thereafter, the court held post-trial

14  status conferences on December 13, 2016, April 5, 2017, July 12, 2017, and July 27, 2017.

15          At the post-trial status conference on December 13, 2016, the court discussed with

16  the parties its concern that the exhibits attached to Huezo's request for judicial notice, ECF

17  171 and 172, were not admitted into evidence at trial, and it appeared to the court that

18  Huezo was attempting to get certain documents into the record "through the back door"

19  after failing to identify these documents to the court and to Ball in the pretrial conference

20  process.[1]  The court continued the post-trial status conference to April 5, 2017 and gave

21  the parties an opportunity to brief the issues raised by Huezo's purported request for

22  judicial notice, including whether the exhibits attached to the request were part of the

---

[1]    Huezo had filed his amended exhibit list on December 20, 2013, listing 60 exhibits.  Defendant's Amended
Register of Exhibits, ECF 162, filed on December 20, 2013.  The pretrial conference was conducted on
January 15, 2014, and the court entered an order approving the exhibit lists of the parties.  ECF 174, filed
and entered on April 7, 2014.  Huezo filed his request for judicial notice consisting of 694 pages for 69 new
documents on April 2, 2014, two and one-half months after the pretrial conference and only 15 days before
the start of trial.  Defendant's Request for Judicial Notice, Volumes I and II, ECF 171 and 172, filed April 2,
2014.  According to Huezo, he stated in his trial testimony that he did not identify these documents as trial
exhibits for the joint pretrial stipulation and the pretrial conference because he "overlooked" them ("At the
time, it was---it was over---overlooked when I was submitting the paperwork.").  *Trial Testimony of Victor
Huezo*, April 25, 2014, ECF 261, Trial Transcript at [page:line] 28:21-29:9.  The lateness and voluminousness
of Huezo's request for judicial notice presented issues of fair notice and due process.

**AMENDED MEMORANDUM DECISION**

1   evidentiary record for trial and/or whether the court was compelled to take judicial notice of

2   those documents.  To that end, the court set a briefing schedule and directed the parties to

3   consider *In re James*, 300 B.R. 890 (Bankr. W.D. Tex. 2003) and Judge Barry Russell's

4   *Bankruptcy Evidence Manual* (2015).

5        On February 17, 2017, Huezo filed his Memorandum of Points and Authorities

6   Regarding the Issue of Whether the Exhibits Attached to Huezo's Requests for Judicial

7   Notice are Part of the Trial Record, ECF 252, and the declaration of Artin Gholian in

8   support thereof, ECF 253.  On March 17, 2017, Ball filed his Memorandum of Points and

9   Authorities in Opposition to Defendant Victor Huezo's Request that the Exhibits in Huezo's

10  Request for Judicial Notice be Included in the Trial Record, ECF 254, and the declaration of

11  Paul C. Bauducco in support thereof, ECF 255.  On March 27, 2017, Huezo filed an

12  unsolicited Reply Memorandum to Plaintiff Joey Ball's Opposition to Defendant Victor

13  Huezo's Request that the Exhibits in Huezo's Request for Judicial Notice be Included in the

14  Trial Record.  ECF 256.  On March 31, 2017, Ball filed his Objections to and Request to

15  Strike Unauthorized Reply Brief by Defendant Victor Huezo.  ECF 257.

16       On April 5, 2017, the court held a further post-trial status conference to address the

17  exhibits to Huezo's request for judicial notice.  At that status conference, the court overruled

18  Ball's objection to and request to strike Huezo's reply brief.  Counsel for Huezo, Mr.

19  Gholian, conceded that the only request for judicial notice exhibits Huezo was concerned

20  with including in the trial record were certain deeds of trust from the relevant time period.

21  *Post-Trial Argument of Victor Huezo by Artin Gholian*, April 5, 2017 at 1:54-1:55 p.m (ECF

22  261, Trial Transcript at [page:line] 20:24-21:03).[2]  Thus, the court granted Huezo leave to

23  file certified copies of certain deeds of trust that were attached to Huezo's trial declaration

24  and included in the request for judicial notice exhibits in the form of uncertified, unstamped

25  copies.  The court set a further post-trial status conference to allow the parties to reargue

26  _____

27  [2]  When the court issued its original memorandum decision, it cited to the trial record to the date and time of
    the testimony or statement based on the audio recordings of the trial proceedings.  Subsequently, written
    transcripts of the trial proceedings have been prepared and filed on the case docket, and the court has
28  inserted citations to the written transcripts with the original citations to the audio recordings of the trial
    proceedings.

the merits of the trial in light of the issues raised in the post-trial status conferences and briefing.  On April 14, 2017, Huezo lodged (though he did not file) with the court certified copies of five deeds of trust, originally included as Defendant's Exhibits 22, 24, 31, 35, and 37, which he denoted D-22A, D-24A, D-31A, D-35A, and D-37A, identified as follows:

(i) Defendant's Exhibit D-22A (uncertified copy submitted at RJN Exhibit 4): Deed of Trust dated November 30, 2007, and recorded December 14, 2007, Los Angeles County Record's Office instrument number 20072748036.  "Borrower": Janet Lee Smith.  "Lender": Fremont Investment Holdings Inc. dba Fremont Investment Funding.  "Property": 7850 Ellenbogen St., Sunland, CA 91040.  Principal: $50,000.  Maturity Date: June 1, 2008.

(ii) Defendant's Exhibit D-24A (uncertified copy submitted at RJN Exhibit 5): Deed of Trust dated December 7, 2007, and recorded December 13, 2007, Los Angeles County Record's Office instrument number 20072737655.  "Borrower": Inocencio Rodriguez.  "Lender": Fremont Investment Holdings Inc. dba Fremont Investment Funding.  "Property": 20 West Montana St., Pasadena, CA 91103.  Principal: $250,000.  Maturity Date: July 1, 2008.

(iii) Defendant's Exhibit D-31A (uncertified copy submitted at RJN Exhibit 6): Deed of Trust dated March 25, 2008, and recorded March 28, 2008, Los Angeles County Recorder's Office instrument number 20080534592.  "Borrower": Eugenia Duran.  "Lender": Fremont Investment Funding.  "Property": 443 N Brannick Ave., Los Angeles, CA 90063.  Principal: $120,000.  Maturity Date: April 1, 2009.  ("After Recording Return To: Zack Morris, 9401 Wayside Dr., Shadow Hills, CA 91040.")

(iv) Defendant's Exhibit D-35A (not submitted as RJN Exhibit): Deed of Trust dated June 5, 2008, and recorded January 13, 2010, Los Angeles County Recorder's Office instrument number 20100052561.  "Borrower": Eugenia Duran.  "Lender": Fremont Investment Funding.  "Property": 443 N Brannick Ave., Los Angeles, CA 90063.  Principal: $260,000.  Maturity Date: April 1, 2009.

(v) Defendant's Exhibit D-37A (uncertified copy submitted at RJN Exhibit 7): Deed of Trust dated June 6, 2008, and recorded June 12, 2008, Los Angeles County Recorder's Office instrument number 20081043486.  "Borrower": Leonel Ramirez.  "Lender": Fremont Investment Holdings Inc. dba Fremont Investment Funding.  "Property": 1082 S Isabella Ave., Monterey Park, CA 91754.  Principal: $100,000.  Maturity Date: June 1, 2009.

As discussed on the record of the post-trial status conference on July 12, 2017, the court will take judicial notice of the fact that these documents were recorded but not of the truth of the facts asserted therein or argued by Huezo.  *See In re James*, 300 B.R. at 895. Because these documents were certified by the County Recorder's Office of the County of

1  Los Angeles, California, they are self-authenticating pursuant to Federal Rule of Evidence
2  902(4).

3        On June 21, 2017, Ball filed his Memorandum of Points and Authorities Regarding
4  Evidentiary Issues and Objections to New Exhibits, ECF 262, and Second Amended
5  Findings of Fact (With Trial Transcript Citations), ECF 264.  Huezo chose not to file any
6  further briefing.  *See generally Docket*; *Closing Argument of Victor Huezo by Artin Gholian*,
7  July 12, 2017 at 2:39 p.m.

8        The court conducted two further post-trial status conferences wherein the parties
9  delivered their closing arguments, one on July 12, 2017 and one on July 27, 2017, where
10  the court gave the parties an opportunity to reargue any issue pending before the court
11  after trial.  At the conclusion of the hearing on July 27, 2017, the court gave Ball an
12  opportunity to file a supplemental brief in response to the publishing of a portion of the trial
13  transcript that the court reporter had previously erroneously omitted.

14        On July 31, 2017, Ball filed a Notice of Intention to Waive Any Additional Briefing
15  Relating to Amended Trial Transcript.  ECF 269.  On August 14, 2017, Ball filed, with leave
16  of court, his Damage Briefing Per Court's Instruction.  ECF 270.  The court thereafter took
17  the matter under submission.

18        Having considered the testimony of the witnesses at trial, the documentary evidence
19  received at trial, the parties' oral and written arguments, including their proposed findings of
20  fact and conclusions of law, the objections interposed thereto, the supplemental briefs on
21  the payment allocation issue, and the supplemental briefing filed after trial, this court
22  hereby makes the following findings of fact and conclusions of law pursuant to Rule 52 of
23  the Federal Rules of Civil Procedure, made applicable here by Rule 7052 of the Federal
24  Rules of Bankruptcy Procedure.

## II.    FACTS

### A.  Ball's Background

27  1.        Ball grew up in La Crescenta, California.  Ball owns and operates tanning
28  salons; he opened or purchased six locations between 1995 and 2006.  At the time of trial,

Ball was operating two tanning salons in Sunland and Montrose, California.  Since 1995, the tanning salons have been, and remained at the time of trial, Ball's primary source of income.  *Trial Declaration of Joey Ball ("Ball Declaration") at* 1-2, ¶ 2.  Ball had owned an apartment building as income property, which he sold with a net capital gain of about $480,000, owned stocks "off and on," and had a net worth of about $1 million in 2006.  *Trial Testimony of Joey Ball,* April 17, 2017, ECF 268 at 63:18-76:17.

2.    On March 2, 1993, Ball obtained a California Real Estate Salesperson's license. Ball placed his license with ERA Castle Realty until September 2, 1994, when his real estate license was suspended because he did not complete continuing education requirements.  Ball did not complete any real estate transactions while affiliated with ERA Castle Realty.  *Ball Declaration* at 2, ¶ 3.

3.    Ball retook the real estate license examination and received another real estate salesperson's license on October 26, 2005.  From October 2005 until July 2007, Ball placed his real estate license with Property Masters Realty.  During this time with Property Masters Realty, Ball did not complete any real estate transactions.  *Ball Declaration* at 2, ¶ 4.

4.    Ball testified at trial about a short-term loan of $120,000 that he made in August 2007 to Keenan Towns, a friend of Ball's, who solicited Ball to lend him (Towns) this money to fund Towns's business.  *Ball Declaration* at 3-4, ¶ 9; *Plaintiff's Exhibit P-3*. According to Ball, he agreed and lent Towns the money, and Towns gave Ball a promissory note for $120,000, all due and payable in 60 days, with interest at 20% per annum.  *Id.* Also, according to Ball, he did not ask Towns to pay 20% interest on the loan, which he said was Towns's idea.  *Id.*  Towns drafted the promissory note, and Ball did not participate in the drafting of the note.  *Id.*  Towns failed to pay back all of the loan on time, and Ball discussed the matter with Huezo, who suggested that he talk with Vahe Jordan, an attorney, and after Ball retained Jordan, Jordan sent a letter to Towns about the loan.  *Id.* Ball and Towns resolved the matter whereby Towns made payments on the principal balance of the note until it was paid off in 2012, but Towns did not pay any interest on the

1  note.  *Id.*  According to Ball, he has never been in the "business" of making loans, and the

2  loans to Towns and Fremont were solicited by them as the borrowers.  *Id.*  Also, according

3  to Ball, he was not aware in August 2007 that the interest on the Towns promissory note

4  was usurious and thus, did not know that there was a potential usury claim until Huezo

5  asserted usury as a defense in this action.  *Id.* at 4, ¶10.  Other than making a loan to

6  Towns and a family loan to his father, Ball did not loan money to anyone else.  *Trial*

7  *Testimony of Joey Ball*, April 25, 2017, ECF 244 at 64:9-12.  Based on this testimony,

8  which the court finds credible, Ball was an occasional lender and not a hard money lender

9  as suggested by Huezo.  *See Proposed Findings of Fact Nos. 14-18, Defendant's*

10  *Proposed Findings of Fact and Conclusions of Law,* ECF 189 at 4-5.

11    5.    Based on the evidence of the above facts, the court finds that although Ball

12  was an experienced small businessperson, he was not a sophisticated business person

13  and investor because he was an infrequent lender, an occasional investor in stocks and an

14  unsuccessful real estate agent.

15    **B.  Ball's Relationship with Huezo and Curtis Hayden**

16    6.    Ball went to Crescenta Valley High School with Huezo's older brother, Juan

17  Huezo.  Through Juan Huezo, Ball has known the Huezo family for nearly 25 years,

18  although he was not friends with Huezo until late 2006, when Huezo began playing golf

19  with Ball and his friends, including Eric Heldwein ("Heldwein") and Curtis Hayden

20  ("Hayden").  *Ball Declaration* at 2, ¶ 5; *Trial Testimony of Joey Ball*, April 17, 2014 at 11:42-

21  11:47 a.m. (ECF 268, Trial Transcript at 101:04-18); *Trial Declaration of Victor Huezo*

22  *("Huezo Declaration")* at 12-13, ¶¶ 27 and 30.

23    7.    Hayden was a real estate agent who placed his license at Property Masters

24  Realty with Ball.  In late 2006, Hayden handled the sale of an apartment building for Ball,

25  which was Ball's personal transaction.  Through this transaction and their friendship,

26  Hayden knew that Ball had accumulated over a million dollars through his business and

27  real estate transactions.  Hayden was Huezo's friend years before meeting Ball, having

28  known Huezo since junior high school and having played football with Huezo in high

1  school.  Hayden knew that Huezo was looking for potential investors in Huezo's lending

2  business, Fremont, and Hayden told Ball about Fremont and suggested that Ball approach

3  Huezo and invest in Fremont.  In 2007, Hayden also began suggesting that Ball move his

4  real estate license to Fremont with Hayden.  *Ball Declaration* at 2-3, ¶¶ 5 and 7; *Trial*

5  *Testimony of Joey Ball*, April 17, 2014 at 1:51-1:54 p.m. and 3:52-3:57 p.m. (ECF 268, Trial

6  Transcript at 224:16-23); *Trial Declaration of Curtis Hayden ("Hayden Declaration")* at 2-3,

7  ¶¶ 3, 5 and 6; *Trial Testimony of Curtis Hayden*, April 25, 2014 at 9:06-9:07 a.m., 9:09-9:10

8  a.m. and 9:12-9:13 a.m. (ECF 244, Trial Transcript at 06:02-23, 08:21-10:10 and 10:20-

9  12:09).

10      **C.  Huezo's and Fremont's Background**

11      8.      Huezo, who held a real estate salesperson's license and a real estate

12  broker's license, had been involved in commercial lending since the late 1990s.

13  Specifically, before creating Fremont, Huezo opened and operated an income tax return

14  preparation office, held positions with John Hancock Life Insurance Company selling

15  various financial products, worked for Santa Monica Bank as a personal banker and

16  insurance investment representative, and worked for U.S. Bank where he managed

17  business loan sales.  *Defendant's Trial Exhibit D-51; Huezo Declaration* at 2-6, ¶¶ 5-12*;*

18  *Trial Testimony of Victor Huezo,* April 24, 2014 at 2:01-2:02 p.m (ECF 250, Trial Transcript

19  at 143:06-08).

20      9.      In 2007 Huezo was the majority owner of Fremont, along with Vahe Jordan

21  ("Jordan"), who was a lawyer and a minority owner.  Huezo later bought out Jordan and

22  became Fremont's sole owner.  Huezo used the title of "Executive Vice President-CEO" at

23  Fremont, and "CEO" for "Chief Executive Officer," meaning that Huezo was Fremont's top

24  manager.  Huezo acted in all of these capacities during the relevant time period involved in

25  this litigation.  Huezo handled all of the accounting functions for Fremont, which included

26  managing its accounts, handling wire transfers of funds in and out of Fremont, signing

27  checks for Fremont, handling all of its books and records, and preparing its tax returns.

28  Huezo was the only person who handled these functions for Fremont.  Huezo had a

1  California real estate salesperson's license and, later, a real estate broker license.  Through

2  Huezo's efforts, Fremont acquired a California Department of Corporations Finance

3  Lender's License.  Although Fremont purported to have two addresses, Huezo operated

4  Fremont mainly at one address, which was his residence.  *Deposition of Victor Huezo,*

5  January 24, 2013, *Plaintiff's Trial Exhibit P-52* at 14:12-21:17, 36:21-40:10, 51:6-52:2 and

6  58:3-60:19; *Huezo Declaration* at 5-9, ¶¶ 11, 16 and 20; *Trial Testimony of Victor Huezo*,

7  April 24, 2014 at 1:46-1:51 p.m. and 2:01-2:02 p.m. (ECF 250, Trial Transcript at 130:11-

8  132:17, 143:09-20).  Based on the evidence admitted at trial, the court finds that Huezo

9  was the principal of Fremont as its sole owner and manager and the sole person acting on

10  behalf of Fremont with respect to Ball's "investments" in, or loans to, Fremont.

11  **D. <u>Huezo's Verbal and Written Representations Concerning Fremont's</u>**

12  **<u>Lending Business</u>**

13  10.  In late 2006 and early 2007, Ball went on golf outings with Hayden, and Ball

14  was introduced to Huezo, who began telling Ball about Fremont.  Huezo told Ball that

15  Fremont was a real estate brokerage and lender and that Fremont was very profitable.  *Ball*

16  *Declaration* at 2-3, ¶ 6; *Trial Testimony of Joey Ball*, April 17, 2014 at 1:33 p.m. (ECF 268,

17  Trial Transcript at 118:11-22).  The court finds Ball's testimony on these points to be

18  credible.

19  11.  Ball testified that during these five or six golf outings from late 2006 to early

20  2007, Huezo told Ball about Fremont's lending business, and Huezo encouraged Ball to

21  consider investing in Fremont.  According to Ball, Huezo orally represented to Ball that:

22  (1) Fremont had been making a lot of money on loans; (2) Fremont was getting a "lender's

23  license" that would allow Fremont to "guarantee" loans; (3) Fremont had other investors

24  who had already invested more money than Huezo was requesting from Ball; and (4) these

25  other investors would buy out Ball's investment within 30 days if Ball wanted his money

26  back.  Huezo orally represented to Ball that the loans were "highly collateralized secured

27  loans," "little to no risk," and "guaranteed," and that Ball would be paid a 15% return on his

28  investment in Fremont.  *Ball Declaration* at 2-3, ¶ 6; *Trial Testimony of Joey Ball*, April 17,

**AMENDED MEMORANDUM DECISION**

2014 at 1:32-1:34 p.m and 1:44-1:55 p.m. (ECF 268, Trial Transcript at 118:11-22, 121:03-122:16 and 128:13-138:18).

12.    According to Ball, Huezo told him while they were golfing one day that "there were a lot of other investors that had invested a lot more money than he was seeking from me and that if I ever wanted my money back that they would be more than willing to buy those loans and it would just take 30 days to get my money back." *Trial Testimony of Joey Ball*, April 17, 2014, ECF 268, Trial Transcript at 128:23-129:3.  As Ball recalled, "I'm actually picturing it in my head right now.  I know which hole on the golf course we were talking about it because that was the day that I decided to loan him [Huezo] the money and it was the one day that we had actually ridden in the golf cart together because he usually rode with Curt Hayden.  And that day he wanted to ride with me for some reason and he was telling [me] all this stuff." *Trial Testimony of Joey Ball*, April 17, 2014, ECF 268, Trial Transcript at 129:4-12.   According to Ball, Curtis Hayden was playing with him and Huezo that day, but was not standing around when Huezo made these statements to him.  *Trial Testimony of Joey Ball*, April 17, 2014, ECF 268, Trial Transcript at 129:13-130:18.

13.    Huezo in his trial declaration denied that he discussed Fremont with Ball while golfing or that he golfed with Ball alone:  "I never golfed with Ball alone as Curt [Hayden] was always present with us on the course.  Nevertheless, I never discussed any investment opportunity regarding Fremont with Ball on the golf course or in the club house." *Huezo Declaration* at 12-13, ¶ 30.

14.    Curtis Hayden in his trial declaration corroborates Huezo's denial that he discussed Fremont with Ball while golfing, stating:  "Though I knew both Ball and Huezo separately for several years, the three of us did not socialize as a group until on or about May 2007 when Ball, Huezo and myself started to golf together on numerous occasions.  I believe Ball and Huezo never had any communications with each other prior to 2007.  I never heard Huezo discuss personal investment opportunities with Ball and we rarely discussed topics beyond golf lingo related to scores, sports, and general conversation.  Since I was the common friend as between Ball and Huezo, I would always coordinate the

golf outings for the three of us usually through a golf professional that worked at Angelus

Golf Course who was an acquaintance of mine.  To my knowledge, I was always present

with Ball and Huezo on the golf course.  I personally never discussed any investment

opportunity regarding Fremont with Ball on the golf course or in the club house nor did I

ever hear Huezo discuss any investment opportunity with Ball during our time golfing

together."  *Hayden Declaration* at 3-4, ¶¶ 8 and 9.

15.    Regarding whether Huezo made the representations that Ball said Huezo

made to Ball on the golf course, the court finds Ball's testimony to be credible and Huezo's

and Hayden's testimony not to be credible.  Doing business on the golf course is a common

business practice because it is a good way for business people to get to know prospective

business partners while playing together in a small group and riding together in a two-

person golf cart over a four- or five-hour round of golf.  *See, e.g.,* Tan, "How to Do Business

on the Golf Course: The etiquette of gracefully mixing business and pleasure on the links;

what to chat about," *The Wall Street Journal* (updated October 5, 2016, online edition

accessed on September 26, 2019) (observing, "Playing golf with business associates is a

longstanding practice.  Mingling business with fun, however, can be tricky. . . 'Whether

you're in France, New York or Asia, when you spend four or five hours on the course with

someone, you start really knowing each other.'").  Huezo and Hayden met each other in

junior high school, both played on the same high school football team and had associated

with many of the same friends which did not include Ball, and Hayden became Huezo's

associate as a real estate salesperson and loan officer from July 2007 through April 2011.

*Hayden Declaration* at 2, ¶¶ 2 and 4; *Ball Declaration* at 2-3, ¶ 6; *Trial Testimony of Joey

Ball*, April 17, 2014 at 1:33 p.m. (ECF 268, Trial Transcript at 118:11-22).  Hayden

introduced Ball to Huezo.  *Id.*  As discussed herein, Fremont's primary source of capital for

its loan business was Ball, who invested $844,750 with Fremont, and Huezo and Hayden

were very motivated to get Ball to invest, or otherwise there was really no capital and thus

no loan business.  *Ball Declaration* at 12-13, ¶¶ 36 and 37; *Plaintiff's Trial Exhibit P-49;

Defendant's Proposed Findings of Facts and Conclusions of Law* ¶ 152.  The only other

outside investor in Fremont was a Mr. Karnakis who may have lent $75,000 to Fremont. *Trial Testimony of Victor Huezo*, April 24, 2017, ECF 250 at 222:6-9.  The only other purported investor was Huezo who may have "invested" $200,000 in Fremont, which came from his commissions earned at Fremont and not from other sources.  It is not credible as Huezo and Hayden testified that on their six or so golf outings with Ball, of four or five hour duration each, that they never discussed Ball's participation in Fremont, which they were trying to otherwise solicit and needed Ball's capital in order for Fremont to have a loan business.   Because Fremont did not have other investors whose investments were larger than Ball's, Huezo's representations to Ball that there were larger investors who could buy out Ball's investments within 30 days if he wanted his money back were untrue.

16.    On or about July 5, 2007, Huezo sent to Ball the written materials explaining Fremont's lending loan program to potential investors (the "Fremont Informational Materials"), stating that the return on investment to Fremont investors was "guaranteed" monthly payments at interest rates of 8.5% to 15% per year, with loans "ideally" at the 15% rate.  Huezo sent the Fremont Informational Materials by email, and the email message from Huezo to Ball accompanying the material included the subject line, "Information on Lending from Victor," and the text of the message stated: "Joey, Here is some information on how the lending works.  Look it over and lets [sic] try to get together to go over this and the contract I sent you.  Thanks, Victor." *Plaintiff's Trial Exhibits P-1 and P-2; Ball Declaration* at 3, ¶ 8; *Trial Testimony of Joey Ball*, April 17, 2014 at 1:55-2:28 p.m. and 2:36-2:57 p.m. (ECF 268, Trial Transcript at 139:06-147:03 and 159:22-189:01); *Trial Testimony of Victor Huezo*, April 24, 2014 at 1:52-1:56 p.m. and 3:52-3:53 p.m. (ECF 250, Trial Transcript at 135:20-141:22 and 217:16-218:05).

17.    The first page of the Fremont Informational Materials with Fremont's letterhead on top was addressed, "To Whom It May Concern," and as indicated by the signature block at the bottom of the page, the responsible person for the materials was "Victor Huezo, Executive Vice President-CEO."  Huezo's responsibility for the Fremont Informational Materials is also indicated by the fact that he is the only contact person for

1  Fremont indicated in the materials and that he was the only email contact person in the

2  materials ("Email: vhuezo@hotmail.com").  The court finds that Huezo is the sole person

3  responsible for the creation and distribution of the Fremont Informational Materials and was

4  the sole person who distributed these materials to Ball.

5      18.    In deciding to loan Fremont money for its lending program, Ball relied on the

6  written representations to potential investors about Fremont's lending program in the

7  Fremont Informational Materials that Huezo sent him, *Plaintiff's Trial Exhibit P-2*, including

8  the following:

9          a.  "Investor does a note with a guarantee [sic] monthly payment from

10  Fremont Investment Holdings Inc. for the money lent out to borrowers.  This money

11  is paid back with a guaranteed monthly or quarterly interest payment from Fremont

12  Investment Holdings Inc.  The investors have their money secured by the assets and

13  collateral Fremont Investment Holdings Inc. holds from the various loans made to

14  borrowers.  Depending on the risk associated with the loan being made the

15  guaranteed monthly payment is going to range between 8.5% and 15%." *Plaintiff's*

16  *Trial Exhibit P-2* at 3.

17          b.  "For example: If a loan is made on a personal residence secured by a

18  deed of trust along with a personal guarantee, the guaranteed monthly payment

19  might be somewhere between 8.5% to 10% if the LTV is 75% or less and the

20  borrowers credit score is around 685.  However, if we have a borrower with a credit

21  score of 600 and a LTV of 85% the guaranteed monthly payment might be between

22  10% to [sic] 15% depending on finance laws." *Plaintiff's Trial Exhibit P-2* at 3.

23          c.  "In order for investors to analyze their risk and reward an activity report is

24  sent out to all investors prior to processing any loans.  The activity report is going to

25  outline what loans are being made and at what rate the investors are getting paid at.

26  (Please refer to activity report.)." *Plaintiff's Trial Exhibit P-2* at 3.

27          d.  Activity Report format, describing the type and amount of loans, proposed

28  interest rate, total debt owed and collateral value for loans being proposed.

-14-

*Plaintiff's Trial Exhibit P-2* at 13.

e.  Activity Report language stating "Here is a list of the proposed loans we are going to close this week.  In order, [sic] to issue credit to our clients we will need to know your commitment in funding these loans.  Please take a few moments to fax back your commitment.  Priority on [sic] to the loan commitments will be based on a first come, first serve basis." *Plaintiff's Trial Exhibit P-2* at 13.

f.  "*Question 1: How are investors paid out completely.* [sic] Answer: Most investors are paid within 12 months or when the loans made come due.  If an investor needs a portion of their money prior to the 12 months or any of the loans coming due, a new investor either purchase [sic] existing debt or Fremont Investment Holdings Inc. pays the investor off." *Plaintiff's Trial Exhibit P-2* at 16.

g.  "*Question 4: How do we know what assets Fremont Investment Holdings Inc. has as collateral to protect the investor's money?*  Answer: A balance sheet showing assets and liabilities will be sent to all investors on a quarterly basis." *Plaintiff's Trial Exhibit P-2* at 16.

h.  "*Question 5: How do we recover our money from clients who cannot pay their debts back?*  Answer: The loan is made to Fremont Investment Holdings Inc. not directly to the client.  It is the responsibility of Fremont Investment Holdings Inc. to pay all investors back within the time frames set.  In order, to lower the risk we spread our liabilities with clients and limit our exposure to any single client." *Plaintiff's Trial Exhibit P-2* at 16.

i.  "*Question 6: What happens if Fremont Investment Holdings Inc. does not get payments from clients for a loan made?* Answer: The investor is lending the money to Fremont Investment Holdings Inc., therefore payments to investors must be made according to the terms agreed on." *Plaintiff's Trial Exhibit P-2* at 16.

j.  "*Question 7: Why does Fremont Investment Holdings Inc. send an Activity report* [sic] *if the investor is not buying that specific loan or loans?* Answer: The reason for the activity report is to determine the guaranteed monthly payment to the

investors.  This way they can see for themselves what loans are being made and

why the guaranteed interest rate is more or less than the last deal they did."

*Plaintiff's Trial Exhibit P-2* at 16.

*Ball Declaration* at 2-3, ¶¶ 6 and 8; *Trial Testimony of Joey Ball*, April 17, 2014 at 1:55-2:28

p.m. and 2:36-2:57 p.m. (ECF 268, Trial Transcript at 139:06-147:03 and 166:10-189:01).

19.    Page 1 of the Fremont Informational Materials provided by Huezo to Ball

stated that "the majority of the lending we do is based on collateral and personal

guarantees." *Plaintiff's Trial Exhibit P-2*.  However, Ball testified that he did not rely on the

representations on page 1 of the Fremont Informational Materials.  *Trial Testimony of Joey*

*Ball*, April 17, 2014 at 2:36 p.m. (ECF 268, Trial Transcript at 166:10-12).

20.    Page 3 of the Fremont Informational Materials, paragraph 1, provided by

Huezo to Ball, specifically stated: "The investors have their money secured by the assets

and collateral Fremont Investment Holdings Inc. holds from the various loans made to

borrowers." *Plaintiff's Trial Exhibit P- 2* at 3, ¶ 1.  Ball testified that he read and relied upon

the representations on page 3 of the Fremont Informational Materials and relied on all of

Page 3 except for Paragraph 3 because Ball believed that paragraph did not pertain to him.

*Id.; Trial Testimony of Joey Ball*, April 17, 2014 at 2:36-2:38 p.m. (ECF 268, Trial Transcript

at 166:10-168:19).  The court finds Ball's testimony on these points to be credible.

21.    The Fremont Informational Materials provided by Huezo to Ball also stated at

Page 3, Paragraph 2: "For example: If a loan is made on a personal residence secured by

a deed of trust along with a personal guarantee, the guaranteed monthly payment might be

somewhere between 8.5% to 10% if the LTV ["Loan To Value"] is 75% or less and the

borrowers credit score is around 685.  However, if we have a borrower with a credit score

of 600 and a[n] LTV of 85% the guaranteed monthly payment might be between 10% to

15% depending on finance laws." *Plaintiff's Trial Exhibit P-2* at 3, ¶ 2.

22.    The Fremont Informational Materials provided by Huezo to Ball further stated

at Page 3, Paragraph 3: "If we are securing a loan with a UCC filing using business assets

the guaranteed monthly payment is going to be somewhere between 10.75% to 15%."

1  *Plaintiff's Trial Exhibit P-2* at 3, ¶ 3.

2      23.    The Fremont Informational Materials provided by Huezo to Ball also stated at

3  Page 3, Paragraph 5: "[I]n order for investors to analyze their risk and reward an activity

4  report is sent out to all investors prior to processing any loans.  The activity report is going

5  to outline what loans are being made and at what rate the investors are getting paid at.

6  (Please refer to the activity report.)"  *Plaintiff's Trial Exhibit P-2* at 3, ¶ 5.

7      24.    The Fremont Informational Materials provided by Huezo to Ball contained a

8  sample "activity report" to show how Fremont purportedly informed investors of loans it was

9  working on, which described the type and amount of loans, proposed interest rate, total

10  debt owed, and collateral value for proposed loans Fremont was going to close in a

11  particular week.  Below the list of proposed loans, the activity report states, "In order, to

12  issue credit to our clients we will need to know your commitment in funding these loans."

13  The activity report contained a fill-in-the-blank area for an investor to fill out, which indicates

14  the investor's commitment to fund the described loans.  *Plaintiff's Trial Exhibit P-2* at 13.

15      25.    Ball testified that during their golf outings, Huezo orally represented that

16  Huezo would provide Ball with balance sheets showing Fremont's assets and liabilities.

17  *Trial Testimony of Joey Ball*, April 17, 2014 at 3:41 p.m. (ECF 268, Trial Transcript at

18  213:09-21).  The court finds Ball's testimony on this point to be credible.

19      26.    At trial, when Huezo was questioned whether he had ever sent any balance

20  sheets to Ball as described above in Question 4 of the "Q&As" in the Fremont Informational

21  Materials, Huezo testified that he had because he considered the investor activity reports to

22  be the balance sheets referenced in Question 4 above.  *Trial Testimony of Victor Huezo*,

23  April 24, 2014 at 1:55-1:57 p.m. (ECF 250, Trial Transcript at 137:18-139:20).  The court

24  does not find Huezo's testimony on this point to be credible.

25      27.    Ball testified that he did not request balance sheets from Huezo or Fremont

26  until 2010.  Ball testified that he requested balance sheets for investments he made with

27  Huezo in January and February 2008, but never received them.  *Trial Testimony of Joey*

28  *Ball*, April 17, 2014 at 3:16 and 3:41-3:43 p.m., (ECF 268, Trial Transcript at 200:01-06),

1   April 25, 2014 at 10:34 a.m. and 10:48-10:50 a.m. (ECF 244, Trial Transcript at 213:09-

2   218:01).  The court finds Ball's testimony on these points to be credible.

3          28.     Ball testified that he believed Huezo's representations regarding Fremont's

4   profitability and that Fremont's loans were made on a secured basis because Ball thought

5   of Huezo as a friend and trusted him. *Ball Declaration* at 4, ¶ 12.  The court finds Ball's

6   testimony on this point to be credible.

7          29.     Ball testified that he relied on the verbal representations of Huezo regarding

8   the profitability and security of an "investment" in Fremont. *Ball Declaration* at 4, ¶ 12.  He

9   testified that if he had to put a number to it, he would say he relied 75 percent on Huezo's

10  verbal representations and 25 percent on Huezo's written representations. *Trial Testimony*

11  *of Joey Ball*, April 17, 2014, ECF 268 at 160:2-21.  The court finds Ball's testimony on these

12  points to be credible.

13         30.     While it is undisputed that Huezo provided Ball with the Fremont Informational

14  Materials, the parties dispute Huezo's purpose for providing Ball with the materials.  Ball

15  contends that Huezo provided him with the Fremont Informational Materials to induce him

16  to "invest" his money in Fremont's lending program.  Huezo contends that he provided Ball

17  with the Fremont Informational Materials to train Ball as a new agent working for Fremont,

18  either in preparation for soliciting other investors or borrowers or clients.  At one point,

19  Huezo testified that the Fremont Information Materials were intended to train Fremont's

20  agents on how to solicit "borrowers" or "clients," even though the vast majority of the

21  information contained in those materials pertains only to investors investing capital in

22  Fremont and would be irrelevant to a borrower looking to take out a loan from Fremont.

23  *Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250 at 233:5-238:10.  The court finds

24  that Ball's contention is supported by a preponderance of the evidence and that Huezo's

25  contention strains credulity.  The evidence indicates that Fremont had few investors to give

26  it the capital it needed to lend to its borrowers, and at trial Huezo produced no other

27  evidence showing that Fremont had any investors other than Ball and perhaps one other

28  individual.  The bulk of the capital, if not all, that Fremont used to lend to borrowers came

1  from Ball.  The lack of any other sources of capital for Fremont other than Ball, on this

2  record, which Huezo has not shown to be otherwise, indicates that Ball was the target of

3  the sales pitch that Huezo was making for Ball to "invest" in, and lend to, Fremont, and

4  Huezo did not distribute the Fremont Information Materials to train Ball in soliciting other

5  investors or borrowers for Fremont.  Before Hayden introduced Huezo to Ball on a golf

6  outing, Hayden talked up Huezo's business, Fremont, to Ball and encouraged Ball to invest

7  in Fremont.  After being introduced to Ball on a golf outing, Huezo actively solicited Ball to

8  invest in Fremont, and the Fremont Informational Materials provided by Huezo to Ball were

9  an integral part of Huezo's sales pitch for Ball to part with his money and invest in Fremont.

10  Huezo contends that the language of the email transmittal accompanying the Fremont

11  Informational Materials was ambiguous and supports his interpretation that the materials

12  were for training purposes only and not for the purpose of soliciting Ball as an investor, and

13  that the timing of transmittal of the materials in July 2007, four months before Ball's first

14  investment in November 2007, demonstrates that the materials could not have been

15  intended as a solicitation.  However, the totality of the circumstances supports Ball's

16  contention that the Fremont Informational Materials were representations intended to be

17  made to him to solicit his "investment" in Fremont by making loans to it.  Huezo, by

18  providing the Fremont Informational Materials to Ball, made the written representations

19  contained in those materials to Ball, and because Huezo was in fact Fremont, no one else

20  but Huezo is responsible for the representations made in those materials.

21       **E.  <u>November Report and $240,000 "Investment"</u>**

22       31.     On November 8, 2007, Fremont obtained a California Finance Lender's

23  License. *Ball Declaration* at 4, ¶ 11; *Huezo Declaration* at 18, ¶ 47.

24       32.     On or about November 26, 2007, Huezo sent by e-mail to Ball an "Activity

25  Report" ("November Report").  Although the November Report listed four "Secured Loans"

26  whose sum adds up to $290,000 ($40,000, $50,000, $150,000, and $50,000, respectively),

27  it listed the total loan amount as $240,000, which appears to be a miscalculation.  Each of

28  the four listed "Secured Loans" listed separate collateral values of $250,000, $500,000,

1    $340,000 and $490,000, respectively, which totals $1,580,000.  Each "Secured Loan" listed

2    an interest rate of $15%.  Below the list of four "Secured Loans" on the November Report,

3    the November Report stated, "Here is a list of proposed loans we are going to close this

4    week.  In order, to issue credit to our clients we will need to know your commitment to

5    Fremont Investment Holdings Inc.  Please take a few moments to fax back your

6    commitment."  *Plaintiff's Trial Exhibits P-4 and P-6; Ball Declaration* at 4, ¶ 11*; Trial*

7    *Testimony of Joey Ball*, April 17, 2014 at 2:57-3:07 p.m. and 3:14-3:15 p.m. (ECF 268, Trial

8    Transcript at 184:09-189:06 and 198:19-199:05); *Huezo Declaration* at 38-39, ¶¶ 109-110;

9    *Trial Testimony of Victor Huezo*, April 24, 2014 at 1:56-1:59 p.m., 2:02-2:04 p.m. and 3:14-

10   3:15 p.m. (ECF 250, Trial Transcript at 139:16-142:01, 143:21-146:18 and 194:12-197:24).

11          33.     In conversations with Ball, Huezo orally confirmed to Ball what the November

12   Report said, i.e. that the $240,000 "investment" in, or loan to, Fremont was intended for the

13   "secured" loans outlined in the November Report, which would be collateralized by real

14   property with more than enough collateral to secure the loans.  According to the November

15   Report, the loans were forecasted to be made to Fremont's borrowers on November 20,

16   2007.  *Plaintiff's Trial Exhibits P-4 and P-6*; *Ball Declaration* at 4, ¶ 11; *Trial Testimony of*

17   *Joey Ball*, April 17, 2014 at 1:37-1:42 p.m. and 2:59-3:04 p.m. (ECF 268, Trial Transcript at

18   122:17-127:24, 185:03-194:23).  The court finds Ball's testimony on this point to be

19   credible.

20          34.     Ball testified that he relied on Huezo's verbal representations regarding the

21   profitability and security of Ball's "investments" in, or loans to, Fremont, which Ball believed

22   was confirmed by the November Report.  *Ball Declaration* at 4, ¶ 12; *Trial Testimony of*

23   *Joey Ball*, April 17, 2014 at 3:10-3:17 p.m. (ECF 268, Trial Transcript at 195:07-199:25).

24   The court finds Ball's testimony on this point to be credible.

25          35.     Ball testified that what was important to him about the November Report was

26   that the loans being made with his "investment" were secured, that they were at the 15%

27   interest rate, and that the collateral had a high value relative to the outstanding loan

28   amounts.  *Trial Testimony of Joey Ball*, April 17, 2014 at 3:14-3:17 p.m. (ECF 268, Trial

1  Transcript at 198-199).  The court finds Ball's testimony on this point to be credible.

2       36.    Ball, relying on Huezo's written and verbal representations regarding the

3  $240,000 in "Secured Loans," immediately completed the "commitment" section of the

4  November Report agreeing to provide Fremont the requested $240,000 "investment" or

5  loan and faxed it back to Huezo.  Ball then wire-transferred Fremont the $240,000 solicited

6  by Huezo for Fremont.  *Plaintiff's Trial Exhibits P-4 and P-6*; *Ball Declaration* at 4-5, ¶¶ 12,

7  13 and 14; *Trial Testimony of Joey Ball*, April 17, 2014 at 1:25-1:29 pm, 1:31 p.m.-1:42 pm,

8  1:44-1:51 p.m., 1:54-2:28 p.m., 2:36-2:41 p.m., 2:48-3:04 p.m., 3:10-3:12 p.m. and 3:14-

9  3:15 p.m.  *See also* ECF 268, Trial Transcript at 181:11-199:05.

10       37.    In or about November or December 2007, Huezo prepared and hand

11  delivered to Ball a $240,000 promissory note from Fremont, dated November 28, 2007

12  ("November Note"), which provided for annual interest of 15%, monthly payments of $3,000

13  to Ball, and a maturity date of January 1, 2009.  Paragraph 7 of the November Note

14  indicated that it was a "Uniform Secured Note."  *Plaintiff's Trial Exhibit P-9; Ball Declaration*

15  at 5, ¶ 14; *Trial Testimony of Joey Ball*, April 17, 2014 at 4:07-4:10 p.m. (ECF 268, Trial

16  Transcript at 234:05-235:25); *Huezo Deposition* at 117:4-118:16; *Trial Testimony of Victor*

17  *Huezo*, April 24, 2014 at 2:40-2:43 p.m. (ECF 250, Trial Transcript at 175:12-176:05).

18       38.    Ball testified that he asked Huezo multiple times for a list of the addresses for

19  the four properties for the "secured loans" that Ball's $240,000 "investment" or loan funded.

20  *Trial Testimony of Joey Ball*, April 17, 2014 at 3:12-3:13 p.m. (ECF 268, Trial Transcript at

21  196:02-19).  The court finds Ball's testimony on this point to be credible.

22       39.    In his January 24, 2013 deposition, Huezo testified that he used Ball's

23  $240,000 loan to Fremont to make loans to another entity and not the loans listed in the

24  November Report and that he got Ball's permission to do so not in writing, but either by

25  phone or by text, though he did not have copies of the texts.  *Deposition of Victor Huezo*,

26  January 24, 2013, *Plaintiff's Exhibit P-52* at 88:5-95:1   At trial, Huezo directly contradicted

27  this testimony from his deposition, claiming he never had such a conversation and actually

28  made the loans proposed in the November Report.  *Compare Huezo Declaration*, ¶¶ 109-

110; *Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250 at 143:21-145:16, 146:8-149:5 *with, Deposition of Victor Huezo*, January 24, 2013, *Plaintiff's Exhibit P-52* at 88:5-95:1. Thus, it is not clear which of these versions of Huezo's testimony is true, if any. The court finds this testimony of Huezo to be self-serving, not credible, and tailored to avoid the truth. Either (1) Huezo's deposition testimony was true, in which case he admitted to misusing the funds from Ball's loan by not using Ball's money to fund the four loans in the November Report as Huezo promised Ball, or (2) Huezo funded the loans and either failed to obtain a security interest for the loans or failed to repay Ball after Fremont was paid the funds by the borrowers and instead "recycled" the funds by lending the funds out again without authorization from Ball. Under either version of the facts offered by Huezo, Ball suffered the loss of his money based on Huezo's representations.

40.    At trial, Huezo testified that Fremont funded the four loans listed on the November Report: "The November 20, 2007 Investor Activity report submitted by Ball and attached to his Complaint shows four loans in the amount of $40,000, $50,000, $150,000 and $50,000. . . .  Fremont . . . moved forward and made loans to the borrowers corresponding to these loans." *Huezo Declaration* at 38-39, ¶ 109.

41.    Huezo testified that the first loan from the November Report was completed on December 14, 2007 for $40,000 to Gemini Security in the final amount of $43,000. *Huezo Declaration* at 29, ¶ 110. Huezo testified that, although he was confident that the Gemini business had valuable assets and Gemini's insider owned a house worth $1.5 million, this loan was unsecured and there was no security agreement of any type because Fremont's "security" was the promissory note given by Gemini, possibly the personal guarantee of the principal of the borrower, Mr. Gemini, but no separate security agreement or deed of trust existed. *Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250 at 154:6-157:4. In this testimony, Huezo expressed his opinion that the promissory note given by Gemini was "my security agreement" and there was no need for a separate security agreement and UCC-1 financing statement or a deed of trust to secure a loan with personal property or real property collateral. *Id.* Huezo admitted in his trial declaration that Gemini

1   never paid back the entire loan amount. *Huezo Declaration* at 79, ¶ 245. However,

2   according to Huezo, this loan was not funded with Ball's loan funds of $240,000 because

3   the entirety of Ball's funds was used to fund the Inocencio Rodriguez loan. *Huezo*

4   *Declaration* at 29, ¶ 110. If Ball's money was used to fund this loan, it should not have

5   been made because the loan was not secured as Huezo represented to Ball, resulting in

6   the loss of Ball's money since the borrower failed to repay the loan.

7        42.    Huezo testified that the second loan from the November Report was

8   completed on December 7, 2007 for $50,000 to Janet Smith. *Huezo Declaration* at 29,

9   ¶¶ 110 and 232. Janet Smith apparently paid back the entire loan amount on August 13,

10   2008. *Huezo Declaration* at 74, ¶ 233. Huezo contends that one of the exhibits of which

11   he requests the court take judicial notice, *Defendant's Exhibit D-22A*, demonstrates that he

12   properly perfected a security interest in Janet Smith's real property by obtaining and

13   recording a deed of trust. *Huezo Declaration* at 73, ¶ 232. While the court may take

14   judicial notice of the fact that this document was recorded, the court cannot take judicial

15   notice of the matters asserted therein, *see In re James*, 300 B.R. at 895, especially here,

16   where Ball has objected on the basis of hearsay and has asserted that Huezo has

17   fabricated certain documents. However, even if the court could take judicial notice of such

18   disputed contentions, the evidence demonstrates that after Janet Smith paid back Fremont,

19   Fremont/Huezo did not repay Ball once the Janet Smith loan was repaid. However,

20   according to Huezo, this loan was not funded with Ball's loan funds of $240,000 because

21   the entirety of Ball's funds was used to fund the Inocencio Rodriguez loan. *Huezo*

22   *Declaration* at 29, ¶ 110. If Ball's money was used to fund this loan, it should have been

23   repaid to Ball when the loan was paid off unless Fremont/Huezo had Ball's authorization to

24   use the money for other purposes, such as making new loans or paying commissions to

25   Huezo.

26        43.    Huezo testified that the third loan in the amount of $150,000 from the

27   November Report was completed on December 7, 2007 in the final amount of $250,000 to

28   Inocencio Rodriguez, which was a different amount as represented to Ball. *Huezo*

*Declaration* at 29, ¶ 110.  According to Huezo in his trial declaration, the entirety of Ball's loan funds of $240,000 for loans listed on the November Report was used to fund the Inocencio Rodriguez loan of $250,000.  *Id.*  (However, in his live testimony at trial, Huezo testified that a loan of $2,000 to Edelmira Cruz was funded with Ball's money based on the November Report.  *Trial Testimony of Victor Huezo*, April 24, 2017, ECF 250 at 169:18-170:8.).  Huezo thus admits that Fremont funded the loan of $250,000 to Inocencio Rodriguez, even though the maximum amount of any loan listed on the November Report was $150,000, which substantially changed the loan to value ratio where the listed collateral value was $340,000.  *Huezo Declaration* at 29, ¶ 110.  Based on the representations in the November Report, Ball only agreed to fund this loan in the amount of $150,000, not $250,000, for a loan secured against collateral worth $340,000.    It appears that Fremont had provided two separate loans to Inocencio Rodriguez on December 7, 2007: one for $175,000, which was also higher than the $150,000 listed in the November Report, *Huezo Declaration* at 48, ¶ 150 and at 75-76, ¶ 238, and the other for $250,000, *id.* at 48, ¶ 153 and at 77, ¶ 240.  Huezo testified that Rodriguez paid off the first loan on December 10, 2007, but requested another loan for $250,000 to pay an additional amount of taxes.  *Huezo Declaration* at 76, ¶ 239.  Fremont funded this second loan without authorization from or discussion with Ball that the loan listed on the November Report for $150,000 on a property valued $340,000 was now going to be for $250,000, or that the proceeds of the first Inocencio Rodriguez loan would be recycled to fund a different and larger loan.[3]  Inocencio Rodriguez paid back the entire loan amount on May 29, 2008 in the amount of $282,687.70, which included the $250,000 principal and the remainder in prepayment and interest charges.  *Huezo Declaration* at 61-62, ¶ 205, and Defendant's Exhibit D-30 (wire transfer memorandum at page 5).  Huezo contends that one of the exhibits of which he requests the court take judicial notice, *Defendant's Exhibit D-24A,*

---

[3]  Based on this record, the court would also infer that the initial loan payoff from Rodriguez was probably funded by Fremont's second loan of $250,000 to Rodriguez and not by new money he had brought to the transaction.  In such a scenario, Huezo would presumably claim an entitlement to a commission on the payoff amount, even though it was being funded by a new loan through Fremont.

**AMENDED MEMORANDUM DECISION**

1  demonstrates that he properly perfected a security interest in Inocencio Rodriguez's real

2  property by obtaining and recording a deed of trust. *Huezo Declaration* at 48, ¶ 153.  While

3  the court may take judicial notice of the fact that this document was recorded, the court

4  cannot take judicial notice of the matters asserted therein, *see In re James*, 300 B.R. at

5  895, especially here, where Ball has objected on the basis of hearsay and has asserted

6  that Huezo has fabricated certain documents.

7       44.  However, even if the court could take judicial notice of such disputed

8  contentions, the evidence demonstrates that after Inocencio Rodriguez paid back Fremont,

9  Fremont did not repay Ball once the Inocencio Rodriguez loan was repaid.  Fremont/Huezo

10 needed Ball's authorization to use Ball's loan money for purposes other than making the

11 loans on the November Report, which they did not get.  Ball's commitment to Fremont was

12 to make specific secured loans as listed on the November Report, and Fremont did not do

13 that exactly by making a loan in a higher amount than listed on the November Report.

14 When the loan that Fremont made with Ball's funds of $240,000 was repaid, Fremont

15 should have repaid the money to Ball or obtain his authorization to do something else with

16 his money.  Fremont did not repay Ball with his money when Inocencio Rodriguez paid off

17 his loan, the one loan on the November Report that Huezo said that Fremont made with

18 Ball's money, and did not get Ball's authorization to use Ball's money for other purposes.

19 Fremont/Huezo used Ball's loan money repaid by Inocencio Rodriguez for purposes not

20 previously authorized by Ball, including paying Huezo a "commission" of $30,000. *Huezo*

21 *Declaration* at 61-62, ¶ 205 (according to Huezo, he earned a "payoff" commission of

22 $32,187.70 based on his agreement with Fremont and paid himself $30,000 by check).

23 Huezo has not explained where the rest of Ball's funds of $240,000 went other than giving

24 himself a "commission" of $30,000 without Ball's authorization.

25      45.  Apparently, the rest of Ball's money for the November Report investment was

26 "recycled", that is, Fremont had a policy to recycle loan payoffs into new loans without such

27 policy being disclosed to investors such as Ball. *Trial Testimony of Victor Huezo*, April 24,

28 2017, ECF 250 at 220:15-221:24.

-25-
**AMENDED MEMORANDUM DECISION**

46.    Huezo admitted in his trial testimony that he and Fremont were "recycling" loan payoff funds into new loans to other Fremont borrowers, including loan payoff funds from Ball's initial investment/loan of $240,000: ("Q: . . . So what was your plan to get Fremont to pay Mr. Ball's notes as they came due?  A:  Fremont had made notes to borrowers so I'm sure there's occasions where I'm sending notice of defaults to borrowers and I'm trying to collect the funds owed to repay these notes.  Q: Okay, you knew well in advance that these sums were coming due in January, February and March of 2009, but even though you knew that, for instance, with the Inocencio Rodriguez payoff at $250,000, you didn't segregate that full 250 to pay Mr. Ball, did you?  A: That was---that loan was paid off on what, July or August?  Q:  In June of 2008.  A:  June and the promissory note was good through the full year.  I was halfway through the promissory note.  I had no reason to believe that any loan that I did was not going to be repaid by the Fremont borrowers."  *Trial Testimony of Victor Huezo*, April 24, 2017, ECF 250 at 257:10-258:2.  Implicit in this testimony is Huezo's admission that Fremont did not have to repay the investor when the specific loan that induced the investor to invest was paid off and could relend the loan payoff funds to new Fremont borrowers without knowledge or consent of the investor since as Huezo put it, he "was halfway through the promissory note [between Fremont and the investor]".  As to Ball, this was contrary to Huezo's representations to Ball that Ball's money would be invested in specific secured loans and not other loans just because Huezo believed that the borrowers that he lent the money to would repay the money, which was easy for him to say because it was not his money, but Ball's.

47.    According to Ball, Huezo never discussed with him how Fremont would pay off his loans.  *Trial Testimony of Joey Ball*, April 25, 2017, ECF 244 at 66:24-67:2.  Also, according to Ball, Huezo never told him that the secured loans made with his money would be used for subsequent unsecured high-risk loans, and Ball would not have loaned the money to Fremont if Huezo had explained that to him.  *Id.,* ECF 244 at 67:24-67:2   The evidence here indicates that Huezo represented to Ball that Ball's money would be used for specific secured loans, but contrary to these representations, Fremont/Huezo used Ball's

money for other purposes without informing Ball or obtaining his consent.

48.      Huezo testified that the fourth loan from the November Report was completed on December 4, 2007 for $2,000 to Edelmira Cruz, even though she originally wanted to borrow $50,000 (as stated in the November Report). *Huezo Declaration* at 29, ¶ 110.  He later testified that this loan was actually for $3,000. *See id.* at 74-75, ¶ 234.  In his live testimony at trial, Huezo testified that this loan was actually made, but in the amount of $2,000.00. *Trial Testimony of Victor Huezo*, April 24, 2017, ECF 250 at 169:18-170:8. Huezo testified that he decided to decrease the loan amount to Edelmira Cruz from $50,000 to $2,000 or $3,000 because she did not have a proper exit strategy. *Huezo Declaration* at 39-40, ¶ 111.  As Huezo testified in his trial declaration, he decided based on his business judgment that Fremont would make the loan to this borrower based on financial information in the borrower's loan application, credit scores and proposed personal property and real property collateral not identified by Huezo.  It appears this loan was also unsecured because Huezo offered no proof that Fremont obtained a deed of trust or a security agreement and UCC-1 financing statement to secure the loan with any real property or personal property collateral as Fremont apparently obtained only a promissory note. *Huezo Declaration* at 48, ¶ 151 and at 74-75, ¶ 234.  According to Huezo's testimony, Edelmira Cruz paid back the entire loan amount in August 2008. *Huezo Declaration* at 75, ¶ 235.   Although Huezo in his trial declaration testified that this loan was not funded with Ball's loan funds of $240,000 because the entirety of Ball's funds was used to fund the Inocencio Rodriguez loan, in his live testimony at trial, he said that this loan to Edelmira Cruz in the amount of $2,000 was funded with Ball's money. *Huezo Declaration* at 29, ¶ 110; *Trial Testimony of Victor Huezo*, April 24, 2017, ECF 250 at 169:18-170:8.  If Ball's money was used to fund this loan, it should have been repaid to Ball when the loan was paid off unless Fremont/Huezo had Ball's authorization to use the money for other purposes, such as recycling loan payoffs to make new loans or paying commissions to Huezo, which authorization that Fremont/Huezo did not have.

49.      Fremont/Huezo needed Ball's authorization to use Ball's loan money for

purposes other than making the secured loans on the November Report, including paying

Fremont's "operational costs," such as Huezo's commissions, and recycling the repaid loan

funds into new loans, but Fremont and Huezo did not get such authorization.  *Ball*

*Declaration* at 5, ¶ 13.  Ball was very specific in his testimony about what he was lending

Fremont for:

> At no time did Huezo tell me my "commitment" under the November Report was too
> late, or that any portion of the $240,000 I loaned Fremont pursuant to said
> commitment was not being used for the four (4) "Secured Loan[s]" outlined in the
> November Report.  At no time did I ever agree that Huezo or Fremont could use the
> $240,000 for anything other than funding the "Secured Loan[s]" in the November
> Report.  Had I known that Huezo and Fremont intended to use all or any portion of
> my $240,000 for purposes other than funding the "Secured Loan[s]" outlined in the
> November Report, which were collateralized by assets valued at $1,580,000, I would
> never have loaned the money to Fremont.  I did not know or believe my loan was
> being used for other purposes.

*Id.*

> 50.     According to Huezo, he did get such authorization from Ball because Ball

"knew" that Fremont would use the funds to pay its operational costs:

> It is my belief, based on the conversations that I had with Ball regarding his act of
> loaning money to Fremont, that Ball knew he was lending money directly to Fremont.
> Ball knew that he was NOT lending his money directly to Fremont borrowers and
> that Fremont would use the funds for any operational costs including using the funds
> to make direct loans to Fremont borrowers pursuant to Fremont's finance lender's
> license.

*Huezo Declaration* at 40, ¶ 113.  This testimony of Huezo is not credible because he has

not shown how Ball "knew" such things because Huezo did not identify any such

documents or conversations that allegedly put Ball on notice that Ball's money that Huezo

represented would be used to fund secured loans would also be used to fund Fremont's

operational costs, including Huezo's commissions which included the sizable $30,000

commission on the payoff of the Inocenio Rodriguez loan, over 10% of the repaid principal.

Ball's testimony that he was investing his money in Fremont solely to fund secured loans to

Fremont's borrowers based on the November Report is credible, and Huezo's testimony

that Fremont could divert Ball's money to other purposes is not credible.  Huezo has not

shown that he or Fremont disclosed that it would use Ball's money that Huezo represented

would be used to fund secured loans for Fremont's operational expenses or other

purposes.

51.    As to recycling the balance of the Inoncencio Rodriguez loan payoff which was the rest of Ball's $240,000 investment based on the November Report, Huezo essentially admitted that he diverted Ball's remaining funds from the Inocencio Rodriguez loan payoff rather than paying Ball his money back under the first Ball promissory note. *Trial Testimony of Victor Huezo*, April 24, 2017, ECF 250 at 220:15-221:24.  The court comments that Huezo essentially admitted recycling Ball's loan payoff money into new loans not authorized by Ball as Huezo, in being asked a direct question about whether he recycled Ball's money into new loans, gave indirect and evasive answers, finally admitting, "At times it [Fremont] would repay that money back to Mr. Ball if the money wasn't ---if there wasn't a place to place it." *Id.*  Translated into plain language, Huezo's testimony was that Fremont would repay Ball his investment money if it could not readily make a new loan, i.e., not being able to find "a place to place it."   This meant that Fremont/Huezo was lending out Ball's money, and this was not what Ball authorized or wanted with his money because this exposed him and his money to risks that he agreed to take.  Fremont/Huezo cannot account for where Ball's $240,000 investment based on the November Report went, other than the nominal amount that Fremont paid Ball, the $30,000 payoff commission that Huezo paid himself and that the money went into new loans, which recycling of Ball's funds Fremont/Huezo cannot show was authorized by Ball.  As shown by Ball's testimony, which the court finds is credible, Ball was willing to invest in specific secured loans with his money based on the investor activity reports, but there is no showing that Huezo can make that Ball specifically authorized the recycling of his money into new loans after the loans that he specifically agreed to invest in were paid off.

52.    The explanation for why Fremont/Huezo "recycled" Ball's investment money is that Fremont did not have other sources of capital to do its loan business.  When Huezo was asked at trial whether Ball's investment money was nearly the entirety of Fremont's outside source of funding, Huezo indirectly responded to the question, stating: "Some of the funds were used from the commissions I earned as well." *Trial Testimony of Victor Huezo,*

1  April 24, 2017, ECF 250 at 221:4-12.  Purportedly, Huezo put in $200,000 of his own

2  money into Fremont, but admittedly, the source of this capital was from his earned

3  commissions at Fremont which he said he left inside it.  *Trial Testimony of Victor Huezo*,

4  April 24, 2017, ECF 250 at 222:18-223:2 and 226:7-13.  The only other source of outside

5  capital for Fremont that Huezo could identify was an investment of $75,000 from a Mr.

6  Karnakis.  *Trial Testimony of Victor Huezo*, April 24, 2017, ECF 250 at 222:6-9.  This was a

7  small amount compared to the $844,750 invested by Ball in Fremont loans.  *Trial*

8  *Testimony of Victor Huezo*, April 24, 2017, ECF 250 at 221:4-12.

9       53.    The court finds that Fremont/Huezo did not file any UCC financing statements

10  with the California Secretary of State for these loans after Fremont made the loans which

11  were needed to secure any personal property collateral.  *Trial Testimony of Victor Huezo*,

12  April 24, 2014, ECF 250 at 156:24-157:04.

13       54.    The court thus finds that Fremont/Huezo made unsecured loans or used

14  Ball's money for operational and other purposes without Ball's knowledge or consent and

15  contrary to Huezo's representations to Ball that Ball's funds would be used for the secured

16  loans identified in the November Report.  *Ball Declaration,* ¶ 13; *Huezo Declaration,* ¶¶ 88,

17  109-113, 150, 155, 232, 234, 238, 240, 244 and 245; *Huezo Trial Testimony,* April 24,

18  2014, 2:02 to 2:10 p.m. and 2:12 to 2:39 p.m. (ECF 250, Trial Transcript at 143:12-149:05

19  and 149:19-175:05); *Plaintiff's Trial Exhibit P-52, Huezo Deposition* at 55:20-25, 88:5-

20  105:13, 106:4-110:21.

21       55.    Ball testified that Huezo never told him his money could fund unsecured or

22  high-risk loans, or could be used for other purposes beyond funding secured loans, and he

23  never would have loaned money to Fremont if Huezo had explained that to him.  *Ball Trial*

24  *Testimony*, April 25, 2014, ECF 244 at 65:16-21, 67:3-10.  Huezo admitted that "[t]he

25  money loaned to Fremont was used as required of all of Fremont's operational needs," but

26  he asserts that Fremont had a right to use Ball's money at its discretion because the money

27  was not earmarked to a specific borrower or purpose.  *Huezo Declaration* at 32, ¶¶ 88-89.

28  The court finds Ball's testimony to be credible, Huezo's testimony to not be credible, and

that Fremont was obligated to fund the specific secured loans set forth in the November

Report that Ball had lent Fremont based on that report.

56.    Huezo argues that the loans to Fremont borrowers funded with Ball's money

based on the November and January Reports were adequately collateralized with total

assets valued at $5,050,943, having a Loan to Value ratio of 4.7%, which was enough to

serve the monthly payment of $3,000 to Ball on his loans to Fremont of $240,000 and

$70,000. *Proposed Findings of Fact Nos. 109 and 110, Defendant's Proposed Findings of

Fact and Conclusions of Law*, ECF 187 at 22-23.  According to Huezo, three of six of the

borrowers on these loans repaid $252,000 in principal, and the other three borrowers who

defaulted on their loans were sued by the Fremont bankruptcy trustee. *Id.*, ¶ 111.  This

argument does not absolve Huezo of liability because, first of all, Huezo's chart does not

reflect whether any of these loans were properly secured, and as noted above, some loans

may have been secured with deeds of trust, but some indisputably were not.  Second, as

discussed above, the evidence indicates that Ball incurred losses resulting from Huezo's

representations regarding these loans because Fremont/Huezo made unsecured loans to

some of these borrowers (e.g., Gemini Security, Inc. and Edelmira Cruz, on the loans on

the November Report, and Robert Gray and Eugenia Duran on the loans based on the

January Report), these borrowers did not repay their loans, Fremont said that these

borrowers had assets, yet Fremont did not perfect security interests in these assets.  Third,

as discussed above, the evidence also indicates that Ball incurred losses resulting from

Huezo's representations regarding these loans because Fremont/Huezo "recycled" Ball's

money after the loans to the original borrowers listed on the chart, such as Inocencio

Rodriguez and Janet Smith, had paid off their loans made with Ball's money, which was

then recycled into new loans or other uses that Huezo has not accounted for.  Thus,

Huezo's assertion in his proposed findings of fact and conclusions of law that "Ball's Money

went to loans secured by real property deeds of trust as shown above [in the chart in

paragraph 184]" is materially inaccurate.  *Proposed Finding of Fact No. 184, Defendant's

Proposed Findings of Fact and Conclusions of Law*, ECF 187 at 46-47.

## F.  January 8, 2008 Report and $70,000 "Investment"

57.     It is undisputed that on January 8, 2008, Huezo solicited a loan from Ball, emailing him a Fremont "Investor Activity Report," dated January 8, 2007 [sic] ("January Report").  The January Report said Fremont was in the process of closing two "Secured" loans, which were "Ready to fund," totaling $70,000, to borrowers with cumulative collateral worth "$790,000," at a proposed interest rate of 15% per loan.  Below the list of two "Secured Loans" on the January Report, it was stated, "Here is a list of proposed loans we are going to close this week.  In order, to issue credit to our clients we will need to know your commitment to Fremont Investment Holdings Inc.  Please take a few moments to fax back your commitment."  *Plaintiff's Trial Exhibits P-10 and P-11; Ball Declaration* at 6, ¶ 16; *Trial Testimony of Joey Ball*, April 17, 2014 at 3:15-3:16 p.m. and 3:35-3:41 p.m. (ECF 268, Trial Transcript at 199:06-19 and 207:23-213:01)*; Huezo Declaration* at 39, ¶ 108; *Trial Testimony of Victor Huezo,* April 24, 2014 at 3:15-3:18 p.m. (ECF 250, Trial Transcript at 194:08-196:11).

58.     Ball testified that Huezo told him that Ball's $70,000 "investment" or loan was intended to fund the "Secured Loans" described in the January Report.  *Trial Testimony of Joey Ball*, April 17, 2014 at 3:15-3:41 p.m. (ECF 268, Trial Transcript at 199:06-213:01).  The court finds Ball's testimony on this point to be credible.  *See Plaintiff's Trial Exhibits P-10 and P-11; Ball Declaration* at 6 ¶ 16.

59.     After having this conversation with Huezo, Ball completed the "commitment" section of the January Report agreeing to provide $70,000 to Fremont, and he faxed the January Report to Huezo.  Ball wire-transferred $70,000 to Fremont in two installments: $40,000 on January 9, 2008 and $30,000 on January 11, 2008 (collectively the "January Investment").  Shortly thereafter, Huezo delivered to Ball a $70,000 promissory note from Fremont, dated January 8, 2008 ("January Note"), which provided for annual interest of 15%, monthly payments of $875 (equal to "interest only" payments at 15% per annum) to Ball and a maturity date of February 1, 2009.  Paragraph 7 of the November Note indicates that it is a "Uniform Secured Note."  *Plaintiff's Trial Exhibits P-11, P-12 and P-13; Ball*

1   *Declaration* at 6-7, ¶¶ 17 and 19; *Trial Testimony of Joey Ball*, April 17, 2014 at 3:15-3:41

2   p.m. and 4:10- 4:11 p.m. (ECF 268, Trial Transcript at 199:06-213:01 and 236:01-237:17);

3   *Deposition of Victor Huezo,* January 24, 2013, *Plaintiff's Trial Exhibit P-52* at 133:12-

4   134:16; *Trial Testimony of Victor Huezo*, April 24, 2014 at 2:43-2:44 p.m. and 3:18-3:21

5   p.m. (ECF 250, Trial Transcript at 177:04-17 and 196:03-197:24).

6         60.    Ball testified that he relied on the written representations in the January

7   Report, Huezo's verbal representations, and the Fremont Informational Materials. *Plaintiff's*

8   *Trial Exhibits P-11, P-12 and P-13; Ball Declaration* at 6, ¶ 17; *Trial Testimony of Joey Ball*,

9   April 17, 2014 at 3:15-3:16 p.m. (ECF 268, Trial Transcript at 199:06-19).  The court finds

10  Ball's testimony on this point to be credible.

11        61.    Huezo testified in his trial declaration that the first loan listed in the January

12  Report corresponded to a $46,000 loan to Robert Gray DBA TGK Enterprises. *Huezo*

13  *Declaration* at 40, ¶ 114.  As Huezo testified in his trial declaration, he decided based on

14  his business judgment that Fremont would make the loan to this borrower based on

15  financial information in the borrower's loan application, credit scores and proposed

16  collateral not identified by Huezo, but it appears this loan was also unsecured because

17  Huezo offered no proof that Fremont obtained a deed of trust or a security agreement and

18  UCC-1 financing statement to secure the loan with any real property or personal property

19  collateral.  There is no evidence that this loan was secured as Fremont apparently obtained

20  only a promissory note. *Huezo Declaration*, 80-81, ¶¶ 248-249. Huezo admitted in his trial

21  declaration based on the filings in an adversary proceeding against the borrower, Robert

22  Gray DBA TGK Enterprises, that the borrower never paid back the loan.  *Id.*  Thus, Fremont

23  made an unsecured loan using Ball's money to Robert Gray DBA TGK Enterprises of

24  $46,000, which loan the borrower failed to repay, and thus resulting in a loss of Ball's

25  money, contrary to Huezo's representation to Ball that the loan would be secured.

26        62.    Huezo testified that the second loan listed in the January Report

27  corresponded to a loan to Eugenia Duran made on May 15, 2008 in the amount of $40,000.

28  *Huezo Declaration* at 40-41, ¶¶ 115 and 116.  As Huezo testified in his trial declaration, he

decided based on his business judgment that Fremont would make the loan to this

borrower based on financial information in the borrower's loan application, including bank

statements, tax returns, work orders, and construction plans, credit scores and proposed

collateral not identified by Huezo, but it appears this loan was also unsecured because

Huezo offered no proof that Fremont obtained a deed of trust or a security agreement and

UCC-1 financing statement to secure the loan with any real property or personal property

collateral as there is no evidence that this loan was secured as Fremont apparently

obtained only a promissory note. *Huezo Declaration* at 50, ¶ 166 and at 84, ¶ 256.  Huezo

in his live trial testimony admitted that other than the promissory note, there were no

agreements, security agreements or liens securing Eugenia Duran's $40,000 loan.[4]  *Trial*

*Testimony of Victor Huezo*, April 25, 2017, ECF 244 at 23:9-16.  Huezo admitted in his trial

declaration that the borrower, Eugenia Duran, never paid back the loan.  *Huezo Declaration*

at 84, ¶ 257.  Thus, Fremont made an unsecured loan using Ball's money to Eugenia

Duran of about $40,000, which loan the borrower failed to repay, and thus resulting in a

loss of Ball's money, contrary to Huezo's representation to Ball that the loan would be

secured.  The court finds that Huezo's testimony regarding this loan also lacks credibility

because this loan to Eugenia Duran was made more than four months after Ball received

the January Report and provided Fremont $70,000 in funds to invest in new loans based on

the January Report, and in the intervening time period between January and May 2008,

Ball had made additional loan investments with Fremont in excess of $500,000, which

Fremont purportedly used to make new loans.  Given the time lapse between January and

May 2008 and Ball's intervening investments, the court does not find it credible that

Fremont held on to Ball's funds of $40,000 lent in January to make a loan in May when

Fremont was supplied with new money from Ball in the meantime from which it purportedly

made new loans.  Whether Ball's money invested based on the January Report was used

---

[4]  Huezo testified at trial that Fremont made other loans to Eugenia Duran for which Fremont had obtained deeds of trust as showed in Defendant's Exhibits D-31A and D-35A, which did not relate to and secure the separate $40,000 loan from the money invested by Ball based on the January Report.  *Trial Testimony of Victor Huezo*, April 24, 2017, ECF 250 at 207:22-209:20; *Trial Testimony of Victor Huezo*, April 25, 2017, ECF 244 at 24:5-19.

1   to fund the Eugenia Duran loan or not, Huezo is otherwise unable to explain what

2   happened to the rest of Ball's $70,000 in funds lent to Fremont aside from the loss from the

3   unsecured loan of $46,000 made to Robert Gray DBA TGK Enterprises.

4          63.     The court finds that Fremont/Huezo did not take steps to secure the loans

5   that were described in the January Report as "Secured Loans."  Fremont/Huezo did not

6   secure these loans by obtaining security agreements and trust deeds in real property

7   collateral signed by the borrowers at the time the loans were made or by obtaining security

8   agreements and UCC financing statements in the borrowers' personal property collateral.

9   *Trial Testimony of Victor Huezo*, April 24, 2014 at 2:16-2:20 p.m.  (ECF 250, Trial

10  Transcript at 153:01-157:05).  Fremont/Huezo also did not file any UCC financing

11  statement with the California Secretary of State after the purported "secured" loans were

12  made.  *Trial Testimony of Victor Huezo*, April 24, 2014 at 2:19-2:20 p.m.  (ECF 250, Trial

13  Transcript at 156:07-157:05).

14         64.     Fremont/Huezo did not fund the secured loans identified in the January

15  Report with Ball's "investment" in, or loan of, $70,000 to Fremont as promised by Huezo in

16  his representations to Ball, and Fremont/Huezo made unsecured loans or used the money

17  for operational and other purposes, including a $30,000 disbursement from Fremont's bank

18  account to Huezo's personal bank account within days of Fremont's receipt of Ball's wire

19  transfers for this loan, without Ball's knowledge or consent and contrary to Huezo's

20  representations to Ball that Ball's funds would be used for the secured loans identified in

21  the January Report. *Ball Declaration,* ¶ 18; *Trial Declaration of Adrian Stern ("Stern*

22  *Declaration"),* ¶ 17C; *Plaintiff's Trial Exhibit P-53, Expert Report of Adrian Stern,* Exhibit B

23  at 2; *Trial Testimony of Adrian Stern,* April 24, 2014 at 9:36 to 9:48 a.m. and 10:03 to 10:06

24  a.m. (ECF 250, Trial Transcript at 27:15-36:17 and 38:01-41:20); *Huezo Declaration,* ¶¶ 88,

25  114, 163, 164, 248, 249; *Huezo Trial Testimony,* April 24, 2014, 2:07 to 2:10 p.m. and 3:15

26  to 3:21 p.m. (ECF 250, Trial Transcript at 146:09-149:05 and 194:08-197:24); *Plaintiff's*

27  *Trial Exhibit P-52, Huezo Deposition,* at 55:20-25.  The $30,000 disbursement to Huezo

28  personally was directly traceable from Ball's investment funds of $70,000 intended for the

1   secured loans to be made by Fremont. *Id.*

2        65.    Fremont/Huezo needed Ball's authorization to use Ball's loan money for

3   purposes other than making the secured loans on the January Report, including paying

4   Fremont's "operational costs," such as Huezo's commissions, and recycling the repaid loan

5   funds into new loans, but Fremont and Huezo did not get such authorization. *Ball*

6   *Declaration* at 6, ¶ 18.  Ball was very specific in his testimony about what he was lending

7   Fremont for:

8        At no time did Huezo tell me my "commitment" under the January Report was too
         late, or that any portion of the $70,000 I loaned Fremont pursuant to said
9        commitment was not being used for the two (2) "Secured Loan[s]" outlined in the
         January Report.  At no time did I ever agree that Huezo or Fremont could use the
10       $70,000 for anything other than funding the "Secured Loan[s]" in the January Report.
         Had I known that Huezo and Fremont intended to use all or any portion of my
11       $70,000 for purposes other than funding the "Secured Loan[s]" outlined in the
         January Report, which were collateralized by assets valued at $790,000, I would
12       never have loaned the money to Fremont.  I did not know or believe my loan was
         being used for other purposes.
13
    *Id.*
14
15       66.    According to Huezo, he did get such authorization from Ball because Ball

16   "knew" that Fremont would use the funds to pay its operational costs:

17       It is my belief, based on the conversations that I had with Ball regarding his act of
         loaning the $70,000 to Fremont pursuant to the second Ball Note, that Ball knew he
18       was lending money directly to Fremont.  Ball knew that he was NOT lending his
         money directly to Fremont borrowers and that Fremont would use the funds for any
19       operational costs including using the funds to make direct loans to Fremont
         borrowers pursuant to Fremont's finance lender's license.

20   *Huezo Declaration* at 41, ¶ 117.  This testimony of Huezo is not credible because he has

21   not shown how Ball "knew" such things because Huezo did not identify any such

22   documents or conversations that allegedly put Ball on notice that Ball's money that Huezo

23   represented would be used to fund secured loans would also be used to fund Fremont's

24   operational costs, including $30,000 immediately moved from Fremont's account to

25   Huezo's personal account from the $70,000 that Ball had wired to Fremont as his

26   investment based on the January Report. *Stern Declaration* at 6, ¶ 17C.  Ball's testimony

27   that he was investing his money in Fremont solely to fund secured loans to Fremont's

28   borrowers based on the January Report is credible, and Huezo's testimony that Fremont

could divert Ball's money to other purposes is not credible.  Huezo has not shown that he or Fremont disclosed that it would use Ball's money that Huezo represented would be used to fund secured loans for Fremont's operational expenses or other purposes.

### G.  January 30, 2008 Email and $130,000 Investment

67.    On January 30, 2008, Huezo sent Ball an email stating, "I also have two deals that I am closing out this week if you want to do them.  It is for a total of $130,000 at the 15% rate.  Let me know if you can do them." *Plaintiff's Trial Exhibit P-17; Ball Declaration* at 7, ¶ 20; *Trial Testimony of Joey Ball*, April 17, 2014 at 3:44-3:52 p.m. (ECF 268, Trial Transcript at 215:13-222:02)*; Trial Testimony of Victor Huezo*, April 24, 2014 at 3:21-3:23 p.m. (ECF 250, Trial Transcript at 197:25-198:05).  As set forth in Ball's direct testimony in his trial declaration on this investment, Ball testified that Huezo solicited a loan from Ball based on this email of January 30, 2008.  *Ball Declaration* at 7, ¶ 20.   According to Ball, "[b]ased on this email and Huezo's comments to me at the time, I believed that this loan was to be like the first two 'secured loans' to Fremont." *Plaintiff's Trial Exhibit P-17; Ball Declaration* at 7, ¶ 20.  In his direct testimony in his trial declaration, Ball then stated: "In reliance on Huezo's representations, I agreed to and loaned Fremont $130,000 on February 1, 2008." *Ball Declaration* at 7, ¶ 21.  Following this testimony in his trial declaration, Ball stated:  "On or about February 1, 2008, Huezo gave me a check from Fremont for $3,875, representing the 'guaranteed' payments due under the November and January Notes.  It led me to believe that my loans to Fremont were as secure as Huezo represented to me."  *; Ball Declaration* at 7, ¶ 22.  This testimony was the sum and substance of Ball's testimony about Huezo's representations to him regarding the $130,000 investment.  However, in Ball's direct testimony in his trial declaration, he did not identify the specific representations that Huezo made to him about this loan investment which he referred to as "Huezo's comments to me at the time" and "Huezo's representations." *Ball Declaration* at 7, ¶¶ 20-22.

68.    In his live testimony at trial, Ball testified on cross-examination that when he asked Huezo what the two deals referenced in the January 30, 2008 email were, Huezo

**AMENDED MEMORANDUM DECISION**

verbally represented that "they were a couple of properties that had a lot of collateral just like the others." *Trial Testimony of Joey Ball*, April 17, 2014 at 3:49-3:51 p.m. (ECF 268, Trial Transcript at 219:05-221:04).  Ball also testified that Huezo did not tell Ball why these particular borrowers needed to borrow money from Fremont.  *Id.*  Ball did not testify that Huezo said anything more specific about the two deals, such as making an express and specific representation that these would be secured loans.  *Id.*  Ball acknowledged that he received Huezo's email message asking if Ball was interested in these deals without reference to the deals being secured loans, but did not respond to this email to ask Huezo if these were secured loans and did not ask for an investor activity report like the November and January Reports in which Huezo specifically represented that the investment opportunities were for secured loans.  *Id.*  The court does not find Ball's testimony on these points to be credible because such testimony is based on Ball's non-specific recollection of a conversation Ball had with Huezo six years prior, of which Ball provided no foundation regarding any of the circumstances surrounding the alleged representations or "comments" by Huezo, and this testimony is not corroborated by any documentary evidence.   The email from Huezo that Ball relied upon did not refer to a secured loan.  *Plaintiff's Trial Exhibit P-17.*  The alleged verbal representation by Huezo that "they were a couple of properties that had a lot of collateral just like the others" is not definite enough to be a representation that the investment would be for a secured loan.  Unlike for the prior "investments" or loans made by Ball, Ball did not offer any documentary evidence that Huezo represented to him that this particular investment would be used to extend secured loans to third party borrowers.  *See Plaintiff's Trial Exhibit P-17.*  Although Ball testified that with respect to these two loans, Huezo conveyed more information verbally than in his email message, lacking specific details and corroboration, indicating that perhaps Huezo was being very careful in his communications with Ball, the court finds that Ball's testimony on this point is based on his assumption that these loans were like the prior ones and is not credible that Huezo made a representation to Ball that the investment was for a secured loan.  *Trial Testimony of Joey Ball*, April 17, 2014 at 3:49-3:51 p.m. (ECF 268, Trial

**AMENDED MEMORANDUM DECISION**

1  Transcript at 219:05-221:04); *Plaintiff's Trial Exhibit P-17.*

2      69.    On February 1, 2008, Ball wire-transferred $130,000 to Fremont.  Shortly

3  thereafter, Huezo delivered to Ball a $130,000 promissory note from Fremont, dated

4  February 1, 2008 ("February Note"), which provided for annual interest of 15%, monthly

5  payments of $1,625 to Ball, and a maturity date of February 1, 2009.  Paragraph 7 of the

6  November Note indicates that it is a "Uniform Secured Note."  *Plaintiff's Trial Exhibits P-18*

7  *and P-19; Ball Declaration* at 7-8, ¶¶ 21 and 23; *Trial Testimony of Joey Ball*, April 17, 2014

8  at 3:44-3:52 p.m. (ECF 268, Trial Transcript at 215:13-222:02); *Trial Testimony of Victor*

9  *Huezo*, April 24, 2014 at 2:43-2:44 p.m. and 3:21-3:23 p.m. (ECF 250, Trial Transcript at

10  177:04-25 and 197:25-198:05).

11      70.    Ball testified that based on the January 30, 2008 email and Huezo's alleged

12  oral comments to Ball, Ball believed the $130,000 "investment" or loan would be used to

13  fund two secured loans by Fremont.  *Plaintiff's Trial Exhibit P-17; Ball Declaration* at 7,

14  ¶ 20.  The email does not refer to secured loans, and the court finds that the testimony on

15  the alleged oral comments lacks sufficient specific detail and corroboration to be credible

16  evidence of a misrepresentation of these loans by Huezo as secured.

17      **H. "Las Vegas" and "Los Angeles" Deals and $404,750 "Investment"**

18      71.    During February and March 2008, Huezo solicited an "investment" or loan

19  from Ball to fund a "Las Vegas deal" for Martin Romano and a "Los Angeles deal" to fund

20  an egg farm.    According to Ball in his direct testimony in his trial declaration,

21      In February and March 2008, Huezo solicited a large loan from me for Fremont to
22      fund two deals, a "Vegas deal" for "Marty Romano" and a "Los Angeles" deal for a
         man named Duran, both of which were to be secured loan.  Huezo told me that the
23      largest loan was going to the "Vegas deal" which was to be secured by real property
         in Las Vegas, with equity well in excess of the amount of the loan.  Huezo also told
24      me that the "Los Angeles" deal was to fund an egg farm for someone named Duran
         and the egg farm business and other family assets would secure the loan.  In March
25      of 2008, Huezo and I exchanged emails addressing these two loans.  True and correct
         copies of the emails are attached hereto as Exhibits P20, P21, P22 and P23.

26  *Ball Declaration* at 8-9, ¶ 26; *Plaintiff's Trial Exhibits P-20, P-21, P-22, P-23 and P-37; Trial*

27  *Testimony of Victor Huezo*, April 24, 2014 at 3:23-3:27 p.m. (ECF 250, Trial Transcript at

28  199:04-201:12).

**AMENDED MEMORANDUM DECISION**

72.     As Ball testified in his direct testimony in his trial declaration, he agreed to

make the $404,750 loan "in reliance on Huezo's representations, oral and written, that the

$404,750 I was lending to Fremont was going to two secured loans, with the larger of the

two loans being secured by real property in Las Vegas with equity well in excess of the loan

amount," and on March 26, 2008, Ball wire-transferred $404,750 in funds to Fremont to

invest in these deals, $367,250 of which was to be used to fund the "Las Vegas deal."

*Plaintiff's Trial Exhibit P-26; Ball Declaration* at 8, ¶ 27.  As Ball stated in his direct

testimony in his trial declaration then stated:

> On March 25, 2008, I agreed to loan Fremont $404,750.  I agreed to make the loan
> in reliance on Huezo's representations, oral and written, that the $404,750 that I was
> lending to Fremont was going to be two secured loans, with the larger of the two
> being secured by real property in Las Vegas with equity well in excess of the loan
> amount.  On March 26, 2008, I wired $404,750 into Fremont's account ("March
> Loan").  A true and correct copy of the Bank of America transfer request and
> authorization for the $404,750 wire to Fremont is attached hereto as Exhibit P26.

*Ball Declaration* at 9, ¶ 27.

73.     Regarding whether Ball knew that this money was not used for the Las Vegas

and Los Angeles property loans, he stated in his direct testimony in his trial declaration:

> At no time did Huezo tell me that the $404,750 I loaned to him would not be used for
> the "Vegas" and "Los Angeles" deals.  At no time did I agree that Huezo and
> Fremont could use my loan of $404,750 for anything other than the two "secured"
> loans Huezo had solicited it to fund.  At no time did Huezo tell me that the "Vegas"
> deal, which was the larger of the two loans he was soliciting my funds for, did not go
> through.  Had he done so, I would have requested my funds back as it was the
> "Vegas deal" in particular that Huezo assured me would be more than adequately
> collateralized.  Huezo repeatedly assured me "Marty Romano" would secure the loan
> with real property which had equity well in excess of the loan amount.

> *Ball Declaration* at 9, ¶ 28.

74.     The emails for these deals that Ball said that he and Huezo exchanged

regarding Huezo's solicitation of Ball's investment for the Las Vegas and Los

Angeles property loans contained the following written statements by Huezo: (1) March 21,

2008 email: "Joey, I wanted to let you know that we are drawing loan docs on the Vegas

deal and the deal in Los Angeles today.  I just want to make sure you are still good for the

loan that we have been discussing for a few months now.  Please let me know as I am

going to the Notary today to get our Promissory Note done as I plan on funding these deals

on Thursday."; (2) March 24, 2008 email: "Joey, Sorry to send another email but I have not

heard back from you regarding this deal.  I know we have been working on the Bruce deal

but can you let me know where you stand on the loan.  Please let me know today if

possible."; and (3) March 25, 2008 email: "Joey, Good news, we are signing loan docs

today and will be ready for funding tomorrow.  Please go ahead and wire the money to me

via the Fremont Investment Holding Account to avoid any bank delays of having the money

go to my personal account and then to the Fremont account.  I will attach a copy of the

Fremont checking account information for you to wire the funds to me." *Plaintiff's Trial*

*Exhibits P-20, P-22 and P-23.*  None of these email communications by Huezo expressly

refer to the deals involving secured loans or loans secured by adequate collateral, and

thus, it appears that it is Ball's testimony that Huezo made verbal representations that these

deals were for secured loans.

75.     Ball stated in his live testimony at trial that Huezo verbally represented to Ball

that in the "Las Vegas deal", Fremont would be lending money on a property in Las Vegas

that had "a ton of collateral."  *Trial Testimony of Joey Ball*, April 17, 2014 at 4:13-4:14 p.m.

(ECF 268, Trial Transcript at 238:1-24).  Asked what Huezo told him about the Romano or

"Las Vegas" deal, Ball specifically testified: "He [Huezo] told me that it was a property in

Las Vegas that had a ton of collateral and he had told me that it a few times and asked me

about lending money on it a few times."  *Id.*

76.     There is no dispute that the loan in the Romano deal was to be a secured

loan for $367,250 as Huezo admitted during his testimony at trial.  *Trial Testimony of Victor*

*Huezo,* April 24, 2014, ECF 250, Trial Transcript at 199:8-22.

77.     In anticipation of the Las Vegas and Los Angeles loan deals, on March 21,

2008, a promissory note from "Fremont Investment Holdings Inc. DBA Fremont Investment

Funding" for $404,750 was executed in favor of Ball.  That note stated that monthly

payments would commence on March 1, 2008.  A second promissory note from "Victor

Huezo of Fremont Investment Holdings, Inc. DBA Fremont Investment Funding" for the

same amount was also executed in favor of Ball ("March Note").  That second note also

1  stated that monthly payments to Ball would commence on March 1, 2008.  *Plaintiff's Trial*

2  *Exhibits P-45 and P-46; Trial Testimony of Victor Huezo*, April 24, 2014 at 2:46-2:51 p.m.

3  (ECF 250, Trial Transcript at 178:23-185:14).

4          78.     On March 21, 2008, a promissory note from "Fremont Investment Holdings,

5  Inc. DBA Fremont Investment Funding" for $460,000 was executed in favor of "Victor

6  Huezo."  On December 31, 2008, an "Assignment of Promissory Note" was executed by

7  Huezo assigning to Ball the beneficial interest in the $460,000 note.  *Plaintiff's Trial Exhibits*

8  *P-46 and P-47.*

9          79.     Huezo prepared the promissory notes reflecting Ball's investments in

10  Fremont.  There is no evidence that Ball was involved in the drafting of promissory notes.

11  *Plaintiff's Trial Exhibits P-1, P-2, P-4, P-5, P-6, P-9, P-10, P-15, P-16, P-17, P-18, P-28, P-*

12  *29 and P-51; Ball Declaration* ¶ 14, 19, 23 and 35; *Trial Testimony of Joey Ball*, April 25,

13  2014 at 10:24-10:26 a.m. (ECF 244, Trial Transcript at 63:11-65:03)*; Trial Testimony of*

14  *Victor Huezo,* April 24, 2014 at 2:37-3:00 p.m. (ECF 250, Trial Transcript at 172:25-

15  193:17), April 25, 2014 at 9:30-9:54 a.m. (ECF 244, Trial Transcript at 33:13-49:09).

16          80.     Fremont/Huezo did not fund the "Las Vegas deal" because the deal fell

17  through.  *Ball Declaration* at 9, ¶ 28; *Huezo Declaration* at 96-99, ¶¶ 288-298.   According

18  to Huezo, "Marty Romano was a loan applicant and I spent numerous hours evaluating and

19  underwriting the loan and preparing to fund the loan, only for Romano to ultimately refuse

20  the loan." *Huezo Declaration* at 96, ¶ 288.

21          81.     However, as of March 25, 2008, the Romano deal was still on as Huezo

22  admitted during his testimony at trial.  *Trial Testimony of Victor Huezo,* April 24, 2014, ECF

23  250, Trial Transcript at 199:17-19.  As noted above, Huezo sent Ball an email on that day,

24  March 25, 2008, telling Ball that the deal was on and to "go ahead and wire the money" to

25  him through the Fremont Investment Holding Account.  *Trial Testimony of Victor Huezo,*

26  April 24, 2014, ECF 250, Trial Transcript at 200:24-201:12.

27          82.     On March 26, 2008, Ball wired $404,750 into Fremont's account as Huezo

28  requested in his email the day before.  *Trial Testimony of Victor Huezo,* April 24, 2014, ECF

250, Trial Transcript at 201:18-20; *Ball Declaration* at 9, ¶ 27; *Plaintiff's Exhibit P-27*.

83.    According to Huezo, a few days after following up with the escrow officers for the Romano deal on March 21, 2008, he discovered that the Romano parties were not signing the loan documents for the deal, and he immediately called and texted Ball numerous times on March 27 and March 28, 2008 to discuss the developments regarding the "Las Vegas deal" and offered to refund Ball's money, but Ball refused to accept a refund. *Huezo Declaration* at 98 and 99, ¶¶ 297 and 298; *Trial Testimony of Victor Huezo*, April 24, 2014 at 2:49-2:52 p.m. (ECF 250, Trial Transcript at 181:21-185:14).

84.    Thus, Huezo's representations in his email to Ball on March 25, 2008, stating: "Good news, we are signing loan docs today and will be ready for funding tomorrow", were not true because at that time, Huezo knew that the Romano parties had not signed the loan documents and that he had no reason to think that they did, and yet Huezo represented that the deal was going through to induce Ball to send the investment money to fund that deal.

85.    According to Huezo, he offered to refund Ball's money, but Ball explained to Huezo that he could not accept a refund due to Ball's March 2008 Internal Revenue Service audit. *Huezo Declaration* at 99, ¶ 298.[5]  Even though the Romano deal fell through, Huezo still wanted to hold onto the funds that Ball wired to Fremont as a personal loan to Huezo to lend to Fremont borrowers.  *Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250, Trial Transcript at 183:3-25.  Huezo testified in response to the court's question why the loans would go through him personally rather than through Fremont as follows:

> That was at Mr. Ball's request.  All the loans were originally made to Fremont.  The fourth note he wanted it made to me personally and he didn't want a maturity date because he wanted to have the ability to collect interest payments if he didn't ---if he ended up losing everything with the IRS.  That was his words.

*Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250, Trial Transcript at 183:17-25.  In

---

[5]  The court originally sustained Ball's objection to Huezo's trial declaration stating that Ball had explained that he did not want a refund due to the IRS audit on grounds of relevance and speculation about Ball's reasons for his actions.  However, upon reconsideration, the court overrules Ball's objection in part because if Ball made the statement as Huezo testified, it would be relevant and not speculation.  Moreover, Ball gave live testimony at trial discussing the IRS audit, which testimony was given without objection.

**AMENDED MEMORANDUM DECISION**

elaborating on this point, Huezo testified:

> When I went to go return it [the money] to him [Ball], he did not want it. He said he couldn't accept it because he was trying to negotiate with the IRS and if he had over $400,000 in liquid assets, it would make it difficult to negotiate with them. And he said I needed to keep it. I didn't have any loans to place that money at that time . . . That was at his request, Your Honor. As for me, I was lending the money out to Fremont borrowers and it didn't make a difference to me.

*Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250, Trial Transcript at 185:8-20.

However, Huezo also testified that Ball had asked him to borrow the money personally before the Las Vegas deal fell through, that is, somewhere around March 14, 2008, a week before the promissory notes dated March 21, 2008 were prepared. *Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250, Trial Transcript at 202:6-20. Asked if he had any letters, emails or text messages from Ball requesting that Huezo borrow the money personally, Huezo testified: "I had the text, but like I said, when I changed my phones it disappeared." *Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250, Trial Transcript at 202:21-25. Huezo admitted that he no longer had such a text message or other email or letter whereby Ball asked him to borrow Ball's money personally. *Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250, Trial Transcript at 201:1-4. According to Huezo, he then lent Ball's money for the Las Vegas and Los Angeles deals to other Fremont clients, including Eugenia Duran for $260,000, a Mr. Duran for $100,000, Leonel Ramirez for two loans of $100,000 each and Janet Smith for $64,000. *Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250, Trial Transcript at 207:17-209:20.

86.    Ball's testimony about Huezo's retention of the money that was wired to Fremont to fund the Romano or Las Vegas deal directly contradicts Huezo's testimony:

> At no time did Huezo tell me that the $404,750 I loaned to him would not be used for the "Vegas" and "Los Angeles" deals. At no time did I agree that Huezo and Fremont could use my loan of $404,750 for anything other than the two "secured" loans Huezo had solicited it to fund. At no time did Huezo tell me that the "Vegas" deal, which was the larger of the two loans he was soliciting my funds for, did not go through. Had he done so, I would have requested my funds back as it was the "Vegas deal" in particular that Huezo assured me would be more than adequately collateralized. Huezo had repeatedly assured me "Marty Romano" would secure the loan with real property in Las Vegas which had equity well in excess of the loan amount.

*Ball Declaration* at 9, ¶ 28. At trial, Ball testified that Huezo did not ask Ball to personally

**AMENDED MEMORANDUM DECISION**

1  borrow the $404,750 that he loaned to Fremont and that Huezo did not tell Ball that he was

2  borrowing this amount personally.  *Trial Testimony of Joey Ball*, April 25, 2017 at 70:16-21.

3  Regarding the IRS audit, Ball testified that he mentioned to Huezo that he was undergoing

4  an IRS audit, but that the only thing he mentioned about the audit was that he was being

5  audited and hoped that it was over soon, but he was never worried that he might need to

6  hide his assets because his understanding in mid-March or April 2008, based on what his

7  accountant estimated, his additional tax liability would only be about $20,000, and

8  eventually, he agreed to an IRS tax adjustment about $28,000.  *Trial Testimony of Joey*

9  *Ball*, April 25, 2017, ECF 244 at 73:3-13 and 75:75:3-76:20; *Plaintiff's Exhibit P-60*.

10        87.    According to Ball, even when Huezo met with him to go over his investment

11  portfolio in July 2008 Huezo had not disclosed that the Romano or Las Vegas deal had not

12  gone through, stating:

> In July of 2008, my family, Huezo's family and the Dunford family met in Laughlin, Nevada to vacation together.  Prior to taking the trip I asked Huezo to provide me with a summary of my loans to Fremont, including how the $404,750 I had lent Fremont in March had been used.  While on vacation together Huezo arranged to meet with me at a Subway store near our hotel one morning to discuss how my loans had been used.  During our morning meeting Huezo continued to represent that the "Vegas" deal loan to "Marty Romano" had gone through.  Huezo showed me a copy of the Fremont June 2, 2008 check to me for $9,966, with various notations around the margins.  Huezo used these figures to discuss various things, including a review of the $844,750 I had lent to Fremont, an explanation of how the $367,250 "Marty Romano" loan for the "Vegas Deal" included $55,250 in "pre-paid" interest, and how the funds had gone into the "egg deal."  As Huezo explained what the figures meant, he traced over a number of them.  At the end of the meeting Huezo left a copy of the check on the table we were sitting at and I picked it up.  At no time during our conversation on this date, or at any time thereafter, did Huezo explain that the "Marty Romano" loan for the "Vegas Deal" had not gone through, or that he had used the money for other projects.  Had I know [sic] that the $404,750 was not going to "secured loans," I never would have loaned such a large sum to Fremont.  Had I known that the $367,250 "Marty Romano" loan, which (according to Huezo) was to be secured by real property with equity well in excess of the amount of the loan, had not been completed, I would have demanded my money back.  At no time did I ever authorize Huezo to use the funds intended for the "Marty Romano" loan for any other purpose.

25  *Ball Declaration* at 9, ¶ 30.  According to Ball, during their meeting, Huezo used the

26  notations on the copy of the check with the numbers to explain the Las Vegas and Los

27  Angeles deal loans, including the $55,250 prepaid interest on the Las Vegas deal loan.  *Id.*

28  Huezo's testimony is contrary to this testimony of Ball's, and Huezo testified the notations

-45-

**AMENDED MEMORANDUM DECISION**

were numbers that Ball directed him to make ("Q: "And then there's an arrow over for the $367,250 loan, which was the loan that was going to Marty and Bonnie Romano, correct? A: And just so we're clear, these are numbers that Mr. Ball told me to put."). *Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250, Trial Transcript at 210:3-7.    Huezo elaborated and stated that he did not ask Ball what the numbers meant (Q: You didn't ask him at the time what these numbers were supposed to be?  A:  I did not."). *Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250, Trial Transcript at 210:11-13.  Although the numbers related to the Las Vegas or Romano deal loan, Huezo testified that he did not realize it at the time when he was writing the numbers at Ball's direction:  ("Q: . . . And so he just sat there and said, 'I want you to write 440 and then 407,050 for a total of 844'?  A: Correct.  Q: And then he told you he wanted the arrow with the 367,250?  A: Correct.  Q: And at that time, you didn't realize it was the Marty Romano loan?  A: I did not at that time.").   However, Huezo did acknowledge that the notations on the copy of the check were in his handwriting. *Trial Testimony of Victor Huezo*, April 24, 2014, ECF 250, Trial Transcript at 211:20-24.  One of the notations on this document that Huezo acknowledged was in his handwriting was the following: "Interest pre-paid Vegas = $55,250." *Plaintiff's Exhibit P-32*.

88.     The court finds Ball's testimony to be credible that he was solicited by Huezo to fund secured loans for the Las Vegas and Los Angeles deals in March 2008 and that Huezo did not inform him or obtain his consent to use the funds of $404,750 that Ball wired Fremont/Huezo to fund other loans.  While there are no specific written representations by Huezo that he was soliciting Ball's funds for secured loans, such as the investor activity reports for the loans based on the November and January Reports, the actions of Ball and Huezo indicate that Ball was solicited for two specific secured loans, the Las Vegas and Los Angeles deals, that Huezo was working on for Fremont.  Although Ball did not give specific details when and where Huezo made the verbal representations that the loans for the Las Vegas and Los Angeles deals would be adequately collateralized and secured, the email messages between Huezo and Ball corroborate Ball's testimony that Huezo made

1  verbal representations that the Las Vegas and Los Angeles deal loans would be

2  adequately collateralized, and thus, secured loans, because Huezo had been working on

3  the loans for months, had been discussing the loans with Ball for months, indicating that

4  Ball had to be convinced to invest in the loans based on his insistence on secured loans

5  and as admitted by Huezo, the Las Vegas deal was indeed a secured loan deal.

6      89.     As to the Los Angeles property deal specifically, Ball testified that Huezo

7  represented that the Los Angeles deal would be "an egg farm or something" involving

8  "Manuel Durand[,]" and that the loan would be secured.  *Trial Testimony of Joey Ball,* April

9  18, 2014, ECF 248 at 34:09-35:04.  Huezo testified that Fremont obtained a $100,000.00

10  promissory note and personal guaranty in its favor from Manuel Duran on August 29, 2008

11  (in connection with disbursements of $48,364.11 and $43,580.16 that Fremont made to

12  Manuel Duran on July 11 and September 3, 2008, respectively).  *Huezo Declaration,* at 51

13  and 88, ¶¶ 170, 172, 266-267.  Because Huezo testified that Manuel Duran provided

14  Fremont with a promissory note—not any security interest—the court finds that Ball's

15  testimony is credible and Huezo misrepresented to Ball that the loan for the Los Angeles

16  deal of $37,500, like the loan for the Las Vegas Deal of $367,250, would be secured.

17      90.     Ball's testimony is specific and consistent with his prior investment history

18  with Fremont that he only wanted to invest his money with Fremont for secured loans for

19  specific borrowers with collateral to adequately protect his investment.  That is why Ball

20  would only invest in a secured loan and make sure his investment was safe and adequately

21  protected by a lien securing appropriate collateral; that is, he only invested after Huezo

22  represented to him that there was "a ton of collateral" to protect Ball's investments.  Ball's

23  testimony regarding his meeting with Huezo in July 2008 to go over Ball's investment

24  portfolio with Fremont is especially credible as corroborated by the copy of the payment

25  check to Ball from Fremont with Huezo's written notations.  *See Plaintiff's Exhibit* P-32.

26  The notations show Huezo's representations of Ball's purported returns on his investments,

27  including the $55,250 in prepaid interest from the Las Vegas Deal that Huezo later said did

28  not go through, and Huezo went over these notations as his notes when he was explaining

to Ball the status of Ball's investments, including the Las Vegas deal.  This raises the
question of why Huezo would tell Ball that Ball earned prepaid interest on the Las Vegas
Deal, as Ball testified, if that deal had not gone through, which testimony the court finds
credible.  The answer is that Huezo did not tell Ball that the deal had fallen through in
March 2008 or at any time thereafter, contrary to what Huezo testified at trial, because
Huezo did not tell or want to tell Ball that Ball's money for the Las Vegas deal was diverted
to other uses.

91.    The court finds that Huezo's testimony that in March 2008, he informed Ball
that the Las Vegas deal fell through and that Ball told Huezo did not want his money back
is not credible, and in fact, incredible. It does not make any sense for Ball wanting to lend
money to Huezo personally to make loans to Fremont borrowers.  Apparently, Huezo
thought if Ball lent the money to him personally, he would have free rein to decide who to
lend Ball's money to, and there is nothing in the record to support that Ball would have
given such free rein to Huezo to lend out his money.  As discussed previously, the dealings
between Ball and Huezo is that Ball only invested his money with Fremont after Huezo told
him about specific loan deals and Ball had generally asked for assurances of his money
being adequately protected and secured by collateral.  Perhaps the only exception was
Ball's $130,000 investment based on the January 30, 2008 email when Ball trusted Huezo
and assumed that the deal would be for secured loans without apparently getting an
express representation that the loans would be secured, but otherwise, Ball always inquired
about adequate collateral and whether the loans were secured and invested after Huezo
provided an explanation of the deal, including details of the specific borrowers and their
collateral.  In this instance, Ball wired the money to Fremont on March 26, 2008, the day
after Huezo notified Ball by email on March 25, 2008 to go ahead and send the money
because the deal was going through, and this was consistent with the general pattern of
Ball's behavior.  The notion that Ball would have given Huezo a personal loan with
complete authority to lend out or dispose of Ball's funds is fanciful and not supported by the
record.  Huezo's testimony that Ball wanted Huezo to hold on to his money because Ball

**AMENDED MEMORANDUM DECISION**

1   would have more of an advantage negotiating with the IRS regarding the tax audit is also

2   fanciful because whether the money was refunded to Ball or lent to Huezo, Ball would have

3   had to report the money either as cash on deposit or an investment or account receivable

4   on any collection information statement submitted to the IRS.  *See,* IRS Form 433-F,

5   Collection Information Statement (accessed online on September 27, 2019 at

6   https://www.irs.gov/pub/irs-pdf/f433f.pdf.[6]  Moreover, Huezo's testimony that the notations

7   on the copy of the check with the numbers regarding Ball's investments, including the Las

8   Vegas or Romano deal, in his handwriting was at Ball's direction and he did not know why

9   Ball was asking him to write the numbers and what they were is not credible, and in fact, in

10  this court's view, preposterous, because the purpose of the meeting between Ball and

11  Huezo was for Huezo to explain the status of Ball's investments with Fremont, and Ball

12  would have had no idea what these figures represented, such as $55,250 was prepaid

13  interest from the Romano deal, and based on the overwhelming evidence of Huezo's failure

14  to inform Ball that the Las Vegas deal fell through, the court finds that this testimony of

15  Huezo's is sheer prevarication.

16       92.    The evidence indicates that while the Romano loan deal had fallen through,

17  Huezo took advantage of the situation by not telling the truth to Ball and used Ball's money

18  for purposes other than he [Huezo] represented to Ball, which resulted in loss of Ball's

19  money in that Fremont/Huezo did not completely repay Ball for the money it took from him

20  and used contrary to Huezo's representations that the money would be used for secured

21  loans to specific borrowers in the Las Vegas and Los Angeles deals.

22       **I.    Payments from Fremont to Ball and Damages**

23       93.    It is undisputed that Ball "invested" in, or lent to, Fremont a total of $844,750

24  through Huezo.  *Ball Declaration* at 12-13, ¶¶ 36 and 37; *Plaintiff's Trial Exhibit P-49;*

25  *Defendant's Proposed Findings of Facts and Conclusions of Law* ¶ 152.

26       94.    From and after January 2008, Fremont made the following payments to Ball,

27

28  _____
    [6]  The court takes judicial notice of this government form posted on the IRS's website pursuant to Federal
    Rule of Evidence 201.

-49-

**AMENDED MEMORANDUM DECISION**

totaling $282,624.27:

        a.     $3,000 on January 3, 2008

        b.     $3,875 on February 1, 2008

        c.     $5,500 on March 1, 2008

        d.     $9,625 on April 16, 2008

        e.     $9,966 on May 1, 2008

        f.     $9,966 on June 2, 2008

        g.     $9,966 on July 1, 2008

        h.     $100,000 on August 15, 2008

        i.     $40,726.27 on February 1, 2009

        j.     $20,000 on February 17, 2009

        k.     $10,000 on June 1, 2009

        l.     $10,000 on July 31, 2009

        m.     $5,000 on June 15, 2010

        n.     $15,000 on July 14, 2010

        o.     $20,000 on July 20, 2010

        p.     $10,000 on July 26, 2010

*Plaintiff's Trial Exhibits P-30, P-31, P-32, P-33, P-34, P-35 and P-49; Ball Declaration* at 5-12, ¶¶ 15, 22, 25, 29, 33 and 36.

95.     According to Ball, from 2008 to 2010, Fremont paid Ball $282,624.27.

*Plaintiff's Trial Exhibits P-27, P-28, P-29, P-30, P-31, P-32, P-33, P-34, P-35 and P-49.*

96.     According to Huezo, during this time period, Huezo and Fremont paid Ball $333,085.49.  *Huezo Declaration* at 42-48, ¶¶ 121-148.

97.     The parties stated their agreement on the record at trial that Ball agreed to credit Fremont and Huezo for insurance adjustment fees as of September 17, 2010, and a payment to a contractor as of September 14, 2009, in the amount of $3,500, against the amount of Ball's claim against Fremont and Huezo.  *Trial Proceedings,* April 18, 2014 at 9:03-9:05 a.m. (ECF 248, Trial Transcript at 04:19-08:24).  Ball claimed the insurance

1    offset should be only $27,855.29, for a total offset of $31,355.29, while Huezo claimed the

2    insurance offset should be $45,961.22, for a total offset of $49,461.22.

3        98.    Ball also received a distribution from the Fremont bankruptcy case on his

4    claims against Fremont in the amount of $102,855.96 on June 7, 2013, which reduces his

5    claims against Fremont and Huezo.

6        99.    Based on these adjustments, on August 1, 2014, the court entered an order

7    reducing Ball's claimed damages in this case by the amount of $134,210.58, subject to the

8    court's determination on the additional offset claimed by Huezo in the amount of

9    $18,105.93. *Trial Proceedings*, April 18, 2014 at 9:03-9:06 a.m. (ECF 248, Trial Transcript

10   at 04:19-08:24)*; Stipulation and Order,* ECF 196 and 200.

11       100.    During the period from November 28, 2007, when Ball made his initial

12   investment in, or loan to, Fremont, to May 5, 2011, when Fremont filed for bankruptcy,

13   Huezo took at least the amount of $307,160.95 out of Fremont.  *Trial Declaration of Adrian*

14   *Stern*, ¶ 17C; *Plaintiff's Trial Exhibit P-53, Exhibit B of Expert Report of Adrian Stern; Trial*

15   *Testimony of Adrian Stern,* April 24, 2014 at 11:06-11:08 a.m. (ECF 250, Trial Transcript at

16   85:19-86:19)*; Huezo Declaration* at 56-73, ¶¶ 193-230.

17       101.    Huezo testified that when the economic recession began due to the mortgage

18   crisis in late 2009, his income, which depended upon real estate transactions, business

19   loans, and home equity financing, dried up and Fremont borrowers began defaulting on

20   their loans. *Huezo Declaration* at 11, ¶ 25.

21       102.    After July 26, 2010, Fremont made no further payments to Ball on his

22   "investments" or loans, despite the expiration of the maturity dates on all of the promissory

23   notes. *Plaintiff's Trial Exhibits P-9, P-16, P-19 and P-44; Ball Declaration* at 12-13, ¶¶ 36

24   and 37; *Trial Testimony of Joey Ball*, April 25, 2014 at 10:57-11:01 a.m. (ECF 244, Trial

25   Transcript at 92:03-97:24).

26       103.    Huezo testified that at Fremont, he assessed the risk of each loan made by

27   Fremont and performed underwriting duties prior to funding each loan. *Huezo Declaration*

28   at 8, 22, 32, 39, 73-96, ¶¶ 17, 56, 89, 110-111, 231-287.

104.    According to Huezo, Fremont made $1,055,766 in loans secured by real property deeds of trust which were listed on a chart in paragraph 184 of his trial declaration. *Huezo Declaration* at 53, ¶184.  By Huezo's calculations, if the refinanced loans (or as he referred to them as "recycled" loans, which terminology this court does not accept) are disregarded, the amount of loans secured by real property deeds of trust made by Fremont was $710,766.00.  Id.   With respect to Fremont loans made with Ball's money based on the November and January Reports resulting in losses to Ball, only the two loans made to Inocencio Rodriguez for $175,000 and $250,000 and the two loans made to Janet Smith of $50,000 and $64,000 are on Huezo's chart as being secured by real property deeds of trust, and both borrowers had refinanced loans.  Id.  However, Ball's losses did not result from these loans which were repaid by the borrowers, but by Fremont/Huezo's "recycling" of Ball's money after these loans were paid off into new loans or other uses, such as Huezo's loan payoff commissions and unsecured loans, such as to Robert Gray and Eugenia Duran, which were not disclosed to or authorized by Ball.  With respect to Fremont loans made with Ball's money for the Las Vegas and Los Angeles deals resulting in losses to Ball, it is unclear whether any of these loans on Huezo's chart were funded with Ball's money intended for the Las Vegas and Los Angeles deals.  However, as to this money, Ball's losses resulted from Fremont/Huezo's diversion of Ball's money from the Las Vegas and Los Angeles deal loans to loans to other borrowers, which were not disclosed to or authorized by Ball.

105.    Ball testified that the most important part to him about lending to Fremont was that the loans that Fremont would make with his money would be collateralized.  *Trial Testimony of Joey Ball*, April 17, 2017, ECF 268 at 150:22-151:13.  According to Ball in his trial declaration, "Huezo told me that I would be paid 15 percent on my loan to Fremont and because the loans would have ample collateral there would be little or no risk in my investment at Fremont."  Ball Declaration at 2-3.  As to what Ball understood Huezo meant when he told Ball about ample collateral, Ball said that "even if the housing market went bad we would still be paid back our money."  *Trial Testimony of Joey Ball*, April 17, 2017,

1   ECF 268 at 152:5-18.  Ball recalled in his own words that "he (Huezo) would give [loan]

2   money to people for properties that had a lot of equity in their properties as collateral."  *Trial*

3   *Testimony of Joey Ball*, April 17, 2017, ECF 268 at 153:21-25.

4          106.    According to Huezo, he never told Ball that he only did loans secured by real

5   property deeds of trust.  *Trial Testimony of Victor Huezo*, April 25, 2015 at 10:22 a.m.  Ball

6   testified that when Huezo asked him to lend Fremont/Huezo money, Huezo made verbal

7   representations to him that every loan he was going to make was going to be collateralized

8   by real property.  *Trial Testimony of Joey Ball*, April 17, 2017, ECF 268 at 147:12-148:21,

9   170:1-3 and 175:10-16.  That is, Ball testified that for the Fremont loans that he was

10  specifically funding, his testimony is that Huezo represented that these loans would be

11  secured by real property.  *Id.*  However, Ball was not sure that either Eric Heldwein or

12  Curtis Hayden was present when Huezo made these representations to Ball.  Id. at 148:22-

13  150:3.

14         107.    Huezo testified that he believed that by Fremont merely holding a promissory

15  note for each loan, the loans were "secured," and Fremont/Huezo would still be able to

16  collect from defaulting borrowers because their loan application documents showed that

17  they owned collateral which could be collected upon.  *Huezo Declaration* at 73-95, ¶¶ 231-

18  286; *Trial Testimony of Victor Huezo,* April 24, 2014 at 2:16–2:20 p.m. (ECF 250, Trial

19  Transcript at 153:01-157:05).  The court finds Huezo's testimony on this point not to be

20  credible.

21         108.    Huezo testified that he believed that the term "secured asset" meant that a

22  borrower had assets as reflected on the borrower's loan application that would help the

23  borrower repay any debt owed if the borrower defaulted.  *Huezo Declaration* at 26, ¶ 70.

24  Huezo testified: "I'm considering the promissory note as my security agreement."  *Trial*

25  *Testimony of Victor Huezo,* April 24, 2014 at 2:20 p.m. (ECF 250, Trial Transcript at

26  156:11-157:05).  In light of Huezo's experience in commercial lending since the late 1990s

27  and Huezo's licensing as a real estate salesperson and a real estate broker, the court does

28  not find Huezo's testimony on this point to be credible because he knew that it took

-53-
**AMENDED MEMORANDUM DECISION**

1 perfection of secured claims by taking and recording deeds of trust as to real property and

2 UCC financing statements with the California Secretary of State as represented and

3 acknowledged in the Fremont Informational Materials that Huezo is responsible for and

4 gave to Ball.

5       109.   According to Huezo, based on the underwriting for each loan and the assets

6 and collateral pledged by each borrower to secure the loans, he could have collected from

7 a defaulting borrower. *Huezo Declaration*, ¶¶ 231-286.  This testimony lacks credibility

8 because there is no evidence to support this assertion, even the evidence in Huezo's case

9 in chief, such as his chart of loans by Fremont in paragraph 148 of his trial declaration,

10 showed that most of the loans that Fremont made were not secured by deeds of trust or

11 other security interest.  Huezo's testimony lacks credibility because how he or Fremont

12 would have collected from the borrowers to pay back Ball's loans completely lacks

13 specifics.  For example, Huezo in his testimony did not show how he would have done

14 better than the Fremont bankruptcy trustee in collecting the loans from the Fremont

15 borrowers.

16       110.   Also, according to Huezo, if all the loans made by Fremont to borrowers had

17 been repaid, Fremont/Huezo would have had the money to pay Ball back. *Trial Testimony*

18 *of Victor Huezo*, April 24, 2014 at 4:33-4:34 p.m. (ECF 250, Trial Transcript at 257:16-

19 258:14).  The court finds Huezo's testimony on this point not to be credible, nor probative.

20 The evidence indicates that the Fremont borrowers did not pay back the loans made to

21 them by Fremont through Huezo's efforts and that Fremont had insufficient collateral to look

22 to for payment of these loans since Fremont through Huezo's efforts did not properly

23 perfect certain security interests in borrower collateral, despite Huezo's representations to

24 Fremont investors like Ball as described herein.

25       111.   Fremont through Huezo's efforts funded loans not secured by real property or

26 business assets with investor money like from Ball. *Trial Testimony of Victor Huezo*, April

27 24, 2014 at 2:07-2:36 p.m. and 3:15-3:47 p.m.*, 3:54-4:14 p.m., 4:27-4:34 p.m.*, *see e.g.*,

28 ECF 250, Trial Transcript at 153:01-157:05; *Trial Testimony of Victor Huezo,* April 25, 2014

1    at 9:20-9:53 a.m., 9:56-10:00 a.m. (ECF 244, Trial Transcript at 17:19-53:11).

2         112.    Huezo sent Ball an email message and two letters on November 19, 2010,

3 suggesting a settlement whereby Fremont would transfer real property valued at $365,000

4 to Ball in return for credit applied towards the amount owed to Ball. *Defendant's Request*

5 *for Judicial Notice, Exhibit 3* at 17:1-4; *Huezo Declaration* at 105-106, ¶ 321; *Defendant's*

6 *Exhibit D-12.*

7         113.    Ball did not accept this settlement offer of Fremont by Huezo. *Huezo*

8 *Declaration* at 107, ¶ 325-326; *Trial Testimony of Joey Ball*, April 18, 2014 at 9:42 a.m.

9 (ECF 248, Trial Transcript at 35:15-38:11).

10                                 **III.**    **ANALYSIS**

11       Ball's complaint in this adversary proceeding alleges claims for relief under 11

12 U.S.C. §§ 523(a)(2)(A) and (a)(6). These claims are "core proceedings" pursuant to 28

13 U.S.C. § 157(b)(2)(I), and this court has jurisdiction over the claims pursuant to 28 U.S.C.

14 §§ 157(b)(1) and 1334.

15        **A.**   **The Court Has Jurisdiction to Enter a Monetary Judgment on Ball's**

16            **Unliquidated State Law Claims.**

17       Under 11 U.S.C. § 157(b)(1), "[b]ankruptcy judges may hear and determine all cases

18 under title 11 and all core proceedings arising under title 11 . . . and may enter appropriate

19 orders and judgments . . . ." Further, under 11 U.S.C. § 157(b)(2)(I), a dischargeability

20 determination of a particular debt is a core proceeding. Accordingly, in conjunction with a

21 dischargeability determination, the bankruptcy court has jurisdiction to enter a judgment on

22 an underlying unliquidated state law claim. *In re Kennedy*, 108 F.3d 1015, 1016-1017 (9th

23 Cir. 1997); *see also* 11 U.S.C. § 157(b)(2)(B) (core proceedings do not include the

24 liquidation of unliquidated personal injury torts).

25       At trial and throughout the course of litigation, the parties failed to present evidence

26 of the entry of any judgment by another court on Ball's underlying claims against Huezo, let

27 alone any evidence of any state court action between the parties concerning the underlying

28 claims. Accordingly, the court determines that Ball has unliquidated fraud claims against

1  Huezo, and pursuant to 11 U.S.C. § 157(b) and *In re Kennedy*, and in conjunction with its

2  debt dischargeability determinations under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6), the court

3  has jurisdiction to enter a monetary judgment on Ball's unliquidated state law claims, which

4  are not based on personal injury torts.

5      **B.  Because Ball's "Investments" in Fremont Were Loans to Fremont,**

6          **California's Usury Laws Apply.**

7          As a preliminary matter, the court considers whether Ball made "loans" to or

8  "investments" with Fremont.  Throughout their papers, the documentary record, and their

9  oral argument and testimony at trial, both parties primarily characterized the four

10  transactions whereby Ball advanced a total of $844,750 to Fremont solicited by Huezo as

11  "loans," but also refer to the transactions as "investments," which seems inconsistent, if not

12  confusing.  *See, e.g., Plaintiff Joey Ball's Trial Brief,* ECF 176, filed on April 10, 2014, at 1

13  ("Ball brings this action for Fraud under 11 U.S.C. § 523(a)(2)(A) and Willful and Malicious

14  Conduct under 11 U.S.C. § 523(a)(6) against Defendant Victor Huezo ('Huezo') based on

15  Huezo's intentional misrepresentations, intended to and resulting in Ball loaning Huezo's

16  company, Fremont Investment Holdings, Inc. ('Fremont'), $844,750 under false pretenses.")

17  and at 3 ("Huezo told Ball that there was little risk to the loans [by Fremont to borrowers]

18  and that Ball would be paid a 15% return on his 'investment' in Fremont.") (citing *Ball*

19  *Declaration,* ¶ 6); *Defendant Victor Huezo's Trial Brief,* ECF 180, filed on April 10, 2014, at

20  2 ("Ball and Fremont/Huezo entered into four agreements wherein Ball loaned Fremont (on

21  three occasions) and Huezo (on one occasion) money at 15% annual interest . . . .

22  Moreover, Ball never invested into Fremont.  Ball never received any equity or shares in

23  Fremont.  Ball admits he made four loans to Fremont."); *Plaintiff's Trial Exhibit P-2,*

24  Fremont Informational Materials (many references to clients like Ball advancing money to

25  Fremont as "investor(s)" and an advance by clients as an "investment").  As part of each of

26  these transactions, Fremont delivered to Ball "promissory notes" stating that, in addition to

27  the principal Fremont owed to Ball, Fremont promised to pay Ball 15% interest per annum.

28  *See Plaintiff's Trial Exhibits P-9, P-16, P-19 and P-44.*  The court must determine whether

the transactions constitute loans or investments because such a determination affects

whether California's usury laws apply, as argued by Huezo, and whether the 15% interest

provided in the notes is recoverable by Ball. *Defendant Victor Huezo's Trial Brief,* ECF 180

at 11-12.

As explained by the Miller and Starr treatise on California real estate law:

> **The Usury Law does not apply to an investment transaction.**
> Numerous transactions involving the advance of money are
> structured in some form other than a loan. In some cases these
> ventures are actually investments and not loans, in the sense that
> the investor expects a return on the funds advanced but also risks a
> loss or receipt of no return. In these cases the courts reject the claim
> of usury even though the investor receives a return on investment
> which exceeds the maximum usury rate.

11 Miller and Starr, California Real Estate Law, § 37:5 ("Loan or forbearance of money")

(4th ed. online ed. September 2019 update) (citing *Roodenburg v. Pavestone Co., L.P.*,

171 Cal.App.4th 185, 194 (2009)). One California court has characterized the situation of

determining whether a transaction is a loan or investment as follows:

> The rule set forth in 55 Am.Jur. 342 does indicate to the court a
> reasonable line of demarkation between a legitimate business
> venture with the parties unequal in the extent of their risk but equally
> eager in their anticipation of profit, and a situation in which such a
> necessitous borrower is victimized by a designing usurious lender. It
> is there suggested that a transaction is likely to be a loan where the
> recipient of the money parts with title to *property of his own* as
> security. On the other hand, the transaction is more likely to be a
> business venture where the money is used entirely for the purchase
> of *property not theretofore owned by either* of the persons.

*Batchelor v. Mandigo,* 95 Cal.App.2d 816, 823 (1950). More precisely, the issue in this

case is whether Ball's advances to Fremont/Huezo were investments in a joint venture or

loans to a borrower, which is a factual question. 11 Miller and Starr, California Real Estate

Law, § 37:13 and nn. 3-5 ("Partnerships and joint ventures") (citing, *inter alia*, *Batchelor v.

Mandigo, supra*); *see also Wooton v. Coerber*, 213 Cal.App.2d 142, 146 (1963) (finding that

a transaction was an investment even where the transaction was documented by a

promissory note); *Giorgi v. Conradi*, 199 Cal.App.2d 82 (1962) (same); *Atkinson v. Wilcken*,

142 Cal.App.2d 246 (1956) (same).

**AMENDED MEMORANDUM DECISION**

1        "There are three primary factors which distinguish a loan transaction from a

2  partnership or joint venture transaction: (1) whether there is an absolute obligation of

3  repayment; (2) whether the investor may suffer a risk of loss; and (3) whether the investor

4  has any right to participate in management."  11 Miller and Starr, California Real Estate

5  Law, § 37:13  and nn. 3-5 and 10 ("Partnerships and joint ventures") (citing *Junkin v.*

6  *Golden West Foreclosure Service, Inc.,* 180 Cal.App.4th 1150, 1155-1157 (2010)).

7  Applying these criteria, it appears that the transactions between Ball and Fremont/Huezo

8  were loans as the parties generally characterized them and as indicated in the transaction

9  documents themselves.  The promissory notes issued by Fremont/Huezo to Ball for the

10  advances made by Ball to Fremont/Huezo recite an absolute obligation to repay Ball, do

11  not indicate that the investor, Ball, may suffer a risk of loss and do not indicate that the

12  investor, Ball, has any right to participate in management of Fremont and its use of the

13  invested funds.  There is no evidence that indicates otherwise, and the parties do not argue

14  otherwise.  Based on the criteria stated above regarding characterization of a transaction

15  as a loan or a joint venture for usury law transaction purposes, Ball's advances to

16  Fremont/Huezo were loans.  Therefore, California's usury laws apply to these transactions.

17  *See* California Constitution, Article XV § 1; *Sheehy v. Franchise Tax Board*, 84 Cal.App.4th

18  280, 282-283 (2000) ("For a transaction to be usurious, (1) it must constitute a loan or

19  forbearance . . . .  A forbearance is an agreement to extend the time for payment of the

20  obligation due either before or after the obligation's due date.") (internal citations and

21  quotations omitted).

22        "A usurious transaction is a 'loan or forbearance of money, goods or things in action'

23  pursuant to which a 'person, company, association or corporation' directly or indirectly

24  takes or receives in 'money, goods, or things in action, or in any other manner whatsoever,

25  any greater sum or any greater value' than is allowed by law."  11 Miller and Starr,

26  California Real Estate Law, § 37:4 and n. 1 ("Essential elements of usury") (citing

27  Uncodified Laws, Stats. 1919, p. 1xxxiii, §§ 1-3 [Civ. Code, §§ 1916-1, 1916-2, 1916-3];

28  Cal. Const., art. XV).  Proving usury is a mixed question of law and fact, and the borrower

**AMENDED MEMORANDUM DECISION**

1   who claims usury has the burden of proving the elements of usury by a preponderance of

2   the evidence.    11 Miller and Starr, California Real Estate Law, § 37:4 and nn. 10 and 11

3   (citing, *inter alia, Ghirardo v. Antonioli,* 8 Cal.4th 791, 798 (1994)).

4           Four essential elements must be proven to establish usury: (1) the transaction must

5   be a loan or forbearance of the use of money; (2) the interest received by the lender must

6   be in excess of the statutory maximum rate that is applicable to the transaction; (3) the loan

7   and interest must be absolutely payable by the borrower, and not contingent, at risk, or in

8   the control of the borrower; and (4) the lender must have a willful intent to enter into a

9   usurious transaction.  11 Miller and Starr, California Real Estate Law, § 37:4 and nn. 3-7

10  (citing, *inter alia,* Cal. Const. art. XV and *Ghirardo v. Antonioli,* 8 Cal.4th at 798).  As

11  discussed above, the first element of the transactions being loans and the third element of

12  an absolute obligation of the borrower to repay the loans have been shown here as not

13  disputed.

14          The second element of usury that the interest received by the lender is in excess of

15  the statutory maximum rate applicable to the transactions is demonstrated here.  The rate

16  of interest for Ball's loans to Fremont/Huezo was 15% based on the agreement of the

17  parties and as reflected in the transaction documents, which facts are not disputed.   For

18  non-consumer loans (i.e., not primarily for personal, family or household purposes), such

19  as Ball's loans to Fremont/Huezo, the statutory maximum rate of interest is either 10

20  percent per year or the "federal discount rate," plus 5 percent per year, whichever is

21  greater, but since the "federal discount rate" has been below 5 percent since January 31,

22  2001, except for a short time period between December 13, 2005 and October 31, 2007

23  (which is not relevant here since the loans were made in November 2007 and March 2008),

24  the maximum rate is 10 percent.  California Constitution, Art. XV; 11 Miller and Starr,

25  California Real Estate Law, § 37:18 and n. 3 ("Determining the maximum allowable  rate of

26  interest – In general – Maximum rate for non-consumer loans") (citing link to current and

27  historical data for "federal discount rate" on the website of the Federal Reserve Bank of

28  San Francisco, http://www.frbsf.org/banking-supervision/banking-economic-

data/discountrate (now http://www.frbsf.org/banking/discount-window/discount-rate)).

Because Ball's loans at 15% exceeded the 10% maximum rate, the loans were usurious on

their face.

"When the transaction is in the form of a loan and it is usurious on its face, there is

no need to examine the underlying facts, and the lender's intent is presumed merely a

patent willingness to charge the excessive rate of interest."  11 Miller and Starr, California

Real Estate Law, § 37:31 and n. 12 ("Intent to violate the Usury Law") (citing, *inter alia,*

California Evidence Code § 668 and *Martin v. Kuchler,* 212 Cal.536, 558-539 (1931)).

Here, Ball's loans were usurious on their face with the excessive 15% interest rate.

"Although an intent to commit usury is a necessary element of a usurious transaction, there

is no requirement to prove the lender's intent to violate the law.  It is merely necessary to

prove an intent by the lender to receive a greater rate of interest than is permitted by law.

Neither ignorance of the law nor the absence of a guilty intent to violate the law is material

in finding the requisite intent for a usurious transaction."   11 Miller and Starr, California

Real Estate Law, § 37:31 and nn. 13 and 14 (citing, *inter alia, Ghirardo v. Antonioli,* 8

Cal.4th at 798 and *Williams v. Reed,* 48 Cal.2d 57, 68 (1957)); *see also In re Dominguez,*

995 F.2d 883, 886 (9th Cir. 1993); 1 Witkin, *Summary of California Law,* Contracts, § 469

("Effect of Usurious Provision – In General") (10th ed. 2005 and 2019 Supp.) ("If a

transaction is usurious on its face, neither good faith nor absence of guilty intent is

material.") (citing, *inter alia, Martin v. Kuchler,* 212 Cal. at 539).  "The usurious interest

provision is void, but the principal of the loan is unaffected."  1 Witkin, *Summary of*

*California Law,* Contracts, § 469 (citing, *inter alia, Haines v. Commercial Mortgage Co.,* 200

Cal. 609, 622 (1927)).

Here, Ball does not argue that his loans are not usurious on their face; rather, he

argues that Huezo should be estopped from claiming the loan is usurious based on his

fraudulent misconduct in structuring the loans as usurious and that Ball should be allowed

prejudgment interest at the legal rate of 7 percent per year.  *Plaintiff Joey Ball's Trial Brief,*

ECF 176 at 22-25 (citing, *inter alia, Buck v. Dahlgren,* 23 Cal.App. 779, 788-789 (1972) and

1  California Civil Code § 3517 ("No one can take advantage of his own wrong.")).

2      Harking back to the language of the California Court of Appeal in *Batchelor v.*

3  *Mandigo,* 95 Cal.App.2d at 823, in the transactions where Ball advanced money to

4  Fremont, this is not a situation where Fremont, the recipient of Ball's money advances and

5  the borrower of these advances, was victimized by a designing usurious lender, Ball, as

6  asserted by Huezo.  To the contrary, it was Fremont, with Huezo acting on its behalf, that

7  designed the structure of the loan transactions, including the issuance and use of investor

8  activity reports and the promissory notes with the 15 percent interest.  The November and

9  January Reports were issued on Fremont's business forms that Huezo emailed to Ball.

10  *Plaintiff's Trial Exhibits P-4, P-6, P-10 and P-11.*  The initial written communications

11  between Huezo and Ball regarding Ball's third and fourth investments—the January 30,

12  2008 email, which solicited an advance for $130,000, *Plaintiff's Trial Exhibit P-17,* and the

13  emails related to the Las Vegas and Los Angeles deals, which resulted in Ball wire-

14  transferring Fremont $404,750, *Plaintiff's Trial Exhibits P-20 through P-23*—were initiated

15  by emails sent on behalf of Fremont from Huezo to Ball.  Ball's money was used by

16  Fremont/Huezo as their capital to make unsecured loans to third party borrowers despite

17  Fremont/Huezo's promises to Ball that some of the loans would be secured.  Accordingly,

18  the court determines that the transactions between Ball (on behalf of himself) and Huezo

19  (on behalf of Fremont), involving Huezo's fraudulent representations, justify an estoppel

20  against Huezo regarding his usury defense and warrant the imposition of prejudgment

21  interest on the loans.

22      "Because the principal of the loan is unaffected, the usurious interest provision

23  results in a note payable at maturity without interest; and the creditor-payee is entitled to

24  interest at the legal rate from the date of maturity to the date of judgment."  1 Witkin,

25  *Summary of California Law,* Contracts, § 469 (citing, *inter alia, Epstein v. Frank,* 212

26  Cal.App.3d 111, 123-124 (1981)).  Thus, under the general rule regarding repayment of

27  principal of the loan without interest and the allowance of prejudgment interest and the

28  basis for an estoppel against Huezo in light of his fraudulent conduct, Ball is entitled to his

1  unpaid loan principal plus prejudgment interest at the legal rate of 7 percent per year from

2  the date of maturity of the loans he made to Fremont.

3        **C.** **<u>Huezo May Be Held Personally Liable to Ball for Debts Arising Out of Ball's</u>**

4                **<u>Loans to Fremont</u>**

5        As another threshold matter, because Ball's loans were made to Fremont and not to

6  Huezo individually, before the court addresses the nondischargeability of any debts of

7  Huezo arising from such loans, the court must first determine whether Huezo is individually

8  liable for the debts owed by Fremont to Ball.  In *Golden v. Anderson*, 256 Cal.App.2d 714,

9  719-720 (1967), the California Court of Appeal stated that in an action for an intentional

10  tort, "[a]ll persons who are shown to have participated are liable for the full amount of the

11  damages suffered."  (citations omitted); *see also Price v. Hibbs*, 225 Cal.App.2d 209, 222

12  (1964) ("When conspiring corporate officials act tortiously and individuals are injured as a

13  proximate result, such tortfeasors are liable to the injured persons even though the

14  corporation may also be liable." (citations omitted)); *Woodworking Enterprises, Inc. v. Baird*

15  *(In re Baird)*, 114 B.R. 198, 204 (9th Cir. BAP 1990) (applying Arizona law, "a corporate

16  officer or director who engages in tortious conduct is personally liable for the tort,

17  notwithstanding the fact that the officer may have acted on behalf of the corporation"); *In re*

18  *Pontier*, 165 B.R. 797, 800 (Bankr. D. Md. 1994) ("The general rule is that corporate

19  officers . . . are personally liable for those torts which they personally commit, or which they

20  inspire or participate in, even though performed in the name of an artificial body.") (citing,

21  *inter alia*, *Fletcher v. Western National Life Insurance Company,* 10 Cal.App.3d 376

22  (1970)).

23        The uncontroverted evidence here indicates that Huezo was an officer and agent of

24  Fremont at all times pertinent to this matter, that Huezo was the sole actor who made the

25  representations on behalf of Fremont to Ball and handled Ball's loans on behalf of Fremont,

26  and Huezo was the sole actor of Fremont who engaged in all the actions that caused harm

27  to Ball.  Thus, the court determines that Huezo is personally liable to Ball for the any torts

28  under applicable law, including deceit and fraud under California Civil Code §§ 1709 and

1  1710.  *See also Engalla v. Permanente Medical Group, Inc.,* 15 Cal.4th 951, 973-981

2  (1997).

3      **D.  <u>Liability for and Nondischargeability of Debt Arising from False</u>**

4         **<u>Representation</u>**

5        Under California law, "[t]he elements of fraud that will give rise to a tort action for

6  deceit are: (a) misrepresentation (false representation, concealment, or nondisclosure);

7  (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance;

8  (d) justifiable reliance; and (e) resulting damage."  *Engalla v. Permanente Medical Group,*

9  *Inc.,* 15 Cal.4th at 974 (citations and internal quotation marks omitted); 5 Witkin, *Summary*

10  *of California Law,* Torts, § 890.  Ball, as the plaintiff, has the burden of proving the tort of

11  fraud or deceit against Huezo, as defendant, by a preponderance of the evidence.

12  California Evidence Code §§ 115 and 500.

13        11 U.S.C. § 523(a)(2)(A) provides in pertinent part that "[a] discharge under section

14  727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor

15  from any debt . . . (2) for money, property, services, or an extension, renewal, or

16  refinancing of credit, to the extent obtained by . . . (A) false pretenses, a false

17  representation, or actual fraud, other than a statement respecting the debtor's or an

18  insider's financial condition . . . ."

19        The elements of a claim under 11 U.S.C. § 523(a)(2)(A) are: (1) the debtor made

20  representations; (2) that at the time the debtor knew they were false; (3) the debtor made

21  those representations with the intention and purpose of deceiving the creditor; (4) the

22  creditor justifiably relied on these representations; and (5) the creditor sustained losses as

23  a proximate result of the debtor's representations.  *Ghomeshi v. Sabban (In re Sabban)*,

24  600 F.3d 1219, 1222 (9th Cir. 2010) (citations omitted); *Citibank (South Dakota), N.A. v.*

25  *Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996) (citations omitted); *accord Van*

26  *Zandt v. Mbunda (In re Mbunda)*, 484 B.R. 344, 350 (9th Cir. BAP 2012).  "The elements of

27  fraud under § 523(a)(2)(A) match the elements of common law fraud and of actual fraud

28  under California law."  *Lee v. Tcast Communications, Inc. (In re Jung Sup Lee)*, 335 B.R.

130, 136 (9th Cir. BAP 2005) (citing *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373-374 (9th Cir. BAP 1997), *aff'd* 163 F.3d 609 (9th Cir.1998).

In this adversary proceeding to determine debt dischargeability under 11 U.S.C. § 523(a)(2)(A), Ball has the burden of proving every element of the claim by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 286-287 (1991); *Kawaauhau v. Geiger*, 523 U.S. 57 (1998).  The standard of proof on the element of reliance is justifiable reliance.  *Field v. Mans*, 516 U.S. 59, 72-75 (1995) (citations and footnotes omitted).  Whether a requisite element of a claim under 11 U.S.C. § 523(a)(2) has been satisfied is a factual determination.  *Islamov v. Ungar (In re Ungar)*, 633 F.3d 675, 679 (8th Cir. 2011).

11 U.S.C. § 523(a)(6) provides in pertinent part that "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . . ."

"Willful" and "malicious" are both required elements to establish non-dischargeability under 11 U.S.C. § 523(a)(6).  *Ormsby v. First American Title Company of Nevada (Matter of Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010).  The "willful injury" requirement is met when the creditor shows that: the debtor had a subjective motive to inflict the injury, or the debtor believed the injury was substantially certain to occur as a result of his or her conduct.  *Petralia v. Jercich (In re Jercich),* 238 F.3d 1202, 1208 (9th Cir. 2001); *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1144 (9th Cir. 2002).

Although Ball made four separate loans to Fremont induced by Huezo, because the first and second loans are similar to each other, the court discusses these two loans together and the third and fourth loans individually.

///

**AMENDED MEMORANDUM DECISION**

1. **Ball's First and Second Loans: The November and January Reports**

   a. **False Representations under California Law and 11 U.S.C.**
      **§ 523(a)(2)(A)**

      i.  Representations

The court determines that Ball has proven by a preponderance of the evidence that Huezo made false representations, as detailed below, to Ball regarding the characterization of the loans to be made by Fremont described in the November and January Reports to induce Ball to "invest" in and fund these loans for Fremont, including whether or not the loans were secured, distribution of the proceeds upon payment, and the appropriate loan to value ratio for each loan.  The dispute between the parties regarding Huezo's representations related to the November and January loans does not solely come down to a contest of credibility about who made what oral representations.  Rather, the court finds that the documentary evidence in this case is dispositive and supports Ball regarding his first and second loans to Fremont.

Huezo's counsel, Mr. Gholian, conceded that Ball did not receive *exactly* what was represented to him in the November and January Reports, but apparently argues that these misrepresentations cannot form the basis for fraud because Ball "assumed the risk" because he knew Fremont offered unsecured loans.  *Closing Argument of Victor Huezo by Artin Gholian*, July 12, 2017 at 5:07-5:10 p.m.  The court rejects this argument and concludes that Huezo made multiple misrepresentations to Ball, both verbally and in the November and January Reports, with the express purpose of inducing Ball to provide funding to Fremont.

As discussed further *infra*, the court finds that Huezo's testimony with regard to Ball's November and January loans was particularly evasive and at times contradictory. *Compare e.g.*, *Huezo Trial Testimony,* April 24, 2014, ECF 250, Trial Transcript at 154:06-155:06 (testifying that it was "not true" that the Gemini loan was unsecured), *with Huezo Trial Testimony,* April 24, 2014, ECF 250, Trial Transcript at 156:07-157:05 (testifying that Fremont did not get a trust deed or security agreement, or file a financing statement, in

1   connection with the Gemini loan).  Huezo was and is a lending and real estate professional

2   with extensive professional experience.  *See Huezo Declaration* at 2-10, ¶¶ 5-24.  The

3   court is hesitant to accept that "one of the top loan producers and managers in Southern

4   California"[7] would not understand the relationship between a promissory note and a

5   secured interest in real, personal, or business property.  The evidence does indicate,

6   however, that Huezo was the principal of Fremont, its sole owner and manager, and the

7   only person acting on behalf of Fremont with respect to Ball's loans.  *See supra* ¶ 9,

8   Section II.C., at 9-10.  Moreover, Ball provided more than 70%—if not all—of Fremont's

9   loan capital, and without Ball's capital, Fremont would have no funding for loans and

10  therefore no commissions for Huezo.  *See e.g.*, *Huezo Trial Testimony,* April 24, 2014, ECF

11  250, Trial Transcript at 134:22-135:02, 225:18-229:04.  But for inducing Ball's loans and

12  recycling Ball's capital without Ball's knowledge or consent, Huezo/Fremont would not have

13  been an income producing enterprise for Huezo.  Specifically, the court finds Ball's

14  testimony that he was only interested in secured, low LTV extensions of credit credible.

15  Huezo, like the court, understood that Ball's interest was limited to over-secured loans;

16  Huezo represented that Ball's capital would fund specific secured loans, and Huezo failed

17  to disclose that Ball's capital was funding various unsecured loans and Fremont's

18  operations.

19         Beginning before Ball's first loan to Fremont, Huezo consistently represented to Ball

20  that the proceeds of Ball's November and January Loans would be used to fund "secured"

21  loans.  Based on Ball's testimony, which the court finds to be credible, during golf outings in

22  late 2006 and early 2007, Huezo told Ball, among other things, that Fremont's loans were

23  "highly collateralized secured loans," "little to no risk," and "guaranteed."  Moreover, the

24  documentary evidence, specifically the Fremont Informational Materials, which Huezo

25  provided to Ball on July 5, 2007, and which explained Fremont's lending business and

26  process to Ball before Ball made any "investments" in, or loans to, Fremont, unequivocally

27  stated that "the majority of the lending we do is based on collateral and personal

28
_____
[7]  *Huezo Declaration* at 4, ¶ 9.

guarantees."  Although the Fremont Informational Materials implied that not all of Fremont's loans were secured, the Fremont Informational Materials did state that the activity reports outlined what loans will be made for the particular investment made by an "investor" (lender) of Fremont.  The Fremont Information Materials established the expectation that investors would receive activity reports prior to lending money to Fremont: "In order for investors to analyze their risk and reward an activity report is sent out to all investors prior to processing any loans. The activity report is going to outline what loans are being made and at what rate the investors are getting paid at. (Please refer to the activity report.)"  Both the November and January Reports provided by Huezo to Ball "outline[d] what loans are being made and at what rate the investors [Fremont's lenders] are getting paid at," and unequivocally represented that Ball's "investments" or loans would be used to make secured loans to borrowers of Fremont.

The November Report that Huezo sent to Ball listed four "Secured Loans" totaling $290,000 with collateral valued at $1,580,000.  Right below this information on the November Report listing the four "Secured Loans," it stated: "Here is a list of the proposed loans we are going to close this week.  In order, to issue credit to our clients we will need to know your commitment to Fremont Investment Holdings Inc."  Similarly, the January Report that Huezo sent to Ball listed two "Secured Loans" totaling $70,000 with collateral valued at $790,000.  The court finds that Huezo, in sending the November and January Reports to Ball, made written representations to Ball that if Ball made the loans to Fremont being solicited through the November and January Reports, then the funds lent by Ball would fund the secured loans listed in the reports.

Ball testified that Huezo also made oral representations to Ball that Fremont's loans to borrowers would be secured by real property and would be "highly collateralized secured loans," "little to no risk," and "guaranteed."  This testimony is corroborated by documentary evidence in the November and January Reports, emailed by Huezo to Ball on November 26, 2007 and January 8, 2008, respectively, representing to Ball that the loans funded by the investments being solicited by Huezo for Fremont were "secured loans" and listing a

1    collateral amount to accompany each loan to be funded by the investor's funds ($1,580,000

2    and $790,000 of collateral, respectively).  The fact that a "collateral value" column on the

3    November and January Reports listing the value of collateral accompanied each loan

4    further reinforced the written representation in the reports that Ball's money lent to Fremont

5    would be funding specific secured loans and corroborates Ball's testimony that Huezo

6    made oral representations to him that Fremont's loans to borrowers with Ball's money

7    would be secured by real property. *Plaintiff's Trial Exhibits P-9 and P-10.*  Based on this

8    evidence, the court determines that Ball has shown by a preponderance of the evidence

9    that Huezo made representations to him orally and in writing that Ball's November and

10    January "Investments" in, or loans to, Fremont would be used to fund the specific secured

11    loans listed in the November and January Reports.

12          Thus, the court determines that Huezo made the following representations to Ball,

13    which supports Ball's claims under 11 U.S.C. § 523(a)(2)(A): (1) that Ball's November

14    "investment" in, or loan to, Fremont would fund four specific secured loans; (2) that the first

15    of these loans was for $40,000, secured by real property valued at $250,000, and this

16    would be the only loan on the real property; (3) that the second of these loans was for

17    $50,000, secured by real property valued at $500,000, and this would be the only loan on

18    the real property; (4) that the third of these loans was for $150,000, secured by real

19    property valued at $340,000, and this would be the only loan on the real property; (5) that

20    the fourth of these loans was for $50,000, secured by real property valued at $490,000, and

21    this would be the only loan on the real property; (6) that Ball's January "investment" in, or

22    loan to, Fremont would fund two specific secured loans; (7) that the first of these loans was

23    for $40,000, secured by real property valued at $375,000, and this would be the only loan

24    on the real property; (8) that the second of these loans was for $30,000, secured by real

25    property valued at $415,000, and the total debt owed on the property was $265,000; and

26    (9) that if Ball wanted his money back at any time, Fremont would buy out Ball's

27    "investments" (or pay back the loans) ahead of schedule.

28          Huezo's representations were false for a number of reasons.  First, according to

Huezo's own testimony, the first loan listed in the November Report was a loan to Gemini Security which was *not* secured by real property. *Huezo Declaration* at 29, ¶ 110. This alone constitutes a material misrepresentation intended to induce Ball to invest in Fremont.

Second, even if Huezo could have proven at trial (which he did not) that the $50,000 loan to Janet Smith was properly secured by real property, Huezo still recycled the loan proceeds after the borrower paid off the loan. As discussed above, this use of Ball's money was simply unauthorized and contrary to the representations made by Huezo in the Fremont Informational Materials and November Report.

Third, regarding the Inocencio Rodriguez loan, Huezo admits that Fremont funded the loan for $250,000 even though the November Report listed the loan amount as $150,000, which substantially changes the loan to value ratio where the listed collateral value was $340,000. Huezo testified that Rodriguez paid off the first loan on December 10, 2007, and rather than pay Ball or propose a further loan to fund with his money, Huezo unilaterally decided to fund the second loan to Rodriguez for $250,000. Finally, when Inocencio Rodriguez paid back the entire loan amount on May 30, 2008 in the amount of $282,687.70, which included the $250,000 principal and the remainder in prepayment and interest charges, Huezo again recycled those funds for purposes not previously authorized by Ball, including paying himself a "commission" of $30,000. *Huezo Declaration* at 61-62, ¶ 205.

Fourth, Huezo testified that the fourth loan from the November Report was funded by Fremont in the amount of $2,000 (or $3,000), *Huezo Declaration* at 29, ¶ 110 and at 74-75, ¶ 234, even though it was listed as a $50,000 secured loan on the November Report. There is no evidence that this loan was secured, and Fremont apparently obtained only a promissory note from the borrower.

Fifth, Huezo has provided no credible evidence of the two secured loans allegedly funded by the January investment and listed on the January Report. His claim that Ball's money funded a loan to Eugenia Duran made on May 15, 2008 in the amount of $40,000 is not credible because this loan to Eugenia Duran was made more than four months after

1   Ball received the January Report and provided Fremont with $70,000, a time period during

2   which he extended two other loans in excess of $500,000.  Moreover, the $46,000 loan to

3   Robert Gray DBS TGK Enterprises was unsecured, so it is inconsistent with the January

4   Report, and the borrower never paid back the loan.

5         Sixth, the evidence shows that Fremont/Huezo used Ball's money for operational

6   and other purposes without Ball's knowledge or consent and contrary to Huezo's

7   representations to Ball that Ball's funds would be used for the secured loans identified in

8   the November and January Reports.

9         Seventh, by modifying the loan to value ratio on the loans funded by Ball's

10  investments or loans, Fremont/Huezo was exposing Ball's money to an increased risk he

11  was expressly told would not be present when he was given the November and January

12  Reports.  In other words, even if Huezo demonstrated at trial that Ball's money went strictly

13  to fund secured loans (which he did not), the November and January Reports still contained

14  material misrepresentations about the loan to value ratio of the collateral because Huezo

15  failed to fund the specific loans listed in the reports.

16        Finally, the evidence shows that Fremont did not make the specific secured loans

17  set forth in the November and January Reports with Ball's November and January

18  "investments" or loans.  At trial, Huezo testified that he believed Fremont made secured

19  loans to borrowers because it obtained promissory notes from borrowers for the loans, but

20  conceded that Fremont did not obtain deeds of trust to secure the loans with real property

21  collateral, nor did it file UCC financing statements to secure loans with personal property

22  collateral with the California Secretary of State.  *Huezo Trial Testimony,* April 24, 2014

23  2:15-2:20 p.m. (ECF 250, Trial Transcript at 153:01-157:05); *see also* California Civil Code

24  § 2922; 4 Witkin, *Summary of California Law,* Security Transactions in Real Property,

25  §§ 39-53 (formalities required to create security interest in real property); California

26  Commercial Code §§ 9310(a)-9316; 4 Witkin, *Summary of California Law,* Secured

27  Transactions in Personal Property, §§ 59-104 (formalities required to create security

28  interest in personal property).

1    Accordingly, the court finds that Ball has shown by a preponderance of the evidence

2  that Huezo made false representations to him that Ball's November and January

3  "investments" in, or loans to, Fremont would be used to fund the specific secured loans set

4  forth in the November and January Reports, and that Ball would be repaid from the loan

5  proceeds, which establishes the first element of false representation to prove a tort claim

6  for fraud or deceit under California law and nondischargeability of debt under 11 U.S.C.

7  § 523(a)(1)(A).

8           ii.    Knowledge of Falsity

9    Based on the evidence admitted at trial, the court finds that Huezo knew that his

10  representations to Ball were false, and in so finding, the court makes several observations

11  based on its review of the evidence before it.  Regarding Huezo's representations that

12  Fremont's loans to borrowers with Ball's money would be secured, the court observes as

13  previously stated, that Huezo testified that he believed Fremont made secured loans

14  because it obtained promissory notes along with the loans, but Huezo conceded that

15  Fremont did not obtain deeds of trust to secure certain loans with real property collateral,

16  nor did Fremont file UCC financing statements to secure loans with personal property

17  collateral with the California Secretary of State.  *Huezo Trial Testimony,* April 24, 2014

18  2:15-2:20 p.m. (ECF 250, Trial Transcript at 153:01-157:05).

19    The court considers the credibility of Huezo's trial testimony that as a licensed real

20  estate salesperson acting on behalf of Fremont, a California Department of Finance

21  licensed lender, he was unaware that in order to truthfully characterize a loan as secured,

22  the loans needed to be perfected.  The court determines that this portion of his testimony is

23  not credible.  First, the Fremont Informational Materials that Huezo sent to Ball before Ball's

24  November and January Investments expressly referred to the rate of return for Fremont

25  investors based on examples of loans made by Fremont, including situations "if a loan is

26  made on a personal residence secured by a deed of trust" and "[i]f we are securing a loan

27  with a UCC filing using business assets," *Plaintiff's Trial Exhibit P-2* at 3, in addition to

28  unsecured loans, which suggests that Huezo knew that there was a difference between

-71-
**AMENDED MEMORANDUM DECISION**

secured and unsecured loans.  Second, given that Huezo had a real estate salesperson's license and a real estate broker's license, and he has been involved in commercial lending since the late 1990s, holding various positions with John Hancock Life Insurance Company, Santa Monica Bank, and U.S. Bank, the last of which where Huezo managed business loan sales, the court determines that, more likely than not, Huezo knew that secured loans needed to be perfected in real property by obtaining security agreements and trust deeds from the borrowers, and by obtaining security agreements and UCC financing statements from the borrowers.  The testimony of Huezo as a lending and real estate professional with extensive experience with commercial lending that he, on behalf of Fremont, would not make multiple representations—orally and in writing—that a loan would be secured without taking the necessary steps to perfect secured loans, then extend unsecured loans while not knowing that his representations were false, is simply unbelievable.

Moreover, Huezo's emphasis of the loan to value ratio, both orally and in the written materials, indicates that he understood the importance to lenders, like Ball, that there would be sufficient collateral securing a loan in the event that the lender would have to collect on the loan.  Huezo told Ball that Ball's money would fund "highly collateralized secured loans," "little to no risk," and "guaranteed," and that Ball would be paid a 15% return on his investment in Fremont because he knew this would induce him to provide money to Fremont.

As stated previously, Huezo testified that he did not obtain separate security agreements from the Fremont borrowers for certain loans from the money from Ball's November and January "investments" or loans or file UCC financing statements with the California Secretary of State on several loans that he claimed were "secured."  *Trial Testimony of Victor Huezo,* April 24, 2014 at 2:16-2:20 p.m. (ECF 250, Trial Transcript at 153:01-157:05).  Moreover, Huezo knew that he would use Ball's money to pay operational expenses, including his commission, even though he told Ball his money would fund only specific secured loans.  Accordingly, the court finds that the preponderance of the evidence shows that Huezo knew these representations were false.

1          iii.    Intent to Deceive

2          The court also determines that Huezo made the previously mentioned

3    representations with the intent to deceive Ball and make Fremont out to be an attractive

4    investment opportunity for Ball.  Although the court finds that Huezo's prior payments to

5    Ball could support the determination that Huezo intended to pay Ball back on the

6    "investments" or loans, it appears that, first and foremost, these were material false

7    statements made both orally and in writing with the intent to induce Ball to "invest" in

8    Fremont by making loans to it.

9          The court also places great weight on the contradictions between Huezo's oral

10   testimony at trial and the documentary record.  The court observes that Fremont's

11   Informational Materials indisputably stated that its "investors" (or lenders) will know what

12   assets Fremont has as collateral by sending a balance sheet showing Fremont's assets

13   and liabilities.  At trial, Huezo testified that the investor activity reports were such balance

14   sheets and were the only balance sheets sent to Ball.  Such testimony is inconsistent with

15   the November and January Reports themselves.  Contrary to Huezo's testimony, the

16   November and January Reports both state "here is a list of proposed loans we are going to

17   close this week."  The reports do not show what loans are going to be closed, as the

18   November and January Reports state, nor do the reports show what assets and liabilities

19   Fremont presently owns as the balance sheets were supposed to show according to the

20   Fremont Informational Materials.  Huezo's trial testimony that the investor activity reports

21   served as the balance sheets reflecting Fremont's assets and liabilities is thus not credible.

22         In addition to this inconsistency, the Reports also represent to prospective

23   "investors" (or lenders) that the "investors" are agreeing to invest in Fremont in order to

24   fund the proposed loans listed in the Report.  Huezo also did not stay true to the

25   statements in the Fremont Informational Materials that "investors" (lenders) would know

26   what loans their "investments" (or loans) would be funding.  Huezo stated numerous times

27   that he did not feel bound to the Investor Activity Reports and used Ball's investments for

28   various purposes.  Accordingly, the court finds Huezo's testimony on this point to be

1  deceptive and thus consistent with his intent to deceive Ball into "investing" in, or lending

2  to, Fremont.  Based on the foregoing, the court determines that the preponderance of the

3  evidence shows that Huezo represented that the money from Ball's November and January

4  "investments" or loans would be used to fund specific secured loans by Fremont with the

5  intent to deceive Ball.

6                          iv.        Justifiable Reliance

7          The court determines that Ball "justifiably" relied on Huezo's representations that

8  Ball's "investments" in, or loans to, Fremont would be used to fund secured loans.  "A

9  creditor claiming nondischargeability under § 523(a)(2)(A) must also show it was justified in

10  relying on the debtor's fraudulent conduct in obtaining the money, property or services."  4

11  March, Ahart & Shapiro, *California Practice Guide: Bankruptcy*, ¶ 22:480 at 22-75 (2019)

12  (citing *Field v. Mans*, 516 U.S. at 73-76).  "A person may justifiably rely on a representation

13  'even if the falsity of the representation[s] could have been ascertained upon investigation.'"

14  4 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy,* ¶ 22:481 at 22-75

15  (citing *In re Eashai*, 87 F.3d 1082, 1090 (9th Cir. 1996)).

16          Here, the court finds Ball's testimony credible that given the long history of familial

17  friendship that Ball had with Huezo's family and the verbal representations, which were

18  consistent with the November Report and the January Report's representations that the

19  loans by Fremont to borrowers funded by "investors" were "guaranteed," "secured," and

20  had large collateral values to accompany the loans, that Ball justifiably relied on Huezo's

21  representations.  Further, Ball did not blindly rely solely on the verbal representations

22  because he also had written documentation showing a collateral value with a seemingly

23  large equity cushion to "secure" his loans to corroborate and confirm Huezo's oral

24  representations.  Along with these representations, Ball also obtained promissory notes

25  from Huezo for these two "investments" or loans.  Therefore, the court finds that the

26  preponderance of the evidence shows that Ball justifiably relied on Huezo's representations

27  which induced him to make loans to Fremont that were riskier than Huezo represented and

28  that Ball had bargained for since the loans made by Fremont had no real collateral to

1    secure them, exposing Ball to a greater risk of loss than Huezo had promised, and Ball had

2    bargained for.

3                        v.      <u>Losses as a Proximate Result</u>

4         "A creditor seeking a § 523(a)(2)(A) nondischargeability determination must

5    demonstrate a *causal nexus* between the fraud and the debt—i.e., that the debtor's fraud

6    was a proximate cause of the loss to the creditor." 4 March, Ahart and Shapiro, *California*

7    *Practice Guide: Bankruptcy*, ¶ 22:490 at 22-76 (citing *Field v. Mans*, 516 U.S. at 64 (1995))

8    (emphasis in original). As to the November and January "investments" in, or loans to,

9    Fremont that Ball made, which totaled $310,000, the court determines that the

10    preponderance of the evidence shows that Huezo's misrepresentations that Fremont's

11    loans would be secured with specific loan to value ratios was a proximate cause of Ball's

12    loss if Ball did not receive at least $310,000 back in satisfaction of the debts owed by

13    Fremont to Ball from Ball's November and January "investments" or loans.

14         In demonstrating that the preponderance of the evidence establishes a claim for

15    relief to deny dischargeability of debt for fraudulent misrepresentation under 11 U.S.C.

16    § 523(a)(2), Ball has also shown that the preponderance of the evidence establishes his

17    state law claims for fraud or deceit. Ball has shown by a preponderance of the evidence

18    that Huezo misled him with promises of using Ball's money through "investments" in, or

19    loans to, Fremont to make loans to borrowers secured with real or personal property

20    collateral to induce Ball to make these "investments" or loans, and instead of doing what he

21    promised, Huezo and Fremont ultimately did not use Ball's money to make secured loans,

22    but used all of the money for unsecured loans or for other purposes, including paying

23    Fremont's operational expenses and paying Huezo personally. Even if Fremont funded

24    secured loans with *some* of Ball's money, the evidence demonstrates that Fremont did not

25    fund the specific loans listed in the November and January Reports. Thus, Ball's money

26    was not used for the purposes of making the specific secured loans in the reports as Huezo

27    promised, but diverted for other purposes, exposing Ball to greater risk of loss than he

28    would have agreed to, and resulting in losses to him when Fremont's borrowers did not

**AMENDED MEMORANDUM DECISION**

1    repay the loans made to them, and Fremont's investors could not rely upon the real or

2    personal property collateral to recover some, if not all, of the value of their losses from

3    Fremont's borrowers.

4         Although the court observes that Ball received at least $416,835.50 in distributions

5    from Fremont, and offsets and distributions from Fremont's bankruptcy estate, there is a

6    question regarding how to credit that amount against the four separate debts Huezo owes

7    to Ball stemming from the four separate investments Ball made to Fremont.  Because the

8    answer to that question depends in part on the nondischargeability analysis with respect to

9    Ball's third and fourth investments in Fremont, before the court considers this question, the

10   court will analyze the remainder of Ball's nondischargeability claims against Huezo, then

11   address the question at the end in the section titled "Payment Allocation Analysis."

12                          **b.  11 U.S.C. § 523(a)(6)**

13        The debt of an individual debtor arising from "willful and malicious injury by the

14   debtor to another" or "to property of another" may be excepted from discharge under 11

15   U.S.C § 523(a)(6).  An injury is "willful" "when it is shown that either the debtor had a

16   subjective motive to inflict injury or that the debtor believed that injury was substantially

17   certain to occur as a result of his conduct."  *In re Jercich*, 238 F.3d at 1208.  If the act was

18   intentional and the debtor knew that it would necessarily cause injury, "willful" intent does

19   not require that the debtor have had the specific intent to injure the creditor.  *Id.* at 1207.

20   "Willful" means "voluntary" or "intentional."  *Kawaahau v. Geiger*, 523 U.S. at 61-62 (citing

21   Restatement (Second) of Torts, § 8A, comment A).  The standard focuses on the debtor's

22   subjective intent and not "whether an objective, reasonable person would have known that

23   the actions in question were substantially certain to injure the creditor."  *In re Su*, 290 F.3d

24   at 1145-1146.

25        The "malicious" injury requirement is separate from the "willful" requirement.  *Id.* at

26   1146.  An injury is "malicious" if it involves "(1) a wrongful act, (2) done intentionally,

27   (3) which necessarily causes injury, and (4) is done without just cause or excuse."  *In re*

28   *Jercich*, 238 F.3d at 1209 (citing *Kawaahau v. Geiger*, *supra*).  This definition "does not

1  require a showing of biblical malice, i.e., personal hatred, spite, or ill will." *In re Bammer*,

2  131 F.3d 788, 791 (9th Cir. 1997).  The Supreme Court narrowly held that

3  "nondischargeablity takes a deliberate or intentional *injury*, not merely a deliberate or

4  intentional *act* that leads to injury." *Kawaahau v. Geiger*, 523 U.S. at 61 (emphasis in

5  original).

6       Here, the court determines that Huezo's wrongful actions, as previously detailed,

7  were Huezo's oral and written representations that Ball's investments would fund specific

8  loans secured by real property, as set forth in the November and January Reports, orally

9  representing that Fremont could "guarantee" payments to Ball, and representing that Ball

10  would be paid from proceeds of the loans, rather than having his money recycled through

11  Fremont or paying Huezo's commissions.  The injury from these false representations by

12  Huezo was "willful" "when the evidence shows that either Huezo had a subjective motive to

13  inflict injury or that he believed that injury was substantially certain to occur as a result of

14  his conduct.  Huezo knew that Ball was making investments for secured loans for specific

15  borrowers in order to make sure that his investment funds were adequately protected

16  because Huezo was soliciting Ball to make investments, or loans, as reflected on the

17  investor activity reports, and Ball was relying on such reports to make his investments, or

18  loans.  Despite this knowledge that Ball was investing in secured loans for specific

19  borrowers, when the specific loans that Ball had authorized had been paid off, Huezo used

20  Ball's money to pay himself commissions which Huezo had not disclosed to Ball, even

21  though Ball only permitted his money to be invested in secured loans, and Huezo recycled

22  the remaining money into new loans to other borrowers, including unsecured loans, without

23  Ball's knowledge or consent.

24       Huezo, as a real estate professional with extensive experience with commercial

25  lending, would have known that a secured loan would be less likely to injure Ball than an

26  unsecured loan, and thus, that is why Ball conditioned his investments in Fremont on it

27  making secured loans with his money adequately protecting his funds with sufficient equity.

28  Huezo disregarded Ball's conditions and chose to expend Ball's money for other uses,

1  including paying himself commissions, which conduct rises to the level of a "subjective

2  motive to inflict injury" on Ball or prove that Huezo had a "substantial certainty" that Ball

3  would be injured by diverting Ball's money to put into his own pocket or making riskier,

4  unsecured loans to borrowers who did not pay the loans back and had no collateral for

5  Fremont to recover Ball's money.  Moreover, the injury caused by Huezo was "malicious" if

6  it involved (1) a wrongful act, (2) done intentionally, (3) which necessarily caused injury,

7  and (4) was done without just cause or excuse.  The injury was malicious because it

8  involved a wrongful act by Huezo in making false representations to Ball, which was done

9  intentionally as previously discussed, which necessarily caused injury because Huezo

10  either took the money for himself or recycled Ball's money into new, risker unsecured loans,

11  contrary to his representations to Ball that the loans would be secured and to specifically

12  identified borrowers and without just cause or excuse since Huezo took the money for

13  himself and recycled Ball's money into new loans without Ball's knowledge or consent.

14      For the foregoing reasons, Ball has shown by a preponderance of the evidence that

15  the injury to him caused by Huezo with respect to Ball's investments based on the

16  November and January Reports was both "willful" and "malicious" under of 11 U.S.C.

17  § 523(a)(6).

18          **2.  <u>Ball's Third Loan: January 30, 2008 Email and $130,000 "Investment"</u>**

19              **a.  <u>11 U.S.C. § 523(a)(2)(A)</u>**

20      As to Ball's third "investment" in, or loan to, Fremont, the $130,000 investment, the

21  court determines that Ball has not proven by a preponderance of the evidence that Huezo

22  made representations, which he knew were false, with the intention to deceive Ball, in

23  which Ball was justified in relying upon and that Ball sustained losses as a proximate result.

24  In contrast to the dispute regarding the November and January Report "investments" or

25  loans, the dispute regarding the $130,000 investment comes down to a contest of credibility

26  regarding whether Huezo made representations that these "investments" or loans would be

27  used to fund specific secured loans. *Ball Declaration* at 7, ¶¶ 20 and 21.  Unlike with Ball's

28  November and January Report "investments" or loans, no such documentary evidence of

false representations by Huezo to induce these "investments" or loans was presented to the court, and the court denies Ball's claims under 11 U.S.C. § 523(a)(2)(A) based on a lack of proof.

The only evidence that Ball offered that Huezo represented to Ball that the money from Ball's $130,000 "investment" would be used to fund specific secured loans is Ball's oral and written trial testimony, based on Ball's recollection of oral statements Huezo made to Ball six years prior that the loans were for a couple of properties that had a "ton of collateral". Such testimony is not corroborated by any documentary evidence or any specific details surrounding when such oral representations were made that would establish that Ball actually remembered such oral representations being made. Further, the allegation that Huezo orally represented that Ball's "investment" or loan would be used to fund secured loans without any corroborating documentary evidence is in stark contrast to the prior transactions between the parties whereby Huezo made written representations in the Activity Reports which Ball relied upon to make "investments" in, or loans to, Fremont, stating that Fremont's loans funded by the investments would be secured.

Regarding the January 30, 2008 email and corresponding $130,000 "investment" or loan, the only documentary evidence submitted by the parties of representations related to that investment is an email from Huezo to Ball, which states "I also have two deals that I am closing out this week if you want to do them. It is for a total of $130,000 at the 15% rate. Let me know if you can do them." That email provides no substantive information other than the requested investment amount and interest rate, and it makes no reference to secured or unsecured loans. Nonetheless, through his declaration, Ball stated that "[b]ased on the email and Huezo's comments to me at the time, I believed that this loan was to be like the first two 'secured loans' to Fremont." Yet at trial, regarding the two deals mentioned in the email, Ball testified that Huezo told Ball that "they were a couple of properties that had a lot of collateral just like the others." Ball also testified that Huezo did not tell Ball why these particular borrowers needed to borrow money from Fremont. This was the only oral testimony Ball gave as to Huezo's verbal representations regarding the $130,000

1    investment, which, combined with the email, in this court's view, does not prove by a

2    preponderance of the evidence that Huezo represented to Ball that the $130,000

3    investment would be used to fund secured loans.  It appears that Ball may have thought or

4    assumed that these loan transactions were the same as before, but he has not shown that

5    Huezo represented that they were the same or were otherwise secured loans.

6        The court also determines that because Ball has not proven that Huezo did make

7    false representations to Ball that the $130,000 "investment" or loan would be used to fund

8    specific secured loans, Ball cannot establish the remaining two elements for his claim

9    under 11 U.S.C. § 523(a)(2)(A) of justifiable reliance on Huezo's representations and

10   losses proximately resulting from such representations.  Regarding the fact that Huezo did

11   not use Ball's $130,000 "investment" to fund the two deals referred to in the January 30,

12   2008 email, the court determines that such conduct, in and of itself, is insufficient to

13   establish nondischargeability under 11 U.S.C. § 523(a)(2)(A).  As previously discussed,

14   given the lack of information that Ball had regarding both "investments" or loans, the court

15   determines that Ball has failed to prove by a preponderance of the evidence that Ball

16   justifiably relied on Huezo's representations regarding the $130,000 "investment" or loan

17   and that Ball suffered losses as a proximate result of Huezo's representations.

18       For the foregoing reasons, as to the $130,000 investment, the court determines that

19   Ball has not proven his claim under 11 U.S.C. § 523(a)(2)(A) by a preponderance of the

20   evidence.

21       **b.  <u>11 U.S.C. § 523(a)(6)</u>**

22       Regarding the "willful" requirement under *In re Jercich, supra,* as to Ball's $130,000

23   "investment" or loan, based on the factual findings recited above, the court determines that

24   Huezo did not have a subjective motive to inflict injury on Ball.  Ball failed to prove that

25   Huezo intended to inflict injury on Ball with respect to Ball's $130,000 investment because

26   Huezo had not promised to make secured loans and did not know that Fremont borrowers

27   would default as Huezo went through an underwriting process for Fremont to make the

28   loans, and Huezo paid Ball back a significant amount on the promissory notes, which

appears at most to indicate negligence in making such loans.  For the same reasons, Ball
failed to prove that Huezo believed the injury was substantially certain to occur as a result
of Huezo's conduct.

Regarding the "malice" requirement under *In re Jercich, supra,* as to the $130,000
investment, based on the factual findings recited above, the court determines that Ball has
not proven that Huezo acted maliciously.  Huezo also testified that he had performed his
customary underwriting duties on these loans and believed that the borrowers that Fremont
made loans to had assets that Fremont would be able to collect, which again suggests at
most negligence as opposed to intentional misconduct as to such loans.  All of these
findings refute the determination that Huezo had the requisite intent to injure Ball as
required by the Supreme Court in *Kawaahau v. Geiger*.  Accordingly, as to Ball's $130,000
investment, the court determines that Ball has failed to prove by a preponderance of the
evidence both the "willful" and "malicious" elements of 11 U.S.C. § 523(a)(6).

3. **Ball's Fourth Loan: the "Las Vegas" and "Los Angeles" Deals and**
**Corresponding $404,750 "Investment"**

a. **11 U.S.C. § 523(a)(2)(A)**

i. Representations

As to Ball's fourth "investment" in, or loan to, Fremont, the $404,750 investment, the
court determines that Ball has proven by a preponderance of the evidence that Huezo
made representations, which he knew were false, with the intention to deceive Ball, in
which Ball was justified in relying upon and that Ball sustained losses as a proximate result.
When the court originally considered Ball's $404,750 investment for the "Las Vegas Deal"
and "Los Angeles Deal" loans, it thought that this transaction was less like Ball's first two
investments or loans based on the November and January Reports, which involved alleged
oral and written misrepresentations, and more like Ball's third investment or loan related to
the January 30, 2008 email, which involved alleged oral misrepresentations.  In further
examination of the evidence relating to Ball's fourth investment, or loan, to Fremont on
reconsideration, the court determines that this transaction is neither like Ball's first two

investments based on the November and January Reports nor like his third investment related to the January 30, 2008 as discussed below.

Regarding the circumstances surrounding the "Las Vegas" and "Los Angeles" deals and the corresponding $404,740 investment, as with the $130,000 investment, the primary evidence that Ball offered that Huezo represented to Ball that the money from Ball's $404,750 "investment" would be used to fund specific secured loans is Ball's oral and written trial testimony, based on Ball's recollection of oral statements Huezo made to Ball six years prior, which has some similarity to the situation of Ball's third investment.  The documentary evidence submitted by the parties of written representations that Huezo made to Ball related to Ball's fourth investment are three emails that state the following: (1) March 21, 2008 email: "Joey, I wanted to let you know that we are drawing loan docs on the Vegas deal and the deal in Los Angeles today.  I just want to make sure you are still good for the loan that we have been discussing for a few months now.  Please let me know as I am going to the Notary today to get our Promissory Note done as I plan on funding these deals on Thursday."; (2) March 24, 2008 email: "Joey, Sorry to send another email but I have not heard back from you regarding this deal.  I know we have been working on the Bruce deal but can you let me know where you stand on the loan.  Please let me know today if possible."; and (3) March 25, 2008 email: "Joey, Good news, we are signing loan docs today and will be ready for funding tomorrow.  Please go ahead and wire the money to me via the Fremont Investment Holding Account to avoid any bank delays of having the money go to my personal account and then to the Fremont account.  I will attach a copy of the Fremont checking account information for you to wire the funds to me."  While these emails themselves provide no substantive information regarding whether the loans would be secured, the emails from Huezo to Ball contained representations by Huezo that Ball's investment would be specifically for the Las Vegas and Los Angeles deals, and the last email from Huezo to Ball of March 25, 2008 contained representations that the Las Vegas deal was going through because the loan documents were going to be signed and the loan funded on the next day, which Huezo knew was not true.  That the Las Vegas deal loan

was to be secured was confirmed by Huezo in his trial testimony, and this admission is consistent with Ball's testimony that Huezo made verbal representations that the loans were secured, and as Ball specifically testified, Huezo represented that there was "a ton of collateral" for these deals. As Ball stated in his trial declaration, he agreed to loan Fremont $404,750 based on Huezo's oral and written representations that the $404,750 was going to two secured loans. At trial, regarding the deals mentioned in the email, Ball testified that Huezo verbally represented to Ball that through the "Las Vegas deal," Fremont would loan money towards property that had "a ton of collateral." This was the primary oral testimony Ball gave about Huezo's verbal representations regarding the $404,750 "investment" or loan before Ball made this investment. As discussed below, there is additional oral testimonial evidence and written documentary evidence relating to a meeting between Ball and Huezo about Ball's fourth investment in July 2008 which corroborates Ball's version of the facts.

The court determines that Ball has proven by a preponderance of the evidence that Huezo made false representations, as detailed below, to Ball regarding the Las Vegas or Romano deal and the Los Angeles deal to induce Ball to "invest" in and fund these loans for Fremont, including whether or not the loans were secured, whether the loans were even going to be made and whether Ball's funds were going to be used for these loans and no other purposes. The dispute between the parties regarding Huezo's representations related to the Las Vegas and Los Angeles loans does not solely come down to a contest of credibility about who made what oral representations, but the court finds that the documentary evidence in this case also corroborates and supports Ball's testimony regarding his fourth loan to Fremont.

Thus, the court determines that Huezo made the following representations to Ball, which supports Ball's claim under 11 U.S.C. § 523(a)(2)(A): (1) that Ball's "investment" in, or loan to, Fremont would fund two specific secured loans; (2) that the first of these loans was for $367,250 for the Las Vegas or Romano deal, secured by real property valued at $250,000; (3) that the second of these loans was for $37,500 (the difference between the

1  amount borrowed and the Las Vegas deal loan), secured by real property valued at

2  $500,000; (4) that the Las Vegas deal was going ahead with the loan documents to be

3  signed and the loan to be funded on March 26, 2008; (5) that Ball's investment earned

4  $55,250 in prepaid interest on the Las Vegas or Romano deal loan.

5       As discussed below, the court finds that Huezo's testimony with regard to Ball's Las

6  Vegas and Los Angeles deal investment was not credible and false.  Huezo knew when he

7  told Ball in his email of March 25, 2008 that the Las Vegas deal was going forward with the

8  loan documents being signed and the loan being funded on the following day on March 26,

9  2008 that these representations were not true because, as Huezo admitted in his trial

10  testimony, he had not heard back from the escrow officers that the loan documents had

11  been signed by the Romanos, he was following up with them as to whether the Romanos

12  had signed them, and he later confirmed that they did not sign them.  These were false

13  representations that induced Ball to go ahead and wire the money to fund the Las Vegas

14  deal loan on March 26, 2008 (even though Huezo knew that he had not been able to

15  confirm that the Romanos had even signed the loan documents) for Huezo tell Ball the

16  "good news" that the loan documents were being signed and the loan being funded on the

17  following day.  Although Huezo testified that he notified Ball that the Las Vegas deal had

18  fallen through and he offered Ball a refund of his money for the deal on or about March 27,

19  2008, Ball testified that he was not so informed by Huezo that the deal did not go through.

20  Huezo also testified that Ball declined his offer to return his money for the Las Vegas deal

21  because Ball was having problems with the IRS over a tax audit and allegedly would have

22  a better negotiating position with the IRS if Ball did not have the money returned.  Ball and

23  Huezo testified that they met in July 2008 to discuss the status of Ball's investments with

24  Fremont.  Ball testified that Huezo reported on the status of all of Ball's investments,

25  including the Las Vegas deal, explaining the deals from notations on a copy of payment

26  check from Fremont to Ball, and specifically, Huezo told Ball that prepaid interest of

27  $55,250 was earned on the Las Vegas deal.  According to Ball, Huezo did not tell him that

28  the Las Vegas deal fell through in March 2008, or at their July 2008 meeting or at any other

1  time.  Huezo testified that he told Ball that the Las Vegas deal fell through in March 2008

2  and that the notations on the copy of the payment check while in Huezo's handwriting, the

3  notations were made by Huezo at Ball's direction, though Huezo did not know the meaning

4  of the notations as he just wrote what Ball told him.  Meanwhile, Huezo had used Ball's

5  funds for the Las Vegas and Los Angeles deals for other loans because according to

6  Huezo, Ball's funds were a loan to him personally rather than to Fremont, so that Huezo

7  could make loans for Fremont borrowers as he saw fit in his business judgment.

8         Huezo's representations were false for a number of reasons.  First, according to

9  Huezo's own testimony, he knew that he did not whether the Romanos had signed the loan

10  documents that he had prepared for the Las Vegas deal when he emailed Ball the "good

11  news" that the deal was going ahead with the loan documents being signed and the loan

12  being funded on the next day on March 26, 2008.  This alone constitutes a material

13  misrepresentation intended to induce Ball to invest in Fremont.

14         Second, when Huezo found out that the Romanos did not sign the loan documents

15  by March 26, 2008, because he had previously represented to Ball that the loans were for

16  the Las Vegas and Los Angeles deals with a "ton of collateral," he did not tell Ball that the

17  deals had fallen through, and he and Fremont were using Ball's money to fund other loans

18  that they had not told Ball about, or obtained his consent.  As discussed above, this use of

19  Ball's money was simply unauthorized and contrary to the representations made by Huezo

20  in his verbal representations to Ball and in his written representations in his emails to Ball

21  about the Las Vegas and Los Angeles deals.

22         Third, Huezo has provided no credible evidence that he told Ball that the Las Vegas

23  and Los Angeles deals had fallen through, that Ball did not accept Huezo's offer to return

24  the money because these deals were not going through and that Ball made a personal loan

25  of his money to Huezo for Huezo to make loans to Fremont borrowers as Huezo saw fit.

26  Ball's testimony, which the court finds credible, was consistent with his prior pattern of

27  behavior of only making investments with Fremont for specific secured loans.  The

28  notations on the copy of the payment check which Huezo admits were in his handwriting

**AMENDED MEMORANDUM DECISION**

showed that Huezo used the notations to report on the status of Ball's investments, which

were discussed at their meeting in July 2008, and Huezo specifically explained that the

purported Las Vegas deal had earned for Ball $55,250 in prepaid interest on his investment

in the deal, which was false information as Huezo knew because the deal did not go

through.

Fourth, the evidence shows that Fremont/Huezo used Ball's money to make loans to

Fremont borrowers without Ball's knowledge or consent and contrary to Huezo's

representations to Ball that Ball's funds would be used for the secured loans identified in

Huezo's emails for the Las Vegas and Los Angeles deals.

As noted previously, the evidence does indicate, however, that Huezo was the

principal of Fremont, its sole owner and manager, and the only person acting on behalf of

Fremont with respect to Ball's loans.  *See supra* ¶ 9, Section II.C., at 9-10.  Moreover, Ball

provided more than 70%—if not all—of Fremont's loan capital, and without Ball's capital,

Fremont would have no funding for loans and therefore no commissions for Huezo.  *See*

*e.g.*, *Huezo Trial Testimony,* April 24, 2014, ECF 250, Trial Transcript at 134:22-135:02,

225:18-229:04.  But for inducing Ball's loans and recycling Ball's capital without Ball's

knowledge or consent, Huezo/Fremont would not have been an income producing

enterprise for Huezo.  Specifically, the court finds credible Ball's testimony that he was only

interested in investing in the specific secured loans in the Las Vegas and Los Angeles

deals because Huezo had represented that the deals had adequate collateral to protect

Ball's principal extensions of credit.  Huezo, like the court, understood that Ball's interest

was limited to over-secured loans; Huezo represented that Ball's capital would fund the

specific secured loans in the Las Vegas and Los Angeles deal, and Huezo failed to

disclose that those deals did not go through and that he and Fremont were diverting Ball's

capital to fund other loans without Ball's knowledge or authorization.

Accordingly, the court finds that Ball has shown by a preponderance of the evidence

that Huezo made false representations to him that Ball's "investment" in, or loan to,

Fremont would be used to fund the specific secured loans in the Las Vegas and Los

**AMENDED MEMORANDUM DECISION**

1  Angeles deals, which establishes the first element of false representation to prove a tort

2  claim for fraud or deceit under California law and nondischargeability of debt under 11

3  U.S.C. § 523(a)(1)(A).

4               ii.    Knowledge of Falsity

5         Based on the evidence admitted at trial, the court finds that Huezo knew that his

6  representations to Ball were false, and in so finding, the court makes several observations

7  based on its review of the evidence before it.  As discussed above, Huezo knew that his

8  representations on March 25, 2008 that the Las Vegas and Los Angeles deals were going

9  forward as the loan documents were going to be signed and the loans funded on the next

10 day when he did not know whether the borrowers had signed the loan documents.  Huezo

11 knew that his prior representations that Ball would be investing in the specific secured

12 loans in the Las Vegas and Los Angeles deals were false when he knew that those deals

13 had fallen through, that he had not informed Ball of that fact and that he had taken Ball's

14 money for those deals and lent it out to other borrowers whom Huezo or Fremont had not

15 told Ball about, nor obtained his authorization to make loans to such borrowers.

16 Accordingly, the court finds that the preponderance of the evidence shows that Huezo

17 knew these representations were false.

18              iii.    Intent to Deceive

19        The court also determines that Huezo made the previously mentioned

20 representations with the intent to deceive Ball because the evidence shows that he knew

21 that the loan documents for the Las Vegas and Los Angeles deals had not been signed,

22 though he told Ball by email on March 25, 2008 that they were being signed on the next

23 day, and when he confirmed that the deals were not going through, he did not tell Ball and

24 diverted Ball's money to make loans to other borrowers about whom he had not informed

25 Ball, nor obtained Ball's authorization.  The evidence also shows that Huezo had the intent

26 to deceive Ball because Huezo continued to deceive Ball by not telling him that the Las

27 Vegas deal never went through and that he and Fremont made loans to other borrowers

28 with Ball's money intended for the Las Vegas and Los Angeles deals when they met in July

1   2008 to go over the status of Ball's investment portfolio with Fremont, especially about the

2   Las Vegas deal that Ball had asked Huezo specifically to report on.  Huezo continued his

3   deception of Ball by not only failing to disclose that the Las Vegas deal fell through, but by

4   making additional misrepresentations by telling Ball that the Las Vegas deal earned Ball

5   prepaid interest of $55,250 as shown by Huezo's handwritten notations on the copy of the

6   payment check that Huezo used to explain the status of Ball's investments.  At trial, Huezo

7   admitted that at the time he told Ball to go ahead and send in his investment money for the

8   Las Vegas deal, he knew that the loan documents were not signed by the Romanos, the

9   Las Vegas deal borrowers, as he was following up on whether the loan documents were

10   signed as it had been several days since he prepared and submitted the loan documents to

11   escrow.

12       As with the November and January Report investments, the court infers Huezo's

13   intent to deceive Ball from the facts that Ball was Fremont's (and Huezo's) primary source

14   of capital for Fremont to conduct its loan business and for Huezo to collect his commissions

15   on Fremont's loans.  Without Ball's investment money, Fremont did not have capital to loan

16   to its borrowers, and thus, Huezo had incentive to deceive Ball into making his investment

17   for the Las Vegas deal, representing that the deal was going forward with the loan

18   documents about to be signed and loan about to be funded, even though Huezo knew that

19   this was not true.  Accordingly, the court finds Huezo's testimony regarding Ball's

20   investment for the Las Vegas and Los Angeles deals to be untrue and thus consistent with

21   his intent to deceive Ball into "investing" in, or lending to, Fremont on the Las Vegas and

22   Los Angeles deals.  Based on the foregoing, the court determines that the preponderance

23   of the evidence shows that Huezo represented that the money from Ball's March 2008

24   "investments" or loans would be used to fund specific secured loans by Fremont for the Las

25   Vegas and Los Angeles deals with the intent to deceive Ball.

26              iv.    Justifiable Reliance

27       The court also determines that Huezo made false representations to Ball that the

28   $404,750 "investment" or loan would be used to fund specific secured loans  and Ball

-88-

1  justifiably relied on those representations.

2      "A creditor claiming nondischargeability under § 523(a)(2)(A) must also show it was

3  justified in relying on the debtor's fraudulent conduct in obtaining the money, property or

4  services."  4 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy*, ¶ 22:480 at

5  22-75 (citing *Field v. Mans*, 516 U.S. at 73-76).  "A person may justifiably rely on a

6  representation 'even if the falsity of the representation[s] could have been ascertained upon

7  investigation.'"  4 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy,*

8  ¶ 22:481 at 22-75 (citing *In re Eashai*, 87 F.3d 1082, 1090 (9th Cir. 1996)).  Although

9  "justifiable" reliance is a lower standard than reasonable reliance, "[j]ustifiability is not

10  without some limits [because] . . . a person is 'required to use his senses, and cannot

11  recover if he blindly relies upon a misrepresentation the falsity of which would be patent to

12  him if he had utilized his opportunity to make a cursory examination or investigation.'"  *Field

13  v. Mans*, 516 U.S. at 71 (quoting Restatement (Second) of Torts § 541, Comment *a*

14  (1976)).

15      Here, the court finds Ball's testimony credible that given the long history of familial

16  friendship that Ball had with Huezo's family and the verbal representations, which were

17  consistent with Huezo's email messages containing representations that the Las Vegas and

18  Los Angeles loan deals involved secured loans to specific borrowers, that the secured

19  loans would have "tons of collateral", meaning that there was sufficient equity to adequately

20  protect Ball's investment funds and that the deals were going forward that Ball justifiably

21  relied on Huezo's representations.  The fact that Fremont had started making regular

22  payments on the other investment loans made by Ball supports a finding of Ball's justifiable

23  reliance.  Ball "trusted Huezo" because he thought of Huezo as a friend and was justified in

24  relying upon Huezo's representations because it appeared that his prior investments with

25  Fremont were paying off since Fremont was making regular payments to Ball on his

26  investments.  Although Ball did not receive investor activity reports for these transactions

27  like the November and January Report investments, Ball received multiple assurances from

28  Huezo that the secured loans to the Las Vegas and Los Angeles deal borrowers would be

**AMENDED MEMORANDUM DECISION**

1  secured with "tons of collateral" and that there was sufficient equity to adequately protect

2  Ball's investment funds.

3       Based on the evidentiary record here, the court determines that Ball "justifiably"

4  relied on Huezo's representations to make the "investments" in, or loans to, Fremont would

5  be used to fund secured loans to the Las Vegas and Los Angeles deal borrowers.

6                    v.    Losses as a Proximate Result

7       "A creditor seeking a § 523(a)(2)(A) nondischargeability determination must

8  demonstrate a *causal nexus* between the fraud and the debt—i.e., that the debtor's fraud

9  was a proximate cause of the loss to the creditor."  4 March, Ahart and Shapiro, *California*

10 *Practice Guide: Bankruptcy*, ¶ 22:490 at 22-76 (citing *Field v. Mans*, 516 U.S. at 64 (1995))

11 (emphasis in original).  As to the Las Vegas and Los Angeles deal "investments" in, or

12 loans to, Fremont that Ball made, which totaled $404,750, the court determines that the

13 preponderance of the evidence shows that Huezo's misrepresentations that Fremont's

14 loans would be secured with specific loans to the Las Vegas and Los Angeles deal

15 borrowers was a proximate cause of Ball's loss in not being able to recover these funds.

16      In demonstrating that the preponderance of the evidence establishes a claim for

17 relief to deny dischargeability of debt for fraudulent misrepresentation under 11 U.S.C.

18 § 523(a)(2), Ball has also shown that the preponderance of the evidence establishes his

19 state law claims for fraud or deceit.  Ball has shown by a preponderance of the evidence

20 that Huezo misled him with promises of using Ball's money through "investments" in, or

21 loans to, Fremont to make secured loans to two specific borrowers, the Romano parties for

22 the Las Vegas deal and the egg farm for the Los Angeles deal, secured with real or

23 personal property collateral to induce Ball to make these "investments" or loans, and

24 instead of doing what he promised, Huezo and Fremont did not use Ball's money to make

25 secured loans to these borrowers, but used the money for loans to other Fremont

26 borrowers who were not known to Ball or authorized by him.  As admitted by Huezo in his

27 trial testimony, the evidence demonstrates that Fremont did not fund the specific loans that

28 were identified by Huezo in the Las Vegas and Los Angeles deals.  Thus, Ball's money was

1  not used for the purposes of making the specific secured loans in the reports as Huezo

2  promised, but diverted for other purposes, loans to other Fremont borrowers, exposing Ball

3  to greater risk of loss than he would have agreed to, and resulting in losses to him when

4  these borrowers did not repay the loans made to them, and Fremont's investors could not

5  rely upon the real or personal property collateral to recover some, if not all, of the value of

6  their losses from Fremont's borrowers.

7        Although the court observes that Ball received at least $416,835.50 in distributions

8  from Fremont, and offsets and distributions from Fremont's bankruptcy estate, there is a

9  question regarding how to credit that amount against the four separate debts Huezo owes

10  to Ball stemming from the four separate investments Ball made to Fremont.  Because the

11  answer to that question depends in part on the nondischargeability analysis with respect to

12  Ball's third and fourth investments in Fremont, before the court considers this question, the

13  court will analyze the remainder of Ball's nondischargeability claims against Huezo, then

14  address the question at the end in the section titled "Payment Allocation Analysis."

15              **b.  <u>11 U.S.C. § 523(a)(6)</u>**

16        As for Ball's investments based on the November and January Report, the court

17  determines that Huezo's actions as to Las Vegas and Los Angeles deal investments were

18  wrongful, consisting of Huezo's oral and written representations that Ball's investments

19  would fund specific loans secured by real property, as set forth in Huezo's verbal and

20  written representations that Ball's money would be invested in secured loans with "tons of

21  collateral" made to specific borrowers, the Romano parties for the Las Vegas deal, and the

22  egg farm for the Los Angeles deal.  The injury from these false representations by Huezo

23  was "willful" "when the evidence shows that either Huezo had a subjective motive to inflict

24  injury or that he believed that injury was substantially certain to occur as a result of his

25  conduct.  Huezo knew that Ball was making investments for secured loans for specific

26  borrowers in order to make sure that his investment funds were adequately protected

27  because Huezo was soliciting Ball to make investments, or loans, as reflected on the

28  investor activity reports, and Ball was relying on such reports to make his investments, or

loans. Despite this knowledge that Ball was investing in secured loans for specific borrowers, when the specific loans that Ball had authorized had been paid off, Huezo used Ball's money for Fremont to make new loans to other borrowers without Ball's knowledge or consent, exposing Ball to risks that he had known about or consented to.

Huezo, as a real estate professional with extensive experience with commercial lending, would have known that a secured loan would be less likely to injure Ball than an unsecured loan, and thus, that is why Ball conditioned his investments in Fremont on it making secured loans with his money with collateral equity adequately protecting his funds. Huezo disregarded Ball's conditions and chose to expend Ball's money for other uses, that is, making loans to different borrowers not disclosed to Ball, which conduct rises to the level of a "subjective motive to inflict injury" on Ball or that Huezo had a "substantial certainty" that Ball would be injured by diverting Ball's money to making riskier, unsecured loans to borrowers who did not pay the loans back and had no collateral for Fremont to recover Ball's money. Moreover, the injury caused by Huezo was "malicious" if it involved (1) a wrongful act, (2) done intentionally, (3) which necessarily caused injury, and (4) was done without just cause or excuse. The injury was malicious because it involved a wrongful act by Huezo in making false representations to Ball, which was done intentionally as previously discussed, which necessarily caused injury because Huezo put Ball's money into new, risker unsecured loans contrary to his representations to Ball that the loans would be secured and to specifically identified borrowers, the Las Vegas and Los Angeles deal borrowers, and without just cause or excuse since Huezo took the money used Ball's money into making new loans without Ball's knowledge or consent.

For the foregoing reasons, Ball has shown by a preponderance of the evidence that the injury to him caused by Huezo with respect to Ball's investments for the Las Vegas and Los Angeles deals was both "willful" and "malicious" under 11 U.S.C. § 523(a)(6).

**E. <u>Payment Allocation Analysis</u>**

As noted above, if Ball did not receive at least $714,750 back in satisfaction of the debts owed by Fremont to Ball from the November, January, and March "investments" or

1  loans, the court determines that Huezo's representations that Ball's November and January

2  "investments" or loans would fund specific secured loans and that the March "investment"

3  or loan would fund the Las Vegas and Los Angeles deals were a proximate cause of Ball's

4  losses, thus giving rise to a nondischargeable claim under 11 U.S.C. § 523(a)(2)(A) as to

5  the November, January, and March investments or loans.

6  　　　　Ball made four loans to Fremont, the first of which was made on November 29, 2007

7  and the last of which was made on March 26, 2008.  Fremont made payments totaling at

8  least $282,624.27 to Ball during the period of January 3, 2008 to July 26, 2010.  Both

9  Huezo and Ball testified that these amounts were paid by Fremont to Ball.  *Compare*

10  *Plaintiff's Trial Exhibits P-30, P-31, P-32, P-33, P-34, P-35 and P-49 and Ball Declaration* at

11  5-12 ¶ 15, 22, 25, 29, 33 and 36, *with Huezo Declaration* at 43-47, ¶¶ 123-147.

12  Nonetheless, because of the timing of the payments from Fremont to Ball, the first of which

13  was made on January 3, 2008, which is between the time of Ball's November and January

14  "investments" in, or loans to, Fremont, and the last payment from Fremont to Ball, which

15  was made on July 26, 2010, which is after Ball's fourth and final loan to Fremont, the court

16  must necessarily decide how to allocate the payouts in satisfaction of Huezo's debts to Ball.

17  　　　　As a preliminary matter, when allocating such payouts, the court must determine

18  whether to apply federal or state law.  "Federal law governs the dischargeability of debts.

19  However, the validity of a creditor's claim is determined by rules of state law."  *In re*

20  *Roussos*, 251 B.R. 86, 91 (9th Cir. BAP 2000) (citing *In re Berr*, 172 B.R. 299, 304 (9th Cir.

21  BAP 1994) and *Grogan v. Garner,* 498 U.S. at 283); *see also Travelers Casualty & Surety*

22  *Co. v. Pacific Gas & Electric Co.*, 549 U.S. 443, 450-451 (2007) (quoting *Vanston*

23  *Bondholders Protective Comm. v. Green*, 329 U.S. 156 161 (1946) ("What claims of

24  creditors are valid and subsisting obligations against the bankruptcy at the time a petition in

25  bankruptcy is filed is a question which, in the absence of overruling federal law, is to be

26  determined by reference to state law.")).  Here, because the allocation of the payments to

27  Ball necessarily determines whether Ball's claims subsist against Huezo, in determining the

28  proper payment allocation, the court applies state law.

**AMENDED MEMORANDUM DECISION**

Under *California Civil Code* § 1479:

> Where a debtor, under several obligations to another, does an act, by way of performance, in whole or in part, which is equally applicable to two or more of such obligations, such performance must be applied as follows:
>
> One—If, at the time of performance, the intention or desire of the debtor that such performance should be applied to the extinction of any particular obligation, be manifested to the creditor, it must be so applied.
>
> Two—If no such application be then made, the creditor, within a reasonable time after such performance, may apply it toward the extinction of any obligation, performance of which was due to him from the debtor at the time of such performance, except that if similar obligations were due to him both individually and as a trustee, he must, unless otherwise directed by the debtor, apply the performance to the extinction of all such obligations in equal proportion; and an application once made by the creditor cannot be rescinded without the consent of [the] debtor.
>
> Three—If neither party makes such application within the time prescribed herein, the performance must be applied to the extinction of obligations in the following order; and, if there be more than one obligation of a particular class, to the extinction of all in that class, ratably:
>
> 1.  Of interest due at the time of the performance.
>
> 2.  Of principal due at that time.
>
> 3.  Of the obligation earliest in date of maturity.
>
> 4.  Of an obligation not secured by a lien or collateral undertaking.
>
> 5.  Of an obligation secured by a lien or collateral undertaking.

From and after January 2008, Fremont made sixteen payments to Ball totaling $282,624.27. Based on California Civil Code § 1479, the court allocates those payments amongst the debts owed from Huezo to Ball for the November, January, February and March Notes as follows:

| Payment Date | Amount Paid | Allocation to November Note | Allocation to January Note | Allocation to February Note | Allocation to March Note |
|---|---|---|---|---|---|
| 1/3/08 | $3,000 | $3,000 | $0 | $0 | $0 |

**Ruling:** The court determines that the payment should be applied to the November Investment because the payment was made before Ball made any other investments in Fremont.

| 2/1/08 | $3,875 | $3,000 | $875 | $0 | $0 |
|---|---|---|---|---|---|

**Ruling:** The court determines that $3,000 should be applied to the November Note and $875 should be applied to the January Note because Huezo made that application by earmarking such on the check. Plaintiff's Trial Exhibit P-28.

| 3/1/08 | $5,500 | $3,000 | $875 | $1,625 | $0 |
|---|---|---|---|---|---|

**Ruling:** The court determines that $3,000 should be applied to the November Note, $875 should be applied to the January Note, and $1,625 should be applied to the February Note because Huezo made that application by earmarking such on the check. Plaintiff's Trial Exhibit P-29. Although the check does not state how much should be applied to each note, the court determines that the following amounts are appropriate because they are consistent with both the previous allocations and the payments called for in the respective notes.

| 4/16/08 | $9,625 | $3,208 | $3,208 | $3,208 | $0 |
|---|---|---|---|---|---|

**Ruling:** The court determines that $3,208 should be applied to the November, January, and February notes because Huezo made that application by earmarking the check: "Final Pymt [sic] for Notes prior to 3/20/08 for 2008." Plaintiff's Trial Exhibit P-30. The court determines that there is insufficient evidence regarding whether any specific application of value was made for each of the three notes and therefore, under California Civil Code § 1479, the court applies the $9,625 ratably to the November, January, and February notes.

| 5/1/08 | $9,966 | $2,491.50 | $2,491.50 | $2,491.50 | $2,491.50 |
|---|---|---|---|---|---|

**Ruling:** The check states "460k x 5% x2", which does not correspond to any of the investment amounts (the November, January and February notes total $440,000, not $460,000). Plaintiff's Trial Exhibit P-31.   Further, no other evidence was presented to the court regarding whether any application was made by Huezo or Ball. The court observes that the March Note stated that its payments would commence on March 1, 2008, which is the same date that this payment was made. Accordingly, the court determines that there is insufficient evidence regarding whether any application was made and therefore, under California Civil Code § 1479, the court applies the $9,966 ratably to all four notes, that is, $2,491.50 to each of the four notes.

| 6/2/08 | $9,966 | $2,491.50 | $2,491.50 | $2,491.50 | $2,491.50 |
|---|---|---|---|---|---|

**Ruling:** The check states "460k x2 extra", which does not correspond to any of the investment amounts (the November, January and February notes total $440,000, not $460,000). Plaintiff's Trial Exhibit P-32. Further, no other evidence was presented to the court regarding how the payments should be allocated. Accordingly, the court determines that there is insufficient evidence regarding whether any application was made and therefore, under California Civil Code § 1479, the court applies the $9,966 ratably, that is, $2,491.50 to each of the four notes.

| 7/1/08 | $9,966 | $2,491.50 | $2,491.50 | $2,491.50 | $2,491.50 |
|---|---|---|---|---|---|

**Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $9,966 ratably, that is, $2,491.50 to each of the four notes.

**AMENDED MEMORANDUM DECISION**

| | | | | | |
|---|---|---|---|---|---|
| 8/15/08 | $100,000 | $25,000 | $25,000 | $25,000 | $25,000 |

**Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code 1479, the court applies the $100,000 ratably, that is, $25,000 to each of the four notes.

| | | | | | |
|---|---|---|---|---|---|
| 2/1/09 | $40,726.27 | $10,181.57 | $10,181.57 | $10,181.57 | $10,181.57 |

**Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $40,726.27 ratably, that is, $10,181.57 to each of the four notes.

| | | | | | |
|---|---|---|---|---|---|
| 2/17/09 | $20,000 | $5,000 | $5,000 | $5,000 | $5,000 |

**Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $20,000 ratably, that is, $5,000 to each of the four notes.

| | | | | | |
|---|---|---|---|---|---|
| 6/1/09 | $10,000 | $2,500 | $2,500 | $2,500 | $2,500 |

**Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $10,000 ratably, that is, $2,500 to each of the four notes.

| | | | | | |
|---|---|---|---|---|---|
| 7/31/09 | $10,000 | $2,500 | $2,500 | $2,500 | $2,500 |

**Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $10,000 ratably , that is, $2,500 to each of the four notes.

| | | | | | |
|---|---|---|---|---|---|
| 6/15/10 | $5,000 | $1,250 | $1,250 | $1,250 | $1,250 |

**Ruling:** Because the check states "1st payment in 2010", which does not clarify whether any application was made, and because no other admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $5,000 ratably, that is, $1,250 to each of the four notes.  Plaintiff's Trial Exhibit P-33.

| | | | | | |
|---|---|---|---|---|---|
| 7/14/10 | $15,000 | $3,750 | $3,750 | $3,750 | $3,750 |

**Ruling:** The court determines that because no admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $15,000 ratably, that is, $3,750 to each of the four notes.

| | | | | | |
|---|---|---|---|---|---|
| 7/20/10 | $20,000 | $5,000 | $5,000 | $5,000 | $5,000 |

**Ruling:** Because the check does not state any application and because no other admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $20,000 ratably, that is, $5,000 to each of the four notes. Plaintiff's Trial Exhibit P-34.

| | | | | | |
|---|---|---|---|---|---|
| 7/26/10 | $10,000 | $2,500 | $2,500 | $2,500 | $2,500 |

**Ruling:** Because the check states "4th payment 3rd was Cashier CK #7/20", which does not clarify whether any application was made, and because no other admissible evidence was submitted regarding whether any application was made, under California Civil Code § 1479, the court applies the $10,000 ratably, that is, $2,500 to each of the four notes. Plaintiff's Trial Exhibit P-35.

| | | | | | |
|---|---|---|---|---|---|
| **Total** | **$282,624** | **$77,364.40** | **$70,114.40** | **$69,989.40** | **$65,156.07** |

**AMENDED MEMORANDUM DECISION**

Accordingly, under California Civil Code § 1479, as to the payments discussed above, the court determines that Ball has received a total of $212,634.87 ($77,364.40 + $70,114.40 + $65,156.07) in satisfaction of the debts Huezo owes to Ball from the November, January and March "investments" or loans.

In addition to the payments discussed above, Fremont paid Manuel Duran $3,500 for construction work on Ball's property, Ball received at least $27,855.29 in insurance adjuster fees, and Ball received $102,855.96 from Fremont's bankruptcy estate.  ECF 196 and 200.  Based thereupon, the court ordered that Plaintiff's damages be reduced by $134,210.58 (it appears the court made an error in calculation and the proper amount is $134,211.25).  ECF 200.  This necessarily presents the question to the court of how these particular amounts should be applied to Ball's loans, pro-rata or otherwise.

Regarding the insurance adjuster fees, by stipulation and order, ECF 196 and 200, the court reserved ruling on whether the insurance adjuster fees should offset Ball's damages by an additional amount of $18,105.93.  The court determines that Huezo has failed to demonstrate that Ball received an extra $18,105.93 in insurance adjuster fees and therefore, as to the insurance adjuster fees, the court limits the offset to Ball's damages by $27,855.29.  Further, regarding the $27,855.29 that Ball received in insurance adjuster fees and the $3,500 that Fremont paid Manuel Duran for construction work on Ball's property, no evidence was presented to the court regarding whether any application under California Civil Code § 1479 was made.  Therefore, the court determines that under California Civil Code § 1479, both amounts should be allocated ratably; that is, $7,838.82 should be applied to the November, January, February and March loans.

Regarding the $102,855.96 payment from Fremont's bankruptcy estate to Ball, the court determines that because the payment is an involuntary payment and because Ball has elected to apply the payment to the dischargeable portion of his debt, that is, to the January investment (aka the February Note), Supplemental Brief On Payment Allocation Issue, ECF 209 at 5, the payment should be applied to that debt.  Under *In re Gerwer*, 253

**AMENDED MEMORANDUM DECISION**

1  B.R. 66 (9th Cir. BAP 2000), a bankruptcy distribution by a Chapter 7 trustee to a creditor is

2  an involuntary payment.  253 B.R. at 70-71.  Accordingly, under California Civil Code

3  § 1479, neither the debtor nor the trustee may direct the allocation of that payment;

4  therefore, Ball can.  *See also In re Stanmock, Inc.*, 103 B.R. 228, 234 (9th Cir. BAP 1989)

5  ("[T]he majority of courts have found that payment in the context of a judicial proceeding,

6  including bankruptcy, should be treated as involuntary.").  Based thereupon, the court

7  determines that the $102,855.96 payment from Fremont's bankruptcy estate to Ball is

8  allocated to the dischargeable portion of Ball's debt and not to either the November,

9  January or March "investments" or loans.

10  **F.  Ball is Owed Interest under the California Prejudgment Rate, Not the**

11  **Interest Rate Set Forth in the Promissory Notes and the Investor Activity**

12  **Reports**

13       In amending its original Memorandum Decision, one of the court's objectives was to

14  correct the standard set forth on the prejudgment interest rate to which Ball is entitled.

15  Because Ball's claims are based on Huezo's fraudulent misrepresentations that Ball's

16  investments would be used to fund specific secured loans and, thus, sound in tort and not

17  in contract, in determining whether Ball is owed interest on any of his loans to Fremont, the

18  court does not apply the 15% interest rate set forth in the investor activity reports and the

19  promissory notes.

20       Parties may be entitled to prejudgment interest as "an element of complete

21  compensation."  *West Virginia v. United States,* 479 U.S. 305, 310 (1987).  "Prejudgment

22  interest is awarded to compensate a party for the lost opportunity to use his or her money

23  between the time a claim accrues and the time of judgment."  3 Jones, Rosen, Wegner and

24  Jones, *Rutter Group Practice Guide: Federal Civil Trials and Evidence,* ¶ 19:511 at 19-163

25  (2019).  Here, because the underlying tort liability of Huezo is a matter of state law, the

26  court applies the state law governing an award of prejudgment interest since this is akin to

27  a diversity jurisdiction case where the substantive claims are decided under state law.  3

28  Jones, Rosen, Wegner and Jones, *Rutter Group Practice Guide: Federal Civil Trials and*

1    *Evidence,* ¶ 19:513 at 19-166, *citing inter alia, Bangert Brothers Construction Co., Inc. v.*

2    *Kiewit Western Co.,* 310 F.3d 1278, 1297 (10th Cir. 2002) and *AIG Baker Sterling Heights,*

3    *LLC v. American Multi-Cinema, Inc.,* 508 F.3d 995, 1002 (11th Cir. 2007); *see also, In re*

4    *Slatkin,* 525 F.3d 805, 820 (9th Cir. 2008) (upholding bankruptcy court's award of

5    prejudgment interest in determining substantive California law claims).  Federal law

6    governs "when affirmative federal interests are at stake that warrant application of federal

7    law."  *Id., citing and quoting, AIG Baker Sterling Heights, LLC v. American Multi-Cinema,*

8    *Inc.,* 508 F.3d at 1001-1002.  The court determines that it should apply state law on

9    prejudgment interest because the underlying substantive claims determining Huezo's

10    liability for a debt owed to Ball is California tort law.

11        Under California Civil Code § 3287(a), "A person who is entitled to recover damages

12    certain, or capable of being made certain by calculation, and the right to recover which is

13    vested in the person upon a particular day, is entitled also to recover interest thereon from

14    that day, except when the debtor is prevented by law, or by the act of the creditor from

15    paying the debt."  Further, under California Civil Code § 3287(a), prejudgment interest may

16    be awarded in tort actions.  *See, e.g., Levy-Zentner Company v. Southern Pacific*

17    *Transportation Company*, 74 Cal.App.3d 762, 798 (1977).  "In an action for breach of an

18    obligation not arising from contract, and in every case of oppression, fraud, or malic,

19    interest may be given, in the discretion of the jury."  California Civil Code § 3288; *see also,*

20    *Greater Westchester Homeowners Association v. City of Los Angeles,* 26 Cal.3d 86, 102-

21    103 (1979); 1 Ahart, *Rutter Group California Practice Guide: Enforcing Judgments and*

22    *Debts,* ¶ 3.306 at 3-110 (2019).  Although prejudgment interest is awardable under

23    California Civil Code §3288 in the jury's discretion, it is also awardable by the trial court

24    after a bench trial when the case is not decided by a jury. 1 Ahart, *Rutter Group California*

25    *Practice Guide: Enforcing Judgments and Debts,* ¶ 3.306a, *citing inter alia, In re Slatkin,*

26    525 F.3d at 820 (applying California law).  Moreover, "[w]here the right to prejudgment

27    interest is not based on a contract ([i.e.,] interest is awarded on a tort or other

28    noncontractual claim), the rate is *7% per annum from the date the claim arose unless a*

1    *statute otherwise provides*."  1 Ahart, *Rutter Group California Practice Guide: Enforcing*

2    *Judgments and Debts,* ¶ 3:307.15 at 3-113 (emphasis in original) (citing California

3    Constitution, Article XV § 1; *Children's Hospital & Medical Center v. Bonta*, 97 Cal.App.4th

4    740, 775 (2002); and *Michelson v. Hamada*, 29 Cal.App.4th 1566, 1585 (1994)).

5        Huezo could have computed the amount of damages based on the difference

6    between what Ball invested and what Fremont owed Ball.  Further, the right to recover was

7    vested in Ball on the day that Fremont/Huezo used the money from Ball's loans to fund

8    unsecured loans by Fremont to borrowers rather than the secured loans as Huezo

9    promised Ball, or on the day that Huezo recycled Ball's money for purposes other than

10   funding the specific loans listed in the activity reports.  Accordingly, the court determines

11   that for the debts of Huezo that are nondischargeable, pursuant to Article XV of the

12   California Constitution § 1, Ball is entitled to prejudgment interest at 7 percent per annum

13   commencing on the day that Fremont/Huezo used Ball's loan to fund unsecured loans by

14   Fremont to borrowers rather than the secured loans as Huezo promised Ball.  In this

15   regard, despite the usurious nature of Ball's loans to Fremont, the court does not apply the

16   general rule for usurious loans to allow recovery of principal plus interest at the legal rate

17   from the date of maturity of the loan, but applies an estoppel against Huezo based on his

18   fraudulent conduct to start the date of accrual of interest at the legal rate for prejudgment

19   interest from the dates that the wrongful conduct occurred, the dates when Fremont made

20   the unsecured loans to borrowers with Ball's money in disregard of Huezo's representations

21   to Ball that only secured loans would be made to borrowers.  Upon recomputation of

22   prejudgment interest at the corrected rate, 7%, Ball may choose a later date, such as the

23   dates of maturity of the November and January notes if he is unable to establish earlier

24   dates.

25        As set forth in the table below, the court's payment analysis[8] leaves a surplus of

26   payments on the principal of the January and February notes to be applied to the

27   prejudgment interest payments that will be ordered by the court for the January and

28

---

[8]  *See* supra, Section III.E. at 92-98.

February notes, or any other payments that will be ordered consistent with this decision.

|  | Amount Paid | November Note | January Note | February Note | March Note |
|---|---|---|---|---|---|
| **Principal** |  | $240,000.00 | $70,000.00 | $130,000.00 | $404,750.00 |
| **Payments by Fremont** (*see supra* at 92-94) | $282,624.00 | (77,364.40) | (70,114.40) | (69,989.40) | (65,156.07) |
| **Construction and Insurance Credit** | $31,355.29 | (7,838.82) | (7,838.82) | (7,838.82) | (7,838.82) |
| **Bankruptcy Estate Credit** | $102,855.96 |  |  | (102,855.96) |  |
|  |  |  |  |  |  |
| **SUBTOTAL** | **$416,835.25** | **$154,796.78** | **(7,953.22)** | **(50,684.18)** | **$331,755.11** |
|  |  |  |  |  |  |
| **OUTSTANDING BALANCE** |  | **$154,796.78** + prejudgment interest | prejudgment interest on the January Note | prejudgment interest on the February Note | **$331,755.11** + prejudgment interest |

## IV.    CONCLUSION

Based on the previous analysis and allocations, the court determines that the sum of the payments of $212,634.87, $7,838.82, $7,838.82, and $7,838.82 which equals $236,151.33, should be credited and applied to the debt of $714,750.00 that Huezo owes to Ball for the losses from the November, January and March investments or loans induced by his fraudulent misrepresentations.  Therefore, the court determines that pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6), Huezo owes Ball a nondischargeable debt in the amount of the difference between $714,750.00 and $236,151.33, which is $478,598.67, plus prejudgment interest at the rate of 7 percent per annum under California Civil Code § 3287(a), and that judgment should be entered in favor of Ball on his claims under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) as to the November, January and March investments (and not as to the investment relating to January 30, 2008 email).

**AMENDED MEMORANDUM DECISION**

1     Within 30 days of entry of this Amended Memorandum Decision, Counsel for Ball is

2  ordered to lodge a proposed final judgment consistent with this Amended Memorandum

3  Decision and file a declaration in support of Ball's computations of prejudgment interest.

4     IT IS SO ORDERED.

5                                         ###

Date: September 30, 2019

                                        _____
                                        Robert Kwan
                                        United States Bankruptcy Judge

**AMENDED MEMORANDUM DECISION**